IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | |
| GARCIA GRAIN TRADING CORP. | ) | CASE NO. 23-70028 |
| | ) | |
| DEBTOR. | ) | (CHAPTER 11) |

**CORRECTED[1]
RESPONSE OF THE UNSECURED CREDITORS' COMMITTEE
TO THE DEBTOR CHAPTER 11 STATUS CONFERENCE STATEMENT**

TO THE HON. EDUARDO V. RODRIGUEZ, UNITED STATE BANKRUPTCY JUDGE:

The Unsecured Creditors' Committee (the "UCC") files this CORRECTED Response to the Debtor's Chapter 11 Status Conference Statement as follows:

**I.
PRELIMINARY STATEMENT**

1. The recently filed Debtor's Chapter 11 Status Conference Statement [Dkt. #87] acknowledges that "[t]he Debtor is currently not buying or selling any grain due to the suspension of its licenses by the TDA which sealed the Progreso facility and Donna/Santa Rosa, along with a grain elevator facility the Debtor owns in Edcouch, Texas…" [*See*, ¶15, pg.4 Debtor's Status Rpt Dkt. #87]. Further it is admitted that "the Debtor *had a significant deficiency* in the amount of grain in inventory (*i.e.*, $20 million missing in inventory) as compared to the grain *reflected on its books*" [*Id*, *See, also* ¶15 pg. 4 Debtor's Status Rpt Dkt. #87]. Most notably is the admission that:

> [s]ince there is no commercial grain trading being conducted at this time the expenditures by the Debtor are pursuant to a cash collateral order where the expenditures are for § 506(c) expenses simply to maintain the value of the grain elevator facilities. *Presently, no other form of adequate protection is possible.*

---

[1] It appears a prior draft was inadvertently filed that included incomplete references. This version corrects the prior version.

[*See*, ¶ 15, pg. 4-5 Debtor's Status Rpt Dkt. #87 (Emphasis added.)]. Likewise, during the now adjourned § 341 meeting of creditors, the Debtor's CEO Octavio Garcia testified that the substantial loss of this inventory was not a result of a casualty (fire, storm, disease or theft) *and that he did not know how it could have happened*.

2. These admissions wholly destroy the justification, much less the basis, of continuing any "debtor in possession" as management of the available cash, movable property, and real property and operations. First, the value of the Debtor's disclosed property is clearly far below the amount of debts and claims against the estate, and although not normally a *per se* disqualification of a debtor in possession, this debtor in possession admits its own disqualification. As the Debtor admits, it has an unexplained loss of millions of dollars in grain inventory and as a result, it is prohibited from all on-going operations (other than liquidation of its current grain inventory by Order of this Court). When a CEO testifies that he has no idea how this loss could have occurred, that admission alone establishes gross mismanagement and, more likely, fraud by its owners and/or management.

3. Not until the TDA audit did the Debtor report that it was "missing" more than $15 million (a likely low estimate) in commodities delivered to its facilities. The Debtor's Status Report also tellingly offers no explanation of this multi-million-dollar loss because the "missing" commodities have likely been converted to cash (*i.e.*, sold) when exclusively under the control of the Debtor's owner-managers, who continued in possession without any accounting for the missing cash or commodities.

4. The scope of the losses to the unsecured creditors seems to indicate that a recovery to the unsecured creditors is remote. However, it is important to note that the claims of the secured lenders, that is, those with the most financial access and knowledge of the Debtor's business, have obtained "affiliate" endorsements or guarantees <u>of the funds advanced to the debtor</u>  (*See, e.g.*

Vantage Bank, Falcon Bank and Grainchain) because the management of this debtor denuded the estate in order to acquire ranches, farm land, and other valuable assets *with the debtor's funds* – then purportedly pledged these assets to the Debtor's preferred lenders to secure the obvious short-fall of cash arising from this denuding of the cash.

