## SUMMARY OF DOCUMENTS ATTACHED TO 557 FORM

StoneX Commodity Solutions LLC, formerly known as FC Stone Merchant Services, LLC, (**"StoneX"**) holds title to 1,491,771 bushels of corn and 680,000 bushels of sorghum in the *In re Garcia Grain Trading Corp.* bankruptcy case. StoneX has an ownership position in this case pursuant to certain valid Warehouse Receipts and the documents related thereto. Copies of the Warehouse Receipts, as well as Purchase Contracts and any payment evidences (usually via wire) are attached hereto. The documents are attached hereto as they are presented in this summary, with a cover page naming the document(s), then the Purchase Contract, copies of the Warehouse Receipts, and evidence of payment, in that order.

From time-to-time, StoneX would deliver Grain to the Debtor's warehouse(s), and the Debtor would agree to store the Grain pursuant to the Warehouse Receipts issued to StoneX. Evidence of said deliveries were memorialized via Truck Tickets and related documents. Applicable Truck Tickets and related documents are included herein.

Additional documents that govern the relationship between the Debtor and StoneX, and highlight StoneX's ownership interest, are:
- A *Master Purchase and Sale Agreement* executed on January 2, 2018 and attached as **Exhibit A**; and
- A UCC Financing Statement covering all of Garcia Grain Trading Corp.'s commodities, Warehouse Receipts and/or bills of lading, accounts and payment intangibles, and cash and other proceeds of the foregoing. This Financing Statement is attached as **Exhibit B.**[1]

The documents above and herein are subject to further amendment. StoneX's submission of these documents does not constitute a waiver or adverse admission of any kind, and StoneX reserves all rights provided to it by applicable law, both State and Federal. StoneX also reserves its right pursuant to any provision in any applicable document.

*(This space is intentional.)*

---

[1] StoneX asserts an ownership position pursuant to the Warehouse Receipts attached hereto. The UCC Financing Statement provides a backup position to StoneX as a secured creditor in the event that any Warehouse Receipts are challenged.

50811553 v5

**EXHIBIT A – the Master Purchase and Sale Agreement**

*(See attached.)*

50811553 v5

### MASTER PURCHASE AND SALE AGREEMENT

This Master Purchase and Sale Agreement (as amended, modified and supplemented from time to time, this "Master Agreement") is entered into as of January 2, 2018 between FCStone Merchant Services, LLC, a Delaware limited liability company ("FCStone") and Garcia Grain Trading Corporation, a Texas corporation ("Customer"). FCStone and Customer are sometimes referred to individually as a "Party" or collectively as "Parties."

### ARTICLE 1

### SCOPE, DEFINITIONS AND TRANSACTION PROCEDURE

Section 1.1   Scope. This Master Agreement governs each Transaction between the Parties for the purchase and sale of the Eligible Commodity, as identified by the Parties pursuant to the terms and conditions herein.

Section 1.2   Definitions. All defined terms shall have the meanings set forth in Exhibit "A" hereto or in the Confirmation for a specific Transaction.

Section 1.3   Single Agreement. The Parties may agree from time to time to enter into one or more Transactions, each of which shall be governed by this Master Agreement and each Confirmation exchanged between the Parties. If the terms of a Confirmation differ from this Master Agreement, the terms of the Confirmation shall control. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single, integrated agreement between the Parties and, in the absence of the same forming such a single agreement, the Parties would not otherwise enter into any Transactions.

Section 1.4   Limited Undertaking. Neither Party commits, by entering into this Master Agreement, to enter into any individual Transaction with the other Party.

Section 1.5   Oral Agreements and Confirmations. A Transaction may be entered into upon oral agreement of the Parties with respect to the price, quantity and delivery date for such Transaction and such agreement shall be binding and enforceable as of the time of oral agreement. Upon receipt of a Confirmation from FCStone specifying the commercial terms above and any other commercial terms, Customer shall examine the terms of such Confirmation and, unless Customer objects in writing to the terms within two (2) Business Days after receipt of that Confirmation, those terms shall be deemed accepted and correct absent manifest error, in which case that Confirmation shall form a binding supplement to this Master Agreement.

Section 1.6   Oral Agreements Enforceable. The Parties agree not to contest, or enter any defense concerning the validity or enforceability of any Transaction on the grounds that the Transaction fails to comply with the requirements of the statute of frauds or any other statute that agreements be written or signed.

Section 1.7    Eligibility.  Each Party represents and warrants that it will enter into Transactions under this Master Agreement only with respect to the Eligible Commodity as defined in Exhibit "A".

Section 1.8    Reliance.  FCStone shall be entitled to rely upon, and shall be fully protected in relying and shall not incur any liability for relying upon, any notice, request, communication, or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by a proper representative of Customer.  FCStone also may rely upon any statement made to it orally or by telephone and believed by it to have been made by a proper representative of Customer, and shall be fully protected in relying and shall not incur any liability for relying thereon.

## ARTICLE 2

## PURCHASE AND SALE TRANSACTIONS

To the extent that FCStone and Customer enter into one or more Transactions in the Eligible Commodity as herein provided, such Transactions shall be conducted as follows:

Section 2.1    Warehouse Purchase Transaction.

(a)    Purchase of the Warehoused Commodity.  On the Trade Date specified in a Confirmation, the Parties shall agree that Customer shall sell and deliver to FCStone, and FCStone shall purchase and receive from Customer, the Quantity of the Warehoused Commodity for the applicable Transaction Purchase Price and on the Transaction Purchase Date (the "Warehouse Purchase Transaction").

(b)    Warehouse Receipts.  Customer shall issue or shall cause to be issued (whether electronically or otherwise) to the order of FCStone one or more Warehouse Receipts to reflect Customer's sale and delivery and FCStone's purchase and receipt of the Warehoused Commodity.  Such Warehouse Receipts shall be delivered by Customer to FCStone or its designee on the Transaction Purchase Date specified in the applicable Confirmation.  Customer agrees to pay all costs and expenses associated with issuing the Warehouse Receipts.  The Warehouse Receipts must be in form and substance acceptable to FCStone in its sole discretion.

(c)    Sale Payment.  The terms governing FCStone's payment to Customer for the Warehoused Commodity shall be specified in the applicable Confirmation.

(d)    Storage.  With respect to each Warehouse Purchase Transaction, Customer or a Warehouse Operator acceptable to FCStone in its sole discretion shall store the Warehoused Commodity for FCStone's account in an Approved Warehouse and Customer or such Warehouse Operator shall maintain the Warehoused Commodity in merchantable condition and in compliance with the terms hereof and the terms of the applicable Warehouse Operator's tariffs and/or schedule of rates and industry standards.

-16-

(e)     Storage Fees.   With respect to each Warehouse Purchase Transaction, FCStone and Customer shall agree to any storage, elevation, handling and other fees applicable to the Warehoused Commodity sold to FCStone in the relevant Confirmation or otherwise as agreed between the Parties.  Notwithstanding the foregoing, FCStone and Customer agree that FCStone shall not be liable for any fees applicable to the Warehoused Commodity, including but not limited to any fees related to: (i) Services that FCStone contests in good faith were not rendered by a Warehouse Operator; (ii) Services prepaid by a third party; (iii) Services that were not authorized by FCStone under the terms of this Master Agreement or otherwise; (iv) invoices received ninety (90) days after the date the Services were rendered; (v) Services rendered in relation to the Eligible Commodity a Warehouse Operator fails or refuses to deliver or load out; or (vi) Services rendered in relation to the Eligible Commodity for which FCStone does not hold a Warehouse Receipt.

(f)     Title.  With respect to each Warehouse Purchase Transaction, title to the Warehoused Commodity shall transfer from Customer to FCStone immediately upon FCStone's receipt of each applicable Warehouse Receipt.

(g)     Insurance.   With respect to each Warehouse Purchase Transaction, Customer or the applicable Warehouse Operator shall provide or shall cause its designee to provide a certificate of insurance to FCStone evidencing coverage against casualty loss to FCStone and Customer as described in the applicable Warehouse Operator's tariffs and/or schedule of rates, including but not limited to coverage against loss or damage as a result of fire, water damage, lightning, windstorm, cyclone, tornado or inherent explosion or other similar event in amounts and covering risks set forth in the storage tariff and/or schedule of rates and reflecting FCStone as additional insured and loss payee with respect to all policies covering the Warehoused Commodity and cause, unless otherwise agreed to by FCStone, each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to FCStone that it will give FCStone thirty (30) days prior written notice before any such policy or policies shall be altered or cancelled (or ten (10) days prior notice in the case of cancellation due to the nonpayment of premiums).

Section 2.2     Forward Cash Purchase Transaction

(a)     Purchase of Forward Cash Commodity.  On the Trade Date specified in a Confirmation, the Parties shall agree that Customer shall sell for forward delivery, and FCStone shall purchase and receive from Customer the Quantity of the Forward Cash Commodity for the applicable Transaction Purchase Price and on the Transaction Purchase Date (the "Forward Cash Purchase Transaction").

(b)     Assignment of Subject Contracts.   Customer shall assign the Subject Contracts delivered to FCStone by executing the Assignment of Subject Contracts substantially in the form attached hereto as Exhibit B. In the event that an Event of Default exists during the term of a Transaction, FCStone may agree to assume Customer's performance under such Subject Contracts; provided, however, (i) FCStone at its sole discretion may direct delivery of the Subject Commodities under such Subject Contracts to a separate delivery location; and (ii) Customer shall remain responsible to the Eligible Producer for performance of Subject Contracts and any costs or expenses incurred with respect to Eligible Producer.  Customer shall cause each

-17-

Subject Contract to include the following provision (with appropriate references for each of the bracketed terms):

> "Assignment to FCStone. Producer hereby irrevocably acknowledges and agrees that Customer has assigned all of its right, title and interest in this [Agreement] to FCStone Merchant Services, LLC ("FCStone") in accordance with the terms and conditions of a Master Purchase and Sale Agreement (the "Master Agreement") with FCStone. Producer agrees that in the event Producer receives a notice from FCStone that an Event of Default has occurred under the Master Agreement and that FCStone has exercised its rights to exercise exclusive control over this Agreement and that Producer will solely follow the instructions of FCStone with respect to the performance of this Agreement regardless of whether Producer has received conflicting instructions from Customer. Producer and Customer acknowledge and agree that FCStone is an express third party beneficiary of this Agreement entitled to rely upon and enforce this Agreement to the same extent as Customer. In the event of any conflict between this provision and any other term and condition of this Agreement this provision shall govern."

