**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **GARCIA GRAIN TRADING** | § | **Case No. 23-70028-EVR-11** |
| **CORP.,** | § | |
| | § | |
| **Debtor.** | § | |

## DEBTOR'S ORIGINAL CHAPTER 11 PLAN OF REORGANIZATION AND ACCOMPANYING DISCLOSURE STATEMENT

TO THE HONORABLE EDUARDO V. RODRIGUEZ, U.S. Bankruptcy Judge, and All Creditors and Parties in Interest:

NOW COMES, Garcia Grain Trading Corporation ("Garcia Grain" or "Debtor"), the Debtor-in-Possession in the above-referenced bankruptcy proceeding, and files this its Original Plan of Reorganization and Accompanying Disclosure Statement. This document is intended to serve the dual purpose of a Plan of Reorganization and a Disclosure Statement as those terms are defined in the Bankruptcy Code. The Plan of Reorganization ("Plan") will set forth the manner and means by which the Debtor intends to pay its creditors and reorganize its financial structure so that it can continue operations. The Disclosure Statement ("Disclosure Statement") contains information intended to solicit the acceptance of the Plan by persons who are entitled to vote on confirmation or rejection of the Plan of Reorganization.

## ARTICLE I
## OVERVIEW OF PLAN IN CHAPTER 11

Pursuant to the terms of the Bankruptcy Code, this Disclosure Statement must be approved by the Bankruptcy Court. Such approval is required by statute and will not constitute a judgment of the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

Contained in the packet of documents which has been sent to you by the Debtor is the Disclosure Statement, the Plan, the Ballot for Voting on the Plan (the "Ballot") and the Order Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejection of Plan, Combined with Notice Thereof. Please read all these materials carefully. Please note that for your vote to be counted, you must: 1) include your name and address, 2) fill in, date, and sign the enclosed Ballot and 3) return it to the attorney for the Debtor by the date and time specified on the Ballot.

### A.      Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, an attempt is made to restructure the Debtor's finances so that the Debtor may continue to operate their business and repay their creditors.  Alternatively, the Chapter 11 Plan may provide for the liquidation of the Debtor's assets, with the properties subject to security interests going to the respective secured creditors and all remaining property satisfying, first, administrative claims and, secondly, general unsecured claims.  Formulation of a Plan of Reorganization is the primary purpose of a reorganization proceeding under Chapter 11.

Purpose of the Plan. The Debtor has filed contemporaneous hereto its Plan of Reorganization. The purpose of the Debtor's Plan is to provide a method for the successful reorganization of the Debtor's business. The Plan was developed by the Debtor with input from the Committee and proposes, among other things, the means by which all Claims against the Debtor will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code. The Plan is essentially a new contract between the Debtor and its Creditors, proposed by the Debtor to its Creditors for approval. Creditors approve or disapprove of the Plan by voting their Ballots on the Plan, if they are in a Class entitled to vote, and, if appropriate, by objecting to confirmation of the Plan. However, the Plan can be confirmed by the Bankruptcy Court even if less than all Creditors or Classes accept the Plan and, in such an instance, the Plan will still be binding on those Creditors or Classes that reject the Plan. Approval and consummation of the Plan will enable the Bankruptcy Case to be finally concluded.

The Debtor believes that the Plan is more attractive than other alternatives, such as conversion to Chapter 7 liquidation or dismissal of this Bankruptcy Case. The alternatives to the Plan are more fully discussed in this Disclosure Statement in Article VIII of this Disclosure Statement. EACH CREDITOR IS URGED TO READ THE PLAN PRIOR TO VOTING.

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets. According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder.  This Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

### B.      Disclosure Statement

Why You Have Received This Disclosure Statement. You have received this Disclosure Statement because the Debtor has proposed a Plan with the Bankruptcy Court to satisfy its debts and provide for reorganization of its business. The Bankruptcy Court held a hearing and approved this Disclosure Statement on _____. A copy of the Plan is enclosed with the materials that you have received. This Disclosure Statement, as required by 11 U.S.C. § 1125, is being provided to all known Creditors and other parties-in-interest whose claims are impaired in connection with the solicitation and acceptance of the Plan proposed by the Debtor.

Purpose of this Disclosure Statement.  The Purpose of this Disclosure Statement is to provide the Creditors and parties in interest adequate information to make an informed judgment about the Debtor's Plan and in exercising their rights either to accept or reject the Plan. Generally, this information includes, among other matters, a brief history of the Debtor, a history of Chapter 11 case, a description of the remaining assets and liabilities of the Debtor, an explanation of how the Plan will function and an explanation of why the reorganization of the Debtor under the proposed Plan should result in a greater benefit to the Creditors than if the Chapter 11 case was converted to a Chapter 7 case and a Chapter 7 Trustee was appointed.

Sources of Information.  The information contained in this Disclosure Statement has been submitted by the Debtor unless specifically stated to be from other sources.  Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.  While the Debtor has made every effort to retain the meaning of such other instruments or the portions transposed, the Debtor urges that any reliance on the contents of such other instrument should depend on a thorough review of the instruments themselves.

Only Authorized Disclosure.  No representations concerning the Plan are authorized by the Debtor or the Bankruptcy Court other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote which are other than herein contained should not be relied upon, and such representations or inducements should be reported to counsel for the Debtor, who shall deliver such information to the Bankruptcy Court.

Voting on the Plan.  **YOUR ACCEPTANCE OF THE PLAN IS IMPORTANT.**  A Creditor or Equity Interest Holder, in order to vote on the Plan, must have filed a proof of claim or interest on or before the Bar Date, unless the Debtor did not schedule the claim as Disputed, Unliquidated or Contingent.  Any Creditor whose Claim is not scheduled as Disputed, Unliquidated or Contingent is, to the extent scheduled, deemed to have filed a Claim and, absent objection, such Claim is deemed Allowed.  A Creditor or Equity Interest Holder may vote to accept or reject the Plan by filling out and mailing to counsel for the Debtor the Ballot which has been provided in this package of information.

In order for the Plan to be accepted by a class of Creditors, more than one half in number and at least two-thirds in amount of such class of Claims must vote to accept the Plan.  Only those Claim Holders that actually vote are considered in the calculations.  In order for the Plan to be accepted by Equity Interest Holders, at least two-thirds in number of interests must vote to accept the plan. Again, only voting Equity Interest Holders are considered in the calculation.  You are, therefore, urged to fill in, date, sign and promptly mail, email and/or fax the enclosed Ballot which has been furnished to you to counsel for the Debtor as follows:

David R. Langston
MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Email: drl@mhba.com
Facsimile: 806-765-0553

The Court has fixed November __, 2023, as the last date by which Ballots must be served on counsel for the Debtor.  Except to the extent allowed by the Bankruptcy Court, Ballots that are received after such time will not be counted. Ballots of Holders of Impaired Claims received pursuant to this solicitation and which are signed but are not expressly voted for acceptance or rejection of the Plan will be counted as Ballots for accepting the Plan.  A Ballot accepting the Plan may not be revoked, except by order of the Bankruptcy Court.

Whether a Creditor votes on the Plan or not, each creditor will be bound by the terms and treatments set forth in the confirmed Plan that is accepted by the requisite majorities of creditors and is confirmed by the Court, or as confirmed by the Court pursuant to the provisions of 11 U.S.C. § 1129(b). Absent some affirmative act constituting a vote, a Creditor not voting on the Plan will not be included in the tally. Allowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will be allowed for distribution purposes.

You are urged to fill in, date, sign and properly mail in duplicate the enclosed ballot, which has been provided.  Be sure to properly complete and legibly identify the name of the creditor, the class in which you believe the claim is treated in the Plan, the amount of the claim, and indicate whether you are voting for or against confirmation of the Plan. Representatives of the Debtor or creditors of the Debtor may solicit your vote. The cost of any solicitation by the Debtor will be borne by the Debtor.  Likewise, the solicitation costs of competing plan proponents will be borne by the parties proposing the competing plan.

**C.   Creditors Entitled to Vote.**  Any creditor whose claim is impaired under the  Plan is entitled to vote, if either i) its claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent, or unliquidated, or ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim as to which an objection has been filed and such objection is still pending is not entitled to vote, unless the Bankruptcy Court temporarily allowed the claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the creditor.  Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court.  A creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Court.

**D,   Definition of Impairment.**  Under Section 1124 of the Bankruptcy Code, a class of claims or equity security interests is impaired under a Chapter 11 Plan unless, with respect to each claim or interest of such class, the  Plan:

    a.   Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity security interest; or

    b.   Notwithstanding any contractual provision or applicable law that entitled the holder of a claim or equity security interests to receive accelerated payment of his claim or equity security interests after the occurrence of a default:

        1.   Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default that consists of a breach of any provisions relating to the insolvency or financial condition of the Debtors at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code;

2. Reinstates the maturity of such claim or equity security interest as it existed before the default;

3. Compensates the holder of such claim or equity security interest for damages incurred as a result of reasonable reliance on such contractual provisions or applicable law; and

4. Does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity security interest entitles the holder of such claim or equity security interest; or

c. Provides that, on the effective date of the Plan of Reorganization, the holder of such claim or equity security interest receives on account of such claims or equity security interest, cash equal to:

1. With respect to a claim, the allowed amount of such claim

2. With respect to any equity security interest, if applicable, the greater of:

i. Any applicable fixed liquidation preference; or

ii. Any fixed price at which the Debtors, under the terms of the security, may redeem the security.

**E.    Classes Impaired.**  Classes Three, Four, Six, Seven, Eight, Nine, Ten, and Eleven are all impaired under the treatment afforded the Creditors in these classes under the provisions of the Plan.

**F.    Votes Required for Class Acceptance.**  The Bankruptcy Code defines acceptance of a Plan by a class of creditors or equity security interests holders as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims or equity security interests of that class which actually cast ballots for acceptance or rejection of the Plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66 2/3%) in amount of claims and equity security interests in each class and more than fifty percent (50%) of claims or equity security interests voting in each class cast their ballots in favor of acceptance.

<u>**NOTICE OF HEARING ON CONFIRMATION**</u>

**NOTICE IS HEREBY GIVEN THAT THE COURT HAS SCHEDULED A HEARING TO DETERMINE WHETHER OR NOT THE PLAN SHOULD BE CONFIRMED ON <u>THE       DAY OF NOVEMBER, AT       .M.,</u> IN THE UNITED STATES BANKRUPTCY COURTROOM. YOU HAVE A RIGHT TO ATTEND THE HEARING AND PRESENT TO THE COURT YOUR ARGUMENTS EITHER IN FAVOR OF OR IN OPPOSITION TO CONFIRMATION OF THE PLAN.**

**The hearing will be held via Go to Meeting.** To participate electronically, parties must follow the instructions set forth on Judge Rodriguez's web page located at:
https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-eduardo-v-rodriguez.

Parties are additionally instructed to: (i) call in utilizing the dial-in-number for hearings before Judge Rodriguez at 832-917-1510, conference room number 999276 and (ii) log on to GoToMeeting for video appearances and witness testimony, utilizing conference code: judgerodriguez.

Parties MUST HAVE TWO SEPARATE DEVICES to appear by video and telephonically. One device will be used to log on to GoToMeeting and the other will be used to call the telephonic conference line.

## NOTICE OF THE FIXING OF A BAR DATE AND THE REQUIREMENTS FOR FILING AND ALLOWANCE OF CLAIMS

NOTICE IS HEREBY GIVEN that the Court set **June 20, 2023**, as the last day upon which proofs of claim can be filed with the Court for the Debtor's case.

## DISCLOSURE OF EFFECT OF COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT AND OF THE ACCURACY OF THE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT:

COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN, NOR DOES COURT APPROVAL OF THE DISCLOSURE STATEMENT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF. APPROVAL OF THE DISCLOSURE STATEMENT BY THE COURT REPRESENTS A DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS REQUIRED BY 11 U.S.C. SECTION 1125 AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE  PLAN.

THE DEBTORS SEEK AN AFFIRMATIVE VOTE FROM EACH CLASS AND EACH HOLDER OF A CLAIM IN THIS BANKRUPTCY PROCEEDING.  THE BALLOT THAT YOU WILL RECEIVE PERMITS YOU TO ACCEPT OR REJECT THE PLAN.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS OR OBTAINED FROM THEIR RECORDS AND FILES.  THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE BEST INFORMATION AVAILABLE TO THE DEBTORS AT THE TIME THAT THE DISCLOSURE STATEMENT WAS PREPARED.

THE DEBTORS FAVOR ACCEPTANCE OF THE PLAN AND BELIEVE THAT CONFIRMATION OF THE PLAN WOULD REALIZE PAYMENT OF LARGER DIVIDENDS TO CREDITORS THAN COULD BE OBTAINED THROUGH A CHAPTER 7 LIQUIDATION. SUCH CONCLUSION IS BASED ON INFORMATION IN THE POSSESSION OF THE DEBTORS AT THE TIME THE DISCLOSURE STATEMENT AND PLAN WAS PREPARED.

WHILE THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED OR VERIFIED EXCEPT WHERE SPECIFICALLY STATED, AND THE RECORDS KEPT BY THE DEBTORS ARE NOT REPRESENTED TO BE WITHOUT ANY

INACCURACY OR OMISSION, THE DEBTORS FIRMLY BELIEVE THAT EVERY EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.

**G.    CRAMDOWN.**   If any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity security interests.   "Fair and equitable" has different meanings for secured claims and unsecured claims.

With respect to a secured claim, "fair and equitable" means either:  i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value on the effective date of the  Plan at least equal to the value of such secured creditor's interest in the property securing its liens; or ii) property subject to the lien of the impaired secured creditors is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the  Plan.

With respect to an unsecured claim, "fair and equitable" means either i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or ii) the holders of the claims and equity security interests that are junior to the claims of the dissenting class will not receive any property under the  Plan.

In the event one or more classes of impaired claims rejects the Plan, the Bankruptcy Court will determine at the hearing for confirmation of the Plan whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims. If the Bankruptcy Court determines that the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims, the Bankruptcy Court can confirm the Plan over the objection of any impaired class.

## ARTICLE II
## INTRODUCTION TO DEBTOR'S PLAN

### A.    Function and Purpose of the Plan of Reorganization

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets.  According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 Plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder.  This Plan and accompanying Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

The Debtor believes the Plan and the Disclosure Statement contain adequate information – that is, information of a kind and in sufficient detail, as far as is reasonably practical in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about the Plan.

**B.  History of the Debtor and Background Information Related to Need for Financial Reorganization.**

**1.   The Debtor**

Garcia Grain filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, McAllen Division (the "Bankruptcy Court"), on February 17, 2023 (the "Petition Date"). Since that time, the Debtor has continued to operate as Debtor-in-Possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor was incorporated on June 22, 1998, by Octavio Garcia, Rodolfo Plascencia, Sr. and Baldemar Salinas Cantu for the purpose of operating licensed grain storage facilities in the Rio Grande Valley and Coastal Bend regions of the State of Texas. The Debtor originally owned and operated grain storage facilities located at Progreso, Texas, and then it acquired additional grain facilities in Donna, Edcouch, Alamo, and Santa Rosa, Texas.

Each of these storage facilities were bonded and licensed by the Texas Department of Agriculture (the "TDA"). The total of the surety bonds issued by Harco National Insurance Co. for each of the public grain warehouses in the possession of the TDA on the Petition Date for each facility is set forth in the following chart:

| Location of the Public Grain Warehouse | Penal Sum of Bond | Date of Last Rider |
|---|---|---|
| Progreso, Texas | $1,009,750 | 6/01/2022 |
| Santa Rosa and Donna, Texas | $739,200 | 6/01/2022 |
| Edcouch, Texas | $406,700 | 6/01/2022 |
| Alamo, Texas | $242,200 | 6/01/2022 |
| **TOTAL** | **$2,397,850** | |

The laws of the State of Texas require that all public grain warehouses be bonded prior to the TDA issuing them a license to operate.

In summary, these bonding requirements are as follows:

Tex. Agric. Code Ann. § 14.031 requires that each applicant for a license to warehouse grain "shall file or have on file a bond" with the Department.

(a) In accordance with this section, each applicant for a license shall file or have on file a bond with the department.

(b) The bond must:

(1) be payable to the State of Texas;
(2) be executed by the applicant as principal;
(3) be issued by a corporate surety licensed to do business as surety in the State of Texas;

and

(4) be in a form and contain terms and conditions prescribed by the department.

Tex. Agric. Code Ann. § 14.031 (West).

These bonds are tied to the location of each public grain warehouse.

Tex. Agric. Code Ann. § 14.031 (f)

"Except as provided by department rule, the applicant must give a single bond meeting the requirements of this section to cover warehouses licensed as a single facility or combination. A single bond may not be used to cover more than one individually licensed facility, more than one combination, or one or more individually licensed facilities and one or more combinations."

The bonds are in place for the benefit of those persons that meet the definition of a "Depositor."

Tex. Agric. Code Ann. § 14.001 defines "depositor" as follows:

"(1) "Depositor" means a person who:
    (A) delivers grain to a public grain warehouse for storing of the grain for hire, handling of the grain for hire, or shipping of the grain for hire;
    (B) is the owner or legal holder of an outstanding receipt for grain stored in the public grain warehouse issuing the receipt; or
    (C) is lawfully entitled to possession of grain stored in a public grain warehouse."

Tex. Agric. Code Ann. § 14.001 (West).

These statutes requiring public grain warehouses to be bonded by a corporate surety licensed in the State of Texas are in place to indemnify or guarantee recourse for "depositors" if their grain is lost or otherwise disposed of without the warehouse honoring the "depositors'" right to possession of the grain.

