United States Bankruptcy Court
Southern District of Texas
**ENTERED**
September 28, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **GARCIA GRAIN TRADING CORP.,** | § | **Case No. 23-70028-EVR-11** |
| | § | |
| | § | |
| **Debtor.** | § | |

### ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO OBTAIN POST PETITION FINANCING, PAYOFF ASSERTED LIENS OF VANTAGE BANK AGAINST ASSETS OF THE ESTATE, AND ESTABLISH PROCEDURES FOR THE FUTURE PURCHASE AND SALE OF EDIBLE BEANS

On the 21st day of September, 2023, came on for consideration the Debtor's Emergency Motion for Authority to Obtain Post Petition Financing, Payoff Asserted Liens of Vantage Bank Texas ("Vantage" and sometimes referred to as the "Bank"), and Establish Procedures for the Future Purchase and Sale of Edible Beans (the ***"Motion"***), filed by the Debtor, and the Court having considered relief requested within the Motion and determined that adequate notice and opportunity for hearing under the circumstances has been given to creditors and parties in interest in the bankruptcy case, and the Court having considered the presentation of the evidence and the argument of counsel and having determined that good cause exists for the granting of the relief sought in such Motion enters the following findings and orders:

1.      On February 17, 2023 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its property as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

2.      An Official Committee of Unsecured Creditors ("Committee") has been appointed in this case and has employed professionals on its behalf.

3.      On August 15, 2023, the Court entered an Agreed Order Granting Debtor's Emergency Motion for Authority to Employ Richard S. Schmidt, Retired U.S. Bankruptcy Judge, as Its Chief Restructuring Officer [Dkt. #4290], and the Honorable Richard S. Schmidt ("Schmidt" or "CRO") continues to serve in that capacity.

4.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.  This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (D), and (O).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Notice of the Motion and the Hearing was served by the Debtor on the Committee and all other parties required under Fed. R. Bankr. P. 4001.  Under the circumstances, such notice constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

5.      In addition to trading feed grains in the Rio Grande Valley of Texas, the Debtor is also engaged in the business of purchasing black and pinto beans from suppliers in the upper Midwest of the United States and selling them to customers in the interior of Mexico.

6.      Before the Petition Date, the Debtor entered purchase contracts for beans from Stony Ridge Foods, Inc. as follows:

| **Commodity** | **Contract #** | **Net Quantity** | **Price** | **Delivery** |
|---|---|---|---|---|
| Black Beans | 891 | 50,000 CWT | $53.00 | 3/18/22 to 11-01-22 |
| Black Beans | 914 | 20,000 CWT | $49.00 | To be determined |

These beans are sold by the Debtor to customers in the interior of Mexico at favorable prices on demand from its customers on a just in time basis.

7.      On April 21, 2023, the Debtor filed its Expedited Motion for Authority to Accept Executory Contracts for the Purchase and Sale of Edible Beans and Sunflower Seeds, or in the Alternative, Request for Authority to Assume and Assign the Contracts to Garba, LLC. [Docket #163].

8.      On May 17, 2023, the Court granted the Motion and entered its Order Granting Debtor Authority to Assume Executory Contracts for Purchase and Sale of Edible Beans and Sunflower Seeds [Docket #229].  This Order granted the Debtor authority to assume the bean supply contracts with Stony Ridge Food, Inc. ("Stony Ridge"), and provided a protocol for the Debtor to purchase and pay for the beans.  The Order provided that the Debtor must keep $400,000.00 in the PACA Reserve Account and order and pay for beans within 5 days of the date of the invoice.  If the Debtor defaulted in the payment of such invoices, then Stony Ridge or any other supplier could provide a Notice of Default and Debtor must take the amount of the unpaid invoice from the PACA Reserve Account, pay the supplier, and then replenish the account back up to the minimum account balance of $400,000.00.

9.      The Order also allowed the Debtor the use of cash collateral derived from the sale of the pre-petition inventory of beans, accounts receivable and cash which were subject to liens and security interests in favor of Vantage Bank Texas ("Vantage").  As adequate protection for the use of the cash collateral the Order granted Vantage replacement liens of like kind, nature, extent, and priority as existed in the same collateral pre-petition plus a super priority administrative claim. Further, the Order specified that the use of the cash collateral was to be in accord with a budget provided by the Debtor reflecting sources and uses of funds for ninety (90) days and required the

Debtor to provide weekly reports to Vantage on the status of its bean inventory, accounts receivable and cash.  Finally, the Order allowed Vantage to issue a Notice of Default, and file it with the Court, requesting the lifting of the automatic stay if the total of the cash consisting of the PACA Reserve Account, the balance in the Bean Enterprise Account plus the value of domestic inventory fell below the total sum of $1,000,000.00.

10.     On August 17, 2023, the Court entered an Agreed Order Granting Debtor Continued Authority for the Use of Cash Collateral for the Purchase and Sale of Edible Beans [Docket #436] which allowed the Debtor to use the cash collateral of Vantage for an additional thirty (30) days on the same terms with expanded reporting requirements as set out in the Order.

11.     While the Debtor has been able to recommence its bean business with the provisions contained in the orders establishing the protocol for the purchase and payment of the beans from Stony Ridge and other suppliers as well as the use of the cash collateral subject to liens in favor of Vantage, the restrictions imposed by maintaining the $400,000.00 balance in the PACA Reserve Account and the limitations related to the maintenance of adequate protection for Vantage of $1,000,000.00 has significantly limited its ability to meet the demand for beans from its customers.

12.     The Debtor brought this Motion seeking authority from the Court to obtain post-petition financing pursuant to the provisions of Section 364(c) of the Bankruptcy Code whereby, upon Vantage releasing its liens to GrainChain's satisfaction, in a form acceptable to Vantage, as to the bean inventory, bean related receivables, and proceeds derived from the sale of beans upon the Debtor's payment as set out in this Order of $400,000.00 out of the PACA Reserve Account and an additional $225,000.00 from its Bean Enterprise Account for a total sum of $625,000.00, GrainChain, Inc. ("GrainChain") extends a $800,000.00 credit facility to the Debtor for the purchase

of bean inventory via a factoring agreement(s) in a form substantially similar to the one attached to this Order as Exhibit "1" ("Factoring Agreement"), with  interest at the rate of *Wall Street Journal* prime interest plus 3.00 percentage points per annum plus the 1% commission as set out in the Factoring Agreement, to be secured by a super priority administrative claim as well as first lien security interests in the Debtor's inventory of beans as well as its accounts receivable derived from beans and the proceeds from the collection of such receivables.