## II.
## THE EFFORT TO EXPEDITE AND SHORT-CUT THE DETERMINATION OF RIGHTS OF THE SECURED CREDITORS OF THE ESTATE – THOSE DEBTS GUARANTEED BY THE DEBTORS' OWNERS – ARE DESIGNED TO PROTECT ONLY THE INSIDERS OF THE DEBTOR

5. The Committee makes two initial observations of current management and its goals. Not only has the Debtors' owners directed almost all of its existing cash to payment of retainers to its proposed Debtor's Counsel but also the Debtor seeks an expedited determination of priority lien claims *for which the Debtors' owners have guaranteed*, and which arose contemporaneous with, and as a result of, the Debtor's mismanagement, fraud, or criminal conduct. Debtor's argument that such expedited proceeding is needed to protect and allow reorganization, here there is no ongoing enterprise that may, under current management, continue to operate buying and selling commodities.[2] Yet the Debtor reports that:

> *the Debtor* and the secured creditors as well as the TDA have initiated discussions about using the expedited procedures set out in 11 U.S.C. § 557 that provide a means to determine the ownership of the grain and the nature, extent, validity and priority of any liens or other claims or interests against the grain.

[*See*, ¶ 17, pg. 5 Debtor's Status Rpt Dkt. #87]. This process will not speed up a reorganization. It will only act to reduce the insider guarantees and pay certain secured debt (which may be the ultimate result, but not justifying emergency or expedited treatment).

---

[2] Under current ownership and management, there is no such Debtor enterprise licensed or allowed to operate. The Debtor is now prohibited by TDA from any operations (as admitted by the Debtor) to continue to buy and sell commodities.

6. Thus, the Debtors' decision when it ran out of operating cash, to finally denude all of the Debtor's remaining cash by retainers paid to the Debtor's counsel (payment in an amount to insure the UCC had no funds to employ professionals) is now followed by the Debtor and its' counsel seeking an expedited process *brought by the Debtor concerning debts the Debtor's owners have guaranteed to the Secured Creditors* claiming liens on all of the Debtors' assets. There does not appear to be a secured lender in the bunch (with the possible exception of Falcon Bank) that has not obtained affiliate guarantees or pledge assets and all secured creditors (again, with the exception of Falcon Bank) likely are under-secured. Accordingly, an expedited process is not to avoid the cost of interest accumulating on under-secured debt – an under-secured creditor does not enjoy collection of interest. Thus, this effort by the Debtor primarily seeks, through an expedited process provided in the code *for an honest operation of a grain storage facility to allow continued operations*. It is not to obtain relief that benefits the Debtor's insiders whose operations have been shut down as a result of their gross mismanagement, and more likely fraud, (and possible collusion by one or more these secured creditors to cover losses with pledges of assets shortly before the filing of this Chapter 11 case[3]) or protect those owners on their guarantees.

### III.
### THE UCC HAS BEEN EFFECTIVELY DEPRIVED OF ITS ABILITY TO RETAIN PROFESSIONALS AND MEANINGFULLY PARTICIPATE IN THIS CASE

7. The UCC has filed its Application to Employ counsel [*See*, Dkt #85] but has no access to funds to do so. Likewise, the UCC is consulting with other professional advisors with specialties in investigation and audit of commodity storage facilities, but without funds to commence that process, the UCC has effectively been emasculate in its rights and duties imposed

---

[3] On information and belief, the Creditor Grainchain acquired liens from a January payment of a Frost Bank debt that was over-collateralized, and by taking second liens on Debtor's and Debtor's affiliates under the control of Debtor's control group, to secure almost $8 million in non-current debt. It appears much of this debt was only secured on or about February 1, 2023.

by the bankruptcy code. It appears that currently all cash is secured by multi-layers of liens with little hope to have a voluntarily carve-out to allow a functioning committee.

8. As a result, Counsel to the UCC has agreed to represent the UCC without a retainer, pending a determination of available funds to compensate UCC professionals. The UCC believes that the value of this Debtor to the unsecured class is dependent on re-instating its going concern value under new replacement management approved by the TDA and other constituencies (*e.g.*, an examiner with expanded powers as manager, or a Chapter 11 Trustee) and a detailed investigation and audit of the insider transactions utilizing the Debtors available funds and opportunities.