(c) Required Sale Closing Documents. Within five (5) days of the Trade Date specified in the Confirmation, Customer shall deliver to FCStone the Subject Contracts assigned to FCStone and any other document reasonably requested by FCStone ("Required Sale Closing Documents"). If the Required Sale Closing Documents are not acceptable to FCStone, then FCStone shall notify Customer and no Forward Cash Purchase Transaction shall occur.

(d) Delivery. Customer shall take any delivery of the Subject Commodities under the Subject Contracts for the sole account of FCStone and shall hold such Subject Commodities in trust for the benefit of FCStone. Customer shall notify FCStone of the delivery of such Subject Commodities. Customer shall issue or shall cause to be issued (whether electronically or otherwise) to the order of FCStone one or more Warehouse Receipts to reflect Customer's sale and delivery and FCStone's purchase and receipt of the Subject Commodity. Upon delivery of the Warehouse Receipts by Customer to FCStone or its designee the Forward Cash Transaction shall become a Warehouse Purchase Transaction subject to Section 2.1(a). Customer agrees to pay all costs and expenses associated with issuing the Warehouse Receipts. The Warehouse Receipts must be in form and substance acceptable to FCStone in its sole discretion.

(e) Payment. The terms governing FCStone's payment to Customer for the Forward Cash Contract shall be specified in the applicable Confirmation.

Section 2.3    Sale Transaction.

(a) Sale of the Subject Commodity. On the Trade Date as specified in Section 2.1(a) and Section 2.2(a), the Parties shall enter into a Confirmation setting forth the terms of a simultaneous Transaction pursuant to which FCStone under the corresponding Purchase Transaction shall sell for forward delivery, and Customer shall purchase and receive, AS IS and WHERE IS, irrespective of loss (including, but not limited to, loss due to any unauthorized load out schedule), destruction, theft or damage thereto (but accounting for any insurance proceeds with respect thereto actually paid to FCStone's account), and irrespective of the quality thereof

-18-

and whether or not there shall be existing any event of Force Majeure (a "Loss Event"), all of the Subject Commodity at the applicable Transaction Sale Price as set forth therein (the "Sale Transaction").

(b)     Transaction Sale Price.   The terms governing Customer's payment to FCStone for the Subject Commodity shall be specified in the applicable Confirmation.

(c)     Surrender of Warehouse and Title.   Promptly upon receipt of payment in full of the Transaction Sale Price, FCStone shall deliver to Customer all Warehouse Receipts for the Warehoused or Subject Commodity endorsed to Customer, and title to the Subject Commodity shall transfer to and vest in Customer, and FCStone shall cease to own any interest in such Subject Commodity.

(d)     Force Majeure.   FCStone under any Sale Transaction shall not be liable to Customer under such Sale Transaction for any loss or damage which may be suffered by Customer as a result of a failure on the part of FCStone to effect delivery of the Subject Commodity in accordance with the terms of any Transaction Document by reason of delivery being prevented, hindered, delayed or rendered illegal by circumstances or events beyond the control of FCStone, whether foreseeable or not, including but not limited to acts of God, war, whether declared or not, warlike operations, terrorism, riot, insurrection, strike, lock-out, trade disputes or labor disturbance, industrial action, accident, shipwreck, break-down of plant or machinery, failure of transport or storage, casualty or delay to any conveyance including arrest thereof, fire, flood, earthquake, storm, hurricane, blockade, embargo, prohibition of import or export, actions or omissions of any governmental or quasi-governmental body, including any agency thereof, refusal by any authority to grant, renew, extend or maintain any license or any other circumstances whatsoever affecting the supply or delivery of the Subject Commodity (a "Force Majeure").

## ARTICLE 3

## COMMODITY TRANSACTION TERMS

Each Transaction shall be made on the following terms:

Section 3.1     Applicable Trade Rules.   Except as otherwise expressly provided herein, this Agreement and all contracts and confirmations for delivery of Subject Feedstock shall be subject to the Trade Rules of the National Grain and Feed Association (NGFA). (the "Applicable Trade Rules"), as they may be updated and amended from time to time and, in their most current version.   In the event of a conflict between the Applicable Trade Rules and any provision in this Master Agreement or a Confirmation hereunder, the provisions of this Master Agreement and/or such Confirmation shall govern the Parties' obligations, including but not limited to any provisions herein regarding payment obligations, title transfer, insurance requirements, risk of loss, indemnification, Events of Default and any calculation of a Net Settlement Amount.

Section 3.2     Merchantable Quality.   Customer shall warrant and assure that all of the Subject Commodity sold by Customer is of merchantable quality, uninfested,

-19-

unadulterated, and unrestricted from movement and sale under all Applicable Laws, and accepted industry rules and practices, including but not limited to the Applicable Trade Rules in Section 3.1.

Section 3.3    Damage.  Where the Subject Commodity is delivered damaged or having damage which appears to have been caused before loading out, such delivery shall be considered under-delivered and handled in accordance with Section 3.4 below.

Section 3.4    Settlement for Under Deliveries; Substitution.  All deliveries made under this Master Agreement shall be for the quality and Quantity specified in the applicable Confirmation.  If, under the applicable Transaction, Customer will not be able to complete delivery of the contracted quality and Quantity, Customer shall so advise FCStone immediately. FCStone, upon notification or knowledge of such under-delivery, shall, by the close of the next Business Day, elect either to: (a) agree with Customer upon an extension of the time for delivery; or (b) determine the Market Value of the undelivered portion of the Subject Commodity.  In the event FCStone elects to determine the Market Value of the undelivered portion of the Subject Commodity, then (i) the Transaction Purchase Price required to be paid by FCStone shall be reduced by the Market Value of the undelivered portion of the Subject Commodity, and if the Transaction Purchase Price has been previously paid by FCStone, a refund paid to FCStone equal to the Market Value of the undelivered portion of the Subject Commodity, and (ii) the corresponding Sale Transaction shall be amended automatically to reflect the reduction in the quality and/or Quantity of the Subject Commodity as a result of such under deliveries; provided, however, that Customer may substitute the Warehoused Commodity for the undelivered portion of the Subject Commodity.  The Parties acknowledge that this Section 3.4 shall be the exclusive remedy for under deliveries.

Section 3.5    Payment Netting.    The Parties hereby agree that they shall discharge mutual debts and payment obligations due and owing to each other on the same date pursuant to all Transactions through netting, so that all amounts owed by each Party to the other Party under this Master Agreement on the same date shall be netted and automatically satisfied and discharged and replaced by the obligation that only the excess amount remaining due shall be required to be paid on such date by the Party who owes such excess amount.

Section 3.6    Interest on Late Payments.  If any payment under any Transaction Document is not paid in full when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest publicly announced plus five percent per annum; or (ii) the maximum applicable lawful interest rate.

Section 3.7    Taxes; Additional Amounts.

(a)    Except as required by law, any and all payments to FCStone hereunder or under any related agreement shall be made free and clear of, and without deduction or withholding for, or on account of, any and all present or future Taxes. If any Taxes are required to be deducted or withheld, or are otherwise levied or imposed on, or with respect to, payments to FCStone hereunder, Customer agrees to (i) notify FCStone, (ii) make such deductions and withholdings and pay the full amount of such Taxes to the appropriate Governmental Authority

-20-

and to pay to FCStone such additional amounts as may be necessary so that after making all required deductions, withholdings, and payments with respect to Non-Excluded Taxes, FCStone receives an amount (after all Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 3.7) equal to the sum it would have received had no such Non-Excluded Taxes been imposed, and (iii) promptly furnish to FCStone certified copies of tax receipts evidencing such payment by Customer.

(b)     Customer hereby agrees to pay any present or future stamp, recording, documentary, excise, filing, intangible, property or value-added taxes, or similar taxes, charges or levies that arise from any payment made under or in respect of this Master Agreement or any related agreement or from the execution, delivery, enforcement or registration of, any performance, receipt or perfection of a security interest under, or otherwise with respect to, this Master Agreement or any related agreement (collectively, "Other Taxes").

(c)     Customer agrees to pay any sales, use, excise, gross receipts, ad valorem, property or other Taxes (that are Non-Excluded Taxes) imposed with respect to the Subject Commodity ("Subject Commodity Taxes").

(d)     Customer shall indemnify and hold harmless FCStone, and reimburse FCStone upon its written request, for the amount of any Non-Excluded Taxes, Subject Commodity Taxes, and Other Taxes, and the full amount of Taxes of any kind imposed by any jurisdiction on amounts payable under this Section 3.7, and any liability (including penalties, additions to Tax, interest and expenses) arising therefrom or with respect thereto, regardless of whether the Non-Excluded Taxes, Subject Commodity Taxes, Other Taxes, or other liabilities for which indemnity is sought have been correctly or legally asserted.  Customer shall have the right to subrogation against FCStone for indemnity amounts paid by Customer under this Section 3.7(d) that have not been correctly or legally asserted.

(e)     FCStone shall promptly provide, upon request of Customer, any applicable certificates or documentation necessary or useful to establish or document any available exemptions from Taxes, Other Taxes, and Subject Commodity Taxes for which Customer would be required to pay additional amounts to or indemnify FCStone, and shall cooperate with Customer to minimize all such Taxes, provided that FCStone shall not be required to take any action pursuant to this paragraph that is materially prejudicial to the legal or commercial position of FCStone.