The Debtor's business operations historically have consisted of buying, storing, and selling feed grains, primarily corn and grain sorghum, within the United States and Mexico. The Debtor has also traded in edible beans and oilseeds, such as black beans, pinto beans, sunflower seeds, sesame seeds, and canola as well. In addition, the Debtor has regularly purchased grain and milo from farmers in the United States to be exported into the country of Mexico where they were used by livestock feed operators and other businesses.

Over the years during which the Debtor was operating, it was the normal course of business for the Debtor to purchase properties with funds derived from the Debtor and then to place the title to such properties under the names of either its individual shareholders or in entities that were

created and owned by its shareholders. For example, in the case of the Alamo Elevator, it was placed under the name of "Alamo Grain," which is a Texas General Partnership with Rodolfo Plascencia, Octavio Garcia, and Baldemar Salinas Cantu as its general partners, but which was operated solely with the funds from the Debtor and none of the personal funds of the three partners.

Likewise, the officers and directors of the Debtor formed or held an interest in affiliated entities created to own real property or facilitate various aspects of the operations of the Debtor. Those entities included PSG Products, LLC; Gacia Balli, Ltd.; Garba, LLC; Rio Bravo Imports, LLC; Alamo Grain, A Texas General Partnership; Val Verde Grain, A Texas General Partnership; International Earth Products, LLC; IEP Minerals, LLC; IEP Logistics, LLC.

The Debtor began encountering financial troubles in 2014 related to the difficulty of financing and managing a large volume of grain operations as well as disputes between individual officers and directors over suspicious receipts and disbursements from company accounts. These conflicts lead Octavio Garcia and Baldemar Salinas to take steps to remove Rodolfo Plascencia as an officer, director, and employee of the company. His removal resulted in five separate lawsuits being filed by Mr. Plascencia against the company and its remaining officers and directors as well as several of the related entities in which they held joint ownership. This litigation sought the partition of properties owned by the company, its individual directors, and several of its related entities. Ultimately, the parties entered into a Settlement Agreement on July 26, 2022, by which title to the Alamo Elevator plus another 10-acre tract of real estate and $200,000 was transferred to Rodolfo Plascencia and his son.

During the last six months of 2022, the Debtor's financial condition began to rapidly deteriorate. A severe drought in the Coastal Bend region of Texas from which the Debtor regularly acquired a large portion of its grain stocks caused almost a complete failure of the area's production of feed grain. In turn, the company encountered significant problems in its cash flow as its grain operations became increasingly difficult to manage. Toward the end of calendar year 2022 the Debtor lacked sufficient funds to pay farmers who had sold their grain to the company during the harvest and began struggling to pay its creditors as the debts became due.

## 2.      Events Leading to Bankruptcy

To understand the measures that the Debtor will take to make its Original Chapter 11 Plan of Reorganization successful, a brief history of the Debtor's operations prior to the filing of the bankruptcy is necessary.

During the first days of 2023, the TDA conducted one of its regular audits to make sure there were sufficient grain stocks in the four public grain warehouses located in Progreso, Santa Rosa/ Donna, and Edcouch to match the outstanding warehouse receipts. The initial audit in January showed the company had sufficient grain in storage to comply with TDA regulations.

Later in January one of its major secured creditors, Frost Bank, accelerated the maturity of the Debtor's notes and demanded the immediate repayment of approximately $2,200,000 in

outstanding loans. The Debtor was successful in arranging a loan from GrainChain, Inc. to pay the bank debt in full.

Then, in late January, TDA conducted another audit of the facilities and discovered significant deficiencies between the records for warehouse receipts when compared to physical measurements of the grain. Due to the shortage, TDA pulled all licenses and sealed the grain in all facilities. No grain could move in or out, and suddenly the Debtor no longer had any means to generate revenues for its operations.

Without any ability to pay its creditors, the Debtor elected to seek bankruptcy relief and filed a petition under chapter 11 of the Bankruptcy Code on February 17, 2023 ("Petition Date").

## C.    Developments in the Bankruptcy Case and Status of Operations

### 1.    Orders Allowing the Use of Cash Collateral, Restoring Operations, and Providing for the Use and Disposition of Assets

The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 17, 2023 (the "Petition Date"), in the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division, where it is pending under Case No. 23-70028-EVR-11 ("Bankruptcy Case"). The Bankruptcy Case is presided over by the Honorable Eduardo V. Rodriguez ("Bankruptcy Judge").

Since the filing of this Bankruptcy Case, the Debtor has taken significant steps to rehabilitate its business and restart operations.

First, to address the suspension of the Debtor's licenses and the sealing of its grain elevator facilities in early February that halted all grain operations the Debtor sought permission from the Bankruptcy Court to use the funds in its possession to reopen its facilities and sell the grain.

On February 23, 2023, the Debtor filed an *Emergency Motion for Authority to Use Cash Collateral.* After conducting a hearing, the Court granted the Debtor's request on an interim 14-day basis. This cash collateral order allowed the Debtor to retain the employment of a skeleton management and work staff to perform the accounting and documentation related to the Debtor's finances as is required by the rules of the Office of the U.S. Trustee while at the same time maintaining the security and safe operation of the grain storage facilities and prevent the deterioration of the grain, edible beans, and other inventory. Since the first hearing on the interim use of cash collateral, the Debtor negotiated the terms with the company's secured creditors and entered three agreed orders on the continued interim use of cash collateral.

Next, the Debtor obtained authority from the Bankruptcy Court quickly to sell the grain remaining in the Progreso Facility. The Debtor sold and successfully delivered all the grain sorghum with most of it being transported to Archer Daniels Midland Company ("ADM") in Corpus Christi, Texas. It provided a complete accounting of the sales, transport fees and other associated costs and

deposited the proceeds into the Grain Escrow Account.

Subsequently, it entered a contract with Impulsora Ganadera de Mexico, S.A. ("Impulsora") for the sale of #2 yellow corn. This corn was imported into Mexico through its ongoing arrangement with a Mexican corporation named Granos y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo"), which acts as the importer of all corn, milo, pinto and black beans to customers in Mexico, directly invoices the customers, and the customers pay Rio Bravo for the invoices, from which Rio Bravo deducts the importation fees, and wires the net receipts to the appropriate escrow account in the United States. As a result of these efforts, the Debtor reflects a cash balance in the Grain Escrow Account in the amount of $3,517,611.77 as of July 31, 2023. [Dkt #463-1].

To determine the legal right to the funds in the Grain Escrow Account, on April 6, 2023, the Debtor obtained an Order Establishing Procedures for Determination of Rights, Ownership Interests, Liens, Security Interests, and All Other Interests in and to Grain and Proceeds of Grain Pursuant To 11 U.S.C. § 557 [Dkt #126]. Following the entry of the order establishing such procedures, only three (3) creditors filed claims against the grain and submitted briefs supporting their interest in the proceeds: StoneX Commodity Solutions, Vantage Bank Texas, and GrainChain, Inc. The Debtor timely responded to these claims and the legal arguments supporting them mainly questioning the validity of the interests asserted by StoneX in foreign and domestic grain receivables. The Bankruptcy Court's decision on these various claims to the grain and grain proceeds remains pending.

In addition, on April 14, 2023, the Debtor obtained an Order [Dkt #157] from the Court establishing procedures for the Court to determine the nature, extent, and validity of any claims of bean suppliers under the provisions of 7 U.S.C. § 499a known as the Perishable Agricultural Commodities Act ("PACA"). Subsequently, the Debtor resolved two PACA Claims of Stony Ridge Food, Inc. in the total amount of $237,077.50. The Debtor continues to hold $400,000 of bean proceeds in the PACA Reserve Account ("PACA Reserve").

Unfortunately, while the Debtor was fulfilling the corn deliveries to Impulsoro, a windstorm hit its facilities on April 29, 2023, causing substantial damage to the Progreso Facility. After filing the appropriate claim with its insurance carrier, FCCI Insurance Company, the Debtor worked to salvage the spoiled grain and cleanup and remediate the damaged facility. Currently, it is awaiting a final determination with respect to the claim associated with the salvaged grain but estimates it to total approximately $2,318,400. With respect to the physical damage to the Progreso grain storage facility the Debtor received an advance check of $275,000.00 it used to initiate the cleanup plus an additional $3.4 million check from FCCI to finance the restoration of the plant. In addition, the Debtor is waiting for the settlement to finalize the claim for the interruption of its business operations which has a policy cap of $1.2 million which will be to mitigate the losses sustained by the company due to the windstorm.

The Debtor has an ongoing arrangement with a Mexican corporation named Granos y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo"), which acts as the importer of all corn, milo, pinto and black beans to customers in Mexico, directly invoices the customers, and the customers pay Rio

Bravo for the invoices, from which Rio Bravo deducts the importation fees, and wires the net receipts to the appropriate escrow account in the United States.

On May 17, 2023, the Court granted the Motion and entered its Order Granting Debtor Authority to Assume Executory Contracts for Purchase and Sale of Edible Beans and Sunflower Seeds [Docket #229]. This Order granted the Debtor to assume the bean supply contracts with Stony Ridge Food, Inc. and provided a protocol for the Debtor to purchase and pay for the beans. It also allowed the Debtor to assume contracts for the assumption of purchase contracts it had with farmers growing sunflower seeds in South Texas and for the Debtor to export them through its Mexican entity, Rio Bravo, and sell them to a Mexican company which crushes the seeds for their oil. The Debtor has projected profits from the sunflower and edible bean enterprises to total $1 million by the end of this calendar year.

At the beginning of the year management of Garcia was notified by its insurance carrier that its liability and casualty coverage on its grain facilities and inventory of grain as well as its workmen's compensation insurance would expire and not be renewed by FCCI Insurance beyond May 31, 2023. Consequently, management planned to lease its facilities at Progreso, Santa Rosa/Donna, and Edcouch to other grain companies in the area.

The Debtor successfully entered into a lease agreement with Texas Valley Grain Co. ("TVG") to lease its grain storage located at Santa Rosa that provided for the insurance coverage to be force placed by Vantage Bank, and then reimbursed in accord with a formula tied to the amount of grain which passed through the facility. Based upon the last reports from TVG, needed repairs at Santa Rosa have been successfully completed and the operations have been generating more revenue than anticipated.

With respect to Donna Facility, Vantage Bank force placed insurance on the grain facility and warehouse located there, and the Debtor has been cooperating with the bank to explore the possibility of purchasing the portion of the facility which is built on the right-of-way of the Union Pacific Railroad Company so that issues related to the property impeding its sale are resolved and the proceeds of any sale can be applied to the bank's indebtedness.

Finally, the Debtor obtained authority from the Bankruptcy Court for the Progreso and Edcouch facilities to be leased to Elkins Grain, LLC ("Elkins") based upon a through-put formula of 5 cents per bushel. The funds necessary for the payment of the premiums for the insurance, including coverage for the physical plant, the grain inventory, along with liability and workmen's coverage are the subject of post-petition financing provided by GrainChain, Inc. ("GrainChain"). In this regard, arrangements have been made for GrainChain and Elkins to cooperate in the management and the use of the grain facilities pursuant to an Operating Agreement with the Debtor. This financial arrangement provides for GrainChain to supply up to $1.5 million of loans to finance the operations of the grain facilities as well as the provisions of a line of credit of up to $15 million for the purchase and sale of the grain. The financing will be provided at an interest rate of prime plus 3.0%, and extensive negotiations have led to an arrangement that allows Elkins to provide the management and accounting functions and GrainChain and the Debtor to share in a division of the net profits from the storage and marketing of the grain under an arrangement that will fund the Debtor's Plan and allow

for a settlement of the contested liens which GrainChain asserts against assets of the Debtor as well as those other tracts of real estate against which GrainChain holds deeds of trust. The Operating Agreement contemplates that net profits will be paid to holders of unsecured claims who also will—through shared liens against these same properties—have guaranteed payments made to the unsecured creditor class over the life of the Plan.

The specific terms and conditions of the financing arrangement and the resolution of the lien disputes are the subject of a compromise and settlement proposed to the creditors of the Debtor in this Plan. The Debtor asserts that if the settlement is approved by its creditors and the Plan is confirmed by the Bankruptcy Judge the claims of all general unsecured creditors filing claims in the Bankruptcy Case can be paid in full.

## 2. Summary of the Plan

A summary of the Plan being proposed appears below. This summary is intended to set forth in a simplified form the way the Debtor will be reorganized if the Plan is approved by the Bankruptcy Court. The summary is also intended to inform each Creditor the way their particular claims are to be paid under the terms of the Plan. A reading of the summary will provide you with general information about the Plan and its proposed treatment of all Creditors. However, to make a fully informed judgment about the Plan, you are urged to read the entire Disclosure Statement and Plan. The Plan is subject to modification prior to the approval of this Disclosure Statement and confirmation of the Plan.

The Plan provides for the Debtor to continue its organizational structure following confirmation – although its stock with be conveyed in the Plan Trust.  In other words, the Plan *does not* provide for a liquidation and subsequent dissolution of the Debtor. However, in the event that the Plan Agent and GrainChain agree to the formation of a new corporation to operate the grain facilities which are the subject of an operating agreement between the Debtor, Elkins Grain, and GrainChain, they may do so.

The Plan provides for all Administrative Claims to be paid in full upon approval by the Bankruptcy Court of applications for their allowance or the Effective Date which is estimated to be before December 31, 2023.

The Debtors dispute the Priority Tax Claim asserted by the Internal Revenue Service for income taxes because upon the filing of a contemplated amended return it believes the Debtor will not liable be for such taxes. They assert that the taxes reflected were based upon false revenues and if properly reflected the Estate may be entitled to tax refunds for prior years. They intend to object to the IRS claim and once established, if any, to pay any taxes owed.

The major Secured Creditors of the Debtor are treated under the terms of the Plan as follows:

- StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC ("StoneX") asserts that it holds title to or a security interest in certain grain inventory located at the Debtor's grain elevator facility in Progreso, Texas ("Progreso facility"), along with the associated grain warehouse receipts, cash, accounts receivable, and other proceeds from the

sale of the grain of the Debtor at such facility to secure the repayment of indebtedness owed to it having an outstanding balance of an estimated $19.5 million. The Debtor estimates the current collateral for the repayment of the StoneX Secured Claim to be as follows:

| | | | |
|---|---|---|---|
| - | Funds in Grain Escrow Account | = | $3,517,371 |
| - | Collectible Accounts Receivable | = | $ 812,184 |
| - | FCCI Claim Against Salvaged Grain | = | $2,318,400 |
| - | Surety Bond Claim at Progreso | = | $1,009,750 |
| - | Total Collateral Value | = | $7,711,705. |

Thus, the Secured Claim of StoneX totals $7,711,705, and its Unsecured Deficiency Claim is approximately $11,749,353.

- Vantage Bank Texas ("Vantage") holds title to or a security interest in certain grain inventory, machinery and equipment, and other personal property assets located at the Debtor's grain elevator facilities located in Santa Rosa and Donna, Texas, ("Santa Rosa/Donna"), and asserts title to or a security interest in any grain currently located at the Progreso facility that in the ordinary course of Debtor's business was relocated from Santa Rosa/Donna to the Progreso facility in preparation for its export and sale to Debtor's customers in Mexico. Vantage also asserts title to or a security interest in grain warehouse receipts associated with the grain inventory at Donna/Santa Rosa, along with any associated cash, accounts receivable, and other proceeds from the sale of the grain at such facilities. Vantage claims its collateral interest in such assets of the Debtor to secure the repayment of indebtedness represented by promissory notes executed by the Debtor having an estimated current outstanding balance of $8,789,064. In addition to its asserted ownership and security interest against the personal property of the Debtor, Vantage holds deeds of trust against real property of the Debtor known as the Pitts Property valued at an estimated $3,600,000; Santa Rosa/Donna having a combined estimated value of $2,750,000; and a claim against the Surety Bond at Santa Rosa/Donna $739,400 – altogether having an estimated total collateral value of $10.2 million.

  Thus, the Secured Claim of Vantage totals $7,089,400, and its Unsecured Deficiency Claim is approximately $1,699,664.

- Falcon International Bank ("Falcon") is owed notes totaling approximately $5,989,153 and holds a first lien deed of trust against the Progreso Elevator valued at an estimated $4,430,000 along with a first lien deed of trust against 1,460 acres of farmland known as the Moore Farms having an estimated value of $7,884,000 and a security interest in equipment having a value of an estimated $330,00.

  Thus, the Debtor believes the total collateral value to secure Falcon's debt is estimated at $12,644,000 leaving equity available of about $6,654,847.

- GrainChain, Inc. ("GrainChain") has total indebtedness according to its Proof of Claim filed in this case of $7,841,055. It asserts second lien deeds of trust against real property having equity after the lien of Falcon (Progreso Elevator & Moore Farms) of approximately $6,654,847 and first lien deeds of trust against the Baryta Industrial Tract, Emory Farms, and the Edcouch Elevator having estimated values totaling $2,754,711.

Thus, the Secured Claim of GrainChain totals $7,841,055 following the extinguishment of the Secured Claim of Falcon totaling $5,989,153 secured by the second liens against the equity in the Progreso facility and Moore Farms, as well as a first lien against the Edcouch facility, Baryta Industrial Tract, an Emory Farms.