13.     To continue to provide Stony Ridge with adequate assurance of future performance for the purchase of the black beans which are the subject of the supply contracts with Stony Ridge, the Debtor shall pay in full the invoices of Stony Ridge prior to Stony Ridge's shipment of beans ordered on said invoice. Further, the line of credit from GrainChain will specify that all invoices for the purchase of beans must be paid in full prior to Stony Ridge shipment of the beans to the Debtor. Additionally, all suppliers of beans will continue to be protected by the provisions of PACA such that the payment of all outstanding balances owed to suppliers of edible beans must be paid from the proceeds of the beans and such rights are superior to the lien claims of secured creditors.  As a result of such protection, that is, the payment of invoices prior to shipment, the PACA protection, and the additional status of an administrative claim for any amounts which might be owed because of its post-petition transactions, the Debtor seeks authority to no longer be required to keep a PACA Reserve Account.

14.     In order to satisfy the existing replacement liens which Vantage holds against the bean inventory, receivables and cash, the Debtor seeks authority to pay Vantage the proceeds from the funds currently in the PACA Reserve Account totaling $400,000.00, along with an additional $225,000.00 from its Bean Enterprise Account.

15.     In addition to the agreement by Vantage to release its liens against the assets of the Debtor's bean enterprise, it seeks the conveyance or an order modifying the automatic stay such that it can realize the value of its collateral position against the Pitts Property, the Santa Rosa and Donna/Val Verde Grain Facilities and, for the sum of $400,000.00, the transfer and assignment of its rights in the warehouse receipts issued by the Debtor or the turnover of monies received by Vantage from the Texas Department of Agriculture surety bonds for the Debtor's grain facilities (the "Surety Bonds").

16.     Vantage has filed its proof of claim in this case (POC #41) in the amount of $8,789,063.88.  By virtue of an agreement between the Debtor and Vantage, the Bank has agreed to accept a release of its secured and unsecured claims solely against the bankruptcy estate for the: (A) (i) transfer to the Bank, or its assigns, free and clear of all liens, and/or (ii) the net sale proceeds, and/or (iii) lifting of the stay to permit foreclosure of the Bank's lien as to Vantage's real property collateral consisting of the Pitts Property, Santa Rosa Grain Facility, and Donna/Val Verde Grain Facility (and any lease payments received prior to sale of such real properties) (collectively, the Vantage Real Property Collateral) and (B) the payment of $1,025,000.00 (the "Vantage Cash Payment"). Debtor estimates the Vantage Real Property Collateral has a total net value of $6,300,000.00 (the "Vantage Real Property Net Value"). The Vantage Real Property Net Value and the Vantage Cash Payment is estimated as a total net value to Vantage of $7,325,000.00. The debtor presently estimates that the Vantage unsecured deficiency claim is in the amount of $1,464,063.88. Save and except as to the Surety Bonds, Vantage will release its secured interests in the debtor's assets and agree not to seek payment from the bankruptcy estate of any deficiency amounts owed to Vantage after the application of any net proceeds received from the sale and/or transfer of the Vantage Real Property and the Vantage Cash Payment. Vantage will not release and/or assign and/or pay the proceeds to the bankruptcy estate from its claim on the Surety Bonds until after it

receives the payment of the $400,000.00. Any monies received by Vantage in excess of Debtor's/Bankruptcy Estate's estimated net proceeds from the sale of the Vantage Real Property Collateral will be retained by Vantage and the debtor/bankruptcy estate acknowledges that it does not decrease the amount of the Vantage Cash Payment. Conversely, if any monies received by Vantage is less than the Debtor's/Bankruptcy Estate's estimated net proceeds from the sale of the Vantage Real Property Collateral, Vantage will not seek/claim any further monies from the Debtor/Bankruptcy Estate other than the Vantage Cash Payment.

17.    The provision of post-petition financing by GrainChain, the provisions for the satisfaction of the secured and unsecured claims of Vantage against the bankruptcy estate at a discount to the bankruptcy estate, and the ability to expand the volume of its purchase and sale of edible beans are all in the best interest of the estate and its creditors.

18. The decision to enter into the post-petition financing arrangement with GrainChain and the satisfaction of the asserted liens of Vantage and establish new procedures for the future purchase and sale of edible beans is a valid and reasoned exercise of the CRO's business judgment.

19.    Emergency relief is required because time is of the essence.  It is important for the Debtor's business and the estate to put in place the post-petition financing of GrainChain as soon as possible.  The current limitations upon its ability to acquire sufficient inventory of black and pinto beans is limiting the ability of the operation to produce profits.  It is important for the Debtor's bean business to produce as much profit as possible to sufficiently fund and be able to confirm a plan of reorganization.