9. The UCC desires to fulfill its statutory responsibilities and duties, and immediate actions are vital to the successful conclusion of this case to maximize the value of this Debtor to the unsecured class[4] of creditors. To accomplish that function and goal without professionals is unlikely. For instance,

    a. the UCC will strongly oppose any Plan that continues the current owners interests in, or owners' efforts to, continue to control management of this Debtor, or simply provides for a liquidation of all assets.

    b. The UCC believes that new management must be obtained and that the value of this facility will be materially damaged if it is prohibited from accepting new storage of commodities during the 2023 harvest. Such management is available, whether through a Chapter 11 Trustee or an Examiner with expanded powers.

    c. The UCC believes that immediate investigations must be commenced regarding the insiders transactions *with affiliates* created by those insiders, to prohibit the insiders or the affiliates (or any third-party entities they control that have been funded

---

[4] This would include the unsecured portions of the under-secured debts of StoneX, Vantage Bank, and Grainchain that could exceed $15 million, depending on the outcome of sales and lien rights.

through the assets, cash or opportunities of the Debtor) are preserved through litigation to enjoin disposition of these affiliates or their assets commenced promptly.

On information and belief, the owners, including Octavio Garcia, have a significant worth comprised of assets obtained with funds generated by the Debtor but funneled to affiliates or third-party entities by these insiders for their benefit. Several of these affiliates were disclosed in the §341 Meeting by Octavio Garcia as having assets *paid for by the Debtor* (*e.g.*, the Moore Farms with a value in excess of $1 million; a transfer of one of the elevators to a departing partner in 2022 valued at over $1 million, *etc.*). As noted above, the lenders debt due by this Debtor are secured by affiliate guarantees and assets. To the extent any assets have been obtained from funds and opportunities belonging to the Debtor (in particular from the $20+ million "missing" from the Debtors Commodities inventories or accounts receivables) which should be avoided and brought back into this Estate, a matter which the current management of the Debtors will not do. For instance, seeking a 60-day protocol to determine all lien claims is not justified, but Debtor's counsel is agreeing and pursuing that relief which does not benefit the unsecured creditors. [*See*, Committee Limited Objection to the StoneX proposed Protocol Order]

## IV.
## CONCLUSION AND RELIEF REQUESTED

10. The UCC files this Response to the Debtor's Status Report to furnish this Court with the prospective and issues impacting the UCC's ability to function, all as a direct result of the Debtor, Debtor in Possession, and the past and current control of the Debtor by the pre-petition Insider owner-management of this Debtor. By depriving this Chapter 11 estate of a functioning UCC, this Debtor in Possession and those lenders in control of assets and affiliate assets, will simply enable the pre-petition mismanagement and fraud continue without investigation or creditor input.

WHEREFORE, the Unsecured Creditors' Committee files this Response to the Status Report of the Debtor in Possession to allow this Court the benefit of the perspective of the UCC and its ability to perform its statutory duty, and the impact of the Debtor's pre-petition and post-petition conduct on the ability of the UCC to perform its duties.

Dated March 23, 2023.

Respectfully submitted,

*/s/ Shelby A. Jordan*
Shelby A. Jordan
St. Bar No. 11016700; S.D. No. 2195
Antonio Ortiz
St. Bar No. 24074839;  SD. No. 1127322
**JORDAN& ORTIZ, P.C.**
500 North Shoreline Drive, Suite 900
Corpus Christi, TX 78401
Telephone:  361.884.5678
Facsimile:  361.888.5555
Email: sjordan@jhwclaw.com
aortiz@jhwclaw.com
**PROPOSED ATTORNEY FOR THE UNSECURED CREDITORS' COMMITTEE**

## CERTIFICATE OF SERVICE

I certify that on March 23, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Shelby A. Jordan*
Shelby A. Jordan