## ARTICLE 4

## NATURE OF TRANSACTIONS

Section 4.1     True Sale.  Customer and FCStone intend that each Warehouse Purchase Transaction and each Forward Cash Purchase Transaction contemplated in Section 2.1 and Section 2.2 of this Master Agreement constitute a true sale of the Subject Commodity applicable thereto for all purposes, which sale is absolute and not in the nature of a secured transaction and which sale provides FCStone with the full benefits of ownership, notwithstanding any storage arrangement or future sale of any of the Subject Commodity from FCStone to Customer entered into in connection with this Master Agreement.

Section 4.2    Precautionary Security Interest.  To protect FCStone in the event that this Master Agreement is for any reason (other than for tax purposes) characterized in whole or in part as a secured transaction and not a true sale by a court of competent jurisdiction, without derogation to the intent of the Parties that this Master Agreement constitutes a true sale of the Subject Commodity the subject of the applicable Confirmation, this Master Agreement shall also constitute a security agreement under the applicable UCC.

Section 4.3    Grant of Security Interest.  Customer hereby grants to FCStone a security interest in all of Customer's right, title and interest, whether now existing or hereafter arising, if any, in all of the following (collectively, the "Collateral"):

(a)    Subject Commodity,

(b)    Subject Contracts;

(c)    Warehouse Receipts and/or Bills of Lading subject of this Master Agreement and each Confirmation;

(d)    all accounts and payment intangibles of Customer arising from the sale or other disposition of the Subject Commodity, Subject Contracts and/or corresponding Warehouse Receipts or Bills of Lading; and

(e)    all cash and other proceeds of the foregoing, including insurance proceeds.

Section 4.4    Secured Obligations.  The security interest granted by Customer to FCStone hereby shall secure all present and future obligations of Customer to FCStone, arising under or in connection with this Master Agreement, each Confirmation and the other Transaction Documents, and whether matured or unmatured, liquidated or unliquidated or absolute or contingent, including any Costs of Collection (the "Secured Obligations").

Section 4.5    Continuing Security Interest.  Customer acknowledges and agrees that the amount of the Secured Obligation may be increased or decreased from time to time as additional Warehouse Purchase Transactions, Forward Cash Purchase Transactions or Sale Transaction are executed and/or paid off, whether in full or in part, but that the security interest granted to FCStone hereby shall continue and remain in effect until this Agreement is terminated in accordance with the terms herein and all Secured Obligations are irrevocably paid in full to FCStone.  Notwithstanding the forgoing, if at any time all or any part of the payment of the Secured Obligations is or must be rescinded or returned by FCStone for any reason whatsoever (including the insolvency, bankruptcy, reorganization or similar proceeding involving the Customer), the Secured Obligations, to the extent that such payment is or must be rescinded or returned, shall be deemed to have continued in existence and this Agreement, including the security interest granted hereunder shall continue to be effective or be reinstated, as the case may be, as to such Secured Obligations are irrevocably repaid in full.

Section 4.6    Perfection of Security Interest.  Customer authorizes FCStone to file financing statements or other similar documents, against Customer covering the Collateral and any continuations or other amendments thereto in the applicable UCC filing office and in other filing and recording offices, and Customer shall take all action reasonably requested by

-22-

FCStone to establish FCStone's title to the Subject Commodity and the applicable Confirmation, and to perfect a first priority security interest in favor of FCStone in the Collateral.

Section 4.7   Collateral Rights and Remedies.   With respect to FCStone's security interest in the Collateral, FCStone shall have, in addition to the rights and remedies under this Master Agreement, all rights and remedies provided to a secured creditor under the applicable UCC and other Applicable Laws, which rights and remedies shall be cumulative.

## ARTICLE 5

## TERM

Section 5.1   Term.   This Master Agreement shall become effective as of the date first set forth above, and shall continue thereafter for an initial term of three (3) year.   The term of this Master Agreement shall be automatically extended for additional one (1) year terms unless a Party delivers to the other Party a notice of its intent to not renew the term at least thirty (30) days prior to the end of the then current term.

Section 5.2   Notice of Termination.  FCStone and Customer shall have the right to terminate this Master Agreement upon thirty (30) days' prior written notice to the other Party; provided, however, that the term for each Transaction shall be governed by the terms thereof and, except as provided in Article 7, no termination of this Master Agreement under this clause shall be effective until the completion and satisfaction of all obligations with respect to all Transactions entered into under this Master Agreement.  For the avoidance of doubt, no new Transactions may be entered into after receipt of such notice.

## ARTICLE 6

## MUTUAL REPRESENTATIONS AND WARRANTIES

Section 6.1   Mutual Representations and Warranties.  Each Party represents and warrants to the other Party as of the date of this Master Agreement and on the date of each Transaction hereunder, that:

(a)   It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(b)   It has the power to execute each Transaction Document or other document relating hereto to which it is a party, to deliver each Transaction Document or other document relating hereto that it is required hereby to deliver, to perform its obligations under each Transaction Document or other document relating hereto to which it is a party, and has taken all necessary action to authorize such execution, delivery and performance;

(c)   Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

-23-

(d)     Its obligations under each Transaction Document constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application regardless of whether enforcement is sought in a proceeding in equity or at law);

(e)     There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that may reasonably be expected to affect the legality, validity or enforceability against it of any Transaction Document to which it is a party or its ability to perform its obligations under the same or to have a material adverse effect on any of the Subject Commodity;

(f)     It (i) has entered into each applicable Transaction Document as a principal (and not as an advisor, agent, broker or in any other capacity, fiduciary or otherwise) and with a full understanding of the material terms and risks of the same, and (ii) is capable of assuming those risks, and has made its decisions based upon its own judgment and any advice from such advisors as it has deemed necessary and not in reliance upon any representations of the other Party other than those expressly set forth in the Transaction Documents;

(g)     It is a "forward contract merchant", "master netting agreement participant", and/or a "financial participant" within the meaning of the Bankruptcy Code;

(h)     All Transactions, including this Master Agreement, the Assignment of Subject Contracts and each Confirmation, constitute "forward contracts" within the meaning of the Bankruptcy Code, and "forward contracts" and sales of a nonfinancial commodity for deferred shipment or delivery that, when made, are intended to be physically settled within the meaning of the Commodity Exchange Act, as amended;

(i)     This Master Agreement constitutes a "master netting agreement" within the meaning of the Bankruptcy Code;

(j)     Upon an Act of Insolvency with respect to a Party, the other Party is entitled to exercise its rights and remedies under this Master Agreement in accordance with the safe harbor provisions of the Bankruptcy Code governing forward contracts and master netting agreements as set forth in, among other provisions, Sections 362(b)(6), 362(b)(27), 546(e), 546(j), 548(d)(2), 556 and 561 thereof; and

(k)     For each Transaction contemplating physical settlement under this Master Agreement, it has the capacity to make or take, as applicable, physical delivery of the Subject Commodity in accordance with such Transaction, and is entering into such Transaction with the intent of making or taking such physical delivery.

Section 6.2     Limitation of Warranties.    OTHER THAN THE EXPRESS WARRANTIES MADE IN THIS ARTICLE 6, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, SELLER UNDER THE APPLICABLE TRANSACTION MAKES NO OTHER REPRESENTATION OR WARRANTY, WRITTEN OR ORAL, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR

-24-

WARRANTY THAT THE COMMODITY WILL BE EITHER SALEABLE OR FIT OR SUITABLE FOR A SPECIFIC PURPOSE, EVEN IF SUCH PURPOSE IS KNOWN TO SELLER, UNLESS OTHERWISE STATED IN THE CONFIRMATION FOR A PARTICULAR TRANSACTION.

Section 6.3 Disclaimer of Warranties. FCSTONE SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS AND WARRANTIES WRITTEN AND ORAL, EXPRESS OR IMPLIED, WITH RESPECT TO THE SUBJECT COMMODITY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PARTY A SPECIFICALLY DISCLAIMS ANY REPRESENTATION THAT THE SUBJECT COMMODITY IS OF THE QUALITY AND GRADE STATED IN THE APPLICABLE CONFIRMATION, THAT THEY COMPLY WITH THE REQUIREMENTS OF ANY APPLICABLE LAW, THAT THEY WILL BE EITHER SALEABLE OR FIT OR SUITABLE FOR A SPECIFIC PURPOSE EVEN IF SUCH PURPOSE IS KNOWN TO PARTY B OR THAT THEY ARE FREE AND CLEAR OF ANY LIENS.

## ARTICLE 7

## CUSTOMER REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 7.1 Customer Assurances. Customer represents and warrants to FCStone as of the date of this Master Agreement and on the date of each Transaction hereunder, and Customer covenants with FCStone that:

(a) No Event of Default with respect to Customer, or event which with notice and/or lapse of time would constitute an Event of Default, has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under any Transaction Document to which it is a party;

(b) Customer or any Warehouse Operator warehousing or storing the Subject Commodity, is duly licensed under state or federal law as a warehouseman, has complied with all applicable licensure, bonding insurance and regulatory requirements applicable thereto, and is storing any such Subject Commodity in an Approved Warehouse;

(c) All Warehouse Receipts issued or caused to be issued by Customer shall be valid, genuine, in compliance with all Applicable Laws and regulations, and reflect actual commodities of the grade, quality and quantity described, owned by Customer and in storage in its facilities or at other facilities acceptable to FCStone;

(d) Each of the Subject Contracts, and any warehouse receipts issued by Customer, shall be valid, genuine, in compliance with all applicable laws and regulations, and reflect actual purchases or ownership of commodities of the grade, quality and quantity described;

(e) Each Subject Contract shall be an Eligible Forward Cash Contract for delivery of Eligible Commodities from an Eligible Producer of the grade and quality specified in the Transaction Confirmation;

-25-

(f)     All Bills of Lading issued or caused to be issued by Customer shall be valid, genuine, in compliance with all Applicable Laws and regulations, and reflect the grade, quality and quantity of the commodity described, owned by Customer and in transit to its facilities or at other facilities acceptable to FCStone;

(g)     The Subject Commodity is of the quality and grade stated in the applicable Confirmation and comply with the requirements of all Applicable Laws;

(h)     No termination event, acceleration, event of default, or event which with notice and/or lapse of time would constitute an event of default has occurred and is continuing under any Material Contract;