The Plan contains a comprehensive settlement of the competing claims and interests held by the four major secured creditors against the Debtor's bankruptcy estate, the principals of the Debtor and their related entities, and the general unsecured creditors. Based upon this concept of settling all claims, the treatment of the claims of the Secured and Unsecured Creditors in the Plan is premised on the following:

> 1.) it is better to settle the competing claims of StoneX and Vantage relating to their respective interests in the proceeds from the sale of grain, surety bonds covering the grain at the grain facilities in which they hold warehouse receipts as evidence of entitlement to the grain than to engage in expensive and lengthy litigation;

> 2.) it is better to settle with GrainChain over the validity of their asserted liens against the various tracts of real property against which they hold deeds of trust signed by the Debtor less than a month before the Petition Date if GrainChain, the General Unsecured Creditors, and Harco can agree to share the net proceeds from the sale of the properties while allowing the Debtor and its grain facilities at Progreso and Edcouch to continue to operate under terms which provide for the sharing of the profits in the same percentage to which their respective claims bear to the total amount of unsecured claims against the Debtor;

> 3.) it is better to negotiate settlements with Unsecured Creditors who received payments from the Debtor within 90 days of the Petition Date than to pursue the preference claims through litigation in the Bankruptcy Court;

> 4.) it is better to reach an agreement to allow the principals of the Debtor to have time to orderly market and sell their assets and then to contribute the net proceeds to the Plan Trust than to litigate the various causes of action owned by the estate against them based upon fraudulent conveyances, breach of fiduciary duty, conversion of corporate opportunities, and other such derivative claims, and then attempt to attach and sell the assets after obtaining a judgment against them; and

> 5.) it is better to reach an agreement with the TDA and Harco relating to the payment of the surety bonds into the Plan Trust than to litigate the complex issues surrounding

the bond claims thereby depleting valuable resources of the estate funding the attorneys' fees and costs of the lawsuit.

**Settlement Terms with Secured and Unsecured Creditors:**

StoneX will release all its claims against the estate in exchange for the following consideration:

- Funds in the Grain Escrow Account        $3,517,371

- Surety Bond Proceeds        $2,397,850

- Collected Grain Receivables        $  812,184

- FCCI Claim for Grain Stock        $2,318,400

- Payment from Plan Agent        $3,500,000

  TOTAL CONSIDERATION:        $12,545,805.

Vantage will release all its claims against the estate in exchange for the following consideration:

| | |
|---|---|
| Pitts Property (1st Lien Deed of Trust) | $3,600,000.00 |
| Santa Rosa Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| Donna Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| **Subtotal** | **$6,300,000.00** |
| Assignment to the estate or its designee all Warehouse Receipts held as collateral and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,402,704 | $400,000.00 |
| Claim against the A/R in inventory and cash for the bean enterprise | $625,000.00 |
| **Subtotal** | **$1,025,000.00** |
| **TOTAL** | **$7,325,000.00** |

Vantage holds security interests against prepetition bean inventory, bean accounts receivable and proceeds from the sale of beans. By virtue of entry of an Order Granting Debtor's Emergency Motion for Authority to Obtain Post-Petition Financing, Payoff Certain Liens of Vantage Bank and Establish Procedures for Purchase of Edible beans [Docket #467] the Court approved the

conveyance, or modification of the automatic stay permitting foreclosure of the tracts of the real property listed in the chart above.  Additionally, due to the payment of $625,000 from the PACA Reserve and the bean enterprise operating account, Vantage will release its claims against the assets of the bean enterprise. The Debtor projects that the provision of financing for the purchase of additional inventories of black and pinto beans will result in net profits from the bean enterprise in the approximate sum of $800,000.  These funds then can be used to fund necessary expenditures by the Debtor in carrying out the provisions of this Plan.

Falcon will receive payment in full of its outstanding claim in the amount of approximately $6,000,000, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farm having an estimate value for purposes of the Plan of $7,000,000.  The payment of the indebtedness owed to Falcon will be consideration for Falcon releasing its Deeds of Trust against all other real property of the estate including but no limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust. For purposes of the Plan, the Debtor projects that the sale of Moore Farms will result in unencumbered net proceeds available to fund the Plan in the approximate sum of $500,000.

In order to compromise and settle the dispute between the Debtor and GrainChain relating to its asserted second liens against the Progreso Facility and Moore Farms, as well as its first liens against the Baryta Industrial Tract, Emory Farms and the Edcouch Facility, the Parties have reached an agreement to nullify the asserted liens of GrainChain against these assets.  In exchange for releasing its Deeds of Trust against these real property tracts, the Debtor has entered into an agreement whereby GrainChain, the Unsecured Creditors, and Harco Insurance will hold joint liens against the tracts with GrainChain being entitled to 45%, the General Unsecured Creditors entitled to 40% and Harco entitled to 15%.  Upon the sale of any of the tracts the net proceeds from the sale will be paid over to the Plan Agent and he will distribute the funds among these constituent groups in accordance with such percentages. These percentages, and the division of the net proceeds according to these ratios, will continue until such time as the claims of the constituent groups have been paid in full or all of the real property assets have been sold.

Further, the percentages held by the three constituent groups against the real property tracts will carry over and control the division of the net profits derived from the operations of the Edcouch and Progreso Facilities in accordance with the terms of the Operating Agreement put in place prior to the confirmation of the Plan.  GrainChain will be obligated to pay a minimum of $250,000 per year to the claims of General Unsecured Creditors.  In the event that the percentage of net profits due to be paid to the General Unsecured Creditors Class exceeds $250,000 the larger sum shall be paid over to the Class and paid pro-rata among the Creditors who have voluntarily chosen to be treated in such Class.  The payment of the net profits to the General Unsecured Creditors will be reduced as the claims are paid.  Such that for each percentage reduction the percentage of net profits to GrainChain will increase and the percentage paid to the General Unsecured Class will decrease.

Since Harco Insurance holds a contingent unliquidated claim that may not be determined by the Effective Date for the first three years the net profits shall be divided solely between GrainChain at the initial percentage of 45% and the General Unsecured Creditors receiving 55%.  The unsecured

claim of Harco is being subordinated due to the fact that they are a creditor who must fund the payment of the surety bonds to the creditors entitled to receive them under the provisions of this Plan. After the third year of the Plan Harco shall be entitled to receive 15% of the net profits to reduce its presumably liquidated claim until such time as the claim is extinguished from either the receipt of net proceeds realized from the sale of real property or its share of the net profits of the Debtor.

The net profits are understood to be derived from the combined operations relating to the purchase and sale of grain, edible beans, and sunflower seeds as well as any other revenue generating activities undertaken by the Debtor.

Farmers holding claims that may be entitled to distributions from the proceeds of the surety bonds may either choose to be paid solely by the bond receipts, or to participate and receive their pro-rata share of the percentages paid to General Unsecured Creditors on a pr-rata basis from the receipt of net proceeds from the sales of real estate or the net profits from the operations of the Debtor.

All grain claimants deemed eligible to participate in the distribution of the surety bond proceeds will be paid from the pool of funds to be distributed by the TDA. However, if these holders of grain claims choose distribution from the bond claims they will not have any preferences they received waived by the Debtor.  The Debtor projects that the holders of grain claims associated with the delivery of feed grains to the Progreso Facility will be paid approximately 12 cents on the dollar; the holders of grain claims associated with the delivery of feed grains to Santa Rosa/Donna will receive approximately 5 cents on the dollar; and the holders of grain claims making deliveries to feed grains to the Edcouch Facility will receive a projected 100 cents on the dollar.

The holders of grain claims who opt to participate in the pool of creditors treated in the General Unsecured Class will have all preference claims waived by the Debtor in exchange for their transfer and assignment of any rights they may have to assert claims and receive distributions from the proceeds of the surety bonds. The amount of their allowed general unsecured claim will then share pro-rata from all distributions made to the Debtor for the benefit of holders of General Unsecured Claims.

The Debtors project that over the five-year term of the Plan that holders of General Unsecured Claims will be paid in full. At the end of the Plan GrainChain will become the sole equity interest holder owing stock in the Debtor or its successor.

3.      **Status of the Administration of the Bankruptcy**

**Formation of Official Committee of Unsecured Creditors**

On March 9, 2023, the U.S. Trustee's Office appointed an Official Committee of Unsecured Creditors ("UCC") in this case. The members of the Committee are as follows:

| | |
|---|---|
| Thomas Walker, Jr.<br>Stony Ridge Foods, Inc.<br>715 Atlantic Ave.<br>Benson, MN 56215<br><br>Frank E. Russell<br>Russell Plantation II<br>28481 St. Hy 100<br>Los Fresnos, TX 78566<br><br>William E. Bailey<br>Frank Bailey Grain Company, Inc.<br>230 Montgomery St.<br>Fort Worth, TX 76107 | Thomas Zdansky<br>1467 Fm 498<br>Lyford, TX 78569<br><br>Johnny Guin<br>PO Box 1773<br>Weslaco, TX 78599<br><br>Karen Arnold<br>PO Box 595<br>Weslaco, TX 78599<br><br>Brian Jones<br>d/b/a Brian Jones Farms<br>PO Box 213<br>Edcouch, TX 78538 |

**Retention and Payments to Professionals**

<u>Employment of Mullin Hoard & Brown, L.L.P. as counsel for the Debtor</u>

On February 27, 2023, the Debtor filed its *Motion to Employ Mullin Hoard & Brown, L.L.P. as Counsel for the Debtor*. As set forth in the motion to employ, Mullin Hoard & Brown, L.L.P. received a retainer in the amount of $100,000.00 from Garcia Grain Trading Corp., prior to the filing of the Bankruptcy Case. Upon filing the Bankruptcy Case, MULLIN HOARD & BROWN, L.L.P. made a draw on the retainer of $38,866.50 to pay for legal fees and expenses that had been incurred prior to filing the petition in this case, leaving a balance in the retainer account of $61,133.50. On April 6, 2023, the Court entered an Order Granting the Motion to Employ Mullin Hoard & Brown, LLP. On August 28, 2023, counsel for the Debtor filed it First Motion for Compensation and First and Last Request for Draw Against Retainer seeking $564,500.50 in fees and reimbursement of expenses of $22,350.29 as well as a request for permission to draw against retainer funds totaling $61,133.50. The hearing on this fee application is set for September 20, 2023.

<u>Employment of D. Williams & Co., Inc. as accountants for the Debtor.</u>

On March 3, 2023, the Debtor filed its *Motion to Employ D. Williams & Co., Inc. as Accountants for the Debtor*. On April 6, 2023, the Court entered an Order Granting the Motion to Employ D. Williams & Co., Inc. The services of the accounting firm of D. Williams & Company included a forensic accounting investigation into the facts and circumstances that resulted in losses of grain or receipts from the grain which resulted in the Debtor's Bankruptcy and a determination as to what causes of action the Estate may have to recover the missing property of the Estate. transferred to insiders within a year prior to the Petition Date. On August 28, 2023, the accountants for the Debtor filed their First Motion for Compensation seeking $61,460.03 of fees. The hearing on this fee application is set for September 20, 2023.

<u>Employment of Jordan & Ortiz, P.C. as counsel for the UCC</u>

On March 17, 2023, the Committee filed its *Application of the Official Committee of Unsecured Creditors of Garcia Grain Trading Corp. to Retain and Employ Jordan & Ortiz, P.C. as Counsel.* On April 10, 2023, the Court entered an order authorizing the employment of Jordan & Ortiz, P.C. as counsel for the Committee. On September 14, 2023, counsel for the UCC filed a corrected fee application with the Court seeking fees totaling $285,353.75 and expenses of $523.48. The hearing on this fee application is set for September 20, 2023.

<u>Employment of Dundon Advisers, LLC as Financial Advisor for the UCC</u>

On April 5, 2023, the Committee filed their *Motion to Employ Dundon Advisers, LLC as Financial Advisor for Committee.* On April 28, 2023, the Court entered an order authorizing the employment of Dundon Advisers, LLC as Financial Advisor for the Committee. On August 30, 2023, Dundon filed an application requesting fees of $92,273, and expenses of $1,606.04. The hearing on this fee application is set for September 20, 2023.

<u>Employment of Sánchez Devanny as Counsel for Debtor to Collect Foreign Receivables</u>

To expedite the collection of the Accounts Receivable in Mexico, the Debtor obtained authority to initiate foreign collection procedures [Dkt #162], and obtained an Order [Dkt #270] authorizing the Debtor to employ the law firm of Sánchez-Devanny Eseverri, S.C. ("Sánchez Devanny"), a law firm based in Nuevo León, Mexico, as counsel for Granos Y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo") to institute foreign collection procedures pursuant to the provisions of 11 U.S.C. § 105. Since then, the Debtor has cooperated with Sánchez Devanny as its attorneys have undertaken efforts to analyze and address the collection of foreign receivables from customers of the Debtor in Mexico. Sánchez Devanny is in the process of preparing an application for compensation and reimbursement of expenses which is anticipated to request $8,000 in fees and $373 in expenses.

<u>Appointment of Chief Restructuring Officer:</u>

The Debtor engaged Richard S. Schmidt, pursuant to the Court's Agreed Order entered on August 15, 2023 [Dkt #429], serve as the Chief Restructuring Officer ("CRO" or "Schmidt") in the Debtor's Chapter 11 bankruptcy case. The compensation for the CRO has been established at $20,000 per month plus reasonable and necessary expenses, and these funds will come from the profits out of the sunflower enterprise whereby GrainChain has committed up to $250,000 to cover the administrative expenses.

<u>Employment of Kay Walker as Independent Counsel for the Chief Reorganization Officer</u>

The Debtor engaged Kay Walker as Independent Counsel for the CRO pursuant to the Court's Order entered on August 16, 2023 [Dkt. #431], and she was paid an initial retainer by the Debtor of $20,000. No fee application has been filed by Ms. Walker to the present date.

### 3.      Status of Reorganization Efforts Undertaken by the Debtor

Following a hearing conducted by the Bankruptcy Judge on July 7, 2023, to consider *Debtor's Amended Emergency Motion for (I) Interim Authority to Incur Post-Petition Indebtedness with GrainChain, Inc. Pursuant to 11 U.S.C. § 364(c)(1) Together with Final Authority to Grant Priority Pursuant to 11 U.S.C. § 364(c)(2),(3)*; *(II) Request to Approve Operating Agreement with GrainChain, Inc., and Elkins Grain, LLC*; *and (III) Request for Preliminary and Final Hearings* [Dkt. #352], the Court instructed the Debtor and its counsel that the Court required a fiduciary be named on behalf of the Debtor's Bankruptcy Case to whom he could look for accountability with respect to the reorganization and management of Garcia. The Bankruptcy Court denied final approval of the Operating Agreement pending the appointment of such a fiduciary and recommendations from such fiduciary concerning the advisability of the Debtor entering such a transaction.

On July 13, 2023, the Court entered its Order granting the Debtor interim authority on an emergency basis to incur indebtedness with GrainChain, Inc. ("GrainChain") not to exceed $1,280,281.00 secured with a super priority administrative claim under 11 U.S.C. § 364(c)(1), as reflected in the Promissory Note attached to such Order, and bearing interest at an annual interest rate of 3 points over the prime interest rate as published by the *Wall Street Journal*, and if not paid before, maturing and becoming fully payable on February 29, 2024. This Order allowed the Debtor to secure financing from GrainChain to put in place a bond with TDA in favor of Elkins Grain and by the premiums for insurance covering the Debtor's Progreso and Edcouch grain facilities, along with the grain stocks stored there, and liability and workmen's compensation insurance as well.  This Order [Dkt. #373] allowed the Debtor to begin operations at Progreso and Edcouch by leasing such facilities to Elkins Grain and allowing Elkins to manage the purchase and sale of feed grains.

In response to the Bankruptcy Judge's instructions with respect to the appointment of a responsible fiduciary for the Bankruptcy Case, on July 11, 2023, the Debtor filed its *Ex Parte Emergency Motion for Authority to Engage the Honorable Richard S. Schmidt as Mediator for the Debtor* [Dkt. #366].

Following the entry of an Order appointing the mediator, the Debtor along with representatives of the major secured creditors, the UCC and its counsel and financial advisor, as well as counsel for the Debtor, the owners of Garcia and their individual counsel, attorneys from the Texas Attorney General's Office, and counsel for Harco National Insurance Co. met in Austin, Texas, to participate in negotiations toward agreements that would allow the filing of a confirmable Plan of Reorganization.

As a result of the progress made during the mediation, the Debtor along with the creditors came up with a Term Sheet which sets forth the basic terms of a Plan of Reorganization which could be further refined, drafted into written form, and submitted to the Court by the Court's established deadline.

To facilitate all these tasks, on August 2, 2023, the Debtor requested appointment of a Chief Restructuring Officer ("CRO") [Dkt #393] to administer the case and to propose a confirmable Plan.

An Agreed Order appointing Richard S. Schmidt as the CRO was entered on August 15, 2023 [Dkt #429].

The Plan of Reorganization and Disclosure Statement as reflected in this document is the result of hours of discussions with counsel representing the major secured creditors in the case, the UCC and its counsel, and attorneys representing the major suppliers of edible beans, as well as the attorneys representing the TDA and Harco National Insurance Co. which is the company that issued the surety bonds connected with the pre-petition licenses for Progreso, Santa Rosa/Donna, and Edcouch.