20.    The Court makes the following findings related to the relief requested in the Motion with respect to the post-petition financing:

a.   Good cause has been shown for the entry of this Order;

b.   There is presently an immediate need for the Debtor to obtain the financing from GrainChain.  For it to obtain such financing it must satisfy the claims of Vantage against such collateral and obtain releases of its replacement liens.  To have sufficient funds to pay $625,000.00 to Vantage it must have the use of the $400,000.00 from the PACA Reserve Account, and then have the authority to turnover sales proceeds, release, or transfer the Vantage Real Property Collateral.  All these actions will benefit the estate and allow it to file a plan of reorganization that is feasible and can be confirmed.  The Debtor is not able to otherwise secure this credit from another source, and it is in the best interest of the estate for these transactions to occur as quickly as possible;

c.   Furthermore, the customers who purchase the pinto and black beans from the Debtor also need to know whether the Debtor will continue to be a source of beans for them.  If the Debtor is not a source for these beans, then the customers in Mexico must locate an alternative source.  Also, the suppliers of the beans need to know whether they continue to market the beans they produce to the Debtor;

d.   The failure to make decisions on an expedited basis about the placement of a viable operating line of credit for the bean enterprise relating to the Debtor's purchase and marketing of the edible beans risks immediate and irreparable harm to the assets of the Debtor and will limit its ability to confirm a plan of reorganization.  The failure to timely undertake these transactions will undoubtedly result in lost opportunities for the estate and damage and diminution to the value of its assets; and

e.   The post-petition financing is fair and reasonable, reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, constitutes reasonably equivalent value and fair consideration, and represents the best financing available.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that, upon Vantage releasing its liens to GrainChain's satisfaction, in a form acceptable to Vantage, as to the bean inventory, bean related receivables, and proceeds derived from the sale of beans upon the Debtor's payment as set out in this Order of $400,000.00 out of the PACA Reserve Account and an additional $225,000.00 from its operating Bean Enterprise Account for a total sum of $625,000.00, the Debtor is hereby granted authority to enter into the lending relationship with GrainChain by

obtaining an $800,000.00 credit facility for the purchase of bean inventory via a factoring agreement(s) in a form substantially similar to the one attached to this Order as Exhibit "1," with interest at the rate of *Wall Street Journal* prime interest plus 3.00 percentage points per annum plus the 1% commission as set out in the Factoring Agreement, to be secured by a super priority administrative claim as well as first lien security interests in the Debtor's inventory of beans as well as its accounts receivable derived from beans and the proceeds from the collection of such receivables.

IT IS FURTHER ORDERED that Debtor is granted authority and directed as a condition of such financing to continue to provide Stony Ridge with adequate assurance of future performance for the purchase of the black beans which are the subject of the supply contracts with Stony Ridge by providing that all invoices for the purchase of beans must be paid in full prior to Stony Ridge's shipment of the beans to the Debtor.

IT IS FURTHER ORDERED that all suppliers of beans will continue to be protected by the provisions of PACA such that the payment of all outstanding balances owed to suppliers of edible beans must be paid from the proceeds of the beans and such rights are superior to the lien claims of secured creditors.

IT IS FURTHER ORDERED, that because of such protection, that is, the payment of invoices prior to shipment, the PACA protection, and the additional status of an administrative claim for any amounts which might be owed because of its post-petition transactions, the Debtor is no longer required to keep a PACA Reserve Account.

IT IS FURTHER ORDERED that, in a form acceptable to Vantage, Vantage shall release its liens as to the bean inventory, bean receivables and cash derived from the sale of beans upon the Debtor's payment to  Vantage of $400,000.00 out of the PACA Reserve Account, and an

additional $225,000.00 from its operating Bean Enterprise Account for a total sum of $625,000.00; the Debtor is authorized to convey or seek to lift the stay against the Pitts Property, the Santa Rosa and Donna/Val Verde Grain Facilities, so as to allow Vantage to realize the value of such collateral, and to purchase from Vantage its warehouse receipts issued by the Debtor and all rights associated with such warehouse receipts or the transfer by Vantage to the bankruptcy estate of any monies received by it from the Surety Bonds for the separate sum of $400,000.00.  In this regard, dependent upon Vantage's election, (i) title to Pitts Property, the Santa Rosa Facility and Donna/Val Verde Grain Facilities will either be transferred and assigned to Vantage, or its designated assigns, free and clear of all liens, by a separate motion and order entered by the Bankruptcy Court; or (ii) the Debtor will agree to the lifting of automatic stay by order of the Bankruptcy Court to permit Vantage to proceed with foreclosure on such real estate assets against which it holds liens; or (iii) if a sale of any or all of such real estate properties occur prior to such election by Vantage, all net proceeds realized from the sale, less reasonable and necessary closing costs, shall be paid over to Vantage.  Furthermore, the transfer and assignment of Vantage's rights in the warehouse receipts issued by the Debtor or the turnover of any monies received by Vantage from the Surety Bonds will not occur until $400,000.00 shall be paid over by the Debtor and delivered to Vantage which in no event shall such payment occur later than the effective date of the Plan or ninety (90) days after entry of the confirmation order.

IT IS FURTHER ORDERED that Vantage shall release its secured and unsecured claims against the estate for the transfer or the foreclosure upon the real estate against which it holds deeds of trust, as is more specifically described herein, having a total estimated net value by debtor of $6,300,000.00 plus the payment of an additional $1,025,000.00 of cash for a total estimated release price of $7,325,000.00. Any monies received by Vantage in excess of Debtor's estimated net

proceeds from the sale of the Pitts Property, the Santa Rosa Facility, or Donna/Val Verde Grain Facilities, and any lease payments received prior to sale of such real properties, will be retained by Vantage and shall not decrease the amount of the cash payment to Vantage of $1,025,000.00. If any monies received by Vantage from the sale of the Pitts Property, the Santa Rosa Facility, or Donna/Val Verde Grain Facilities is less than the Debtor's estimated net proceeds from the sale of such real properties, Vantage will not seek/claim any further monies from the Debtor other than the cash payment to Vantage of $1,025,000.00.

IT IS FURTHER ORDERED THAT the terms and provisions of this Order are effective upon its entry and any stay of its effectiveness is waived.

IT IS FURTHER ORDERED that upon the consummation of this transaction by the transfer and conveyance of the real estate subject to its liens as set forth herein, and the payment of the cash consideration of $1,025,000.00, Vantage will waive its unsecured deficiency claim it holds in this case, estimated by the Debtor in the amount of $1,464,063.88, solely as to the Debtor's estate and Octavio Garcia, individually, but not as to any other guarantors of the notes/monies owed to Vantage as set forth in its proof of claim on file (POC #41) in this bankruptcy proceeding .