(i)     On the date hereof, the date of each Transaction and Transaction Purchase Date, Customer, individually and consolidated with its subsidiaries, is Solvent;

(j)     Customer warrants that at the time of delivery it will have good title to the Subject Commodity, it will deliver to FCStone good title to the Subject Commodity free from all liens, security interests, encumbrances, claims or any interest therein) arising prior to the point of delivery, including but not limited to any state or federal agricultural liens, and that Customer has the right to sell to FCStone the Subject Commodity specified in the applicable Confirmation;

(k)     Preservation of Existence, Etc.  Customer shall preserve and maintain its corporate, partnership or limited liability company (as the case may be) existence and all material rights (charter and statutory) and franchises;

(l)     Compliance with Laws, Etc.  Customer shall comply and cause each of its subsidiaries to comply, in all material respects, with Applicable Law, with such compliance to include compliance with ERISA and environmental laws;

(m)     Performance and Compliance with Other Agreements.  Customer shall perform and comply, and cause each of its subsidiaries to perform and comply, with the provisions of each indenture, credit agreement, contract or other agreement by which it is bound, the non-performance of or non-compliance with which would result in a material adverse change;

(n)     Maintenance of Insurance.  Customer shall maintain, and cause each of its subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by companies engaged in similar businesses and owning similar properties, each naming FCStone as an additional insured and loss payee;

(o)     Payment of Taxes, Etc.  Customer (i) has timely paid and will timely pay and discharge, before the same shall become delinquent, (A) all Taxes, assessments and governmental charges or levies imposed upon it or upon its property and (B) all lawful claims that, if unpaid, might by law become a lien upon its property; provided, however, that neither Customer shall be required to pay or discharge any such Tax, assessment, charge or claim that is being contested in good faith and by proper proceedings and as to which adequate reserves are being maintained in accordance with GAAP, unless and until any Lien resulting therefrom

-26-

attaches to its property and becomes enforceable against its other creditors, and (ii) has timely filed and will timely file, and has caused and will cause each of its subsidiaries to timely file, all Tax returns required to be filed by it; and

Section 7.2    Limitations on Liens. Customer shall not (a) create, incur, assume or suffer to exist any Lien on or with respect to any of the Subject Commodity or proceeds or accounts related thereto whether now owned or hereafter acquired; (b) sign or file, under the UCC of any jurisdiction, a financing statement that names Customer as debtor and includes the Subject Commodity in the description of collateral (whether specifically or generically) set forth in such financing statement, or sign, any security agreement authorizing any secured party thereunder to file such financing statement, or suffer to exist any of the aforementioned financing statements or security agreements; or (c) assign any accounts or other right to receive income from the Subject Commodity.

Section 7.3    Adequate Assurances.    In the event FCStone determines in its reasonable discretion that its rights under this Master Agreement or any Transaction contemplated hereby are insecure, Customer shall provide adequate assurances to FCStone of its ability to perform any of its obligations under this Master Agreement within one Business Days of a request by FCStone.    Adequate assurance will be in the form of Performance Assurances. During the pendency of a demand by FCStone to Customer for adequate assurances of Customer's ability to perform its obligations under the Agreement, FCStone may, at its election and without penalty, suspend its obligations under the Agreement.

## ARTICLE 8

## EVENTS OF DEFAULT, REMEDIES AND INDEMNIFICATION

Section 8.1    Early Termination.    If an Event of Default has occurred and is continuing as set forth in this Agreement with respect to Customer, FCStone shall have the right to designate a Business Day as an early termination date (the "Early Termination Date") for the liquidation and termination of all Transactions under this Master Agreement; provided however, in the case of a Loss Event, FCStone shall have the right to liquidate and terminate the applicable Sale Transactions subject to such Loss Event in accordance with Section 8.2 (each a "Terminated Transaction").

Section 8.2    Liquidation of Terminated Transactions. As of the Early Termination Date, FCStone shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each Party with respect to all of the Subject Commodity delivered and received between the Parties under Terminated Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts, for which payment has not yet been made by the Party that owes such payment under this Master Agreement and (ii) the Market Value, as defined below, of each Terminated Transaction. FCStone shall liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the Buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the Seller if the opposite is the case.

-27-

Section 8.3    Contract Value.  "Contract Value" means the amount of the Subject Commodity remaining to be delivered or purchased under a Transaction multiplied by each Transaction Purchase Price or the Transaction Sale Price, as applicable.  "Market Value" means the amount of the Subject Commodity remaining to be delivered or purchased under a Transaction multiplied by the market price for a similar transaction determined by FCStone in a commercially reasonable manner.

Section 8.4    Settlement.  FCStone shall net or aggregate, as appropriate, any and all amounts owing between the Parties, so that all such amounts are netted or aggregated to a single liquidated amount payable by one Party to the other (the "Net Settlement Amount").  At its sole option, and without prior notice to Customer, FCStone is hereby authorized to setoff any Net Settlement Amount against any amount(s) owed by FCStone or its Affiliates to Customer or its Affiliates under any agreement or arrangement.

Section 8.5    Permitted Estimation.  If any obligation that is to be included in any netting, aggregation or setoff hereunder is unascertained, FCStone may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate.

Section 8.6    Dispute of Amounts.  If Customer disputes FCStone's calculation of the Net Settlement Amount, in whole or in part, Customer shall, within one (1) Business Day of receipt of FCStone's calculation of the Net Settlement Amount, provide to FCStone a detailed written explanation of the basis for such dispute; provided, however, that if the Net Settlement Amount is due from Customer, Customer shall first transfer Performance Assurance to FCStone in an amount equal to the Net Settlement Amount.

Section 8.7    Notice of Net Settlement Amount.  As soon as practicable after a liquidation, written notice shall be given by FCStone to Customer of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from Customer.  The notice shall include a written statement explaining the calculation of the Net Settlement Amount, provided that failure to give such notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by Customer against FCStone.  The Net Settlement Amount as adjusted by any setoffs applied against such amount, shall be paid by the close of business on the first (1st) Business Day following such notice, which date shall not be earlier than the Early Termination Date.  Interest on any unpaid portion of the Net Settlement Amount as adjusted by setoffs shall accrue from the date of the Event of Default until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest, plus five percent per annum; or (ii) the maximum applicable lawful interest rate.

Section 8.8    Permitted Sales.  Notwithstanding anything to the contrary herein, FCStone in its sole discretion shall be entitled to sell, at the Defaulting Party's sole cost and expense, any Bills of Lading and Warehouse Receipts associated with any Subject Commodity in accordance with accepted industry rules and practices.  Any costs, fees, tariffs and expenses incurred by FCStone as a result of loading out such Subject Commodity shall be for the account of Customer and FCStone shall be entitled to recover from Customer any such costs, fees, tariffs and expenses so incurred.

Section 8.9    Remedies Cumulative. FCStone's remedies under this Article 8 are cumulative and shall include all remedies it may have, whether at law or in equity, including without limitation, all rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from this Master Agreement and the Transactions hereunder. Such costs, fees and expenses shall include any storage, elevation, handling, loading and other fees, any taxes, or any costs associated with transporting the Subject Commodity from the storage facility, and all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with the termination of this Master Agreement.

Section 8.10    FCStone Right to Protect Interest. If at any time Customer shall fail to be in compliance with the terms of any Transaction, including, but not limited to, Customer's obligations to store, protect, preserve, insure, and deliver Subject Commodities, then FCStone shall have the right to take all reasonable steps to protect its interest, and any costs actually incurred by FCStone as a result shall be repaid by Customer to FCStone upon demand.

Section 8.11    Indemnification. Each Party agrees to indemnify, defend and hold harmless the other Party, and any of said other Party's affiliates, directors, officers, employees, agents and permitted assigns, from and against all claims, losses, liabilities, damages, judgments, awards, fines, penalties, costs and expenses (including reasonable attorneys' fees and disbursements) directly incurred in connection with or directly arising out of:

(a)    any breach of representation or warranty or failure to perform any covenant or agreement in this Master Agreement or in a Confirmation of a Sale/Repurchase Transaction by said Party; and

(b)    any violation of applicable law, regulation or order by said Party.

In addition to Customer's obligation to indemnify FCStone as set forth in this Master Agreement, Customer's obligation to indemnify FCStone shall include, but not be limited to, an indemnification from any loss or damage arising from any shortage or failure of quality or condition of the Subject Commodities.

Section 8.12    Limitations of Liability. FCSTONE SHALL NOT BE LIABLE TO CUSTOMER UNDER ANY TRANSACTION DOCUMENT FOR ANY CLAIM FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES.

## ARTICLE 9

### NOTICES AND PAYMENTS

Section 9.1    Methods. All invoices, statements, notices, and communications made pursuant to this Master Agreement shall be in writing and made as follows: all written communications to the other Party shall be sent by first class, registered, certified or express mail, return receipt requested, postage prepaid, or by comparable delivery service, or by hand, or by facsimile (with the original sent by first class mail) or mutually acceptable electronic means as set forth below. Such notice shall be deemed to have been given on the date of the delivery

thereof to the party receiving such notice. A Party may change its address upon notice to the other Party. All notices or communications to FCStone shall, with respect to any particular Transaction, be sent or delivered to the address or facsimile number specified by FCStone in the relevant Confirmation or if not so specified, as specified by FCStone in writing for that Transaction or type of Transaction, or if not so specified, then to its address or facsimile number specified below:

FCStone:     FCStone Merchant Services, LLC
1251 NW Briarcliff Parkway
Suite 800
Kansas City, Missouri 64116
ATTN: Global Head of Risk
PHONE: 816-410-7145

*With copy to:*
FCStone Merchant Services, LLC
1251 NW Briarcliff Parkway
Suite 800
Kansas City, Missouri 64116
ATTN: Brent Grecian
PHONE: 816-410-7123

All notices or communications to Customer shall, with respect to any particular Transaction, be sent or delivered to the address, email, or facsimile number specified by Customer in the relevant Confirmation or if not so specified, as specified by Customer in writing for that Transaction or type of Transaction, or if not so specified, then to its address, email, or facsimile number specified below:

Customer:   Garcia Grain Trading Corporation

101 N. Val Verde Road

Donna, Texas 78537-9561
ATTN:  Rene Izaguirre
EMAIL: rene.izaguirre@garciagraintrading.com
PHONE: 956-464-6000

**ARTICLE 10**

**GENERAL PROVISIONS**

Section 10.1    Entire Agreement and Counterparts.   The terms of this Master Agreement and the Confirmation for any Transaction entered into pursuant to this Master Agreement constitute the entire agreement between the parties with respect to the matters set forth in this Master Agreement and with respect to such Transaction and supersede any and all negotiations, agreements, and expressions of intent, written or oral, prior hereto. This Master Agreement may be changed only by written agreement executed after the date hereof by the

-30-

Parties or, in the case of an oral modification for a specific Transaction, in accordance with Section 1.5. This Master Agreement, the Confirmation for any Transaction, and any modification of the foregoing may be executed and delivered in counterparts, including by a facsimile transmission thereof, each of which shall be deemed an original.