### 4.         Estimated Value of Current Assets and Liabilities

The estimated current value of the Debtor's major assets along with a listing of its liabilities is set forth in summary form in the charts below.

| ASSETS (As of July 31, 2023) | | |
|---|---|---|
| **Category** | **Description** | | **Estimated Value** |
| **PERSONAL PROPERTY** | | | |
| Cash and Cash Equivalents | Cash on hand | | $2,800.00 |
| | Checking, savings, money market, or financial brokerage accounts | Wells Fargo – Gen. Operating | $16,365.09 |
| | | Wells Fargo – Grain Escrow | $3,517,611.77 |
| | | Wells Fargo – Edcouch repair | $868.83 |
| | | Wells Fargo – Progreso repair | $7,801.49 |
| | | Wells Fargo – Sunflower | $11,951.01 |
| | | Wells Fargo – Bean | $258,419.22 |
| | | Wells Fargo – PACA Reserve | $408.327.38 |
| | | Wells Fargo -- Investment for Progreso Rehab. | $3,425,766.34 |
| **Category Subtotal** | | | **$7,649,911.13** |
| Accounts Receivable | Grain & Sunflower a/r | | $1,049,895.90 |
| | Bean a/r | | $218,459.92 |
| | Accounts receivable – Petition Date | | $2,140,698.79 |
| **Category Subtotal** | | | **$3,409,054.61** |

| | | |
|---|---|---|
| Surety Bonds | Hargo National Insurance Company (Surety Bonds for grain in storage for benefits of TDA ) | $2,155,650.00 |
| **Category Subtotal** | | **$2,155,650.00** |
| Inventory, Excluding Agricultural Assets | Work in progress: In and out service of yellow peas | $20,000.00 |
| | Inventory of pinto and black beans, | $584,236.65 |
| | Grain at Progreso Elevator (Salvage Claim) | $2,318,400.00 |
| | Soybean seed | $284,000.00 |
| **Category Subtotal** | | **$3,206,636.65** |
| Office Furniture, Fixtures, and Equipment and Collectibles | See Dkt #50, Exhibit B50 | $38,360.00 |
| **Category Subtotal** | | **$38,360.00** |
| Machinery, Equipment, and Vehicles | 2017 Ford 250 VIN#1FT7W2BT3HEE56508 | $48,999.72 |
| | 2020 Ford F159 VIN#1FTEWVV1E59LFB68462 | $29,200.00 |
| | Other – miscellaneous located at Progreso, Edcouch, Santa Rosa/Donna | $444,600.00 |
| **Category Subtotal** | | **$522,799.72** |
| **TOTAL PERSONAL PROPERTY** | | **$16,982,412.11** |

| REAL PROPERTY | | |
|---|---|---|
| Real Property | Santa Rosa Elevator (22056 Bass Blvd, Harlingen, Texas); Adams Gardens Subdivisions B&C PT Blk 281 and 503 | $2,000,000.00 |
| | Progreso Elevator (1/8 Mile N. Int'l Bridge 1015 | $4,430,000.00 |
| | Edcouch Elevator (624 W. Missouri Edcouch, Texas 78538) | $1,334,435.00 |
| | Pitts Property Corporate Office & Val Verde Elevator (101 N. Val | $2,410,000.00 |

| | | |
|---|---|---|
| | Verde Rd, Donna, Texas 78537) | |
| | Willacy Property (25 acres) | $75,000.00 |
| | McCook Property (subject to contract of sale) (FM 490 1/2 Mile East of FM 681) | $22,670.00 |
| | Donna Elevator (101 N. Val Verde) | $1,500,000.00 |
| **Category Subtotal** | | **$11,772,105.00** |
| **TOTAL REAL PROPERTY** | | **$11,772,105.00** |
| All Other Assets | Notes Receivable from Val Verde Grain Holding LC ($614,603.00) | $0 |
| | Note Receivable from PSG Products ($3,453,493.00) | $0 |
| | Note Receivable from Mission Crane, LLC ($28,000.00) | $0 |
| | Insurance Claim (Edcouch Elevator) FCCI Insurance Co. | $0 |
| **Category Subtotal** | | **-0-** |
| **TOTAL OF REAL AND PERSONAL PROPERTY** | | **$28,439,242.28** |
| | | |
| **LIABILITIES (As of July 31,2023)** | | |

**Secured Creditors and Their Collateral:**

| Name of Creditor | Description of Asset/Collateral | Liquidation Value of Collateral/Source of Estimated Value | Amount of Secured Claim | Amount of Equity /(Deficiency) |
|---|---|---|---|---|
| StoneX | Ownership or security interest in warehouse receipts for grain in Progreso, along with any associated accounts receivable, bond claims, or insurance claims associated with such grain | Grain Escrow Acct.: $3,571,371<br><br>Surety Bond for Progreso: $1,009,750<br><br>Accounts receivable: $812,184<br><br>FCCI Claim for grain stock: $2,318,400 (Estimated for 240,000 bushels @ $9.66)<br><br>**TOTAL: $7,711,705.00** | Claim: $19,461,058.00<br><br><br><br><br><br>**TOTAL: $19,461,058** | ($11,749,353) |
| Falcon Bank | 1st lien deeds of trust against real estate consisting of Progresso Elevator and Moore Farm (1,460 acres) | Progreso Elevator: $4,430,000<br><br>Security interest in equipment valued at $330,000<br><br>Moore Farm: $7,000,000<br>**TOTAL: $11,760,000** | Claim: $5,989,153<br><br><br><br>**TOTAL: $5,989,153** | $5,770,847 |

| | | | | |
|---|---|---|---|---|
| Vantage Bank | 1st lien deeds of trust against real estate consisting of Pitts Property, 101 N. Val Verde Donna), and Santa Rosa elevator, and security interest in warehouse receipts for grain in Santa Rosa, along with inventory, accounts receivable, and cash of bean enterprise | Surety Bond for Donna/Santa Rosa (TXIFSU 0570548): $739,200.00<br><br>Pitts Property: $2,410,000<br><br>Santa Rosa Elevator: $2,200,000<br><br>101 N. Val Verde (Donna) [Titled in Val Verde Holdings]: $1,500,000<br><br>Inventory, A/R, and Cash of Bean Enterprise = $1,000,000<br><br>**TOTAL: $7,849,200** | Claim: $8,789,064<br><br><br><br><br><br><br><br><br><br><br><br>**TOTAL: $8,789,064** | ($939,864) |
| Grain Chain, LLC | 2nd lien against Progreso Elevator and Moore Farms;<br><br>1st lien deeds of trust against real estate consisting of Emory Farms (56 acres) [Titled in PSG Products], and Baryta Industrial [Titled in Octavio Garcia] and | Equity in Progreso Elevator and Moore Farms: $5,770,847<br><br>Emory Farms: $770,000<br><br>Baryta industrial tract: $650,276<br><br>Edcouch Elevator: $1,334,435 | Claim: $7,841,055<br><br><br><br><br><br>**TOTAL: $7,841,055** | $684,503 |

| | Edcouch Elevator facilities | TOTAL: $8,525,558 | | |
|---|---|---|---|---|
| **EQUITY AFTER SECURED CLAIMS** | | | | **$684,503** |

| UNSECURED CLAIMS | | | | |
|---|---|---|---|---|
| **General Unsecured** | | **Priority** | **Non-Priority** | |
| American Bean, LLC | $184,000.00 | | $184,000.00 | |
| American Express | $4,617.90 | | $4,617.90 | |
| Amex Trs. Co., Inc. | $8,524.35 | | $8,524.35 | |
| Brian Jones Farms | $76,916.82 | $7,475.00 | $69,441.82 | |
| Cargill | $44,422.90 | | $44,422.90 | |
| Carl Hensz | $97,748.78 | $7,475.00 | $90,273.78 | |
| Chad Szutz | $58,495.56 | $7,475.00 | $51,020.56 | |
| Dreibelbis Farms | $290,691.70 | $7,475.00 | $283,216.70 | |
| East Fresh Farms | $65,769.41 | $7,475.00 | $58,294.41 | |
| Fike Farms | $353,230.88 | $7,475.00 | $345,755.88 | |
| Frank Bailey Grain Co. | $653,585.11 | | $653,585.11 | |
| Graneros Guadalupe SA | $506,334.56 | | $506,334.56 | |
| HAR-VEST | $182,214.60 | $7,475.00 | $174,739.60 | |
| Helena Enterprises, LLC | $518,134.08 | | $518,134.08 | |
| Internal Revenue Service | $190,597.64 | | $190,597.64 | |
| Johnny Guin | $117,560.65 | $7,475.00 | $110,085.65 | |

| | | | | |
|---|---|---|---|---|
| Karen Arnold | $107,332.39 | $7,475.00 | $99,857.39 | |
| Lothringer Family Farms | $70,618.69 | $7,475.00 | $63,143.69 | |
| Planter's Grain Coop | $255,696.00 | | $255,696.00 | |
| Robert Walsdorf | $8,018.76 | $7,475.00 | $543.76 | |
| Russell Plantation II | $668,169.85 | $7,475.00 | $660,694.85 | |
| Simplot A.B. Retail | $217,537.13 | | $217,537.13 | |
| Skalitsky Farms | $149,842.47 | $7,475.00 | $142,367.47 | |
| Sorghum Checkoff Program | $301,795.30 | | $301,795.30 | |
| Stony Ridge Food, Inc. | $1,439,027.75 | | $1,439,027.75 | |
| ValleyCoop Oil Mill | $115,201.99 | | $115,201.99 | |
| Wesley Valerius | $119,444.52 | $7,475.00 | $111,969.52 | |
| Zdansky, J.V. | $346,739.93 | $7,475.00 | $339,264.93 | |
| **TOTAL GENERAL UNSECURED** | **$7,152,269.72** | **$112,125.00** | **$7,040,144.72** | |
| | | | | |

**Administrative Claims:**

| | |
|---|---|
| **Administrative Expenses** | $1,500,000 |
| **Priority Claims pursuant to 11 U.S.C. Section 507(a)(6)(A)** | $   112,125 |
| **Priority Claim of the IRS** | $   571,705 |
| **Priority Claim of the Texas Comptroller** | $      5,676 |
| **Priority Claims of Local Taxing Authorities** | $   138,537 |

**Total Estimated Priority Claims:**                    **$2,328,045**

| Summary of General Unsecured Claims: | |
|---|---|
| StoneX (Deficiency Claim) | $11,749,383 |
| Vantage Bank (Deficiency Claim) | $    939,684 |
| Unsecured Claim of the IRS (Penalties) | $    190,598 |
| Unsecured Claims (Outstanding Grain Payables) | $ 3,254,255 |
| Unsecured Claims (Outstanding Bean Payables) | $ 1,504,489 |
| Unsecured Claims (Outstanding General Payables) | $ 1,977,193 |
| Harco Insurance Co. (Outstanding Bond Claim) | $ 1,748,950 |
| **Total General Unsecured Claims:** | **$21,364,552** |

Insider Suit to Recover the Alamo Grain Elevator and Other Assets:

The Debtor will continue to prosecute and pursue to judgment the recovery of the assets transferred to Rodolfo Plascencia, Sr. and WNGU Properties, LLC as is now joined in Adversary Proceeding No. 23-7002, styled Garcia Grain Trading Corporation vs. Rodolfo Plascencia, Sr. and WNGU Properties, LLC, pending before the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division (the "Alamo Adversary"). The Alamo Adversary will be transferred to the Plan Trust and be administered by the Plan Agent.

In addition, all other causes of action owned by the estate against insiders or third parties will be transferred to the Plan Trust and administered by the Plan Agent. These claims would include any lawsuits relating to the collection of pre-petition accounts receivable as well as any preference, turnover actions, fraudulent conveyances or other rights belonging to a Debtor in Possession in the bankruptcy cases.

Plan Contributions:

Certain tracts of real property held in the name of PSG Products, LLC, Garcia Balli, Ltd., and Val Verde Grain Holdings, LLC, as well as in the name of Octavio Garcia, as more specifically described herein and in the plan of reorganization, will be marketed and liquidated by Octavio Garcia so that the net proceeds from the sales of these assets which shall not be less than $3,500,000 shall be paid over to the CRO and used to pay creditors of the Debtor's bankruptcy estate as is provided in this Plan.

All funds paid into the bankruptcy estate or constituting property of the estate, including any funds from the business interruption claim connected with the damage to the Progreso facility, and any funds recovered by the Debtor in any pending or contemplated litigation brought by the Debtor under the provisions of the Bankruptcy Code.

The sum of $350,000 to be funded by GrainChain as provided in the Operating Agreement between the Debtor, Elkins Grain Company, and GrainChain for the payment of administrative fees and expenses of Garcia.

Implementation of Restructuring:

On the day following the Effective Date, Garcia as reorganized pursuant to the provisions of the Plan shall emerge as a Texas corporation ("Reorganized Debtor").

Plan Trust:

A post-confirmation trust (the "Plan Trust") will be established to carry out the implementation of the Plan and administration of claims as provided herein.  The Plan Contribution and the Alamo Adversary shall be transferred to the Plan Trust on the Effective Date.  The Plan Agent (as defined below) shall be the trustee of the Plan Trust. The beneficiaries of the Plan Trust shall be the general unsecured creditors of the Debtor as more specifically defined in the plan of reorganization. The Plan Agent is authorized to engage counsel and other professionals as is reasonably necessary to administer the Plan Trust without further Bankruptcy Court order or approval.  The Plan Agent will charge an hourly fee as provided in the Plan for the work involved in administering the Plan Trust.  The Plan Agent's fees and expenses related to the administration of the Plan Trust, including the fees and expenses of all professionals engaged by the Plan Agent shall be paid from the assets of the Trust, along with any unpaid administrative expenses of the Debtor approved by the Court shall be paid prior to disbursement to the Plan beneficiaries.

Plan Agent:

Upon confirmation of the plan of reorganization the CRO shall become the Plan Agent (the "Plan Agent"), and shall administer the Plan Trust in accordance with the terms and provisions of the trust agreement as described and set forth in the Plan.

Residual of Reserve Account From Sale of Assets:

The balance of the Plan Contribution, if any, existing after payment in full of all allowed claims as provided in the Plan, shall be returned to the Plan Sponsors.

Governing Law:

Reorganized Debtor will be maintained as a Texas corporation organized under Texas law.

Debtor's Equity:

As of the Effective Date, all of the existing equity in the Debtor will be transferred and assigned to the Plan Trust.

Plan Provisions for Releases and Injunction:

On the Effective Date, and except as otherwise provided herein, the Debtor, on behalf of itself and its bankruptcy estate, shall release, acquit, and forever discharge the Plan Sponsors, the CRO and GrainChain, and each of their respective directors, officers, representatives, agents and attorneys, from any and all claims, counterclaims, demands, controversies, costs, contracts, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, actions, and causes of action of any nature, type or description, whether at law or equity, by common law or statute, in contract, for, or otherwise, known or unknown, asserted or unasserted, or suspected or unsuspected that have or could have been asserted in connection with the Debtor's bankruptcy case.

Conditions to Confirmation:

The Plan Contribution necessary to fund distributions under the Plan on the Effective Date as provided herein shall be not less than $6,500,000.

## ARTICLE III
## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### A.     Class 1 – Administrative Claims (Unimpaired)

**Class 1** shall consist of the Administrative Claims entitled to priority under Section 507(a)(1) through (7) of the Bankruptcy Code, including the fees for services rendered and expenses incurred by the court-appointed counsel and other professionals for the Debtor through the Effective Date.

| Class 1 - Administrative Claims | | |
|---|---|---|
| **Name of Claim Holder** | **Description** | **Estimated Amount** |
| Mullin Hoard & Brown, LLP | Counsel for Debtor | $850,000 |
| D. Williams & Co. | Accountants for Debtor | $120,000 |
| Jordan & Ortiz, P.C. | Counsel for UCC | $450,000 |
| Dundon Advisors, LLC | Financial Advisor for UCC | $150,000 |
| Sánchez-Devanny Eseverri, S.C. | Special Counsel for Debtor | $20,000 |
| Richard Schmidt | CRO | $250,000 |
| Kay Walker | Counsel for CRO | $50,000 |
| **TOTAL** | | **$1,890,000.00** |

The Plan provides that holders of Class 1 claims shall be treated in the following manner: On or before the Effective Date, allowed administrative expense claims, including any unpaid fees and expenses of the CRO, counsel, financial advisors, and accountants for the Debtor and the Committee, and allowed priority tax claims shall be paid in full from the Plan Contribution. Reorganized Debtor shall pay allowed administrative expense claims that come due after the Effective Date in the ordinary course of business as they come due. All fees for services rendered and expenses incurred after the Effective Date by court-appointed counsel and other professionals for Debtor shall be paid by the Debtor in the ordinary course of their business without the necessity

of filing fee applications or seeking approval or allowance of the Bankruptcy Court.

Additionally, if there are any pre-confirmation U.S. Trustee quarterly fees, these will be paid upon Confirmation of the Plan. Further, any post confirmation fees pursuant to 28 U.S.C. § 1930(a)(6) will be paid in the Debtor's ordinary course of business as these fees arise. After confirmation, the Debtor shall file with the Court and serve on the United States Trustee a monthly financial report for each month (or portion thereof) the case remains open in a format prescribed by the U.S. Trustee and provided to the Debtor by the U.S. Trustee. All U.S. Trustee Fees will cease upon the closing of the case by the court.