Signed: September 28, 2023

_____
Eduardo V. Rodriguez
Chief United States Bankruptcy Judge

**APPROVED AS TO FORM AND CONTENT
AND ENTRY REQUESTED:**

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806) 765-7491
Facsimile: (806) 765-0553
Email: drl@mhba.com

/s/ David R. Langston
David R. Langston, SBN: 11923800
Southern District Bar No. 9489
***Attorneys for the Debtor, Garcia Grain Trading Corp.***

ATLAS, HALL & RODRIGUEZ, LLP
P.O. Box 3725
McAllen, TX  78502-3725
(956) 682-5501 Office
(956) 686-6109 Telecopier
Email: vmskaggs@atlashall.com

 /s/ Vicki M. Skaggs
Vicki M. Skaggs, State Bar No. 13320100
S.D. Texas Federal I.D.  No. 1226
***Attorneys for Vantage Bank Texas***

FLUEGEL, ANDERSON, MCLAUGHLIN,
& BRUTLAG, CHARTERED
129 2nd St. NW
Ortonville, MN  56278
(320) 839-2549
Email: dmclaughlin@fluegellaw.com

/s/ David C. McLaughlin
David C. McLaughlin, Attorney License #127383
***Attorneys for Stony Ridge Food, Inc.***

MCGINNIS LOCHRIDGE
P.O. Box 720788
McAllen, Texas 78504
(956) 489-5958 (Phone)
(956) 331-2304 (Fax)
Email: ccurtis@mcginnislaw.com


/s/Catherine Stone Curtis_____
CATHERINE STONE CURTIS, TBN: 24074100
Federal ID No.: 1129434


And



Steven Shurn
TBN 24013507
sshurn@hwa.com
HUGHES, WATTERS & ASKANASE, LLP
Total Energies Tower
1201 Louisiana, 28th Floor
Houston, Texas  77002
(713) 759-0818 Telephone
(713) 759-6834 Facsimile
(713) 410-2139 Cell Phone
**Counsel for GrainChain, Inc.**

# GRAINCHAIN
# MASTER FACTORING AGREEMENT

This Master Factoring Agreement ("Factoring Agreement") is entered into by and between Garcia Grain Trading Corp, a Texas corporation ("Seller") and GrainChain, Inc., a Delaware corporation ("GrainChain") effective as of _____ ("Effective Date").

## RECITALS

**WHEREAS**, the Seller is operating its business pursuant to its authority as the Debtor in Possession in a Chapter 11 bankruptcy case filed in the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division, styled *In Re: Garcia Grain Trading Corp*, under Case No. 23-70028-11 ("Bankruptcy Case");

**WHEREAS**, the Seller has received authority from the Court in the Bankruptcy Case to enter into this Agreement for the financing of its bean operation with GrainChain;

**WHEREAS,** the Seller desires to sell, and GrainChain desires to purchase certain bean account receivables as described hereto;

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1 DEFINITIONS

1.01    In this Agreement the singular shall include the plural whenever the context requires such construction. The plural shall instead mean the singular whenever the context requires such construction.

1.02    The definitions contained in the Texas Uniform Commercial Code (Chapters 1 through 14 of the Texas Business and Commerce Code) shall apply to terms in this Agreement, unless the terms are specifically defined otherwise in this Article.  Additionally, this Agreement is governed by and interpreted in accordance with Section 306.001 and 306.103 of the Texas Finance Code.

1.03    "Accounts" as used in this Agreement mean Seller's accounts, accounts receivable, chattel paper, and general intangibles that are related to beans only. "Account" refers to one of the Accounts.

1.04    "Approved Accounts" as used in this Agreement means all Accounts fully approved by GrainChain through individual Factoring Operations, in terms substantially similar to those contained in Exhibit 1 (Factoring Confirmation) of the Agreement, and for which GrainChain's approval has not been withdrawn.

1.05    "Collateral" as used in this Agreement means all proceeds and collections, all guaranties and other security, and all right, title, and interest of Seller in all of the Seller's current and future Accounts arising out of or related to Farm Products, limited to beans for this Agreement. All right, title, and interest in the Collateral shall include (w) the right of stoppage in transit of goods; all returned, rejected, rerouted, or repossessed goods; (x) the right of sale or lease of goods that shall have given rise to any Account or instrument; (y) all rights, title and interest in any documents related to or arising from the Collateral; and (z) any rights Seller may have against third

# EXHIBIT "1"

parties for any goods, including but not limited to Farm Products, or services that caused the creation of any Account.

1.06   "Credit Risk" as used in this Agreement means the financial inability of Seller's Customers to pay at maturity any Account.

1.07   "Credit Date" as used in this Agreement means the last date of the month in which Accounts are assigned to GrainChain during a month.

1.08   "Customers" as used in this Agreement mean Seller's customers to whom Seller provides goods or services and from which provision Seller's Accounts are created.

1.09   "Dispute" as used in this Agreement means any dispute, offset, claim, deduction, defense, or counterclaim of whatever type. Dispute includes any dispute concerning goods or services for which have been paid or for which an Account has been created.

1.10   "GrainChain's Offices" as used in this Agreement mean GrainChain's chief place of business, which is located at 2023 N. Jackson Rd., McAllen, Texas 78501.

1.11   "Factored Amount" as used in this Agreement means the amount paid by GrainChain to the Seller in relation to each Factoring Operation.

1.12   "Factoring Confirmation" as used in this Agreement means the electronic or physical approval where, among other things, the Seller will confirm the Factoring Operation of an Approved Account to GrainChain on terms substantially similar to those contained in Exhibit A (Factoring Confirmation) of this Agreement.

1.13   "Factoring Operation" as used in this Agreements means each individual factoring transaction entered into by the Seller and GrainChain in accordance with the provisions of this Agreement, for the transfer and assignment by the Seller in favor of GrainChain of all rights in its Approved Accounts.

1.14   "Farm Products" as used in this Agreement is limited to beans.

1.15   "Maturity Date" as used in this Agreement means December 29, 2023.

1.16   "Net Amount" as used in this Agreement means the faces amount shown on an Account, less all returns, credits, discounts, and allowances given to or claimed by the Customers.