Section 10.2   No Waiver. No waiver by either Party of any one or more defaults by the other Party in the performance of any of the provisions of this Master Agreement or the Confirmation for a Transaction shall operate or be construed as a waiver of any other default or defaults whether of a like kind or different nature.

Section 10.3   Headings. The headings used for the articles and sections herein are for convenience only and shall not affect the meaning or interpretation of the provisions of this Master Agreement or any Transaction or Confirmation hereunder.

Section 10.4   Recording. Each Party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties or any of their Affiliates in connection with this Master Agreement or any Transaction or potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and those of its Affiliates and (iii) agrees, to the extent permitted by Applicable Law, that such recordings may be submitted in evidence in any proceedings.

Section 10.5   No Partnership. Nothing in this Master Agreement or any Confirmation shall be construed to create a partnership or joint venture between the Parties.

Section 10.6   Effect of Regulatory or Judicial Actions. The invalidation of any provision of any Transaction Document due to any Change in Law shall not affect the validity of the remaining provisions hereof; provided, however, that if, due to a Change in Law (i) it becomes illegal or impossible for one or both Parties to perform one or more of its material obligations hereunder, (ii) a Party is deprived of a material portion of the benefit of its bargain hereunder or (iii) a Governmental Authority or Exchange imposes position limits or similar trading restrictions on a Party that limits the Party's ability to enter into Transactions, then the affected Party (or either Party if both Parties are affected) may send a written notice to the other Party describing in reasonable detail the Change in Law and the relevant effect on such Party (a "Change-In-Law Notice"). A Change-In-Law Notice may not be sent more than thirty (30) days after the Change in Law has become effective.

Upon the receipt of a Change-In-Law Notice:

(1)   the Parties shall negotiate in good faith to amend the Transaction Document in a manner that allocates the economic benefits and burdens of the Change in Law equally between the Parties; and

(2)   if the Parties are unable to agree upon an amendment to the Transaction Document within thirty (30) days of the receipt of a Change-In-Law Notice, then FCStone may issue a notice to Customer stating that it intends to terminate all outstanding Transactions and

-31-

designating a termination date on which to terminate all, and no less than all, Transactions.

Section 10.7   GOVERNING LAW.  THIS MASTER AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE LAWS THAT MIGHT BE APPLICABLE UNDER CONFLICTS OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.  EACH PARTY WAIVES ITS RESPECTIVE RIGHT TO ANY JURY TRIAL WITH RESPECT TO ANY LITIGATION ARISING UNDER OR IN CONNECTION WITH THIS MASTER AGREEMENT.  The Parties hereby agree that any legal action or proceeding with respect to this Master Agreement may be brought in the courts of the County of New York or Federal Courts sitting in New York.  Each Party waives any objection which it may have at any time to the laying of venue of any proceeding brought in any such court, waives any claim that such proceedings have been brought in an inconvenient forum, and further waives the right to object, with respect to such proceedings, that such court does not have jurisdiction over such Party.

Section 10.8   No Third Party Beneficiaries.  This Master Agreement and any Confirmation pursuant hereto confer no rights whatsoever upon any Person other than the Parties and shall not create, or be interpreted as creating, any standard of care, duty or liability to any Person not a Party hereto.

Section 10.9   Binding Effect.  This Master Agreement shall be binding on and inure to the benefit of the Parties and their respective successors and permitted assigns, except as expressly provided in this Master Agreement or the Confirmation for a specific Transaction.

Section 10.10  Assignment.  This Master Agreement shall not be assigned by either Party without the written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, either Party may, without the consent of the other Party, transfer, pledge or assign this Master Agreement to an Affiliate provided such Affiliate's creditworthiness is equal to or greater than that of the Party at the time of such transfer.

*(Signature page to follow)*

Duly and fully authorized representatives of the Parties have signed and delivered this Master Purchase and Sale Agreement as of the date first set out above.

FCSTONE MERCHANT SERVICES, LLC

By: _____
Printed Name: Ryan McNearney
Title: Vice President

By: _____
Printed Name: Ahmad Nazir
Title: Authorized Signatory

GARCIA GRAIN TRADING CORPORATION

By: _____
Printed Name: Octavio Garcia
Title: GENERAL MANAGER

-33-

**EXHIBIT "A"**

DEFINITIONS

The terms defined under this Master Agreement include the plural as well as the singular. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Master Agreement as a whole and not to any particular Article, Section or other subdivision unless otherwise specified. As used in the Master Agreement, the following defined terms have the meanings set forth below:

"Act of Insolvency" means (a) making a general assignment for the benefit of, or entering into a reorganization, arrangement or composition with creditors, (b) admitting in writing the inability to pay debts as they become due, (c) seeking, consenting to or acquiescing in the appointment or any trustee, administrator, receiver or liquidator for yourself or your assets, or (d) the voluntary or involuntary commencement of any case or proceeding under any state or federal bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution or similar laws, including, without limitation, the Bankruptcy Code.

"Affiliate" means, in relation to any Person, any entity controlled, directly or indirectly, by the Person, any entity that controls, directly or indirectly, the person, or any entity directly or indirectly under common control with the person. For this purpose, "control" of any Person means ownership of a majority of the voting power of the Person.

"Applicable Law" means any present or future international, federal, state or local laws (including common law and criminal law), statutes, treaties, codes, regulations, rules, tariffs, guideline, policy, ordinance, by-law, charter, judgment, order, and directive (as modified by the practice of any relevant Governmental Authority), or any rule of common law, issued, followed or promulgated by a Governmental Authority, or any rule or practice of an Exchange, the Applicable Trade Rules, and any judicial or administrative interpretation of the foregoing.

"Applicable Title Document" means a title document for an Eligible Commodity as accepted by FCStone in its sole discretion.

"Approved Warehouse" means any warehouse or storage facility that is set forth or approved by FCStone in its sole discretion.

"Bankruptcy Code" means Title 11 of the United States Code as amended from time to time.

"Business Day" means a 24-hour period ending at 5:00 p.m. E.P.T. on a weekday on which banks are open for general commercial business in New York.

"Change in Law" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any Applicable Law (or in the application or official interpretation of any Applicable Law) that occurs on or after the date of this Master Agreement.

"Change-In-Law Notice" has the meaning specified in Section 10.6.

A-1

"Collateral" has the meaning specified in Section 4.3.

"Confirmation" means the written notice confirming the terms of a Purchase Transaction or a written notice confirming the terms of a Sale Transaction, in the form as provided by FCStone.

"Contract Value" has the meaning specified in Section 8.3.

"Conveyance" means the individual means of transportation (truck, railroad car, unit train, barge, or vessel) used in Receiving or shipping the relevant Eligible Commodity.

"Costs of Collection" means all costs by FCStone to collect the payment obligations of Customer or otherwise cause Customer to perform its obligations hereunder, including reasonable attorneys' fees, associated with defending, protecting or enforcing the FCStone's rights in any bankruptcy proceeding, including the costs of litigating the dischargeability of all or any portion of the Secured Obligations, the cost of litigating the amount, validity, or secured status of FCStone's claim, the cost of litigating the avoidability of any allegedly preferential or fraudulent transfer, the cost of any litigation concerning conformation of a plan of reorganization, and the cost of litigating the applicability of or seeking relief from the automatic stay.

"Credit Event Upon Merger" shall mean that Customer has consolidated or amalgamated with, merged with or into, or transferred all or substantially all of its assets or business (whether by sale, lease or other disposition, in a single transaction or a series of transactions) to, another entity, and either (i) on or before the date of such action, the resulting, surviving or transferee entity fails to assume all of the obligations of such Person under this Master Agreement and each other Transaction Document as such Person is party to, as the case may be, either by operation of law or by agreement satisfactory to FCStone, or (ii) in the reasonable opinion of FCStone, the creditworthiness of the successor, surviving or transferee entity, taking into account any guaranty, collateral or other credit support provided to FCStone, is materially weaker than immediately prior to such consolidation, amalgamation, merger or transfer.

"Cross Default Threshold" means, with respect to FCStone, not applicable, and with respect to Customer, an amount equal to Two Hundred Fifty Thousand dollars ($250,000), provided that for any Specified Indebtedness payable by Customer to FCStone, to any of FCStone's Affiliates, or to any third party, Cross Default Threshold means any amount of such Specified Indebtedness.

"Customer" has the meaning set forth in the preamble.

"Early Termination Date" has the meaning specified in Section 8.1.

"Electronic Warehouse Receipts" means information in a central filing system that contains, at a minimum (a) the information required to be included in a warehouse receipt under the Warehouse Act and the EWR Regulations, regarding the Eligible Commodity that has been identified to a EWR Holder, (b) the name of the current EWR Holder, and (c) the name of the Person that has the ownership interest in the Eligible Commodity.