### B.    Class 2 – Priority Unsecured Claims (Unimpaired)

**Class 2** shall consist of the unpaid pre-petition claims of the taxing authorities owed by the Debtor as to Ad Valorem taxes, income taxes and sales taxes, which are allowed pursuant to Section 507(a)(8) of the Bankruptcy Code. A total amount of taxes due shall be determined by the filed Proof of Claim filed by the taxing entities prior to the date set by the Bankruptcy Court for filing proofs of claim. However, the Debtor believes that the total amount outstanding in Class 2 for pre-petition Ad Valorem taxes due Cameron County and for Hidalgo County to be less than the amounts reflected in the filed Proofs of Claim of these taxing authorities. Thus, the Debtor will either clarify the amount owing these counties through negotiations or, if necessary, file an objection to the Proofs of Claim and allow the Court to determine the exact amount owed by the Debtor.

| Class 2 – Priority Unsecured Claims | |
|---|---:|
| 1. IRS Asserted Priority Claim | $571,705.00 |
| 2. Ad Valorem Tax Claims | $138,537.00 |
| 3. Texas Comptroller of Public Accounts | $5,675.00 |
| 4. Grain Priority – Section 507(a)(6) | $112,125.00 |
| **TOTAL:** | **$828,042.00** |

On or before the Effective Date, the allowed priority tax claims shall be paid in full from the Plan Contribution. Reorganized Debtor shall pay allowed administrative expense claims that come due after the Effective Date in the ordinary course of business as they come due.

Treatment of Secured Tax Claims of Ad Valorem Taxing Authorities:

The allowed secured claims of ad valorem taxing authorities shall bear interest at the statutory rate (12% per annum) and shall be paid in full from the proceeds of any sales of estate assets, if not paid in full from the proceeds of the sale, then by the Debtor upon or before the Effective Date of the plan by Reorganized Debtor. Taxing authorities shall retain their statutory liens until their allowed claims are paid in full.

Treatment of Claim of State Comptroller:

Any unpaid claims of the Texas State Comptroller will be paid in full on the Effective Date of the Plan of Reorganization.

Treatment of Tax Claims of the Internal Revenue Service:

After the Debtor has analyzed any asserted tax claims of the IRS and filed any appropriate amended IRS returns of the Debtor the allowed priority claims of the IRS shall bear interest at the applicable statutory rate and shall be paid in 60 monthly installments by the Reorganized Debtor. Reorganized Debtor is permitted to pre-pay the allowed priority tax claims are paid in full at any time at its sole discretion.

## SECURED CLAIMS

Secured Claims under the proposed Plan consist of Classes 3 through 6 described below.

**C.     Class 3 – Secured Claim of StoneX Commodity Solutions, LLC f/k/a FCStone Merchant Services, LLC ("StoneX") (Impaired)**

**Class 3** consists of the Secured Claim of StoneX Commodity Solutions, LLC f/k/a FCStone Merchant Services, LLC ("StoneX") in the approximate amount of $19,461,058.0 (POC #37 filed on 6/13/2023). StoneX has a claim represented by negotiable warehouse receipts and it asserts ownership interests or security interests in the following collateral:

- Pre-Petition Accounts Receivable ("A/R") derived from the sale of the grain in the approximate sum of $1,929,160.00 of which the estimated sum of **$812,184.01** is collectible.

- Funds in the Grain Escrow Account in the amount of **$3,517,371.00**.

- Surety Bond in the amount of **$1,009,750.** This amount consists of the surety bond covering the Progreso Elevator (Progreso Elevator refers to the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas) in the amount of $1,009,750.

- FCCI Check for the stock insurance claim for salvaged corn from out of the corn damaged in the April 2023 windstorm in the amount of **$2,318,400.00** (i.e., ~240,000 bushels at $9.66 per bushel per Impulsora Contract).

Total value of these collateral in which StoneX has a security interest is **$7,711,705.01**.

| StoneX's Security Interest in the Collateral | Value |
|---|---|
| Pre-Petition Accounts Receivable ("A/R") derived from the sale of the grain | $812,184.01 |
| Funds in Grain Escrow Account | $3,571,371.00 |

| | |
|---|---|
| Surety Bond for Progreso (TXIFSU 0570549) for $1,009,750 | $1,009,750.00 |
| FCCI Check for the stock insurance claim for salvaged corn | $2,318,400.00 |
| **Subtotal (StoneX's security interest)** | **$7,711,705.01** |

The source of payment for this claim is as follows:

Octavio Garcia, the principal of the Debtor, has assets with an estimated value of $4,086,000.00, which consists of three rental houses (Garcia Balli, LLC) approximately worth $370,000.00; the Fort Stockton land (4.6 acres) worth approximately $14,000.00; equity in Rincon Ranch [i.e., 1,882 acres of ranch land located in Starr County, Texas, known as Rincon Ranch] and Duke Energy Wind Lease royalties in the approximate amount of $2,795,600.00 [consisting of Toluca Ranch with the $1,500,000 estimated value less Vantage secured position ($450,000.00), i.e., $1,050,000.00, plus Rincon Ranch ($850,000.00 in IOLTA account + $1,000,000.00 Note), i.e., $1,800,000.00), total about $2.8 million]; equity in Moore South, SPI Condo, & Huffman in the approximate amount of $866,000.00. The estimated value of the unencumbered assets of Octavio Garcia consisting of equity in those assets is around **$3,036,000.00.**

There are claims against Octavio Garcia for personal guarantees on Notes; however, these claims are only worth as much as the amount that can realistically be collected. Moreover, if the Estate owns these causes of action, the amount recovered from Octavio Garcia's unencumbered assets would be shared with all of the creditors, not just StoneX. Instead, the parties will enter into a Compromise and Settlement Agreement to resolve these claims, as allowed under the Bankruptcy Code for Chapter 11 proceedings.

| Source of Payment to StoneX | Amount |
|---|---|
| StoneX's Security Interest | $7,711,705.01 |
| Payment from Plan Agent | $3,500.000.00 |
| **TOTAL** | **$11,211,705.01** |

If Octavio Garcia contributes around $3.5 million from his unencumbered assets, the amount that can be paid to StoneX will be around **$11,211,705.01** (including StoneX's security interest in the amount of $7,711,705.01).

**Treatment:**

The approximate amount of StoneX's distribution from the Debtor's estate in exchange for StoneX's release all its claims against the estate is estimated at **$12,545,005.00** which is summarized in as follows:

Funds in the Grain Escrow Account          $3,517,371.00

| | |
|---|---|
| Surety Bond Proceeds | $2,397,050.00 |
| Collected Grain Receivables | $812,184.00 |
| FCCI Claim for Grain Stock | $2,318,400.00 |
| Payment from Plan Agent | $3,500,000.00 |
| TOTAL CONSIDERATION: | **$12,545,005.00** |

In accordance with the Compromise and Settlement Agreement reached between StoneX and the Debtor, the parties have agreed to resolve all of the claims of StoneX and release the Debtor and all related parties in exchange for **payment of $12,545,005.00 to StoneX.**

Specifically, the partially secured claim of StoneX and its unsecured claim shall be treated as follows:

a.  $12,545,005.00 ("StoneX Payment") to be paid pursuant to an agreed upon Chapter 11 Plan;

b.  A minimum of $7,000,000 of the StoneX Payment will be paid no later than confirmation of the Chapter 11 Plan;

c.  The minimum initial payment will include the then current balance of the Grain Escrow Account and a $3.5MM cash payment paid into the bankruptcy estate from Octavio Garcia and then paid out to StoneX;

d.  After payment of $7,000,000.00, the remaining $5,545,005.00 will be paid from the Surety Bond Proceeds; Collected Grain Receivables; FCCI Claim for Grain Stock; and Accounts Receivable;

e.  The remaining $5,545,005.00 will be guaranteed by Octavio Garcia to cover any shortfalls in the sources of cash identified above; the guaranty will be executed upon plan approval and will be without any defense known or unknown, specifically including any defenses raised in the pending District Court Guaranty litigation being pursued by StoneX;

f.  Until such time as the $3.5MM cash is paid by Octavio Garcia (through Plan Agent), the current District Court litigation will continue to proceed pursuant to the current Case Management Order;

g.  The parties will agree upon provisions to include in the Chapter 11 Plan to mitigate and account for the risk of Octavio's either filing or being involuntarily placed into bankruptcy within 90 days of making the $3.5MM payment; and

h.  Upon the payment of $12,545,005.00, StoneX claims will be considered fully paid and extinguished and it shall not be entitled to assert any unsecured deficiency claims against the bankruptcy estate.

### D.      Class 4 – Secured Claim of Vantage Bank Texas (Impaired)

**Class 4** consists of the Secured Claim of Vantage Bank Texas ("Vantage Bank") who filed a Proof of Claim (POC #41) in the amount of $8,789,063.88 on June 16, 2023 for loan of monies.

Vantage Bank's claim is secured by 1st Lien Deed of Trust against the Santa Rosa Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 22056 Bass Boulevard in Harlingen, Texas) which the Debtor believes has an approximate value of **$1,350,000.00;** a 1st Lien Deed of Trust against the Donna Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 101 North Val Verde Rd. Donna, Texas) which the Debtor believes has an approximate value of **$1,350,000.00;** and a 1st Lien Deed of Trust against the Pitts Property (i.e., the real property owned by the Debtor with the municipal address of 1919 Mile 3 ½ Road, Donna, Texas, i.e., corporate office and the Val Verde Elevator) which the Debtor believes has an approximate value of **$3,600,000.00**.

Vantage Bank has an outstanding loan in the amount of approximately $450,000 (plus interest) which his secured by a Deed of Trust against a 170-acre tract of land known as "Toluca Ranch" (the real property at the municipal address of Country Rd 793 & 1702 TX Hidalgo County, Texas) owned by Garcia Balli, Ltd. having an estimated value of $1,700,000.00; however, such indebtedness is not cross-collateralized with the debt and assets of the Debtor.

Vantage Bank also has a claim for the warehouse receipts to grain in the Donna/Santa Rosa Facility (Donna Elevator refers to the grain elevator facility owned by the Debtor located at 101 North Val Verde Rd. Donna, Texas and the Santa Rosa Elevator refers to the grain elevator facility owned by the Debtor located at the municipal address of 22056 Bass Boulevard in Harlingen, Texas) which has a bond (TXIFSU 0570548) in the amount of **$739,200.00.**

In addition, Vantage Bank has claim against the A/R in the inventory and cash for the bean enterprise, the Debtor estimates that Vantage Bank will be entitled to an additional amount of about $1,000,000.00. Per Compromise and Settlement agreement between the parties, the Debtor offered and Vantage Bank agreed to accept **$625,000.00** instead of $1,000,000.00 for its interest in the bean enterprise.

Thus, Vantage Bank's total collateral can be summarized as follows:

| Vantage Bank's Security Interest in the Collateral | Value |
|---|---|
| Pitts Property (1st Lien Deed of Trust) | $3,600,000.00 |
| Santa Rosa Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| Donna Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| **Subtotal** | **$6,300,000.00** |
| Assignment to the estate or its designee all Warehouse Receipts held as collateral and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,402,704 | $400,000.00 |
| Claim against the A/R in inventory and cash for the bean enterprise | $625,000.00 |

| Subtotal | $1,025,000.00 |
|---|---|
| TOTAL | $7,325,000.00 |

Therefore, the total payment to Vantage Bank is estimated to be **$6,300,000.00** (total value of its collateral) plus $1,025,000.00 which will be **$7,325,000.00**.

Therefore, Vantage Bank's estimated take-out amount will be **$7,325,000.00**.

**Treatment:**

The partially secured claim of Vantage and its unsecured claim shall be treated as follows:

a. **Loan #54613 [Garcia Grain Trading Corporation]** – At Vantage Bank Texas' (at times may be referred to as "Bank" or "Lender") election, the Debtor will deed and assign the Pitts Farmland including any and all rights that may include but are not limited to water and mineral rights and agreements associated with the Pitts Farmland (collectively the "Pitts Farmland Collateral"), to the Bank pursuant to a bankruptcy court order  deeding and assigning the Pitts Farmland Collateral to the Bank (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit the Bank to proceed with foreclosure (deed and assignment to Bank by court order or foreclosure by Bank of Pitts Farmland Collateral shall collectively be referred to as the "Pitts Farmland Collateral Bank Sale"). Prior to the Pitts Farmland Collateral Bank Sale, the Pitts Farmland Collateral may be sold to a third party for a sales price agreed upon by the Bank in writing. The sale of the Pitts Farmland Collateral will be subject to any Lender regulatory requirements including but not limited to such requirements of the Office of Foreign Assets Control (also referred to as "OFAC"). For clarification, prior to Pitts Farmland Collateral Bank Sale, the Pitts Farmland Collateral will not be sold nor a contract for sale be entered into with a third party ("Proposed Buyer") without prior written approval from the Bank which shall be contingent upon an OFAC search of all beneficial owners of the Proposed Buyer and/or its assigns (collectively, "Beneficial Owners") acceptable to the Bank. The Proposed Buyer and its Beneficial Owners will be required to provide any information needed by the Lender to conduct such OFAC search.  The sale of the Pitts Farmland Collateral to any 3rd party approved by the Bank will be free and clear of all liens and the Bank shall be entitled to all net proceeds after payment of standard closing costs. It is further understood that the Bank shall have the right to review and approve the closing settlement statement including all settlement or closing costs, proration of expenses and withholdings from sale proceeds upon any sale of the Pitts Farmland Collateral. Any and all income, including but not limited to rental income, due and/or received for the Pitts Farmland Collateral prior to the sale to a 3rd party approved by the Bank or the Pitts Farmland Collateral Bank Sale shall be paid to Bank. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Pitts Farmland Collateral will be the responsibility of and borne by the Debtor and Bank is released from any and all liability as to

such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Pitts Farmland Collateral may produce net proceeds to be paid to the Bank on its claim owed by Debtor in the approximate amount of $3,600,000.00.

b. **Loan #112382 & #112390 [Garcia Grain Trading Corporation]** – At Bank's election, the Debtor will deed and assign the Santa Rosa Grain Facility, including any and all rights that may include but are not limited to water and mineral rights, and agreements associated with the Santa Rosa Grain Facility (collectively, the "Santa Rosa Collateral"), composed of Tract 1 and Tract 2 as described in the deeds securing the loans of Debtor to the Bank pursuant to a bankruptcy court order deeding and assigning the Santa Rosa Collateral to the Bank (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit the Bank to proceed with foreclosure (deed and assignment to Bank by court order or foreclosure by Bank of Santa Rosa Collateral shall collectively be referred to as the "Santa Rosa Collateral Bank Sale"). Prior to the Santa Rosa Collateral Bank Sale, the Santa Rosa Collateral may be sold to a third party for a sales price agreed upon by the Bank in writing. The sale of the Santa Rosa Collateral will be subject to any Lender regulatory requirements including but not limited to such requirements of the Office of Foreign Assets Control (also referred to as "OFAC"). For clarification, prior to the Santa Rosa Collateral Bank Sale, the Santa Rosa Collateral will not be sold nor a contract for sale be entered into with a third party ("Proposed Buyer") without prior written approval from the Bank which shall be contingent upon an OFAC search of all beneficial owners of the Proposed Buyer and/or its assigns (collectively, "Beneficial Owners") acceptable to the Bank. The Proposed Buyer and its Beneficial Owners will be required to provide any information needed by the Lender to conduct such an OFAC search. The sale of the Santa Rosa Collateral to any 3rd party approved by the Bank will be free and clear of all liens and the Bank shall be entitled to all net proceeds after payment of standard closing costs. It is further understood that the Bank shall have the right to review and approve the closing settlement statement to include but not limited to all settlement or closing costs, proration of expenses, and withholdings from sale proceeds upon any sale of the Santa Rosa Collateral. It is specifically understood by Debtor that no contract for the sale of the Santa Rosa Collateral will be entered into until all impediments to the sale of the Santa Rosa Collateral have been cleared and approved by the Bank. The sale of the Santa Rosa Collateral is subject to any limitation in the existing lease agreement between the Debtor and Texas Valley Grain and any other current limitation that may exist impacting the Santa Rosa Collateral. For clarification, the Bank is and will remain entitled to all rental income received through the existing lease period with Texas Valley Grain of the Santa Rosa Collateral. The Debtor shall work and cooperate with the Lender to resolve any issues that may impact the sale of the Santa Rosa Collateral including but not limited to Tract 2. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Santa Rosa Collateral will be the responsibility of and borne by the Debtor and Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Santa Rosa Collateral may produce net proceeds to be paid to the Bank on its claim owed by

Debtor in the approximate amount of $1,350,000.00.

c. **Loan #115998 [Garcia Balli Loan]** –Debtor, Octavio Garcia and Spouse, individually and as owners of Garcia Balli, LTD, acknowledge and agree that Vantage Bank Texas has a first lien on the property described as the Toluca Ranch, including any and all rights that may include but are not limited to water and mineral rights, and agreements associated with the Toluca Ranch (the "Toluca Ranch Collateral") that secures the non-bankruptcy Loan #115998 to Garcia Balli, LTD, as borrower, (the "Garcia Balli Loan"). The Bank shall be paid all amounts due and owing on the Garcia Balli Loan upon the sale and/or foreclosure of the Toluca Ranch Collateral. Any and all income, including but not limited to rental income, due and/or received for the Toluca Ranch Collateral prior to the sale of the Toluca Ranch Collateral shall be paid to Lender. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from a sale of the Toluca Ranch Collateral will be the responsibility of and borne by Garcia Balli, LTD and/or Octavio Garcia and Spouse, individually and as owners of Garcia Balli, LTD, and the Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the amount owed to Bank at time of sale of the Toluca Ranch Collateral may produce proceeds to be paid to the Bank on the Garcia Balli Loan in the approximate amount of $460,000.00 (plus any accrued interest, expenses, and costs of collection).