1.17   "Outstanding Factored Amount" as used in this Agreements means the aggregate of the Factored Amount in all Factoring Confirmations minus any amounts received and applied by GrainChain to said Factoring Amount.

1.18   "Total Factoring Amount" as used in this Agreement is the maximum Outstanding Factored Amount, at any given time, that the Seller can access. The maximum Outstanding Factored Amount for this Agreement is eight hundred thousand dollars ($800,000.00) USD. GrainChain, in addition to its rights set out in Section 3.09 herein, reserves the right to approve or reject a written request from Seller for an increase or decrease to the Total Factoring Amount.

1.19   "Unapproved Accounts" as used in this Agreement means all sales and all Accounts that have not been fully approved by GrainChain or all Accounts and all sales for which GrainChain's approval has been withdrawn.

## ARTICLE 2 PURPOSE

The purpose of this Agreement is to recite the terms and agreements by which Seller and GrainChain enter into a maturity factoring agreement for Seller's Accounts and to create a security interest in Seller's Accounts in favor of GrainChain to secure the payment and performance of all liabilities of Seller to GrainChain.

## ARTICLE 3 FACTORING OPERATION AND SALE OF ACCOUNTS

3.01   Subject to the terms and conditions set forth in this Agreement, GrainChain hereby authorizes the factoring of Seller's Accounts through individual Factoring Operations for up to the Total Factoring Amount.

3.02   Seller agrees that GrainChain shall be, and so appoints GrainChain as, the sole factor for all of Seller's Approved Accounts during the term of this Agreement.

3.03   Seller assigns and sells to GrainChain all of Seller's present and future Accounts that are acceptable to GrainChain through Factoring Confirmations similar to those contained in Exhibit A.

3.04   Seller assigns and sells to GrainChain all of Seller's rights in any Collateral arising from any Factoring Operation for Approved Accounts.

3.05   During the term of this Agreement, Seller will not sell, transfer, pledge, or hypothecate any of its Accounts or create a security interest in, to any person, firm, association, or corporation other than GrainChain.

3.06   For any Collateral returned, recovered, or repossessed, Seller shall separate and hold apart that Collateral and shall mark the Collateral with GrainChain's name to indicate that GrainChain is the owner of the Collateral.

3.07   Seller agrees, should any remittance be made direct to Seller, to receive it in trust for GrainChain as the property of GrainChain and to turn over immediately to GrainChain the identical check or other form of payment that was received.

3.08   Seller irrevocably appoints GrainChain, or any person designated by GrainChain, as Seller's true and lawful attorney-in-fact to receive, open, and dispose of all mail addressed to Seller; to endorse the name of Seller on any notes, acceptances, checks, drafts, money orders, or other remittances; to endorse the name of Seller on any invoice, freight, or express bill or bill of lading, storage receipt, warehouse receipt, or other instrument or document in respect to any Approved Account; to sign the name of Seller to drafts against Seller, assignments, or verifications of Approved Accounts and notices to Customers; to change the post office address of Seller if Seller ceases business due to bankruptcy or otherwise, if Seller breaches this Agreement, or if for any reason GrainChain feels insecure; and to do all other acts and things necessary to carry out the

intent of this Agreement. The authority granted to GrainChain in this Agreement shall remain in full force and effect until all Accounts assigned to GrainChain have been paid in full.

3.09    GrainChain reserves the right to reduce or restrict the Total Factoring Amount at its sole discretion, thereby limiting or extinguishing, as the case may be, the Seller's right to enter into Factoring Confirmations.

## ARTICLE 4 GRAINCHAIN'S AGREEMENT TO BUY ACCOUNTS

4.01    GrainChain agrees to purchase from Seller all of Seller's Approved Accounts for the Factored Amount, up to the Total Factoring Amount.

4.02    All Approved Accounts are purchased by GrainChain without recourse to Seller for any Dispute arising from the Account, except as provided in Section 16.04 herein.

4.03    In the event an Account is not an Approved Account but is otherwise acceptable to GrainChain and GrainChain purchases the Account, such acceptable nonapproved Accounts are purchased by GrainChain with full recourse to Seller for any dispute, claim, setoff, counterclaim, or deduction claimed by the Customer on the Account.

## ARTICLE 5 INVOICE AND PAYMENT DISTRIBUTION

5.01    Unless agreed to otherwise by GrainChain and the Seller in writing, the Seller shall notify each Customer of an Approved Account that the Account has been assigned to GrainChain and that the Account balance is payable directly to GrainChain in United States dollars.

5.02    Failure by the Seller to make this notification to Customers of Approved Accounts in no way constitutes a breach of this Agreement by GrainChain, and this Agreement shall remain in full force and effect.

5.03    Upon receipt of payments from Customers of Approved Accounts, GrainChain shall calculate and remit to the Seller the balance, which shall be derived from subtracting the Factored Amount and the fees set forth in this Agreement from the total amount received.

5.04    Seller shall keep copies of all invoices and shipping and delivery receipts at the its main office. Seller shall make these invoices and receipts available for inspection by GrainChain or its agents. At GrainChain's request, Seller will deliver these invoices and receipts to GrainChain's Offices.

5.05    Seller will show on its books and accounting records that Seller has sold the assigned Accounts to GrainChain.

## ARTICLE 6 PURCHASE PRICE AND COMMISSION

6.01    The Factored Amount that GrainChain pays to Seller shall be the Net Amount less GrainChain's commission.

6.02    Seller agrees to using the Factored Amount exclusively for acquiring Farm Products. The Seller shall not allocate any part of the Factored Amount for its operational expenses without explicit written authorization.

6.03    Unless agreed to otherwise in a Factoring Confirmation, GrainChain's commission is one (1) percent of the face amount of each Approved Account, less discounts to the Customer on that Account. GrainChain will charge its commission upon recovery.

6.04    GrainChain will pay the Factored Amount no later than five (5) business days after the date of each Factoring Operation, as specified in the corresponding Factoring Confirmation. GrainChain will pay the Factored Amount to the Seller, at GrainChain's choice, (i) directly to the Seller's Account, or (ii) on behalf of the Seller, to suppliers or third parties who are making payments with the funds from such Factored Amount. For all purposes, it is expressly established that any amounts paid by GrainChain to third parties or reserved by GrainChain are and will constitute effective payments to the Seller under this Agreement.