"Eligible Commodity" means grain (or as otherwise agreed by the Parties in a Confirmation) that is:

(a)     Either (i) on site and in storage within an Approved Warehouse operated by Customer or a Warehouse Operator which are the subject of a fully valid Warehouse Receipt or (ii) in-transit to an Approved Warehouse operated by Customer or a Warehouse Operator which are the subject of a Bill of Lading;

(b)     Owned by Customer and are transferable free and clear of all liens and encumbrances, and subject to the provisions contained in this Master Agreement; and

(c)     Fully insured against casualty loss while in storage with Customer.

"Eligible Forward Cash Contract" means a bona fide cash contract for forward delivery between Customer and an Eligible Producer which:

(a)     Provides for delivery of a specified quantity of an Eligible Commodity; and

(b)     Is documented on a form of contract that is specifically assignable to FCStone.

"Eligible Producer" means a farmer or farm entity that has produced, is producing, or intends to produce Eligible Commodities and that has not defaulted on delivery with respect to any grain contract with Customer within the preceding five (5) years, and for which Customer has not received any knowledge or notice that the ability of such farmer or farm entity to deliver the specified quantity of grain free and clear of liens and encumbrances has been impaired.

"ERISA" means Employee Retirement Income Security Act of 1974 found in Title 29 of the United States Code as amended from time to time

"Event of Default" means the occurrence of any of the following events with respect to Customer:

(a)     Customer fails to make a payment when due under, or in relation to this Master Agreement, any Transaction hereunder, or any other Transaction Document;

(b)     Customer fails to comply with or perform any other agreement, covenant or obligation under this Master Agreement, any Transaction hereunder or any other Transaction Document, which failure is not remedied within one (1) Business Day after it is notified thereof (excluding any failure to deliver or receive Eligible Commodity, the exclusive remedies for which are provided in Section 3.4 above), or Customer repudiates or challenges the validity of this Master Agreement, any Confirmation or any Transaction or any other Transaction Document;

(c)     Any representation or warranty made (or deemed made) by Customer in this Master Agreement or any other Transaction Document is incorrect or untrue in any

A-3

material respect when made (or deemed made), and if capable of being remedied, is not remedied within one (1) Business Day after Customer is notified thereof, respectively;

(d)     An Act of Insolvency by Customer;

(e)     A Credit Event Upon Merger shall occur with respect to Customer; provided, however, that if such Party posts sufficient collateral in a form and amount determined by FCStone in its sole discretion within one (1) Business Day of such FCStone's request for collateral, then such Credit Event Upon Merger shall not constitute an Event of Default hereunder;

(f)     Customer, (i) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Specified Indebtedness having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Cross Default Threshold, or (ii) fails to observe or perform any other agreement or condition relating to any such Specified Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs; the effect of which default or other event is to cause, or to permit the holder or holders of such Specified Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Specified Indebtedness to be demanded or to become due or to be sold, prepaid, defeased or redeemed (automatically or otherwise), or an offer to sell, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

(g)     In relation to Customer, (i) there is a breach of or a default under any Specified Transaction and any applicable cure period shall have elapsed or there occurs any liquidation or early termination of that Specified Transaction; (ii) there is a default, after giving effect to any applicable notice requirement or cure period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least two (2) Business Days if there is no applicable notice requirement or cure period); or (iii) there is a disaffirmation, disclaimer, repudiation or rejection of a Specified Transaction, in whole or in part.

(h)     Customer fails to comply with or perform any agreement or obligation to be complied with or performed by Customer in this Master Agreement, any Transaction hereunder, or any other Transaction Document.

"EWR Holder" means a Person in possession, in fact or by operation of law, of an Electronic Warehouse Receipt and, by extension, the Warehoused Commodity represented thereby.

"EWR Regulations" means those regulations from time to time promulgated pursuant to the Warehouse Act, concerning the issuance of Electronic Warehouse Receipts,

including the regulations promulgated in Volume 7, Part 735, of the Code of Federal Regulations.

"Exchange" means any commodity exchange on which a futures contract for an Eligible Commodity is traded.

"FCStone" has the meaning set forth in the preamble.

"Force Majeure" has the meaning specified in Section 2.3(d).

"GAAP" means generally accepted accounting principles, consistently applied.

"Governmental Authority" means any (i) international, national, state, county, city, town, municipal or other governing organization; (ii) governmental or quasi-governmental authority of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); (iii) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power (including any standard-setting organization or self-regulatory organization); or (iv) official of any of the foregoing.

"Forward Cash Commodity" means the Eligible Commodity sold and purchased in any Forward Cash Purchase Transaction under this Master Agreement.

"Forward Cash Purchase Transaction" has the meaning specified in Section 2.2(a).

"License Capacity" means the capacity limit given by the Secretary (as defined in the Warehouse Act) under the Warehouse License of a Warehouse Operator for storage of the Eligible Commodity.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind.

"Losses" has the meaning specified in Section 8.10.

"Loss Event" has the meaning specified in Section 2.3(a).

"Market Value" has the meaning specified in Section 8.3.

"Master Agreement" has the meaning set forth in the preamble.

"Material Contract" means any agreement, contract or other document to which Customer is a party (i) in which the obligations of any party thereto exceed the Cross Default Threshold or (ii) the occurrence of any termination event, acceleration, event of default, or event which with notice and/or lapse of time would constitute an event of default thereunder could reasonably be expected to have a material adverse change in or effect upon the operations, business, properties, liabilities, financial condition or prospects of Customer.

A-5

"Net Settlement Amount" has the meaning specified in Section 8.4.

"Non-Excluded Taxes" means any Taxes, other than a Tax imposed on or measured by the net income or net profits of FCStone, franchise taxes imposed in lieu of net income taxes, or branch taxes, in each case, by the jurisdiction (or any political subdivision thereof) under the laws of which FCStone is organized.

"Other Taxes" has the meaning specified in Section 3.7(b).

"Party" or "Parties" has the meaning set forth in the preamble.

"Performance Assurance" means collateral in the form of cash or other security acceptable to the requesting party.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, cooperative association, Governmental Authority or any other entity.

"Purchase Transaction" means a Warehouse Purchase Transaction or a Forward Cash Purchase Transaction, as applicable.

"Quantity" means the quantity of the Subject Commodity in the applicable Confirmation.

"Receiving" means the process of receiving the Eligible Commodity for storage, including unloading the Eligible Commodity from Conveyance; sampling the Eligible Commodity on arrival at an Approved Warehouse, if requested; tagging the Eligible Commodity; weighing the Eligible Commodity; issuing Warehouse Receipts; placing the Eligible Commodity in storage in an Approved Warehouse; and other customary receiving services performed by Warehouse Operators.

"Required Sale Closing Documents" is defined in Section 2.2(c).

"Sale Transaction" has the meaning specified in Section 2.3(a).

"Services" means the provision of Approved Warehouse facilities, associated handling, storage and quality preservation, Conveyancing, and customary packing and freight services for the Eligible Commodity or other services as are requested from time to time by FCStone and all ancillary services reasonably required to properly perform the Services.

"Solvent" means, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's

property would constitute unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Indebtedness" means any obligation (whether present, future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money or relating to the payment or delivery of funds, securities or other property (including, without limitation, collateral), other than indebtedness in respect of any bank deposits received in the ordinary course of business.

"Specified Transaction(s)" means any contract or transaction, including an agreement with respect thereto (whether or not documented under or effected pursuant to a master agreement), now existing or hereafter entered into between one Party (or any Affiliate of such Party) and the other Party (or any Affiliate of such Party).

"Subject Commodity" means the Warehoused Commodity and the Forward Cash Commodity.

"Subject Commodity Taxes" has the meaning specified in Section 3.7(c).

"Subject Contract" means an Eligible Forward Cash Contract sold and repurchased pursuant to a Transaction Confirmation under this Master Agreement.

"Tax" or "Taxes" shall mean all taxes, charges, duties, fees, levies or other assessments, including income, excise, property, sales or use, value added, profits, license, withholding (with respect to compensation or otherwise), payroll, employment, net worth, capital gains, transfer, social security, environmental, occupation, franchise taxes, or similar, taxes, charges or levees, whether imposed by any Governmental Authority or taxing authority anywhere in the world, including any interest, penalties and additions attributable thereto or imposed on or with respect thereto.

"Transaction Documents" means, collectively, this Master Agreement, each Confirmation to the Master Agreement and each other document now or hereafter executed and/or delivered pursuant to or in connection with any of the foregoing.

"Terminated Transaction" has the meaning specified in Section 8.1.

"Trade Date" shall be the date specified in a Confirmation.

"Transaction" means a transaction between FCStone and Customer for the purchase and/or sale of the Eligible Commodity pursuant to this Master Agreement.

"Transaction Purchase Date" shall be the date specified as such in the Confirmation for the applicable Purchase Transaction.

A-7

"Transaction Purchase Price" shall be the price specified as such in the Confirmation for the applicable Purchase Transaction.

"Transaction Sale Date" shall be the date specified as such in the Confirmation for the applicable Sale Transaction.

"Transaction Sale Price" shall be the price specified as such in the Confirmation for the applicable Sale Transaction.

"UCC" means the Uniform Commercial Code.

"USDA" means the United States Department of Agriculture.

"Warehouse Act" means the United States Warehouse Act, 7 U.S.C. Section 241, et. seq.

"Warehoused Commodity" means the Eligible Commodity sold and purchased in any Transaction under this Master Agreement which is on site and in storage within an Approved Warehouse operated by Customer or a Warehouse Operator.

"Warehouse License" means the license granted to a Warehouse Operator by the USDA under which the Warehouse Operator is federally licensed to operate an Approved Warehouse within the License Capacity for that warehouse.

"Warehouse Operator" means a third party who owns or manages an Approved Warehouse that holds a current Warehouse License and operates an Approved Warehouse within the License Capacity of that Warehouse License.

"Warehouse Purchase Transaction" has the meaning specified in Section 2.1(a).