d. **Loan #116006 [Garcia Grain Trading Corporation]** – Debtor, Val Verde Grain Holdings, and Octavio Garcia and Spouse, individually and as owners of Val Verde Grain Holdings (collectively, Octavio Garcia and Spouse and Val Verde Grain Holdings will be referred to as "Val Verde Holdings"), acknowledge and agree that Vantage Bank Texas has a first lien on the property described as the Donna Warehouse, including any and all rights and agreements associated with the Donna Warehouse, (the "Donna Warehouse Collateral") that secures the bankruptcy Loan #116006 to Garcia Grain Trading Corporation, as Borrower, as collateral securing all amounts owed to Vantage Bank Texas by Debtor. Debtor and Val Verde Grain Holdings agree that, at the Bank's election, the Debtor and Val Verde Grain Holdings will deed and assign the Donna Warehouse Collateral to the Bank pursuant to a bankruptcy court order deeding and assigning the Donna Warehouse Collateral to the Bank (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit the Bank to proceed with foreclosure (deed and assignment to Bank by court order or foreclosure by Bank of Donna Warehouse Collateral shall collectively be referred to as the "Donna Warehouse Collateral Bank Sale"). Prior to the Donna Warehouse Collateral Bank Sale, the Donna Warehouse Collateral may be sold to a third party for a sales price agreed upon by the Bank in writing. The sale of the Donna Warehouse Collateral will be subject to any Lender regulatory requirements including but not limited to such requirements of the Office of Foreign Assets Control (also referred to as "OFAC"). For clarification, the Donna Warehouse Collateral will not be sold nor a contract for sale be entered into with a third party ("Proposed Buyer") without prior written approval from the Bank which shall be contingent upon an OFAC search of all beneficial owners of the Proposed Buyer and/or its assigns (collectively, "Beneficial Owners") acceptable to the Bank. The Proposed Buyer and its Beneficial Owners will be required to provide any

information needed by the Lender to conduct such an OFAC search. The sale of the Donna Warehouse Collateral to any 3rd party buyer approved by the Bank will be free and clear of all liens and the Bank shall be entitled to all net proceeds after payment of standard closing costs from the sale of the Donna Warehouse Collateral. It is further understood that Vantage Bank Texas shall have the right to review and approve the closing settlement statement to include but not limited to all settlement or closing costs, proration of expenses, and withholdings from sale proceeds upon any sale of the Donna Warehouse Collateral. Any and all income, including but not limited to rental income, due and/or received for the Donna Warehouse Collateral shall be paid to the Bank. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Donna Warehouse Collateral will be the responsibility of and borne by the Debtor and/or Val Verde Grain Holdings and Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Donna Warehouse Collateral may produce net proceeds to be paid to the Bank on its claim owed by Debtor in the approximate amount of $1,350,000.00.

e. **Bean Cash Collateral Proceeds** – Debtor shall pay to Vantage Bank Texas the sum of $625,000.00 in cash ("$625,000.00 Bean Cash Collateral Payment") derived from the cash and accounts receivable from the sale of the bean inventory ("Bean Cash Collateral Proceeds") as a full and final settlement of its claim on the Bean Cash Collateral Proceeds. The $625,000.00 Bean Cash Collateral Payment shall be paid to the Bank no later than 10 days after the entry of an order approving such payment to Vantage Bank Texas.

f. **Bean Inventory, Grain Inventory/Accounts Receivable, and Grain Surety Bonds Collateral** – There is estimated an amount in excess of $600,000.00 of value of bean inventory ("Bean Inventory Collateral") in which, pursuant to orders permitting use of the bean inventory and bean cash collateral, the Bank retains a first lien security interest.

Additionally, the Bank claims a secured claim to any and all grain inventory and grain accounts receivable of Debtor (collectively, "Grain Collateral"). It is undetermined how much of such grain inventory and grain accounts receivable that are subject to the Bank's claimed secured interest.

Further, pursuant to warehouse receipts, the Bank claims a secured claim to the proceeds of any surety bond that covers any missing grain at the Santa Rosa Grain Facility and/or Progreso Grain Facility. The amount of the surety bond for the Santa Rosa Facility is approximately $739,000.00 and the amount of the surety bond for the Progreso Facility is approximately $1,009,750.00 (collectively, the Santa Rosa surety bond and Progreso surety bond will be referred to as the "Surety Bond") for a Surety Bond total amount of $1,748,750.00.

Debtor shall pay to Vantage Bank Texas the sum of $400,000.00 in cash in consideration of the Bank releasing any and claims it has as to the Bean Inventory Collateral, Grain Collateral, and Surety Bond. Vantage Bank Texas will not release its claim on the Surety Bonds until after it receives the payment of the $400,000.00 which is to paid the earlier of (i)

the closing of the sale of Toluca Ranch or (ii) the effective date of the confirmed Plan of Reorganization which shall be no later than 90 days from entry of the order confirming the plan of reorganization.

g. **Life Insurance on Octavio Garcia** – As part of the Settlement, Octavio Garcia agrees to continue the assignment of Life Insurance Policy #T4000118328 issued by The Lincoln National Life Insurance Company covering the life of Octavio Garcia in the amount of $3,000,000 (the "Life Insurance Policy") to Vantage Bank Texas and further agrees to continue the payment of the Life Insurance Policy through and including the Life Insurance Policy annual premium payment due for 2027. Vantage Bank Texas agrees to release its assignment of the Life Insurance Policy no earlier than 3/31/2028 and further agrees that in the event a claim is filed on the Life Insurance Policy and the Insurer tenders the benefits / funds to the Bank (the "Assigned Party'), the Bank and the Policy Owner and Beneficiaries agree that the Bank will use the Life Insurance Policy Proceeds to pay any remaining debt outstanding (the "Bank Deficiency"), if any, owed by Debtor, Garcia Grain Trading Corporation, and not paid or reduced from the net proceeds of the sale of collateral securing the loans described above, and/or other funds or proceeds as provided to the Bank as part of the Bankruptcy Settlement or a confirmed Bankruptcy Plan. For purposes of this provision, the Bank Deficiency shall include any remaining principal, accrued interest, expenses, legal and collections fees and other permissible expenses incurred by the Bank as to the above-described loans after application of any monies received by the Bank under the terms of this Agreement. All remaining Life Insurance proceeds after payment of any Bank Deficiency will be returned to the Decedent's Estate or Beneficiary of Record. The Bank retains the right to fund the annual premium owing on the Life Insurance Policy.

h. **Release:** Octavio Garcia, Gabriela Garcia, Val Verde Grain Holdings, Garcia Balli, LTD, Debtor and Debtor's Bankruptcy Estate will release any and all claims, known or unknown, that they may have as to Vantage Bank Texas, its officers, directors, etc.

i. **Co-Guarantor:** Vantage Bank Texas retains all rights and claims it has against co-guarantor, Plascencia.

### E.    Class 5 – Secured Claim of Falcon International Bank (Unimpaired)

**Class 5** consists of the Secured Claim of Falcon International Bank ("Falcon") who filed three Proofs of Claims (**POC#38** for $1,152,412.11, **POC #39** for $2,424,044.10 and **POC #40** for $2,412,696.50) in the total amount of **$5,989,152.71** on June 14, 2023 for loaned money.

Falcon's claim is secured by a 1st Lien Deed of Trust against the Progreso Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas) having an estimated value of **$4,430,000.00**, and a 1st Lien Deed of Trust against Moore Farms (located at Military Road, Progreso, Texas) having a current estimated value of **$7,000,000.00** along with a security interest at equipment valued at **$330,000.00**.

Thus, Falcon's total collateral can be summarized as follows:

| Falcon's Security interest in Collateral | Value |
|---|---|
| Progreso Elevator (1st Lien Deed of Trust) | $4,430,000.00 |
| Moore Farms (1st Lien Deed of Trust) | $7,000,000.00 |
| Equipment | $330,00.00 |
| **TOTAL** | **$11,760,000** |

Therefore, it follows that Falcon has an equity in the above collateral in the amount of **$5,770,847.29** (which is calculated as follows: total value of Falcon's collateral, which is $11,760,000, minus the total amount of POC #38, #39, #40, which is $5,989,152.71).

**Treatment:**

Falcon will receive **payment in full of its outstanding claim in the amount of approximately $6,000,000.00**, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farm having an estimate value for purposes of the Plan of $7,000,000.00. The payment of the indebtedness owed to Falcon will be consideration for Falcon releasing its Deeds of Trust against all other real property of the estate including but no limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust. For purposes of the Plan, the Debtor projects that the sale of Moore Farms will result in unencumbered net proceeds available to fund the Plan in the approximate sum of $500,000.

Specifically:

a. The secured claim of Falcon International Bank shall be satisfied in full by the sale of the Moore Farm tract. The Debtor agrees for the Moore Farm to be listed by Octavio with the real estate brokerage firm of Hanna Solutions for a listing price of $8,000,000, and a real estate commission of not more than 4%.

b. Falcon agrees that it will accept a price for the Moore Farm sufficient to pay its secured claim in full. Octavio agrees that it shall accept a price of not less than **$6,000,000.00**.

c. Any proceeds more than the amount necessary to satisfy the secured claim of Falcon shall be paid over to the bankruptcy estate and paid out as a plan contribution to satisfy any unpaid administrative claims and then as dividends paid to the holders of Allowed General Unsecured Claims as more specifically provided hereinbelow.

### F.     Class 6 – Secured Claim of GrainChain, Inc. (Impaired)

**Class 6** consists of the Secured Claim of GrainChain, Inc. (GrainChain") who filed a Proof of Claim (**POC #42** filed on 6/19/2023)) in the amount of **$7,841,054.99**.

GrainChain's claim is secured by a 2nd Lien Deed of Trust against the Progreso Elevator and Moore Farms (described above) against which Falcon International Bank holds the 1st Lien Deed of

Trust. The value of GrainChain's equity interest in the above-described collateral is approximately **$5,770,847.29**.

In addition, GrainChain has a 1st Lien Deed of Trust against Emory Farms (i.e., a 56-acre tract of land titled in PGS Properties[1]) valued at **$770,000.00**, 1st Lien Deed of Trust against Baryta Industrial Tract (titled in Octavio Garcia) valued at **$650,276.00**, and a 1st Lien Deed of Trust against the Edcouch Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538) valued at **$1,334,435.00**.

Together, the amount of GrainChain's security interest is about **$8,525,558.29**, which can be summarized as follows:

| GrainChain's Security interest in Collateral | Value |
|---|---|
| Progreso Elevator and Moore Farms (2st Lien Deed of Trust), against which Falcon holds the 1st Lien Deed of Trust | $5,770,847.29 |
| Emory Farms (1st Lien Deed of Trust) | $770,000.00 |
| Baryta Industrial Tract (1st Lien Deed of Trust) | $650,276.00 |
| Edcouch Elevator (1st Lien Deed of Trust) | $1,334,435.00 |
| **TOTAL** | **$8,525,558.29** |

However, GrainChain obtained its liens within 90 days of the Petition Date of February 17, 2023, known as the "preference period" under 11 U.S.C. § 547, in order to secure an antecedent debt and enabled GrainChain to receive more than it would have been paid under a Chapter 7 proceeding; and therefore those liens are subject to be nullified. This matter is settled between the Debtor and GrainChain as set forth in this Plan.

In order to compromise and settle the dispute between the Debtor and GrainChain relating to its asserted second liens against the Progreso Facility and Moore Farms, as well as its first liens against the Baryta Industrial Tract, Emory Farms and the Edcouch Facility, the Parties have reached an agreement to nullify the asserted liens of GrainChain against these assets. In exchange for releasing its Deeds of Trust against these real property tracts, the Debtor has entered into an agreement whereby GrainChain, the Unsecured Creditors (only Classes 7, 8 and 10), and Harco Insurance will hold joint liens against the tracts with GrainChain being entitled to 45%, the General Unsecured Creditors entitled to 40% and Harco entitled to 15%. Upon the sale of any of the tracts the net proceeds from the sale will be paid over to the Plan Agent and he will distribute the funds among these constituent groups in accordance with such percentages. These percentages, and the division of the net proceeds according to these ratios, will continue until such time as the claims of the constituent groups have been paid in full or all of the real property assets have been sold.

---

[1] PSG Equipment? PSGProducts, LLC?

Since Harco Insurance holds a contingent unliquidated claim that may not be determined by the Effective Date for the first three years the net profits shall be divided solely between GrainChain at the initial percentage of 45% and the General Unsecured Creditors receiving 55%. The unsecured claim of Harco is being subordinated due to the fact that they are a creditor who must fund the payment of the surety bonds to the creditors entitled to receive them under the provisions of this Plan. After the third year of the Plan Harco shall be entitled to receive 15% of the net profits to reduce its presumably liquidated claim until such time as the claim is extinguished from either the receipt of net proceeds realized from the sale of real property or its share of the net profits of the Debtor.

The net profits are understood to be derived from the combined operations relating to the purchase and sale of grain, edible beans, and sunflower seeds as well as any other revenue generating activities undertaken by the Debtor.

## UNSECURED CLAIMS

The Unsecured Claims under the proposed Plan consist of Classes 7 through 10 described below.

The Unsecured Claims described in this section do not include the unsecured portions of the claims of StoneX, Vantage Bank, and GrainChain, Inc. because they are being treated and resolved by another method as described above. Any preferences shown in the Plan which are not specifically designated to be settled and released for opting into treatment under General Unsecured Claims or retained by the Debtor may be prosecuted or settled at the discretion of the Plan Agent.

This Plan classifies the Unsecured Claims into four main groups: **(1) Bean Claims**; **(2) Farmers' and Grain Claims**; **(3) Administrative Convenience Class;** and **General Trade Claims**, each of which correspond to its own class.

The category "Bean Claims" (**Class 7**) consists of the claims of companies who sold beans to the Debtor; the category "Farmers and Grain Claims" (**Class 8**) consists of the claims of farmers who sold grain (corn, sorghum, and the like) to the Debtor; the category of "Administrative Convenience Class" (**Class 9**) consists of the claims and the category "General Trade Claims" (**Class 10**) consists of the claims of parties that have sold other goods and merchandise (such as fertilizers, chemicals, and the like) to the Debtor.

### G.    Class 7 – Unsecured Bean Claims (Impaired)

**Class 7** (the Unsecured Bean Claims) consists of the Unsecured Bean Claims of American Bean, LLC (POC #14 filed 3/10/2023) in the amount of **$184,000.00**; and the claim of Stony Ridge Food, Inc. (POC #31 filed 5/5/2023) in the net amount of **$1,320,489.00** after deduction of $237,077.50 (for two PACA Claims paid) from the original POC #31 amount of $1,557,566.50. The Debtor's calculations based on the information provided in its Statement of Financial Affairs (SOFA) [Dkt #51], Exhibit 3, indicates that these two claimants have received a total of

**$1,337,189.27** of payments that constitute "preference claims" of the estate under 11 U.S.C. § 547, as shown in more detail below.

| Name of Unsecured Creditor | Amount of Claim (POC) | Potential Preference Received | |
|---|---|---|---|
| American Bean, LLC (POC #14) | $184,000.00 | 12/21/2022 | $45,954.00 |
| | | 12/21/2022 | $45,954.00 |
| | | 12/27/2022 | $46,000.00 |
| | | 12/27/2022 | $46,000.00 |
| | | 11/14/2022 | $119,000.00 |
| | | 11/14/2022 | $119,000.00 |
| | | 1/31/2023 | $92,000.00 |
| | | 1/10/2023 | $90,000.00 |
| | | **TOTAL = $603,908.00** | |
| Stony Ridge Food, Inc. (POC #31) | $1,557,566.50 minus $237,077.50 (two PACA Claims paid) = $1,320,489.00 | 12/27/2022 | $61,130.90 |
| | | 12/27/2022 | $59,036.85 |
| | | 12/27/2022 | $23,320.00 |
| | | 12/27/2022 | $23,320.00 |
| | | 12/27/2022 | $59,065.88 |
| | | 12/27/2022 | $59,065.88 |
| | | 1/3/2023 | $59,065.88 |
| | | 1/3/2023 | $59,065.88 |
| | | 1/3/2023 | $60,320.00 |
| | | 1/3/2023 | $60,320.00 |
| | | 1/19/2023 | $58,145.00 |
| | | 1/19/2023 | $58,145.00 |
| | | 1/19/2023 | $23,320.00 |
| | | 1/19/2023 | $23,320.00 |
| | | 1/19/2023 | $23,320.00 |
| | | 1/19/2023 | $23,320.00 |
| | | **TOTAL = $733,281.27** | |
| **TOTAL Bean Claims** | **POCs $1,504,489.00** | **Preferences $1,337,189.27** | |

This Plan will resolve the Unsecured Bean Claims as follows:

## A. The Unsecured Bean Claim of American Bean, LLC (POC #14)

American Bean, LLC has filed an unsecured claim in the amount of $184,000 (POC #14). In return, the Estate has a preference claim against American Bean, LLC in the amount of $603,908.00. The preference claims will be settled or prosecuted by the Plan Agent.

### B.  The Unsecured Bean Claim of Stony Ridge Food, LLC (POC #31)

Stony Ridge Food, Inc. ("Stony Ridge") has an unsecured claim in the net amount of $1,320,489.00 after deduction of $237,077.50 (for two PACA Claims paid) from the original POC #31 amount of $1,557,566.50. In return, the Estate has a preference claim against Stony Ridge in the amount of $733,281.27. The preference claims will be settled or prosecuted by the Plan Agent.

### H.  Class 8 – Farmers' and Grain Claims (Impaired)

**Class 8** (the Farmers' and Grain Claims) consists of the claims of farmers ("Farmers") or other grain claimants ("Grain Claimants") who have sold grains to the Debtor. Farmers and Grain Claimants holding claims that may be entitled to distributions from the proceeds of the surety bonds may either choose to be paid solely by the bond receipts, or to participate and receive their pro-rata share of the percentages paid to General Unsecured Creditors on a pr-rata basis from the receipt of net proceeds from the sales of real estate or the net profits from the operations of the Debtor.