6.05    The Parties agree and acknowledge that the Factored Amount constitutes the entire price and consideration payable to the Seller for the assignment and transfer of all credit or payment rights, but not the obligations, for the Collateral on Approved Accounts in favor of GrainChain. The Seller will not be entitled to receive any amount in addition to that Factored Amount for Factoring Operations.

## ARTICLE 7 GRAINCHAIN'S STATEMENT TO SELLER

GrainChain will send to Seller, upon request, a settlement statement that shall show any open Factoring Operations along with the amount of Accounts assigned, the total amounts collected on any Account, the Outstanding Factored Amount, the amount of GrainChain's commission paid, and the amount of interest charged to Seller by GrainChain for any advances.

## ARTICLE 8  MAINTENANCE FEE ON FACTORED AMOUNT

8.01    A maintenance fee per Factoring Operation shall accrue from the date of the Factoring Confirmation to its full payment. If there is no rate included or a Factoring Operation is performed with an Unapproved Account, the maintenance fee will be at a rate of prime plus 3% annually (computed on the basis of a 360 day year).  All accrued and unpaid maintenance fees and the entire unpaid principal balance of the Outstanding Factored Amount shall be due and payable.

8.03    GrainChain shall charge the maintenance fee and Factored Amount to Seller's account and shall deduct such sums from any monies due by GrainChain to Seller.

8.04    Upon the occurrence of an event of default as defined in this Agreement or any individual Factoring Operation between the Seller and GrainChain, whether on its scheduled date or due to early maturity, and without the need for any notification or declaration to the Seller, the maintenance fee for the individual Factoring Operations will no longer apply, and instead, the Seller will pay a default rate of two (2) percent per month multiplied by the Outstanding Factored Amount, payable on demand for the amount of days effectively elapsed from the date of non-compliance until the date of full payment of the default amounts.

## ARTICLE 9 SECURITY INTEREST

9.01    Seller, for valuable consideration that has been received, grants to GrainChain a continuing general lien and security interest in the Collateral. The granted continuing lien and

security interest also shall extend to the proceeds of all Collateral and to all of Seller's books and records relating to the Collateral.

9.02    Seller agrees to take any actions and deliver any documents or instruments necessary for GrainChain to perfect and enforce its security interest in the Collateral, including, but not limited to, executing any financing statements under the Uniform Commercial Code or any other applicable laws of the State of Texas, and hereby authorizes GrainChain to file or record any documents or instruments GrainChain determines, in its sole discretion, are necessary to establish, perfect or continue its security interest in the Collateral.

9.03    Upon the occurrence of an event of default as defined in this Agreement or any other agreement between the Seller and GrainChain, GrainChain shall have the rights and remedies of a secured party under the Uniform Commercial Code of Texas, in addition to any other rights and remedies available under this Agreement or any applicable law. The security interest granted hereunder shall be released upon the full payment and performance of all of the Seller's obligations under this Agreement.

9.04    Seller agrees that the security interest granted herein shall secure any and all indebtedness or other obligations owed by Seller to GrainChain, whether arising under this Agreement or any other agreement between Seller and GrainChain.

### ARTICLE 10 REPRESENTATIONS AND INDEMNIFICATION BY SELLER

10.01    The Seller represents and warrants to GrainChain that:

(a)    All Approved Accounts are genuine, due, and payable without any contingencies or conditions;

(b)    The Seller has the legal right to sell, assign, and transfer the Collateral, including but not limited to the Approved Accounts; and

(c)    The Collateral, including but not limited to the Approved Accounts, is free of any liens, claims, or encumbrances.

10.02    Knowledge or discovery by GrainChain of any Dispute between any Customer and Seller with respect to the Collateral or an Approved Account, regardless of the manner in which knowledge or discovery of disputes is received by GrainChain, shall be conclusive and binding on Seller.

10.03    Seller agrees to indemnify and protect GrainChain against liability, loss, or expense caused by or arising out of the rejection of goods or alleged claims or offset of every kind and nature by the Customer.

10.04    Seller will immediately advise GrainChain of any and all Disputes with any Customer and shall, subject to GrainChain's approval, promptly settle such disputes.

10.05    GrainChain shall have the right to charge Seller the amount of any sale or sales which is disputed by a Customer or which is not paid at maturity for any reason. If a deficiency is due to GrainChain, it shall be considered an indebtedness immediately due and payable by Seller.

10.06   GrainChain shall be relieved of any credit risk responsibility involved in any disputed Account, sale, or sales.

10.07   The charging of any disputed sale or Account shall not be deemed a reassignment of the Account but shall merely constitute a bookkeeping entry. Title to the Account and to the goods or services that created the Account shall remain with GrainChain as security for any indebtedness due or to become due.

10.08   Seller further represents and warrants that it is compliance with all federal, state, and local laws, regulations, and governmental requirements applicable to it or to any of its property, business operations, employees and obligations (including but not limited to the Perishable Agricultural Commodities Act of 1930, Employee Retirement Income Security Act of 1974, Occupational Safety and Health Act of 1970, and any environmental laws) and further represents and warrants that compliance with any such laws, regulations and governmental guidance is solely the obligation of Seller.

## ARTICLE 11 PAYMENT OF INDEBTEDNESS TO GRAINCHAIN

11.01   Seller agrees to pay GrainChain on demand for any sum of money that is due or becomes due under this Agreement or that results from any indebtedness due to GrainChain or to any firms for which GrainChain acts as a factor on any open or other account.

11.02   All of Seller's property that comes into GrainChain's possession or control may be withheld as security for any such sum due or indebtedness, as well as any and all obligations owed to any other branch, division, office, or department of GrainChain, regardless of how such obligations arise.