"Warehouse Receipts" means negotiable warehouse receipts that are (i) issued by Customer or a Warehouse Operator, as applicable, in accordance with the Warehouse Act (ii) against stocks held in Customer's or such Warehouse Operator's warehouses, (iii) in the name of FCStone (or naming FCStone as the EWR Holder and the Person that has the ownership interest in the case of Electronic Warehouse Receipts), (iv) without any stated limitation or restriction, and (v) in accordance with EWR Regulations, if applicable. For the avoidance of doubt, Electronic Warehouse Receipts and Applicable Title Documents qualify as acceptable 'Warehouse Receipts' for purposes of this Master Agreement.

**EXHIBIT B – the UCC Financing Statement**

*(See attached.)*

50811553 v5

# UCC FINANCING STATEMENT
**FOLLOW INSTRUCTIONS**

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>Lien Solutions | |
| **B. E-MAIL CONTACT AT FILER (optional)** | |
| **C. SEND ACKNOWLEDGMENT TO: (Name and Address)**<br>**CT Lien Solutions<br>2929 Allen Parkway, Ste. 100<br>Houston, TX 77019<br>USA | |

**FILING NUMBER:** 18-0019434747
**FILING DATE:** 06/04/2018      03:37 PM
**DOCUMENT NUMBER:** 816910390001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Garcia Grain Trading Corporation** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **101 North Valverde Rd** | **Donna** | **TX** | **78537** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **INTL FCStone Merchant Services, LLC** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1251 NW Briarcliff Drive, Suite 800** | **Kansas City** | **MO** | **64116** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's right, title and interest, whether now existing or hereafter arising in all: (a) commodities sold and purchased in any transaction under a Master Purchase and Sale Agreement between Debtor and Secured Party (as amended or otherwise modified from time to time, a "Master Agreement") which are on site and in storage within a warehouse operated by Debtor or a third party warehouse operator and all commodities sold and purchased in any transaction under a Master Agreement (the "Subject Commodities"), (b) warehouse receipts and/or bills of lading subject to a Master Agreement, (c) accounts and payment intangibles of Debtor arising from the sale or other disposition of any Subject Commodities and/or corresponding warehouse receipts or bills of lading, and (d) cash and other proceeds of the foregoing, including insurance proceeds.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Lien Solutions |

| B. E-MAIL CONTACT AT FILER (optional) |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
| **CT Lien Solutions |
| 2929 Allen Parkway, Ste. 3300 |
| Houston, TX 77019 |
| USA |

**FILING NUMBER: 21-00359390**
FILING DATE: 08/18/2021      05:15 PM
DOCUMENT NUMBER: 1072868760001
FILED: Texas Secretary of State
IMAGE GENERATED ELECTRONICALLY FOR XML FILING
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**18-0019434747**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of the Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b and address of Assignee in item 7c and also name of Assignor in item 9.
For partial assignment, complete item 7 and 9 and also indicate affected collateral in item 8

4. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**
Check one of these two boxes. This Change affects ☐ Debtor or ☐ Secured Party of record. AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b.

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
| OR | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
| OR | | | | |
| | 7b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

8. ☑ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☑ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

All of Debtor's right, title and interest, whether now existing or hereafter
arising in all: (a) commodities sold and purchased in any transaction (the
"Subject Commodities") under a Master Purchase and Sale Agreement between Debtor
and Secured Party (as amended or otherwise modified from time to time, a
"Master Agreement"), (b) warehouse receipts and/or bills of lading subject to
the Master Agreement, (c) accounts and payment intangibles of Debtor arising
from the sale or other disposition of any Subject Commodities and/or
corresponding warehouse receipts or bills of lading, and (d) cash and other
proceeds of the foregoing, including insurance proceeds, located at two Debtor

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
| | **INTL FCStone Merchant Services, LLC** | | | |
| OR | | | | |
| | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

**UCC FINANCING STATEMENT AMENDMENT ADDENDUM**

**FOLLOW INSTRUCTIONS**

| 11. INITIAL FINANCING STATEMENT FILE NUMBER Same as item 1a on Amendment form |
|---|
| **18-0019434747** |

| 12. NAME of PARTY AUTHORIZING THIS AMENDMENT Same as item 9 on Amendment form |
|---|

| OR | 12a. ORGANIZATION'S NAME **INTL FCStone Merchant Services, LLC** |
|---|---|
| | 12b. INDIVIDUAL'S SURNAME |
| | FIRST PERSONAL NAME |
| | ADDITIONAL NAME(S)/INITIAL(S) |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

13. Name of DEBTOR on related financing statement (Name of a current Debtor of record required for indexing purposes only in some filing offices - see instruction item 13): Provide only <u>one</u> Debtor name (13a or 13b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); see Instructions if name does not fit

| OR | 13a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 13b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

14. ADDITIONAL SPACE FOR ITEM 8 (Collateral):

facilities. The facility addresses are: South on FM 907, Alamo, TX 78516 and 6.5 Miles South FM 1015 Near Progreso TX 78596.

| 15. THIS FINANCING STATEMENT AMENDMENT: | 17. Description of real estate: |
|---|---|
| ☐ covers timber to be cut ☐ covers as-extracted collateral ☐ is filed as a fixture filing | |
| 16. Name and address of a RECORD OWNER of real estate described in item 17 (if Debtor does not have a record interest) | |

18. MISCELLANEOUS:

**FILING OFFICE COPY**

<u>CORN</u>

**KCT96494 – July 2, 2021 – 120,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2053, 2054, 2055, 2056, and 2057.
- Payment made via wire on July 2, 2021 (Ref. No. 5639).

**KCT97906 – August 16, 2021 – 100,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2098, 2099, 2100, 2101, and 2102.
- Payment made via wire on August 16, 2021 (Ref. No. 5330).

**FIN101148 – January 13, 2022 – 100,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2126, 2127, 2128, 2129, and 2130.
- Payment made via wire on January 13, 2022 (Ref. No. 6624).

**FIN101182 – January 14, 2022 – 100,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2131, 2132, 2133, 2134, and 2135.
- Payment made via wire on January 18, 2022 (Ref. No. 6503).

**FIN101410 – January 27, 2022 – 60,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2136, 2137, and 2138.
- Payment made via wire on January 27, 2022 (Ref. No. 5257).

**SCS104637 – August 3, 2022 – 100,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2142, 2143, 2144, 2145, and 2146.
- Payment made via wire on August 3, 2022 (Ref. No. 5565).

**SCS105455 – August 31, 2022 – 40,000.00 Bus of #2 Yellow Corn:**
- Warehouse Receipts: 2156 and 2157.
- Payment made via wire on August 31, 2022 (Ref. No. 1682).

**SCS107733; SCS107732 – November 1, 2022 – 430,000.00 Bus of #2 Yellow Corn:**[2]
- Truck Tickets: 78702, 78703, 78704, 78705, 78706, 78707, 78708, 78709, 78710, 78711, 78712, 78713, 78714, 78715, 78717, 78716, 78718, 78721, 78722, 78724, 78875, 78876, 78877, 78879, 78880, 78881, 78882, 78883, 78884, 78885, 78886, 78887, 78888, 78891, 78892, 78893, 78894, 78896, 78897, 78898, 78899, 78901, 78902, 78904, 78905, 78726, 78727, 78728, 78729, 78730, 78731, 78732, 78733, 78734, 78735, 78736, 78756, 78737, 78738, 78739, 78740, 78741, 78742, 78743, 78744, 78745, 78746, 78747, 78748, 78749, 78750, 78751, 78752, 78753, 78754, 78755, 78758, 78759, 78760, 78761, 78762, 78763, 78764, 78765, 78766, 78767, 78768, 78769, 78770, 78771, 78772, 78773, 78774, 78775, 78776, 78777, 78778, 78779, 78780, 78781, 78782, 78783, 78784, 78785, 78786, 78787, 78788, 78789, 78790, 78791, 78792, 78793, 78794, 78795, 78796, 78797, 78798, 78799,

---

[2] This attachment features both a Sale Contract (SCS107733) and a Purchase Contract (SCS107732). The Sale and Purchase Contracts were amended from time-to-time to evidence a change in basis price or futures, among other things.

78800, 78801, 78802, 78803, 78804, 78805, 78806, 78807, 78808, 78809, 78810, 78811, 78812, 78813, 78814, 78815, 78816, 78817, 78818, 78819, 78820, 78821, 78822, 78823, 78824, 78825, 78826, 78827, 78828, 78829, 78830, 78831, 78832, 78833, 78834, 78835, 78836, 78837, 78838, 78839, 78840, 78841, 78842, 78843, 78844, 78845, 78846, 78847, 78848, 78849, 78850, 78851, 78852, 78853, 78854, 78855, 78856, 78858, 78859, 78860, 78861, 78863, 78864, 78867, 78868, 78869, 78870, 78871, 78874, 78906, 78907, 78908, 78909, 78910, 78911, 78912, 78913, 78914, 78915, 78916, 78917, 78918, 78919, 78921, 78923, 78924, 78925, 78926, 78927, 78928, 78929, 78931, 78932, 78933, 78934, 78935, 78936, 78937, 78938, 78939, 78940, 78941, 78942, 78943, 78944, 78945, 78946, 78947, 78948, 78950, 78951, 78952, 78954, 78955, 78956, 78957, 78960, 78961, 78962, 78963, 78964, 78965, 78966, 78967, 78968, 78970, 78972, 78973, 78974, 78976, 78977, 78978, 78979, 78980, 78981, 78982, 78984, 78985, 78986, 78987, 78988, 78989, 78990, 78991, 78992, 78993, 78994, 78995, 78996, 78997, 78998, 78999, 79000, 79001, 79002, 79003, 79004, 79005, 79006, 79009, 79010, 79011, 79012, 79013, 79014, 79015, 79016, 79017, 79018, 79019, 79020, 79021, 79022, 79023, 79024, 79025, 79026, 79027, 79028, 79029, 79030, 79032, 79033, 79034, 79035, 79036, 79037, 79038, 79039, 79040, 79041, 79042, 79043, 79044, 79045, 79046, 79047, 79049, 79050, 79051, 79052, 79053, 79055, 79056, 79058, 79059, 79060, 79061, 79062, 79063, 79064, 79065, 79068, 79066, 79067, 79069, 79070, 79071, 79072, 79074, 79076, 79073, 79075, 79077, 79078, 79079, 79080, 79081, 79083, 79085, 79087, 79089, 79090, 79093, 79094, 79092, 79096, 79097, 79098, 79099, 79102, 79100, 79103, 79104, 79105, 79114, 79115, 79116, 79117, 79118, 79119, 79122, 79121, 79123, 79124, 79126, 79127, 79128, 79129, 79130, 79131, 79132, 79134, 79136, 79137, 79138, 79139, 79141, 79142, 79143, 79144, 79145, 79146, 79152, 79153, 79154, 79155, 79156, 79157, 79158, 79159, 79160, 79162, 79163, 79176, 79177, 79179, 79178, 79180, 79181, 79182, 79184, 79185, 79189, 79190, 79187, 79191, 79193, 79196, 79197, 79198, 79201, 79205, 79204, 79211, 79217, 79219, 79223, 79224, 79227, 79226, 79230, 79242, 79246, 79247, 79248, 79250, 79253, 79254, 79256, 79259, 79261, 79266, 79267, 79268, 79275, 79279, 79285, 79287, 79291, 79295, 79296, 79297, 79298, 79303, 79312, 79313, 79314, 79319, and 79320.