All Farmers and Grain Claimants deemed eligible to participate in the distribution of the surety bond proceeds will be paid from the pool of funds to be distributed by the TDA. However, if these holders of grain claims choose distribution from the bond claims they will not have any preferences they received waived by the Debtor.

The Debtor's calculations based on the information provided in its Statement of Financial Affairs (SOFA) [Dkt #51], Exhibit 3, indicates that these Farmers have received a total of **$2,964,506.71** of payments that constitute "preference claims" of the Estate under 11 U.S.C. § 547, as shown in more detail below:

| Name of Unsecured Creditor | Amount of Claim (POC) | Potential Preference Received | |
|---|---|---|---|
| Brian Jones Farms (POC #19) | $76,916.82 | 1/27/2023 (GrainChain) | $84,749.45 |
| | | **TOTAL = $84,749.45** | |
| Carl Hensz (POC #22) | $97,748.78 | 1/17/2023 | $50,000.00 |
| | | **TOTAL = $50,000.00** | |
| Chad Szutz (POC #24) | $58,495.56 | (No preference claims) | |
| Dreibelbis Farms (POC #35) | $290,691.70 | (No preference claims) | |
| Eat Fresh Farms (POC #13) | $65,769.41 | 2/2/2023 | $64,976.24 |
| | | 2/3/2023 | $793.02 |
| | | 1/27/2023 Z-Ernte (EatFresch/Advance Harvesting) | $1,900.00 |

| | | 2/1/2023 Z-Ernte (EatFresch/Advance Harvesting) | $4,050.00 |
|---|---|---|---|
| | | **TOTAL = $71,719.26** | |
| Fike Farms (POC #32) | $353,230.88 | 1/3/2023 | $1,515.00 |
| | | 1/3/2023 | $37,051.61 |
| | | 12/12/2022 | $50,000.00 |
| | | 12/12/2022 | $50,000.00 |
| | | 1/3/2023 | $59,500.45 |
| | | 1/3/2023 | $59,500.45 |
| | | 1/3/2023 | $59,500.45 |
| | | 1/3/2023 | $59,500.45 |
| | | 1/3/2023 | $59,500.45 |
| | | 2/3/2023 | $49,564.06 |
| | | **TOTAL = $485,632.92** | |
| Frank Bailey Grain Company (POC #33) | $653,585.11 | 12/1/2022 | $65,375.37 |
| | | 12/1/2022 | $58,022,48 |
| | | 12/1/2022 | $65,830.54 |
| | | 12/13/2022 | $58,869.22 |
| | | 12/13/2022 | $20,292.55 |
| | | 12/13/2022 | $46,959.48 |
| | | 12/13/2022 | $47,286.60 |
| | | 12/13/2022 | $54,412.81 |
| | | 12/13/2022 | $53,780.99 |
| | | 12/13/2022 | $45,108.44 |
| | | 12/13/2022 | $50,638.10 |
| | | 1/10/2023 | $65,375.37 |
| | | 1/10/2023 | $58,022,48 |
| | | 1/10/2023 | $65,830.54 |
| | | **TOTAL = $639,760.01** | |
| HAR-VEST (POC #15) | $182,214.60 | (No preference claims) | |
| Johnny Guin (POC #25) | $117,560.65 | (No preference claims) | |
| Karen Arnold (POC #26) | $107,332.39 | (No preference claims) | |
| Lothringer Family Farms (POC #46) (Late) | $70,618.69 | 2/2/2023 Soybean setl | $23,452.13 |
| | | 12/15/2022 Z-Ernte (Harv Lothringer | $6,300.00 |

| | | Soybean) | |
|---|---|---|---|
| | | | **TOTAL = $29,752.13** |
| Robert Walsdorf (POC #43) | $8,018.76 | (No preference claims) | |
| Russell Plantation II (POC #11) | $668,169.85 | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.99 |
| | | 1/27/2023 | $66,516.94 |
| | | | **TOTAL = $931,237.81** |
| Skalitsky Farms (POC #29) | $149,842.47 | (No preference claims) | |
| Wesley Valerius (POC #28) | $119,444.52 | 1/27/2023 | $60,100.87 |
| | | 1/27/2023 | $60,100.87 |
| | | 1/27/2023 | $60,100.87 |
| | | 1/27/2023 | $60,100.87 |
| | | 1/27/2023 | $59,343.64 |
| | | | **TOTAL = $299,747.12** |
| Zdansky Joint Venture (POC #17) | $346,739.93 | 11/9/2023 (GrainChain) | $53,127.73 |
| | | 11/9/2023 (GrainChain) | $247,367.81 |
| | | | **TOTAL = $300,495.54** |
| **TOTAL Farmers' and Grain Claims** | **POCs $3,366,380.12** | | **Preferences $2,893,094.24** |

In sum, the Unsecured Farmers' and Grain Claims will be resolved according to each claimant's choice to opt in or opt out of the treatment of General Unsecured Claims under the Plan, i.e., either be paid solely by the bond receipts or to participate and receive their pro-rata share of the percentages paid to General Unsecured Creditors on a pro-rata basis from the receipt of net proceeds from the sales of real estate or the net profits from the operations of the Debtor in exchange for release of all preference claims and obligations arising under this Bankruptcy Proceeding.

The division and distribution of profits of the Reorganized Debtor shall be in accord with the provisions established for the split of profits in the Operation Agreement approved by the Bankruptcy Court whereby GrainChain, Harco National Insurance Company ("Harco"), and the General Unsecured Creditors each receive their respective share of the profits from the operations of the Debtor in relation to the amount their claims constitute a percentage of the total amount of the General Unsecured Class. In this regard, the total amount of unsecured claims is estimated to total $17,284,000 while the claims of the General Unsecured Creditors are estimated to total $7,038,659.27 (40%), Harco's unliquidated and contingent subrogation claim tied to the payment of the surety bonds it granted to the Texas Department of Agriculture ("TDA") is estimated to total $2,402,704.00 (15%), and GrainChain's unsecured claim in the amount of $7,841,054.99 (45%).

A specific provision of the Plan of Reorganizations shall be that upon the entry of the confirmation order the claims asserted by the estate contesting the nature, extent and validity of the liens of GrainChain against certain assets of the estate and its related entities as well as any other claims or causes of action the estate may be entitled to assert against GrainChain shall be fully compromised and settled in exchange for the commitment by GrainChain to provide post-confirmation financing to the Reorganized Debtor and its agreement to release and declare null and void its liens asserted against the Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract. The Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract are collectively referred to herein as the Contested Lien Tracts ("Contested Lien Tracts").

In consideration of GrainChain's agreement to release its asserted liens against the Contested Lien Tracts, and in consideration of the estate's agreement to release any claims or causes of action it may hold against GrainChain, the provisions of the Plan of Reorganization shall provide that GrainChain, the General Unsecured Creditors, and Harco are each granted a lien against the Contested Lien Tracts in the amounts of their respective percentages – i.e. GrainChain a 45% lien to secure the payment of its claim of $7,841,054.99, the holders of General Unsecured Claims a 40% lien to secure the payment of its estimated claims of $7,038,659.27, and Harco a 15% lien to secure the payment of its contingent unliquidated claim in the amount $2,402,704.00.

## I.    Class 9 –Administrative Convenience Class (Impaired)

**Class 9** consists of the Administrative Convenience Class. These claimants will be given two options: either (1) to receive 40% of their claims on the effective date or (2) to participate in the sharing of net profits of operation of GrainChain and Elkins according to the scheme outlined above and repeated in this section.

The Administrative Convenience Class consists of the following claims:

| Name of Unsecured Creditor | Amount of Claim (POC) | Potential Preference Received |
|---|---|---|
| American Express National Bank (POC #12) | $4,617.90 | (No preference claims) |
| Amex Trs. Co. Inc. (POC #30) | $8,524.35 | (No preference claims) |
| Cargill Incorporated (POC #45) | $49,351.20 | (No preference claims) |
| **TOTAL Administrative Convenience Claims** | | **$62,493.45** |

The Debtor offers to pay 40 cents on the dollar for each of the claimants making up the Administrative Convenience Claims disregarding any of its preference claims against any. This way, the amount paid for Administrative Convenience Claims will amount to **$24,997.38** [which is calculated as $62,493.45 (x0.40)]

In sum, the Administrative Convenience Claims will be resolved by payment of a total sum of **$24,997.38** to the claimants making up this class in exchange of release of all claims and obligations arising under this Bankruptcy Proceeding or they participate in the Plan treatment for General Unsecured Creditors.

Of the total amount of General Unsecured Claims of **$6,848,061.63**, a total amount of **$112,125.00** are considered "**Priority**." This amount is made up of the claims of the Farmers claiming $7,475.00 Priority under 11 U.S.C. § 507(a)(6). Those Farmers are as follows: Brian Jones Farms, Carl Hensz, Chad Szutz, Dreibelbis Farms, Eat Fresh Farms, Fike Farms, HAR-VEST, Johnny Guin, Karen Arnold, Lothringer Family Farms, Robert Walsdorf, Russell Plantation II, Skalitsky Farms, Wesley Valerius, and Zdansky, J.V. These priority claims are treated in the Administrative Claims (Class 1) category.

Allowed general unsecured claims in an amount less than $10,000, including the Priority Claims of shall be paid in full by the Plan Agent on the Effective Date of the Plan.

## J. Class 10 – General Trade Claims (Impaired)

Class 10 consists of General Unsecured Trade Claims of the following claimants:

| Name of Unsecured Creditor | Amount of Claim (POC) | Potential Preference Received | |
|---|---|---|---|
| Graneros Guadalupe SA de CV (POC #27) | $506,334.56 | (No preference claims) | |
| Helena Agri-Enterprises, LLC (POC #16) | $518,134.08 | (No preference claims) | |
| Planters Grain Cooperative of Odem, TX (POC #34) | $255,696.00 | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | **TOTAL Preference of Planters = $253,306.55** | |
| Simplot AB Retail (POC #23) | $217,537.13 | (No preference claims) | |
| United Sorghum Checkoff Program (USCP) (POC #20) | $301,795.30 | (No preference claims) | |
| Valley Coop Mill (VALCO) (POC #21) | $115,201.99 | (No preference claims) | |
| **TOTAL General Trade Claims** | **POCs $1,914,699.06** | **Total Preferences $253,306.55** | |

## K.  Class 11 – Unsecured Claims of Harco and GrainChain, Inc. (Impaired)

Class 11 is a category of unsecured claims that is separate from Classes 7, 8, and 9. Class 10 consists of the Unsecured Claims of <u>Harco National Insurance Company</u> ("Harco") who has a claim in the amount of **$2,402,704.00** (POC #44 filed 6/20/2023) for surety bonds, general indemnity agreement, and of <u>GrainChain, Inc.</u> ("GrainChain") who has a claim in the amount of **$7,841,054.99** (POC #42 filed 6/19/2023) for factoring Agreements, indebtedness owed, and claims against the Debtor, including but not limited to, conversion, breach of contract, misrepresentation, and/or breach of fiduciary duty.

The Debtor proposes the following solution to resolve all unsecured claims (which includes the Unsecured Claims section described above, plus the unsecured portions of Harco's and GrainChain's claims):

- Since GrainChain and Elkins Grain Company ("Elkins") are leasing the Edcouch (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538) and Progreso Facility (i.e., the grain elevator facility

owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas), as set forth in the Operating Agreement between the parties, and

GrainChain, Harco and General Unsecured Claims each will receive under the Plan according to the following percentages mutually agreed between all parties described herein: GrainChain 45% of the net proceeds from sale proceeds of encumbered real estate and net profits; Unsecured Claims 40% of the net proceeds from the sale of encumbered real estate and 55% of the net profits for 3 years and 40% beginning on the fourth year; Harco 15% of net proceeds of encumbered real estate, and 15% of the net profits staring in the fourth year.

Under the Plan, the Debtor will give these parties according to their respective percentages as part of settlement against those assets. But for the first three years, Harco will be subordinated until such time as their claim is fully liquidated and the amount is established by the claims reconciliation process or by the agreement of the parties.

**Treatment:**

**Class 11** Claims will be treated as follows:

a. Upon confirmation of the Plan of Reorganization GrainChain shall exclusively control the sale and management of all assets of the Reorganized Debtor not otherwise conveyed into the Plan Trust.

b. Upon completion of the payments to the General Unsecured Creditors GrainChain will own 100% of the equity of the Reorganized Debtor.

c. The Debtor and its insiders and their affiliates cannot be involved in any grain transactions outside of the operations of the Reorganized Debtor until the unsecured creditors are paid in full, and such non-competition agreements must be signed at confirmation binding all the requisite parties to not compete with Reorganized Debtor.

d. All property of the Reorganized Debtor not otherwise liquidated by the provisions of the Plan of Reorganization shall be free and clear of all liens, claims, interests and encumbrances, including the asserted claims of GrainChain, save and except for those liens specifically identified and contemplated under the terms and provisions of the plan of reorganization.

e. The tax basis of all assets of the Reorganized Debtor will be determined by the professionals of the estate so as to minimize any tax consequences of the sale of estate assets or assets of its related entities so the maximum amount possible can be paid to GrainChain and the holders of General Unsecured Creditors as contemplated under its terms and provisions.

f. Any sale of an asset of the Reorganized Debtor will consider appropriate capital gains taxes that the Reorganized Debtor must pay and all allocation and splitting of the sale proceeds with respect to net sale proceeds shall only be distributed after applicable capital gains taxes and costs of sale are paid in full.

g. The division and distribution of profits of the Reorganized Debtor shall be in accord with the provisions established for the split of profits in the Operation Agreement approved by the Bankruptcy Court whereby GrainChain, Harco National Insurance Company ("Harco"), and the General Unsecured Creditors each receive their respective share of the profits from the operations of the Debtor in relation to the amount their claims constitute a percentage of the total amount of the General Unsecured Class. In this regard, the total amount of unsecured claims is estimated to total $17,284,000 while the claims of the General Unsecured Creditors are estimated to total $7,038,659.27 (40%), Harco's unliquidated and contingent subrogation claim tied to the payment of the surety bonds it granted to the Texas Department of Agriculture ("TDA") is estimated to total $2,402,704.00 (15%), and GrainChain's unsecured claim in the amount of $7,841,054.99 (45%).

h. A specific provision of the Plan of Reorganization shall be that upon the entry of the confirmation order the claims asserted by the estate contesting the nature, extent and validity of the liens of GrainChain against certain assets of the estate and its related entities as well as any other claims or causes of action the estate may be entitled to assert against GrainChain shall be fully compromised and settled in exchange for the commitment by GrainChain to provide post-confirmation financing to the Reorganized Debtor and its agreement to release and declare null and void its liens asserted against the Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract. The Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract are collectively referred to herein as the Contested Lien Tracts ("Contested Lien Tracts").

i. In consideration of GrainChain's agreement to release its asserted liens against the Contested Lien Tracts, and in consideration of the estate's agreement to release any claims or causes of action it may hold against GrainChain, the provisions of the Plan of Reorganization shall provide that GrainChain, the General Unsecured Creditors, and Harco are each granted a lien against the Contested Lien Tracts in the amounts of their respective percentages – i.e. GrainChain a 45% lien to secure the payment of its claim of $7,841,054.99, the holders of General Unsecured Claims a 40% lien to secure the payment of its estimated claims of $7,038,659.27, and Harco a 15% lien to secure the payment of its contingent unliquidated claim in the amount $2,402,704.00.

j. General Unsecured Creditors shall receive a minimum profit distribution of $250,000 annually or their percentage of the net profits, whichever is greater, and such net profits are to be paid over to the Plan Trust. Upon the distribution of the net profits to the Plan Agent the lien securing their claim shall be reduced by a dollar-for-dollar credit, and its percentage share of the net profits shall be reduced proportionately. The Plan Agent shall pay over the net proceeds to the holders of the General Unsecured Claim at least once annually.

k. Since Harco's claim is contingent and unliquidated Harco shall not participate in a share of the net profits of the Reorganized Debtor for the first three (3) operating years of the Plan (meaning 2023, 2024, and 2025). Thereafter, it shall be entitled to have its share of the net

profits paid over to the Plan Trust, that is, the amount its allowed claim bears to the remaining claims of the Unsecured Creditors and the 45% claim of GrainChain, and the Plan Agent shall annually distribute the funds to Harco.

l. GrainChain will expeditiously market and seek to sell the Emory Farms tract and the Baryta Industrial tract ("Debtor Non-Operational Assets"), and the net sales proceeds from the sale of the Debtor Non-Operational Assets are to be paid over to the Plan Trust – 40% to be held for payments to holders of General Unsecured Claims and 15% for the benefit of Harco. It being understood that the Plan Agent shall distribute these proceeds to the holders of General Unsecured Claims at least once annually and that the 3-year moratorium on the distribution of net profits to Harco from operations shall not apply to its percentage of the distribution of the net sales proceeds from the sale of the Debtor Non-Operational Assets. It being understood that the distributions of the percentage of net sales proceeds shall not affect the respective percentages to which the General Unsecured Creditors and Harco are entitled to share in any future sales of the Debtor Non-Operational Assets or any sales of the other assets of the Reorganized Debtor.

m. The insurance funds paid to the Debtor for the repair of the Progreso and Edcouch Facilities shall be used by the CRO to fully repair and put in good order the two grain elevator facilities so they are fully operational. These grain elevator facilities shall continue to be leased to Elkins Grain Company and their operations financed by GrainChain in accord with the provisions of the Operating Agreement approved by the Bankruptcy Court. In this regard, Elkins Grain Company in cooperation with GrainChain agree to use their best good faith efforts to operate the facilities using the best management and storage practices recognized to be prudent and efficient in the grain industry so that they can endeavor to produce the maximum profits possible from their operations.