11.03   On termination of this Agreement, any sum due or that will become due to GrainChain, shall be immediately due and payable. On Seller's failure to pay on demand such sum, GrainChain shall have the right to dispose of any and all of Seller's property in its possession or control in satisfaction of such indebtedness. Seller authorizes GrainChain to sell such property or commodities at GrainChain's sole discretion. Any expenses incurred in the selling of such property are to be charged to Seller. Seller agrees to pay to GrainChain, on demand, any deficiency remaining after any sale.

## ARTICLE 12 RIGHT OF STOPPAGE OF GOODS IN TRANSIT

The right of stoppage in transit on all shipments of sales on all Assigned Accounts or Accounts to be assigned to GrainChain is reserved to GrainChain. On GrainChain's request, Seller agrees to stop any delivery of goods or services on its Accounts, to assert its vendor's lien in favor of GrainChain, or to take such other proceedings in connection with its Accounts to effect GrainChain's rights. Any commodities returned by reclaim, exercise of vendor's lien, or under the right reserved in this Article shall be considered returned commodities, and shall be deemed to be Collateral under this Agreement.

## ARTICLE 13 TAXES TO BE PAID BY SELLER

Any and all taxes levied by any and all authorities on sales, accounts receivable, or any transactions under this Agreement shall be paid by Seller; however, if Seller does not pay, GrainChain is authorized to pay said taxes and to charge Seller for such sums.

## ARTICLE 14 RECORDS AND REPORTS

14.01    Seller agrees to keep proper books of its Accounts showing all sales, claims, and allowances, and such books, Accounts, correspondence, and papers shall be open to GrainChain's inspection at all times.

14.02    Seller agrees that, so long as any Approved Account or part of any Approved Account is unpaid, Seller will furnish to GrainChain quarterly, thirty (30) days following the close of each quarterly period, balance sheets and profit and loss statements of Seller as of the close of the preceding quarter and any other information that GrainChain may from time to time reasonably request.

14.03    Seller will furnish to GrainChain within ninety (90) days after the close of the fiscal year of Seller, a copy of the annual audit of Seller prepared in accordance with generally accepted accounting practices and certified in a manner satisfactory to GrainChain by an accountant or accountants selected by Seller and satisfactory to GrainChain.

14.04    In the event Seller fails to perform promptly or breaches any of the promises or obligations contained in this Article, GrainChain shall be entitled to recover from Seller, and Seller shall pay to GrainChain, all attorney's fees, court costs, and all other expenses that may be incurred by GrainChain in the collection of any and all sums due GrainChain from Seller or any guarantor of Seller.

## ARTICLE 15 GRAINCHAIN MAY SETTLE CLAIMS WITH CUSTOMERS AND WAIVER OF RIGHTS

15.01    GrainChain shall have the right to settle or adjust all disputes or claims directly with the Customer with respect to any Approved Accounts and to compromise or extend the time of payment for any Approved Accounts on such terms and conditions as GrainChain may determine without affecting the liability of Seller under this Agreement.

15.02    Seller is prohibited from negotiation of any Approved Accounts, including acceptance of partial payment and settling or offsetting payments on an Account without prior written consent from GrainChain.

15.03    The waiver by GrainChain of any breach of this Agreement or warranty or representation stated in this Agreement shall not be construed as a waiver of any subsequent breach.

15.04    The failure to exercise any right under this Agreement by GrainChain shall not operate as a waiver of such right. All rights and remedies in this Agreement are cumulative.

## ARTICLE 16 TERMINATION OF AGREEMENT

16.01   Unless agreed to by the parties or in the Bankruptcy Case, GrainChain may at its option terminate this Agreement immediately at the occurrence of any of the following:

(a)   If Seller should default in the performance of or breach any of the provisions of this Agreement;

(b)   If Seller should default in the payment of any other indebtedness owing to GrainChain;

(c)   If a petition in bankruptcy or application for other relief under the Bankruptcy Code is filed by or against Seller;

(d)   If a Receiver is appointed for the assets or affairs of Seller;

(e)   If Seller shall make a general assignment for the benefit of creditors;

(f)   If Seller shall become insolvent, or if, in the opinion of GrainChain, there is a materially adverse change in the financial condition of Seller;

(g)   If an attachment or execution should be levied against Seller;

(h)   If for any other reason GrainChain shall deem itself insecure.

16.02   If this Agreement is terminated for any of the reasons listed in this Article 16 or for any other reason whatsoever, all sums due to GrainChain from Seller shall become immediately due and payable.

16.03   In the event that GrainChain ceases to act as factor for Seller, Seller agrees to furnish to GrainChain indemnity satisfactory to GrainChain against any items which could be charged to Seller under the terms of this Agreement.

16.04   If Seller ceases to do business, all Accounts previously purchased by GrainChain on a nonrecourse basis shall be immediately deemed to have been purchased with recourse and shall become immediately due and payable.

16.05   Seller waives the rights of demand of performance, advertisement, and presence of property at sale.

16.06   GrainChain is authorized to sell any evidence of debt assigned to it.

16.07   All demands and presentments of every kind or nature are expressly waived by Seller. Seller waives the right to request GrainChain to proceed against any Customer or to proceed against any security that GrainChain may hold including, but not limited to, the Accounts assigned under this Agreement. Seller waives the right to require GrainChain to pursue any other remedy for the benefit of Seller. Seller agrees that GrainChain may proceed against Seller for the amount of any indebtedness owed by Seller to GrainChain without taking any action against any Customer or any other party and without selling or otherwise proceeding against or applying any security that GrainChain may hold, including, but not limited to, the Collateral and assigned Accounts.

## ARTICLE 17 TERM OF AGREEMENT

This Agreement shall terminate as of the Maturity Date. If at the end of the duration of this Agreement, Factoring Operations are still ongoing, the Parties agree to continue applying the terms and conditions agreed upon in this Agreement for such Factoring Operations until the rights and obligations derived from the respective Factoring Operations have been fully satisfied and fulfilled. Notwithstanding anything in this Article, GrainChain may terminate this Agreement at any time on seven (7) days' written notice sent to Seller; provided, however, if Seller is in default under any provision of this Agreement, GrainChain may terminate this Agreement immediately.