- Warehouse Receipts: 2159, 2160, 2161, 2162, 2163, 2164, 2165, 2166, 2167, 2168, 2169, 2170, 2171, 2172, 2173, 2174, 2175, 2176, 2177, 2178, 2179, 2180, 2181, 2182, 2183, 2184, 2185, 2186, 2187, and 2188.

## SCS108408; SCS108407 – November 28, 2022 – 430,000.00 Bus of #2 Yellow Corn:[3]

- Truck Tickets: 79389, 79390, 79392, 79393, 79394, 79396, 79400, 79398, 79397, 79399, 79407, 79408, 79409, 79410, 79412, 79414, 79413, 79415, 79417, 79416, 79419, 79421, 79422, 79426, 79427, 79428, 79430, 79432, 79433, 79433, 79437, 79436, 79440, 79442, 79445, 79447, 79446, 79449, 79451, 79452, 79456, 79458, 79460, 79462, 79461, 79463, 79467, 79464, 79469, 79465, 79468, 79471, 79473, 79474, 79475, 79481, 79482, 79483, 79484, 79486, 79487, 79490, 79488, 79491, 79492, 79494, 79496, 79497, 79498, 79501, 79502, 79504, 79506, 79481, 79482, 79483, 79484, 79486, 79487, 79490, 79488, 79491,

---

[3] This attachment features both a Sale Contract (SCS108408) and a Purchase Contract (SCS108407). The Sale and Purchase Contracts were amended from time-to-time to evidence a change in basis price or Bu amounts, among other things.

79492, 79494, 79496, 79497, 79498, 79501, 79502, 79504, 79506, 79507, 79508, 79509, 79513, 79514, 79515, 79524, 79517, 79523, 79527, 79528, 79526, 79529, 79531, 79535, 79538, 79537, 79539, 79541, 79540, 79544, 79543, 79545, 79547, 79549, 79554, 79556, 79555, 79558, 79557, 79559, 79560, 79561, 79563, 79564, 79565, 79567, 79572, 79575, 79574, 79576, 79581, 79580, 79582, 79584, 79586, 79587, 79588, 79591, 79590, 79595, 79597, 79598, 79599, 79600, 79602, 79604, 79603, 79607, 79608, 79608, 79609, 79610, 79612, 79613, 79614, 79615, 79616, 79619, 79621, 79622, 79623, 79624, 79628, 79631, 79632, 79633, 79634, 79636, 79639, 79640, 79642, 79644, 79645, 79646, 79649, 79651, 79652, 79653, 79656, 79657, 79658, 79660, 79661, 79662, 79663, 79664, 79665, 79666, 79667, 79670, 79672, 79673, 79674, 79676, 79678, 79679, 79685, 79686, 79687, 79688, 79689, 79692, 79693, 79694, 79695, 79696, 79700, 79702, 79701, 79703, 79704, 79705, 79706, 79707, 79708, 79710, 79717, 79718, 79721, 79722, 79724, 79727, 79731, 79732, 79733, 79738, 79740, 79741, 79742, 79743, 79745, 79749, 79746, 79747, 79748, 79750, 79765, 79762, 79764, 79755, 79759, 79760, 79757, 79756, 79767, 79754, 79768, 79770, 79773, 79772, 79774, 79776, 79778, 79779, 79781, 79786, 79787, 79790, 79791, 79794, 79796, 79800, 79802, 79805, 79808, 79818, 79820, 79822, 79823, 79824, 79828, 79825, 79830, 79833, 79835, 79836, 79838, 79839, 79841, 79844, 79842, 79845, 79846, 79847, 79848, 79849, 79850, 79851, 79853, 79854, 79855, 79856, 79866, 79867, 79868, 79869, 79870, 79872, 79873, 79875, 79876, 79877, 79878, 79880, 79879, 79881, 79882, 79883, 79886, 79888, 79889, 79890, 79891, 79892, 79893, 79897, 79898, 79899, 79900, 79901, 79902, 79903, 79907, 79908, 79911, 79912, 79915, 79913, 79914, 79916, 79918, 79919, 79920, 79921, 79922, 79923, 79924, 79925, 79926, 79928, 79927, 79929, 79931, 79932, 79933, 79934, 79935, 79936, 79937, 79938, 79939, 79942, 79944, 79945, 79947, 79946, 79948, 79949, 79950, 79951, 79952, 79953, 79954, 79955, 79956, 79957, 79958, 79959, 79960, 79961, 79962, 79963, 79964, 79965, 79966, 79968, 79969, 79970, 79972, 79973, 79976, 79979, 79981, 79982, 79983, 79986, 79987, 79989, 79992, 79995, 79996, 79998, 80002, 80003, 80004, 80005, 80008, 80010, 80016, 80017, 80019, 80020, 80021, 80022, 80023, 80024, 80025, 80027, 80028, 80029, 80030, 80031, 80032, 80033, 80034, 80035, 80036, 80037, 80038, 80039, 80040, 80041, 80042, 80045, 80046, 80047, 80048, 80049, 80050, 80051, 80053, 80057, 80059, 80060, 80062, 80063, 80065, 80067, 80069, 80071, 80075, 80077, 80078, 80080, 80081, 80099, 80098, 80096, 80095, 80093, 80094, 80101, 80103, 80110, 80113, 80114, 80115, 80116, 80118, 80119, 80106, 80121, 80124, 80125, 80135, 80136, 80138, 80139, 80140, 80143, 80144, 80145, 80156, 80155, 80157, 80158, 80161, and 80162.

- Warehouse Receipts: 2189, 2190, 2191, 2192, 2193, 2194, 2195, 2196, 2197, 2198, 2199, 2200, 2201, 2202, 2203, 2204, 2205, 2206, 2207, 2208, 2209, 2210, 2211, 2212, 2213, 2214, 2215, 2216, 2217, 2218, 2219, 2220, 2221, 2222, and 2223.

**SCS109471; SCS109470 – December 30, 2022 – 22,993.00 Bus of #2 Yellow Corn:**[4]

- Truck Tickets: 80136, 80138, 80139, 80140, 80135, 80143, 80144, 80145, 80156, 80155, 80157, 80158, 80161, 80162, 80177, 80178, 80179, 80182, 80183, 80184, 80186, and 80192.
- Warehouse Receipts: 2223 and 2224.

---

[4] This attachment also features both a Sale Contract (SCS109471) and a Purchase Contract (SCS109470).

<u>SORGHUM</u>

**<u>KCT97046 – July 22, 2021 – 120,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipt: 2087.
- Payment made via wire on July 22, 2021 (Ref. No. 4818).

**<u>KCT97221 – July 28, 2021 – 100,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2088, 2089, 2090, 2091, and 2092.
- Payment made via wire on July 28, 2021 (Ref. No. 5147).

**<u>KCT97604 – August 6, 2021 – 100,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2093, 2094, 2095, 2096, and 2097.
- Payment made via wire August 6, 2021 (Ref. No. 6313).

**<u>KCT97976 – August 18, 2021 – 100,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2103, 2104, 2105, 2106, and 2107.
- Payment made via wire on August 18, 2021 (Ref. No. 5226).

**<u>KCT98151 – August 23, 2021 – 100,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2108, 2109, 2110, 2111, and 2112.
- Payment made via wire on August 23, 2021 (Ref. No. 4792).

**<u>KCT98652 – September 8, 2021 – 20,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipt: 2113.
- Payment made via wire on September 8, 2021 (Ref. No. 6014).

**<u>FIN101408 – January 27, 2022 – 60,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2139, 2140, and 2141.
- Payment made via wire on January 27, 2022 (Ref. No. 5263).

**<u>SCS104639 – August 3, 2022 – 40,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2147 and 2148.
- Payment made via wire on August 3, 2022 (Ref. No. 5559).

**<u>SCS105213 – August 24, 2022 – 80,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2149, 2150, 2151, and 2152.

**<u>SCS105450 – August 31, 2022 – 60,000.00 Bus of #2 Yellow Sorghum:</u>**
- Warehouse Receipts: 2153, 2154, and 2155.
- Payment made via wire on August 31, 2022 (Ref. No. 1685).

Respectfully submitted this 15th day of May, 2023.

/s / *Kurt Stephen*

Kurt Stephen, *Of Counsel*
David W. Houston, IV
D. Christopher Carson

*Attorneys for StoneX Commodity Solutions LLC*

**OF COUNSEL**:
The Law Office of Kurt Stephen, PLLC
100 South Bicentennial
McAllen, Texas 78501
Email: kurt@kstephenlaw.com

**OF COUNSEL**:
BURR & FORMAN LLP
222 2nd Ave S #2000
Nashville, TN 37201
Telephone: (615) 724-3200
Email: dhouston@burr.com

**OF COUNSEL**:
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
Email: ccarson@burr.com

50811553 v5

8