## ARTICLE IV
## <u>TREATMENT OF CLAIMS OWNED BY THE ESTATE</u>

The Debtor has initiated one adversary proceeding based upon fraudulent conveyance and preference actions against a former owner of the Debtor.

Except as settled prior to or as a part of the Plan, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, all claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, are hereby preserved and will vest in the Plan Trust for enforcement in accordance with the discretion of the Plan Agent subsequent to the Effective Date of this Plan for a period of 2 years following the Confirmation Order.

This includes any claims or causes of action that the Debtor may have derivatively or otherwise that are discovered as a result of the forensic accounting investigation being conducted by D. Williams & Co. and Dundon Advisors or otherwise revealed during the course of the administration of the bankruptcy case.

Additionally, any claims or causes of action belonging to or acquired by the Debtor over the course of the administration of the bankruptcy case tied to or related in any way to the surety bonds issued to indemnify depositors of grains from the proceeds of surety bonds issued by Harco Insurance Co. in order for the TDA to issue public grain warehouse licenses at the locations of the various grain facilities owned or operated by the Debtor.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties are specifically reserved, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

## ARTICLE V
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

All executory contracts and unexpired leases not assumed prior to or through the Plan shall be assumed if not previously rejected by formal order of the Bankruptcy Court.

## ARTICLE VI
## THE PLAN TRUST

The Plan Trust.  The Plan Trust, duly organized under the laws of the State of Texas, is created for the purpose of carrying out the implementation of the Plan and administration of claims as provided herein and making the Payments or Distributions to (i) certain holders of Allowed Unsecured Clams and (ii)settling parties who are entitled to the payment of consideration pursuant to a compromise and settlement of claims described in the Plan. The recipients of such distribution will be deemed Plan Trust Beneficiaries, who will be treated as grantors and deemed owners for federal income tax purposes, are the holders of Plan Trust Interest. The Plan Trust shall file federal income tax returns for the Plan Trust as a grantor trust pursuant to Section 671 of the Internal Revenue Code

of 1986, as amended, and the Treasury Tax Regulations promulgated thereunder. The parties shall not take any position on their respective tax returns with respect to any other matter related to taxes that is inconsistent with treating the Plan Trust as a "Plan Trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance from the Internal Revenue Service.

Funding of Res of Trust.  For all federal and applicable state and local income tax purposes, all Persons (including without limitation the Debtors, the Plan Agent and the Plan Trust Beneficiaries) will treat the transfers and assignment of the Plan Trust Assets to the Plan Trust for the benefit of the Plan Trust Beneficiaries as (a) a transfer of the Plan Trust Assets directly to the Plan Trust Beneficiaries followed by (b) the transfer of the Plan Trust Assets by the Plan Trust Beneficiaries to the Plan Trust. The Plan Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Plan Trust Beneficiaries will be treated as the grantors and deemed owners of their allocable portion of the Plan Trust Assets for federal income tax purposes.

The fair market value of the portion of the Plan Trust Assets that is treated for U.S. federal income tax purposes as having been transferred to each Plan Trust Beneficiary will be determined by the Plan Agent, and all parties (including, without limitation, the Plan Agent and the Plan Agent Beneficiaries) must utilize such fair market values determined by the Plan Agent for federal and applicable state and local income tax purposes.

The Plan Trust's taxable income, gain, loss, deduction or credit will be allocated to the Plan Trust Beneficiaries in accordance with their relative beneficial interests in the Plan Trust during the applicable taxable period. Such allocation will be binding on all parties for federal and applicable state and local income tax purposes, and the parties will responsible for the payment of any federal, state and local income tax due on the income and gain so allocated to them.

Plan Agent.    Upon confirmation of the plan of reorganization the CRO shall become the Plan Agent (the "Plan Agent"), and shall administer the Plan Trust in accordance with the terms and provisions of the trust agreement as described and set forth in the Plan. The Plan Agent shall administer the Plan Trust consistent with the terms of this Plan, Confirmation Order, general trust law (except as superseded by this Plan) and the Plan Trust Agreement, and shall have all of the rights, obligations, powers and duties as set forth in the Plan, Plan Trust Agreement and Confirmation Order.

Retention of Professionals.    The Plan Agent shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Agent, are necessary to assist the Plan Agent in performance of his duties.  The Plan Agent shall be permitted to use a portion of the Plan Trust Expense Reserve to retain attorneys, accountants or other professionals that may be necessary to evaluate and/or effectuate the liquidation of the Liquidating Assets.  However, after initial payments are made for retention of such professionals, any further fees of such professionals shall be paid by the Plan Trust only after recovery and liquidation of the Liquidating Assets has begun, and such fees shall only be paid to the extent that such fees and expenses are related to Liquidating Assets that have actually been liquidated.  Subject to any further agreement with the Professionals, the Plan Trust shall bear its own expenses.  Professionals of the Debtor shall

be eligible for retention by the Plan Agent, and former employees of the Debtor shall be eligible for retention by the Plan Trust and Plan Agent.

Compensation of the Plan Agent.    For services rendered by the Plan Agent in administering the Plan Trust, the Plan Agent shall receive reasonable compensation as the Plan Agent may agree to with the Plan Trust Board if one is formed.

Plan Trust Expenses.   Subject to the provisions of the Plan Trust Agreement, all costs, expenses and obligations incurred by the Plan Agent in administering this Plan, the Plan Trust, or in any manner connected, incidental or related thereto, in effecting distributions from the Plan Trust thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Plan Trust Assets remaining from time to time in the hands of the Plan Agent. Such expenses shall be paid as they are incurred without the need for Bankruptcy Court approval.

Liability, Indemnification of Plan Agent.   The Plan Agent shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Agent, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud.   The Plan Agent may, in connection with the performance of his or her functions, and in his or her sole absolute discretions, consult with attorneys, accountant and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.   Notwithstanding such authority, the Plan Agent shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Plan Agent unless such determination is based on willful misconduct, gross negligence or fraud.   The Plan Trust shall indemnify and hold harmless the Plan Agent and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of this Plan; *provided, however*, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

Termination.   The duties, responsibilities and powers of the Plan Agent shall terminate after all Plan Trust Assets, including Causes of Action transferred and assigned to the Plan Trust, are fully resolved, abandoned or liquidated and the Cash and other amounts held in Reserve Accounts have been distributed in accordance with this Plan and the Plan Trust Agreement. Except in circumstances set forth below, the Plan Trust shall terminate no later than five (5) years after the Effective Date. However, if warranted by the facts and circumstance provided for in this Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Plan Trust, the terms of the Plan Trust may be extended one or more times (not to exceed a total of five extensions, unless the Plan Agent received a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the state of the Plan Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed six months, based on the particular circumstances at issue.   Each such extension must be approved by the Bankruptcy Court with notice thereof to all of the unpaid beneficiaries of the Plan Trust. Upon the occurrence of the termination of the Plan Trust, the Plan Agent shall file with the Bankruptcy Court a report thereof, seeking an order discharging the Plan Agent.

Plan Trust Board.   Not later than five (5) days before the Confirmation Hearing, at least three (3) of the members of the Unsecured Creditors Committee may be designated by the Committee to serve on the Plan Trust Board.  The members selected to serve must, by that deadline, file with the Bankruptcy Court a notice of the same, signed by the members or its counsel (and multiple notices for multiple members may be combined into one such notice).  So long as at least three (3) members file such notices, the Plan Trust Board shall be created by this Plan.  If at least three (3) members do not timely file such notice(s), no Plan Trust Board shall be created and all provisions of this Plan and any provisions in the Plan Trust Agreement applicable to the Plan Trust Board shall be null and void.  In the event of the death or resignation of a member of the Plan Trust Board, the remaining members of the Plan Trust Board shall have the authority to, and shall promptly, appoint a successor member to the Plan Trust Board, unless the remaining members number at least three (3), in which case the remaining members may, instead, determine to not appoint a successor member.  The Plan Trust Board shall dissolve if, at any point in time, and after a reasonable period to locate and obtain a replacement member has expired, there are fewer than three (3) Plan Trust Board Members.

Function, Duties and Responsibilities.  The Plan Trust Board and the Plan Agent may agree to such role for the Plan Trust Board as they find appropriate, so long as such role does not conflict with any provision of this Plan.

Compensation and Expenses.  The members of the Plan Trust Board shall be entitled to reimbursement of reasonable expenses by the Plan Trust, provided, that, any such reimbursement of reasonable expenses shall not include fees or compensation of an individual member's attorneys or other professionals. Such reimbursement shall be paid from the Plan Trust without further order of the Bankruptcy Court. Members of the Plan Trust Board shall not be entitled to any other compensation from the Plan Trust.

Liability, Indemnification of Plan Trust Board.  Neither the Plan Trust Board, nor any of its members, or designees, nor any duly designated agent or representative or the Plan Trust Board, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Trust Board, nor shall any member of the Plan Trust Board be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Trust Board, other than acts or omissions resulting from such member's willful misconduct, gross negligence or fraud. The Plan Trust Board may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with attorneys, accountants, and its agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Plan Trust Board shall be under no obligation to consult with attorneys, accountants or its agents, and its determination to not do so should not result in imposition of liability on the Plan Trust Board, or its members and/or designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Plan Trust shall indemnify and hold harmless the Plan Trust Board and its members, designees, and Professionals, and any duly assigned agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of this Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross

negligence or fraud.

Privilege.  All communication between the Plan Agent and the Plan Trust Board shall be confidential and privileged by the attorney-client and the joint-interest privilege, unless a majority of the Plan Trust Board waives the same for any given issue or actual litigation ensues between the Plan Agent and the Plan Trust Board.

Standing of the Plan Trust.  The Plan Trust shall be deemed an independent entity and shall have standing to sue and be sued in its own name in any court and to otherwise appear before any administrative body, tribunal or other proceeding.

## ARTICLE VII
## LIQUIDATION AS AN ALTERNATIVE TO PLAN CONFIRMATION

The alternative to a Chapter 11 Plan of Reorganization would be a Chapter 7 liquidation, whereby the assets of the bankruptcy estate would be liquidated and proceeds distributed to the Creditors. All of the Debtor's assets are encumbered by the liens of secured creditors and upon liquidation in a Chapter 7 it is uncertain as to whether the proceeds would extinguish the amount of the secured claims. It is estimated by the Debtor that the liquidation value of the Debtor's assets is such that there would in a best case scenario there would be only sufficient funds to pay 40% of the claims of General Unsecured Creditors after the payment of all outstanding liens, encumbrances, and administrative claims.

However, the Debtor asserts that the proposed Plan will provide more certainty for a full pay-out to the Creditors than the Chapter 7 liquidation alternative. Under the Plan, the impaired classes of Creditors will receive a larger percentage of their claims as the Debtor continues to operate its business; whereas, a Chapter 7 liquidation would yield uncertain distributions to the General Unsecured Creditors.  The Plan provides for an immediate 40% dividend to be paid to all creditors in the Administrative Convenience Class and a 100% dividend to the remaining Unsecured Creditors over a 5-year period. Thus, the Plan yields a more certain payout to Creditors than the Chapter 7 liquidation alternative.

The risk to Creditors is minimal as the Debtor has sufficient amounts of cash flow to make the above-mentioned payments from the Debtor's continued operations as well as the anticipated sale of certain real property.

## ARTICLE VIII
## TAX EFFECTS OF PLAN

An analysis of the federal income tax consequences of the Plan to Creditors, Interest Holders, and the Debtor requires a review of the Internal Revenue Code of 1986 (the "IRC"), final and temporary Treasury Regulations promulgated thereunder, judicial decisions and administrative determinations of the Internal Revenue Service (the "IRS") in effect as of the date of this Disclosure Statement.  Changes in these authorities, which may have retroactive effect or new interpretations of existing authorities, may cause the federal income tax consequences of the Plan to differ materially from the consequences described below. No rulings have been requested from the IRS and no legal opinions have been requested from counsel with respect to any tax consequences of the Plan.

No tax opinion is given by this Disclosure Statement. No representation or assurance is being made with respect to the federal income tax consequences as described herein. The foregoing discussion is not intended as tax advice to the Debtor' Creditors and Interest Holders regarding the federal income tax consequences to them under the Plan. Each Holder of a Claim or Equity Interest affected by the Plan must consult and rely upon such holder's own tax advisor regarding the specific tax consequences of the Plan with respect to such holder's claim or equity interest.

## ARTICLE IX
## FEASIBILITY AND ACCOUNTING PROCESSES USED AND THE IDENTITY OF THE PERSONS WHO FURNISHED THE INFORMATION

### A.      FEASIBILITY

The Debtor believes that the Plan as proposed is feasible based on the financial projections for the next five years as reflected in the cash flow statements to be attached hereto prior to approval of the Disclosure Statement and the solicitations of votes for confirmation of the Plan. The cash flow projections reflect that the Plan Agent will be able to make the payments contemplated under the provisions of the Plan. Therefore, based upon these financial projections, the Debtor asserts that the Plan is feasible and is not likely to be followed by liquidation or the need for further financial reorganization. These financial projections illustrate that the Debtor will have available the necessary cash to fund the Plan of Reorganization after confirmation; have the ability to generate future cash flows sufficient to make the payments called for under the Plan and necessary to continue in business; and other than vagaries of its operations and markets and general economic conditions there are no factors which might make it impossible for the Debtor to accomplish that which it promises under the terms of the Plan or allow it to continue in business as contemplated under the Plan.

### B.      ACCOUNTING PROCESSES USED AND IDENTITY OF PERSONS FURNISHING INFORMATION

All information in the Original Plan of Reorganization and this Accompanying Disclosure Statement has been submitted by the Debtor, unless otherwise indicated. The Debtor's accounting system is on a cash basis and all financial information provided herein is, therefore, based on a cash basis accounting system as opposed to an accrual basis accounting system.

## ARTICLE X
## RETENTION OF JURISDICTION

**Implementation of Plan.** Until this Proceeding is closed, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including that necessary to insure that the purpose and intent of the Plan are carried out and to hear and determine all Claims and Interests set forth in Article III or elsewhere herein that could have been brought before the entry of the Confirmation Order.

**Causes of Action.** The Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors, and to enforce all causes of action that may exist on behalf of the Debtors. Nothing contained herein shall prevent the Reorganized Debtors from taking such action as may be necessary in the enforcement of any cause of action which may exist on behalf of the

Debtors and which may not have been enforced or prosecuted, unless satisfied herein.

**Claims Determinations.**  After the Effective Date, the Bankruptcy Court shall further retain jurisdiction for the purpose of classification of Claims that have been allowed for purposes of voting, and the determination of such objections as may be filed to Claims and Interests.

**Property Determinations.**  The Bankruptcy Court shall further retain jurisdiction through and after the Effective Date for the purpose of determining all questions and disputes regarding ownership and/or title to the assets of the Estate, or the proceeds thereof, and determination of all causes of action, controversies, disputes concerning the Debtors and any other party, including, but not limited to any claim or entitlement associated with the Equity Interests of the Debtors or any right of the Debtors to recover assets pursuant to the provisions of the Bankruptcy Code and to adjudicate all Claims or controversies arising out of any purchase, sale or contract made or undertaken by the Debtors or the Debtors corporation with respect to this Proceeding, the terms or actual implementation or enforcement of the  Plan.

**Other Post-Confirmation Matters.**  The Bankruptcy Court shall further retain jurisdiction for the following purposes through and after the Cash Distribution Date:

(a)     To modify the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code;

(b)     To assure the performance by the Reorganized Debtors of its obligations under the Plan;

(c)     To enter such orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Reorganized Debtors and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

(d)     To enter an order concluding and terminating this Proceeding;

(e)     To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan;

(f)     To decide issues and Claims concerning all tax liabilities which arise in connection with or related to the Debtors, this Proceeding or the Plan, including, without limitation, to hear and determine matters concerning state, local and federal taxes pursuant to Sections 346, 505, 506, 507, 523, and 1146 of the Bankruptcy Code;

(g)     To hear and determine any action or proceeding brought by the Reorganized Debtors pursuant Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code;

(h)     To resolve any disputes arising from distributions made pursuant to the Plan, and adjudicate all controversies concerning classification or allowance of any Claim or Interest;

(i)    To hear and determine all Claims arising from the rejection of Executory Contracts and Unexpired Leases and to consummate the rejection and termination thereof, and further, to hear and determine all matters relating to the assumption of Executory Contracts and Unexpired Leases;

(j)    To liquidate damages or estimate Claims in connection with disputed, contingent or unliquidated Claims;

(k)    To hear and determine all actions brought by or against the Reorganized Debtors arising in or related to this Proceeding or arising under the Bankruptcy Code;

(l)    To hear and determine all requests for compensation and/or reimbursement of expense that may be made after the Confirmation Date.

The Debtor requests all creditors vote in favor of confirmation of the Plan.  In order to pursue a cram-down confirmation under the provisions of 11 U.S.C. §1129(b) the Debtor invokes the Federal Rules of Bankruptcy Procedure governing adversary proceedings.

Respectfully submitted,

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806)765-7491
Facsimile: (806) 765-0553

By   /s/ David R. Langston
David R. Langston:  SBN 11923800
Southern District Bar No. 9489
**Attorneys for Debtor, Garcia Grain Trading Corporation**