## ARTICLE 18 PAYMENT OF CREDIT BALANCE TO SELLER

When all sums due to GrainChain have been paid, any credit balance on GrainChain's books in favor of Seller will be paid to Seller on execution and delivery of the termination agreement.

## ARTICLE 19 EXECUTION AND DELIVERY OF ADDITIONAL DOCUMENTS

Seller agrees to execute and deliver to GrainChain any and all additional instruments or documents, including, but not limited to, all documents required by the Texas Business and Commerce Code for the perfection or modification of security interests. Seller also agrees to do all things that GrainChain from time to time may deem necessary or convenient to carry into effect the provisions of this Agreement.

## ARTICLE 20 ADDRESSES AND METHODS FOR NOTICES

Unless agreed to otherwise in writing, any notice to be sent to Seller pursuant to this Agreement shall be sent to Seller by email to rss@judgerss.com and dlangston@mhba.com by registered mail to:

> Hon. Richard Schmidt
> Garcia Grain Trading Corp
> 101 N. Val Verde Road
> Donna, Texas 78537

> With a copy to David R. Langston:
> David R. Langston
> Mullin Hoard & Brown, L.L.P.
> P.O. Box 2585
> Lubbock, Texas 79408

Any notice to be sent to GrainChain pursuant to this Agreement shall be sent to GrainChain by email to lmacias@grainchain.io and jlopez@grainchain.io, or by registered mail to GrainChain's Offices, unless previously changed in writing.

## ARTICLE 21 MISCELLANEOUS PROVISIONS

21.01   The laws of the United States of America and the State of Texas govern all matters arising out of or relating to this Agreement without giving effect to any conflict of law principles.

Each of the parties irrevocably consents to the exclusive personal jurisdiction of the federal and state courts located in Hidalgo County, Texas, as applicable, for any matter arising out of or relating to this Agreement.

21.02   Any of the terms or conditions of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof but only by a written notice signed by the party or parties waiving such terms or conditions.

21.03   This Agreement may be amended or supplemented at any time only by written instrument duly executed by GrainChain and the Seller.

21.04   Each of Seller and GrainChain shall be solely responsible for, and shall pay all of its own expenses associated with the transaction described in this Agreement, including but not limited to its accounting, consultants, attorney's fees, and out-of-pocket expenses incurred in connection with this Agreement, or the transactions herein contemplated.

21.05   This Agreement (and any related documents executed by the parties contemporaneously) set forth the entire understanding of the parties with respect to the subject matter hereof. Any agreements or understandings on previous dates between the parties regarding the subject matter hereof are merged into and superseded by this Agreement. All representations, warranties, covenants, terms and conditions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by each respective party and their respective heirs, legal representatives, successors and assigns; provided, however, that none of the rights or obligations of any of the parties hereto may be assigned without the prior written consent of, in the case of assignment by Seller, GrainChain, or, in the case of assignment by GrainChain, Seller.

21.06   In the event that any one or more of the provisions contained in this Agreement shall be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions of this Agreement shall not be in any way impaired.

21.07   This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument. Each counterpart will be deemed to be an original instrument and all counterparts taken together will constitute one agreement. An electronic signature (including a facsimile or email scanned signature or signatures obtained via DocuSign or similar applications) shall be deemed an original signature for all purposes.


GrainChain, Inc                                  Garcia Grain Trading Corp



_____        _____
By: Luis Macias                                  By: Hon. Richard Schmidt
Title: CEO                                          Title: Chief Restructuring Officer

# EXHIBIT A

## FACTORING CONFIRMATION

This Factoring Confirmation is executed on _____ in accordance with the provisions of the Master Factoring Agreement (the "Agreement") with an Effective Date of _____, entered into by and between Garcia Grain Trading Corp, a Texas corporation ("Seller") and GrainChain, Inc., a Delaware corporation ("GrainChain"). Terms capitalized in this document that are not defined herein shall have the meanings ascribed to them in the Agreement.

In accordance with the provisions of the Agreement, the Seller and GrainChain hereby confirm their mutual agreement and understanding concerning the following:

(a) Assignment of Approved Accounts. The Seller hereby assigns and transfers in favor of GrainChain all of its rights in any Collateral, as well as any payable and/or paid amounts arising from, or related to, the following Approved Accounts and all amounts owed or that will be owed in accordance with the same and all amounts received in relation to the same:

| Approved Account | Factoring Operation Date | Factored Amount | Forward Sale Price (Estimated) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

(b) Maintenance Fee. The Maintenance Fee applicable to the Factoring Operation according to this Factoring Confirmation will be calculated from the date of this Factoring Confirmation until the final payment date of the Factoring Operation, as applicable: Same as Article 8 of the Agreement

(c) Commissions. The Seller hereby agrees to pay the following Commissions to GrainChain: Same as Article 6 of the Agreement.

(d) Seller Warranties. The Seller guarantees and warrants that: (i) the statements made in this document are accurate and true as of this date, before and after giving effect to the operations contemplated by this, (ii) there is no default, and no default will occur as a result of the operations contemplated by this, (iii) there is no breach by the Seller or any payer and no claims, actions or proceedings involving the Seller, any payer or any individual or entity related to the assigned Approved Accounts that could affect the fulfillment of the Seller's obligations under the Agreement and any other financing documents, and (iv) it is the legal owner of the rights to be assigned, and there is no legal or contractual limitation to assign them in favor of GrainChain.

By signing where indicated, I hereby acknowledge my agreement with the stated terms and conditions. If manually signing this agreement, please sign and date the original and attached copy of this document. The original must be returned to GrainChain, and a copy should be retained for your records. Your failure to execute and return this Factoring Confirmation or to notify GrainChain of its disagreement with any term of this contract within three (3) business days following the date of this Factoring Confirmation will constitute your acceptance of all terms set forth herein.


GrainChain, Inc                                    Garcia Grain Trading Corp



_____          _____
By: Luis Macias                                    By: Hon. Richard Schmidt
Title: CEO                                         Title: Chief Restructuring Officer