**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | |
| **GARCIA GRAIN TRADING** | § | **Case No. 23-70028-EVR-11** |
| **CORP.,** | § | |
| | § | |
| **Debtor.** | § | |

**DEBTOR'S ~~ORIGINAL~~FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

**TABLE OF CONTENTS**

**ARTICLE I**
SUMMARY OF THE PLAN .................................................................................3

**ARTICLE II**
DEFINITIONS, RULES OF INTERPRETATION AND ~~ACCOMPANYING~~COMPUTATION OF TIME.................................................................................4

    A. FUNCTION AND PURPOSE OF THE PLAN OF REORGANIZATION ...........4
    B. DEFINITIONS OF TERMS USED IN THE PLAN AND DISCLOSURE
    STATEMENT ....................................................................4

**ARTICLE III**
DESIGNATION OF CLASSES OF CLAIMS ...........................................................15

**ARTICLE IV**
PAYMENT OF ADMINISTRATIVE CLAIMS PRIORITY UNSECURED CLAIMS .............16

**ARTICLE V**
SUMMARY OF TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS .....17

    A. TREATMENT OF CLAIMS OF SECURED CREDITORS................................17
    B. TREATMENT OF OTHER CLAIMS .................................................21
    C. MEANS FOR IMPLEMENTATION OF THE PLAN .......................................23

**ARTICLE VI**
TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ....................................29

**ARTICLE VII**
TREATMENT OF CLAIMS OWNED BY THE ESTATE ..........................................................66

**ARTICLE VIII**
EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....................................................67

**ARTICLE IX**
THE PLAN TRUST.........................................................................................................67

**ARTICLE X**
LIQUIDATION AS AN ALTERNATIVE TO PLAN CONFIRMATION ..................................71

**ARTICLE XI**
TAX EFFECTS OF PLAN ...............................................................................................71

**ARTICLE XII**
FEASIBILITY AND ACCOUNTING PROCESSES USED AND THE
IDENTITY OF THE PERSONS WHO FURNISHED THE INFORMATION..........................72

     A. FEASIBILITY  ................................................................................................72
     B. ACCOUNTING PROCESSES USED AND IDENTITY OF PERSONS
       FURNISHING INFORMATION ....................................................................72

**ARTICLE XIII**
EFFECTS OF CONFIRMATION OF PLAN, INJUNCTION AND EXCULPATION ...............73

**ARTICLE XIV**
MODIFICATIONS OF PLAN ...........................................................................................74

**ARTICLE XV**
GENERAL PROVISIONS ................................................................................................74

**ARTICLE XVI**
RETENTION OF JURISDICTION.....................................................................................76

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| **In Re:** | **§** | |
| | **§** | |
| **GARCIA GRAIN TRADING** | **§** | **Case No. 23-70028-EVR-11** |
| **CORP.,** | **§** | |
| | **§** | |
| **_____ Debtor.** | **§** | |

**DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

TO THE HONORABLE EDUARDO V. RODRIGUEZ, U.S. Bankruptcy Judge, and All Creditors and Parties in Interest:

NOW COMES, Garcia Grain Trading Corporation ("**Garcia Grain**" or "**Debtor**"), the Debtor-in-Possession in the above-referenced bankruptcy proceeding, and files this its ~~Original~~First Amended Plan of Reorganization ~~and Accompanying~~("**Plan**"). A First Amended Disclosure Statement. ~~This document is intended to serve the dual purpose of a Plan of Reorganization and a~~ ("**Disclosure Statement**~~as those terms are defined in~~") is simultaneously being filed which must be approved (including any approved amendments, supplements or attachments) by ~~the Bankruptcy Code. The~~ Court before any solicitation of the Plan ~~of Reorganization ("Plan") will set forth~~may proceed. Accordingly, the ~~manner and means by which the Debtor intends to pay its creditors and reorganize its financial structure so that it can continue operations. The Disclosure Statement ("Disclosure Statement") contains information intended to solicit the~~ filing or service of a copy of this First Amended Plan is not a solicitation of acceptance of ~~the~~this Plan until accompanied by ~~persons who are entitled to vote on confirmation or rejection of the Plan of Reorganization.~~ the Approved Disclosure Statement

## ~~ARTICLE I~~
## ~~OVERVIEW OF PLAN IN CHAPTER 11~~

~~Pursuant to the terms of the Bankruptcy Code, this Disclosure Statement must be approved by the Bankruptcy Court. Such approval is required by statute and will not constitute a judgment of the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.~~

~~Contained in the packet of documents which has been sent to you by the Debtor is the Disclosure Statement, the Plan, the Ballot for Voting on the Plan (the "Ballot") and the Order Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejection of Plan, Combined with Notice Thereof. Please read all these materials carefully. Please note that for your vote to be counted, you must: 1) include your name and address, 2) fill in, date, and sign the enclosed Ballot and 3) return it to the attorney for the Debtor by the date and time specified on the Ballot.~~

~~A.~~ ~~Explanation of Chapter 11~~

~~Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, an attempt is made to restructure the Debtor's finances so that the Debtor may continue to operate their business and repay their creditors.  Alternatively, the Chapter 11 Plan may provide for the liquidation of the Debtor's assets, with the properties subject to security interests going to the respective secured creditors and all remaining property satisfying, first, administrative claims and, secondly, general unsecured claims.  Formulation of a~~<u>This First Amended</u> Plan of Reorganization ~~is~~<u>("**Plan**") will set forth</u> the ~~primary purpose of a reorganization proceeding under Chapter 11.~~

~~Purpose of the Plan. The Debtor has filed contemporaneous hereto its Plan of Reorganization. The purpose of the Debtor's Plan is to provide for the successful reorganization of the Debtor's business. The Plan was developed by the Debtor with input from the Committee~~<u>manner</u> ~~and proposes, among other things, the~~<u>means by</u> which ~~all Claims against the Debtor will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code. The Plan is essentially a new contract between the Debtor and~~ <u>the Debtor intends to treat and pay its creditors and reorganize</u> its ~~Creditors, proposed by the Debtor to its Creditors for approval. Creditors approve or disapprove of the Plan by voting their Ballots on the Plan, if they are in a Class entitled to vote, and, if appropriate, by objecting to confirmation of the Plan. However, the Plan can be confirmed by the Bankruptcy Court even if less than all Creditors or Classes accept the Plan and, in such an instance, the Plan will still be binding on those Creditors or Classes that reject the Plan. Approval and consummation of the Plan will enable the Bankruptcy Case to be finally concluded.~~

~~The Debtor believes that the Plan is more attractive than other alternatives, such as conversion to Chapter 7 liquidation or dismissal of this Bankruptcy Case. The alternatives to the Plan are more fully discussed in this Disclosure Statement in Article VIII of this Disclosure~~

Statement. EACH CREDITOR IS URGED TO READ THE PLAN PRIOR TO VOTING.

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets. According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing financial structure so that its operations may be continued as a post-Chapter 11 under a structure designed to allow the maximum payment potential to its creditors. The Approved Disclosure Statement contains adequate information has been provided to each creditor or equity interest holder. This Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

**B.     Disclosure Statement**

Why You Have Received This Disclosure Statement. You have received this Disclosure Statement because the Debtor has proposed a Plan with the Bankruptcy Court to satisfy its debts and provide for reorganization of its business. The Bankruptcy Court held a hearing and approved this Disclosure Statement on _____. A copy of the Plan is enclosed with the materials that you have received. This Disclosure Statement, as required by 11 U.S.C. § 1125, is being provided to all known Creditors and other intended to allow the Debtor, interested parties in interest whose claims are impaired in connection with the solicitation and including the Official Committee of Unsecured Creditors, and any Plan Proponent1, to solicit the acceptance of the Plan proposed by the Debtor.

Purpose of this Disclosure Statement. The Purpose of this Disclosure Statement is to provide the Creditors and parties in interest adequate information to make an informed judgment about the Debtor's Plan and in exercising their rights either to accept or reject the Plan. Generally, this information includes, among other matters, a brief history of the Debtor, a history of Chapter 11 case, a description of the remaining assets and liabilities of the Debtor, an explanation of how the Plan will function and an explanation of why the reorganization of the Debtor under the proposed Plan should result in a greater benefit to the Creditors than if the Chapter 11 case was converted to a Chapter 7 case and a Chapter 7 Trustee was appointed.

Sources of Information. The information contained in this Disclosure Statement has been submitted by the Debtor unless specifically stated to be from other sources. Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments. While the Debtor has made every effort to retain the meaning of such other instruments or the portions transposed, the Debtor urges that any reliance on the contents of such other instrument should depend on a thorough review of the instruments themselves.

Only Authorized Disclosure. No representations concerning the Plan are authorized by the

---

1     Other than the Debtor, is anticipated that GrainChain, Inc. will be the only Plan Proponent.

Debtor or the Bankruptcy Court other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote which are other than herein contained should not be relied upon, and such representations or inducements should be reported to counsel for the Debtor,persons who shall deliver such information to the Bankruptcy Court.

Voting on the Plan.  **YOUR ACCEPTANCE OF THE PLAN IS IMPORTANT.**  A Creditor or Equity Interest Holder, in order to vote on the Plan, must have filed a proof of claim or interest on or before the Bar Date, unless the Debtor did not schedule the claim as Disputed, Unliquidated or Contingent. Any Creditor whose Claim is not scheduled as Disputed, Unliquidated or Contingent is, to the extent scheduled, deemed to have filed a Claim and, absent objection, such Claim is deemed Allowed.  A Creditor or Equity Interest Holder may vote to accept or reject the Plan by filling out and mailing to counsel for the Debtor the Ballot which has been provided in this package of information.

In order for the Plan to be accepted by a class of Creditors, more than one half in number and at least two-thirds in amount of such class of Claims must vote to accept the Plan.  Only those Claim Holders that actually vote are considered in the calculations.  In order for the Plan to be accepted by Equity Interest Holders, at least two-thirds in number of interests must vote to accept the plan.  Again, only voting Equity Interest Holders are considered in the calculation.  You are, therefore, urged to fill in, date, sign and promptly mail, email and/or fax the enclosed Ballot which has been furnished to you to counsel for the Debtor as follows:

David R. Langston
MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Email: drl@mhba.com
Facsimile: 806-765-0553

The Court has fixed November ___, 2023, as the last date by which Ballots must be served on counsel for the Debtor.  Except to the extent allowed by the Bankruptcy Court, Ballots that are received after such time will not be counted.  Ballots of Holders of Impaired Claims received pursuant to this solicitation and which are signed but are not expressly voted for are entitled to vote on acceptance or rejection of the Plan will be counted as Ballots for accepting the Plan.  A Ballot accepting the Plan may not be revoked, except by order of the Bankruptcy Court.confirmation of the Plan of Reorganization.

Whether a Creditor votes on the Plan or not, each creditor will be bound by the terms and treatments set forth in the confirmed Plan that is accepted by the requisite majorities of creditors and is confirmed by the Court, or as confirmed by the Court pursuant to the provisions of 11 U.S.C. § 1129(b). Absent some affirmative act constituting a vote, a Creditor not voting on the Plan will not be included in the tally. Allowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will be allowed for distribution purposes.

You are urged to fill in, date, sign and properly mail in duplicate the enclosed ballot, which has been provided.  Be sure to properly complete and legibly identify the name of the creditor, the

class in which you believe the claim is treated in the Plan, the amount of the claim, and indicate whether you are voting for or against confirmation of the Plan. Representatives of the Debtor or creditors of the Debtor may solicit your vote. The cost of any solicitation by the Debtor will be borne by the Debtor.  Likewise, the solicitation costs of competing plan proponents will be borne by the parties proposing the competing plan.

**C.    Creditors Entitled to Vote.**  Any creditor whose claim is impaired under the  Plan is entitled to vote, if either i) its claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent, or unliquidated, or ii) it has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings.  Any claim as to which an objection has been filed and such objection is still pending is not entitled to vote, unless the Bankruptcy Court temporarily allowed the claim in an amount which it deems proper for the purpose of accepting or rejecting the Plan upon application by the creditor.  Such application must be heard and determined by the Bankruptcy Court at such time as specified by the Bankruptcy Court.  A creditor's vote may be disregarded if the Bankruptcy Court determines that the creditor's acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Court.

**D.    Definition of Impairment.**  Under Section 1124 of the Bankruptcy Code, a class of claims or equity security interests is impaired under a Chapter 11 Plan unless, with respect to each claim or interest of such class, the  Plan:

    a.    Leaves unaltered the legal, equitable, and contractual rights of the holder of such claim or equity security interest; or

    b.    Notwithstanding any contractual provision or applicable law that entitled the holder of a claim or equity security interests to receive accelerated payment of his claim or equity security interests after the occurrence of a default:

        1.    Cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default that consists of a breach of any provisions relating to the insolvency or financial condition of the Debtors at any time before the closing of the case, the commencement of a case under the Bankruptcy Code, or the appointment of or taking possession by a trustee in a case under the Bankruptcy Code;

        2.    Reinstates the maturity of such claim or equity security interest as it existed before the default;

        3.    Compensates the holder of such claim or equity security interest for damages incurred as a result of reasonable reliance on such contractual provisions or applicable law; and

        4.    Does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity security interest entitles the holder of such claim or equity security interest; or

    c.    Provides that, on the effective date of the Plan of Reorganization, the holder of such claim or equity security interest receives on account of such claims or equity security interest, cash equal to:

        1.    With respect to a claim, the allowed amount of such claim

~~2.   With respect to any equity security interest, if applicable, the greater of:~~

~~i.   Any applicable fixed liquidation preference; or~~

~~ii.   Any fixed price at which the Debtors, under the terms of the security, may redeem the security.~~

~~E.   **Classes Impaired.**   Classes Three, Four, Six, Seven, Eight, Nine, Ten, and Eleven are all impaired under the treatment afforded the Creditors in these classes under the provisions of the Plan.~~

~~F.   **Votes Required for Class Acceptance.**   The Bankruptcy Code defines acceptance of a Plan by a class of creditors or equity security interests holders as acceptance by holders of two-thirds in dollar amount and a majority in number of the claims or equity security interests of that class which actually cast ballots for acceptance or rejection of the Plan; i.e., acceptance takes place only if sixty-six and two-thirds percent (66 2/3%) in amount of claims and equity security interests in each class and more than fifty percent (50%) of claims or equity security interests voting in each class cast their ballots in favor of acceptance.~~

~~NOTICE~~

**ARTICLE I**

SUMMARY **OF** ~~HEARING ON CONFIRMATION~~

~~NOTICE IS HEREBY GIVEN THAT THE COURT HAS SCHEDULED A HEARING TO DETERMINE WHETHER OR NOT~~ **THE PLAN** ~~SHOULD BE CONFIRMED ON THE DAY OF NOVEMBER, AT       .M., IN THE UNITED STATES BANKRUPTCY COURTROOM. YOU HAVE A RIGHT TO ATTEND THE HEARING AND PRESENT TO THE COURT YOUR ARGUMENTS EITHER IN FAVOR OF OR IN OPPOSITION TO CONFIRMATION OF THE PLAN.~~

~~**The hearing will be held via Go to Meeting.**   To participate electronically, parties must follow the instructions set forth on Judge Rodriguez's web page located at: https://www.txs.uscourts.gov/content/united-states-bankruptcy-judge-eduardo-v-rodriguez. Parties are additionally instructed to: (i) call in utilizing the dial-in number for hearings before Judge Rodriguez at 832-917-1510, conference room number 999276 and (ii) log on to GoToMeeting for video appearances and witness testimony, utilizing conference code: judgerodriguez.~~

~~Parties MUST HAVE TWO SEPARATE DEVICES to appear by video and telephonically. One device will be used to log on to GoToMeeting and the other will be used to call the telephonic conference line.~~

~~**NOTICE OF THE FIXING OF A BAR DATE AND THE REQUIREMENTS FOR FILING AND ALLOWANCE OF CLAIMS**~~

~~NOTICE IS HEREBY GIVEN that the Court set~~ **June 20, 2023,** ~~as the last day upon which proofs of claim can be filed with the Court for the Debtor's case.~~

~~DISCLOSURE OF EFFECT OF COURT'S APPROVAL OF~~ Overview of the Plan. ~~THIS~~ OVERVIEW DOES NOT REPLACE A THOROUGH READING OF THE DISCLOSURE STATEMENT AND ~~OF THE ACCURACY OF THE REPRESENTATIONS CONTAINED IN~~ A READING OF THIS ~~DISCLOSURE STATEMENT.~~ PLAN.

~~COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN, NOR DOES COURT APPROVAL OF THE DISCLOSURE STATEMENT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF. APPROVAL OF THE DISCLOSURE STATEMENT BY THE COURT REPRESENTS A DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS REQUIRED BY 11 U.S.C. SECTION 1125 AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.~~

~~THE DEBTORS SEEK AN AFFIRMATIVE VOTE FROM EACH CLASS AND EACH HOLDER OF A CLAIM IN THIS BANKRUPTCY PROCEEDING. THE BALLOT THAT YOU WILL RECEIVE PERMITS YOU TO ACCEPT OR REJECT THE PLAN.~~

~~EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS OR OBTAINED FROM THEIR RECORDS AND FILES. THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE BEST INFORMATION AVAILABLE TO THE DEBTORS AT THE TIME THAT THE DISCLOSURE STATEMENT WAS PREPARED.~~

~~THE DEBTORS FAVOR ACCEPTANCE OF THE PLAN AND BELIEVE THAT CONFIRMATION OF THE PLAN WOULD REALIZE PAYMENT OF LARGER DIVIDENDS TO CREDITORS THAN COULD BE OBTAINED THROUGH A CHAPTER 7 LIQUIDATION. SUCH CONCLUSION IS BASED ON INFORMATION IN THE POSSESSION OF THE DEBTORS AT THE TIME THE DISCLOSURE STATEMENT AND PLAN WAS PREPARED.~~

~~WHILE THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED OR VERIFIED EXCEPT WHERE SPECIFICALLY STATED, AND THE RECORDS KEPT BY THE DEBTORS ARE NOT REPRESENTED TO BE WITHOUT ANY INACCURACY OR OMISSION, THE DEBTORS FIRMLY BELIEVE THAT EVERY EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.~~

~~G.    CRAMDOWN. If any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity security interests. "Fair and equitable" has different meanings for secured claims and unsecured claims.~~

~~With respect to a secured claim, "fair and equitable" means either: i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at~~

least equal to the allowed amount of its claim with a present value on the effective date of the  Plan at least equal to the value of such secured creditor's interest in the property securing its liens; or ii) property subject to the lien of the impaired secured creditors is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the  Plan.

With respect to an unsecured claim, "fair and equitable" means either i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or ii) the holders of the claims and equity security interests that are junior to the claims of the dissenting class will not receive any property under the  Plan.

In the event one or more classes of impaired claims rejects the Plan, the Bankruptcy Court will determine at the hearing for confirmation of the Plan whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims. If the Bankruptcy Court determines that the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims, the Bankruptcy Court can confirm the Plan over the objection of any impaired class.

The Plan provides for a reorganization of the Debtor and for the resolution and treatment of outstanding Claims and Equity Interests and payments to creditors. The Plan provides for the Debtor to transfer its issued and outstanding stock to the Plan Trust created herein, and to eventually dissolve its organizational structure following confirmation – with the result being all of its assets transferred to a **Plan Trust** or to a new entity ("**New Co.**") that owns and holds those assets subject to the terms of this Plan. In other words, the Plan does not provide for the continued operations of Garcia Grain Trading Corp. as an ongoing Texas corporation. Instead, the Plan contemplates operations by New Co. that will supervise operations, work with the Plan Agent, and will pay over net profits to the Plan Trust Agent (the "**Plan Agent**") to be distributed to the holders of unsecured claims over the 5-year term of the Plan. The Plan Agent and New Co. will also work to realize the highest obtainable price for the assets to be contributed to the Plan Trust and to be sold in accordance with this Plan and when sold, the net proceeds to be distributed by the Plan Trust to Creditors who are the Beneficiaries of the Plan Trust.

**Payments to Creditors**. The Plan provides for Creditors to be paid as provided in Article V herein. All Creditors of the Debtor will be paid as provided in accordance with the priority scheme established by the Bankruptcy Code. PLEASE CONSULT ARTICLE V FOR SEPARATE INFORMATION REGARDING THE SPECIFIC TREATMENT OF YOUR CLAIM. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE II
### ~~INTRODUCTION TO DEBTOR'S PLAN~~

A.  ~~Function and Purpose of the Plan of Reorganization~~DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

A.  FUNCTION AND PURPOSE OF THE PLAN OF REORGANIZATION

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets. According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 Plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder. This Plan and accompanying Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

The Debtor believes the Plan and the Disclosure Statement contain adequate information – that is, information of a kind and in sufficient detail, as far as is reasonably practical in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about the Plan.

**B.   History of the Debtor and Background Information Related to Need for Financial Reorganization.**

**1.   The Debtor**

Garcia Grain filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, McAllen Division (the "Bankruptcy Court"), on February 17, 2023 (the "Petition Date"). Since that time, the Debtor has continued to operate as Debtor-in-Possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code.

The Debtor was incorporated on June 22, 1998, by Octavio Garcia, Rodolfo Plascencia, Sr. and Baldemar Salinas Cantu for the purpose of operating licensed grain storage facilities in the Rio Grande Valley and Coastal Bend regions of the State of Texas. The Debtor originally owned and operated grain storage facilities located at Progreso, Texas, and then it acquired additional grain facilities in Donna, Edcouch, Alamo, and Santa Rosa, Texas.

Each of these storage facilities were bonded and licensed by the Texas Department of Agriculture (the "TDA"). The total of the surety bonds issued by Harco National Insurance Co. for each of the public grain warehouses in the possession of the TDA on the Petition Date for each facility is set forth in the following chart:

| Location of the Public Grain Warehouse | Penal Sum of Bond | Date of Last Rider |
|---|---|---|
| Progreso, Texas | $1,009,750 | 6/01/2022 |
| Santa Rosa and Donna, Texas | $739,200 | 6/01/2022 |
| Edcouch, Texas | $406,700 | 6/01/2022 |
| Alamo, Texas | $242,200 | 6/01/2022 |
| TOTAL | $2,397,850 | |

The laws of the State of Texas require that all public grain warehouses be bonded prior to the TDA issuing them a license to operate.

In summary, these bonding requirements are as follows:

Tex. Agric. Code Ann. § 14.031 requires that each applicant for a license to warehouse grain "shall file or have on file a bond" with the Department.

(a) In accordance with this section, each applicant for a license shall file or have on file a bond with the department.

(b) The bond must:

(1) be payable to the State of Texas;
(2) be executed by the applicant as principal;
(3) be issued by a corporate surety licensed to do business as surety in the State of Texas; and

(4) be in a form and contain terms and conditions prescribed by the department.

Tex. Agric. Code Ann. § 14.031 (West).

These bonds are tied to the location of each public grain warehouse.

Tex. Agric. Code Ann. § 14.031 (f)

"Except as provided by department rule, the applicant must give a single bond meeting the requirements of this section to cover warehouses licensed as a single facility or combination. A single bond may not be used to cover more than one individually licensed facility, more than one combination, or one or more individually licensed facilities and one or more combinations."

The bonds are in place for the benefit of those persons that meet the definition of a "Depositor."

Tex. Agric. Code Ann. § 14.001 defines "depositor" as follows:

"(1) "Depositor" means a person who:
(A) delivers grain to a public grain warehouse for storing of the grain for hire, handling of the grain for hire, or shipping of the grain for hire;
(B) is the owner or legal holder of an outstanding receipt for grain stored in the public grain warehouse issuing the receipt; or
(C) is lawfully entitled to possession of grain stored in a public grain warehouse."

Tex. Agric. Code Ann. § 14.001 (West).

These statutes requiring public grain warehouses to be bonded by a corporate surety licensed

in the State of Texas are in place to indemnify or guarantee recourse for "depositors" if their grain is lost or otherwise disposed of without the warehouse honoring the "depositors'" right to possession of the grain.

The Debtor's business operations historically have consisted of buying, storing, and selling feed grains, primarily corn and grain sorghum, within the United States and Mexico. The Debtor has also traded in edible beans and oilseeds, such as black beans, pinto beans, sunflower seeds, sesame seeds, and canola as well. In addition, the Debtor has regularly purchased grain and milo from farmers in the United States to be exported into the country of Mexico where they were used by livestock feed operators and other businesses.

Over the years during which the Debtor was operating, it was the normal course of business for the Debtor to purchase properties with funds derived from the Debtor and then to place the title to such properties under the names of either its individual shareholders or in entities that were created and owned by its shareholders. For example, in the case of the Alamo Elevator, it was placed under the name of "Alamo Grain," which is a Texas General Partnership with Rodolfo Plascencia, Octavio Garcia, and Baldemar Salinas Cantu as its general partners, but which was operated solely with the funds from the Debtor and none of the personal funds of the three partners.

Likewise, the officers and directors of the Debtor formed or held an interest in affiliated entities created to own real property or facilitate various aspects of the operations of the Debtor. Those entities included PSG Products, LLC; Gacia Balli, Ltd.; Garba, LLC; Rio Bravo Imports, LLC; Alamo Grain, A Texas General Partnership; Val Verde Grain, A Texas General Partnership; International Earth Products, LLC; IEP Minerals, LLC; IEP Logistics, LLC.

The Debtor began encountering financial troubles in 2014 related to the difficulty of financing and managing a large volume of grain operations as well as disputes between individual officers and directors over suspicious receipts and disbursements from company accounts. These conflicts lead Octavio Garcia and Baldemar Salinas to take steps to remove Rodolfo Plascencia as an officer, director, and employee of the company. His removal resulted in five separate lawsuits being filed by Mr. Plascencia against the company and its remaining officers and directors as well as several of the related entities in which they held joint ownership. This litigation sought the partition of properties owned by the company, its individual directors, and several of its related entities. Ultimately, the parties entered into a Settlement Agreement on July 26, 2022, by which title to the Alamo Elevator plus another 10-acre tract of real estate and $200,000 was transferred to Rodolfo Plascencia and his son.

During the last six months of 2022, the Debtor's financial condition began to rapidly deteriorate. A severe drought in the Coastal Bend region of Texas from which the Debtor regularly acquired a large portion of its grain stocks caused almost a complete failure of the area's production of feed grain. In turn, the company encountered significant problems in its cash flow as its grain operations became increasingly difficult to manage. Toward the end of calendar year 2022 the Debtor lacked sufficient funds to pay farmers who had sold their grain to the company during the harvest and began struggling to pay its creditors as the debts became due.

2. ~~Events Leading to Bankruptcy~~

~~To understand the measures that the Debtor will take to make its Original Chapter 11 Plan of Reorganization successful, a brief history of the Debtor's operations prior to the filing of the bankruptcy is necessary.~~

~~During the first days of 2023, the TDA conducted one of its regular audits to make sure there were sufficient grain stocks in the four public grain warehouses located in Progreso, Santa Rosa/ Donna, and Edcouch to match the outstanding warehouse receipts. The initial audit in January showed the company had sufficient grain in storage to comply with TDA regulations.~~

~~Later in January one of its major secured creditors, Frost Bank, accelerated the maturity of the Debtor's notes and demanded the immediate repayment of approximately $2,200,000 in outstanding loans. The Debtor was successful in arranging a loan from GrainChain, Inc. to pay the bank debt in full.~~

~~Then, in late January, TDA conducted another audit of the facilities and discovered significant deficiencies between the records for warehouse receipts when compared to physical measurements of the grain. Due to the shortage, TDA pulled all licenses and sealed the grain in all facilities. No grain could move in or out, and suddenly the Debtor no longer had any means to generate revenues for its operations.~~

~~Without any ability to pay its creditors, the Debtor elected to seek bankruptcy relief and filed a petition under chapter 11 of the Bankruptcy Code on February 17, 2023 ("Petition Date").~~

C. ~~Developments in the Bankruptcy Case and Status of Operations~~

1. ~~Orders Allowing the Use of Cash Collateral, Restoring Operations, and Providing for the Use and Disposition of Assets~~

~~The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 17, 2023 (the "Petition Date").~~

**B. DEFINITIONS OF TERMS USED IN THE PLAN AND DISCLOSURE STATEMENT**

Scope of Definitions. Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings. Any term used in this Plan that is not defined below but that is defined in Title 11 of the United States Code, as amended, shall have the meaning assigned to such term therein. Any term defined in this Plan not included in this section shall have the meaning provided in the Plan and Plan usage.

If any definition of any term used in this Plan and Disclosure Statement is not referenced in the following Definitions section, then the Bankruptcy Code shall be controlling as to the meaning of the word. However, if the term is not defined in the Bankruptcy Code, then the plain meaning of the

word is intended to be used.

**General.** Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings. Any term used in this Plan that is not defined below but that is defined in Title 11 of the United States Code, as, shall have the meaning assigned to such term therein.

**2.1   Administrative Claim** shall mean any Claim in respect of costs or expenses of administration for the Proceeding that is allowed under Sections 503 and 507(a) of the Bankruptcy Code.

**2.2   Affiliates** shall mean all persons or entities affiliated with the Debtor pursuant to Section 101(2) of the Bankruptcy Code.

**2.3   Allowed or Allowed Amount** shall mean the amount of any Allowed Claim.

**2.4   Allowed** shall mean, when used with respect to a Claim or Equity Interest, means the Claim or Equity Interest (as applicable) (a) to the extent that it is listed in the Schedules in a liquidated, non-contingent, and undisputed amount, but only if no proof of Claim or proof of Equity Interest is Filed with the Bankruptcy Court to evidence such Claim or Equity Interest on or before the Bar Date; (b) any Equity Interest registered in a Debtor' books and records as of the Petition Date; (c) as evidenced by a proof of Claim or proof of Equity Interest Filed on or before the Bar Date, but only to the extent asserted in a liquidated amount, and only if no objection to the allowance of the Claim or Equity Interest or no motion to expunge the proof of Claim or Equity Interest is Filed on or before the Claims Objection Deadline; or (d) to the extent allowed by a Final Order.

**2.5   Allowed Claim** shall mean a Claim against the Debtor that (i) is allowed by an Order which is not stayed on appeal, (ii) is scheduled as liquidated, undisputed and non-contingent by the Debtor in their schedules filed with the Bankruptcy Court as they may be or supplemented (collectively the "Schedules"), (iii) is timely filed with the Clerk of the Bankruptcy Court and no objection has been made to the allowance thereof, (iv) any reconciled contested claim that has been negotiated to an agreed amount or established by Court Order, or (v) is provided to be allowed by the terms of this  Plan.

**2.6   Allowed Administrative Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority pursuant to Sections 503 and 507(a)(1) of the Bankruptcy Code.

**2.7   Allowed Priority Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority under Section 507 of the Bankruptcy Code.

**2.8   Allowed Secured Claim** shall mean an Allowed Claim for which a Claimant asserts and is determined by an Order not stayed on appeal to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance on property in which the Debtor have an interest

to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the Claimant's interest in the property.

**2.9   Allowed Unsecured Claim** shall mean an Allowed Claim for which the Claimant has not asserted or is determined by an Order not stayed on appeal not to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance against property of the Debtor or right to setoff to secure the payment of such Claim.

**2.10 Austin Settlement Conference** shall mean the settlement conference that took place on July 15-16, 2023 among certain key parties and interests over two-days in Austin including the Debtor, the Secured Creditors (StoneX, Vantage and Falcon), the Contested Secured Creditor (GrainChain), the Unsecured Creditors Committee, and Octavio Garcia, individually.

**2.11 Avoidance Action** shall mean those causes of action such as preferences, fraudulent transfers and other such avoidance claims arising under section 506, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws.

**2.12 Ballot** shall mean the ballot to be delivered with the Disclosure Statement to holders of Claims and Interests on which such holder will be able to vote to accept or reject the Plan. The Ballot may be different for holders of the various Claims and Interests.

~~2.12~~**13     Bankruptcy Case** shall mean the Debtor's Bankruptcy Case, commenced by the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code on February 17, 2023, and currently pending under Case No. 23-70028-EVR-11 in the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division~~, where it is pending under Case No. 23-70028-EVR-11 ("Bankruptcy Case"). The Bankruptcy Case is presided over by the Honorable Eduardo V. Rodriguez ("Bankruptcy Judge").~~.

**2.14** ~~Since~~**Bankruptcy Code** shall mean the ~~filing~~ United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* and all amendments thereto.

**2.15 Bankruptcy Court** shall mean the United States Bankruptcy Court for the Southern District of ~~this~~ Texas, McAllen Division.

**2.16 Bankruptcy Clerk** shall mean the Clerk of the Bankruptcy Court located at U.S. Bankruptcy Court, 1701 W. Business Hwy. 83, McAllen, Texas 78501.

**2.17 Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure and all relevant local rules of the Bankruptcy Court.

**2.18 Bar Date** shall mean December 15, 2023, being the deadline ordered by the Bankruptcy Court for Claimants to file Proofs of Claim in the Bankruptcy Case~~, the~~.

**2.19 Baryta Industrial Tract** shall mean a 22-acre tract of real property contiguous to the Progreso Facility, and legally described as Lion Lake Division Lot Nos. 28 and 29, Hidalgo County, Texas.

**2.20 Chief Reorganization Officer** shall mean Richard S. Schmidt (retired U.S. Bankruptcy Judge), who was authorized, pursuant to the Court's Agreed Order entered on August 15, 2023 [Dkt #429], to serve as the Chief Restructuring Officer ("**CRO**") in the Debtor's Chapter 11 Bankruptcy Case.

**2.21 Claim** shall mean (i) a right to payment from the Debtor, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy has produced a judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**2.22 Claimant** shall mean the holder of a Claim.

**2.23 Class** shall mean a category designated in the Plan of holders or owners of Claims or Interests that are substantially similar pursuant to section 1122 of the Bankruptcy Code.

**2.24    Committee** shall mean the Official Committee of Unsecured Creditors of the Debtor.

**2.25    Confirmation Date** shall be the date that the Bankruptcy Court enters its written Order confirming the Plan.

**2.26    Confirmation Hearing** shall mean the hearing that will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code.

**2.27    Confirmation Order** shall mean the Order of the Bankruptcy Court confirming the Plan.

**2.28    Contested Claims** shall mean Claims to which objections are timely filed or which are listed as disputed, contingent or unliquidated in the Schedules of the Debtor.

~~2.22~~2.29    **Contested Secured Creditor** shall mean GrainChain with respect to pre-Petition liens ~~taken significant steps to rehabilitate its business and restart operations~~against Moore Farms, Emory Farms, the Pitts Property, the Edcouch Facility and the Progreso Facility.

~~First, to address the suspension of the Debtor's licenses and the sealing of its grain elevator facilities in early February that halted all grain operations the Debtor sought permission from the Bankruptcy Court to use the funds in its possession to reopen its facilities and sell the grain.~~

On February 23, 2023, the Debtor filed an *Emergency Motion for Authority to Use Cash Collateral*. After conducting a hearing, the Court granted the Debtor's request on an interim 14-day basis. This cash collateral order allowed the Debtor to retain the employment of a skeleton management and work staff to perform the accounting and documentation related to the Debtor's finances as is required by the rules of the Office of the U.S. Trustee while at the same time maintaining the security and safe operation of the grain storage facilities and prevent the deterioration of the grain, edible beans, and other inventory. Since the first hearing on the interim use of cash collateral, the Debtor negotiated the terms with the company's secured creditors and entered three agreed orders on the continued interim use of cash collateral.

Next, the Debtor obtained authority from the Bankruptcy Court quickly to sell the grain remaining in the Progreso Facility. The Debtor sold and successfully delivered all the grain sorghum with most of it being transported to Archer Daniels Midland Company ("ADM") in Corpus Christi, Texas. It provided a complete accounting of the sales, transport fees and other associated costs and deposited the proceeds into the Grain Escrow Account.

**2.30** Subsequently, it entered a contract with Impulsora Ganadera de Mexico, S.A. ("Impulsora") for the sale of #2 yellow corn. This corn was imported into Mexico through its ongoing arrangement with**Creditor** shall have the meaning set forth in Section 101(10) of the Bankruptcy Code.

**2.31    Debtor or Debtor-in-Possession** shall mean Garcia Grain Trading Corp.

**2.32    Debtor Related Entity-Owned Property** includes: Moore Farms, Garcia Balli, Ltd., PSG Products, LLC, Emory Farm, Rincon Ranch, SPI Condominium, Moore Farm South, Hoffman, Toluca Ranch, Pitts Property, Miscellaneous Rental Tracts, and the Baryta Industrial Tract.

**2.33    Debtor Owned Property** includes: the Progreso Facility, the Santa Rosa Facility, the Edcouch Facility, Willacy Farm and the Donna (Val Verde) Facility.

**2.34    DIP Accounts** shall mean the Debtor-in-Possession bank accounts maintained by the Debtor at Wells Fargo Bank as of the Effective Date.

**2.35    Disclosure Statement** shall mean the Disclosure Statement prepared and submitted by the Debtor with respect to the Plan, including all Exhibits attached thereto, and prepared pursuant to the Bankruptcy Court's Orders and Section 1125 of the Bankruptcy Code and, if applicable, Bankruptcy Rule 3018(b) for the Solicitation of Ballots, and all supplements and amendments thereto.

**2.36    Disputed** shall mean the portion (including, when appropriate, the whole) of a Claim or Equity Interest that is not an Allowed Claim or Allowed Equity Interest as to which: (a) a proof of Claim or proof of Equity Interest has been File, or deemed Filed under applicable law or Order of the Bankruptcy Court; (b) an objection has been or may be timely Filed; and (c) such objection has not been (i) withdrawn, (ii) overruled or denied in whole or in part pursuant to a Final Order, or (iii)

granted in whole or part pursuant to a Final Order. Before the time that an objection has been or may be Filed, a Claim or Equity Interest shall be considered a Disputed Claim or Equity Interest (a) if the amount or classification of the Claim or Equity Interest specified in the proof of Claim or proof of Equity Interest exceeds the amount or classification of any corresponding Claim or Equity Interest is listed by a Debtor in its Schedules, to the extent of such excess; (b) in its entirety, if any corresponding Claim or Equity Interest is listed by a Debtor in its Schedules as disputed, contingent, or unliquidated; or (c) in its entirety, if no corresponding Claim or Equity Interest has been listed by a Debtor in its Schedules.

**2.37   Distribution(s)** shall mean funds paid out to Secured Creditors, holders of Administrative Claims, Priority Claims, Unsecured Claims, or others under the provisions of the Plan by the Plan Agent while administering the Plan Trust.

**2.38   Distribution Date(s)** shall mean the date(s) when the Debtor pay out the funds from the sale of unencumbered, non-exempt assets of the Estate. The Debtor anticipates that the first Distribution Date will be on the Effective Date of the Plan.

**2.39   Donna Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 101 North Val Verde Rd. Donna, Texas

**2.40   Edcouch Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538.

**2.41   Effective Date** shall mean the later of March 31, 2024 or the date that is the thirtieth (30th) day following the date when the Confirmation Order becomes final, if the Confirmation Order has not been stayed on appeal, or if such a stay has issued, immediately after such stay is dissolved by Final Order.

**2.42   Elkins** shall mean Elkins Grain, LLC, a Texas limited liability company, which has its registered office address at 910 Rio Grande Dr. Mission, Texas 78572

**2.43   Emory Farms** shall mean the 56-acres tract located at Santiago Galvan Rd. in Progreso, Texas (Lion Lake Division) titled in PSG Products.

**2.44   Equity Interest** shall mean any equity interest, any claim of ownership of an equity interest, or any right to acquire any equity interest in Debtor.

**2.45   Estate** shall mean the estate of Debtor created by section 541 of the Bankruptcy Code upon commencement of the case under Chapter 11 of the Bankruptcy Code.

**2.46   Executory Contract or Unexpired Lease** shall mean an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, in effect between or among the Debtor and any other Person or Persons as of the Petition Date.

Debtor's First Amended Chapter 11 Plan of Reorganization
Page 19

**2.47    Face Amount** shall mean (a) when used in reference to a Disputed or Disallowed Claim, the full stated amount claimed by the holder of such Claim in any proof of claim timely Filed or otherwise deemed timely Filed by a Final Order or other applicable bankruptcy law, and (b) when used in reference to an Allowed Claim, the Allowed Amount of such Claim.

**2.48    Filed** shall mean filed with the Clerk of the Bankruptcy Court.

**2.49    Final Order** shall mean an order of the Bankruptcy Court or any appellate court thereof that has not been reversed, modified, or stayed, and the time for appeal or to seek review or certiorari or rehearing thereof has expired and as to which no appeal, review or rehearing is pending, and has become conclusive of all matters adjudicated thereby and is in full force and effect.

**2.50    Garcia Grain** shall mean Garcia Grain Trading Corporation, the Debtor or Debtor in Possession in Case No. 23-70028-EVR-11, pending in the United States Bankruptcy Court for the Southern District of Texas, McAllen Division.

**2.51    GrainChain** shall mean GrainChain, Inc., a Texas Corporation as a Secured and Unsecured Creditor and a participant in this Plan.

**2.52    Harco** shall mean the Harco National Insurance Co.

**2.53    Impaired** shall mean a class of claims or interests that falls within the definition set forth in section 1124 of the Bankruptcy Code.

**2.54    Insider** shall mean the various persons and entities listed under section 101(31) of the Bankruptcy Code.

**2.55    IRS** shall mean the Internal Revenue Service of the United States of America Department of the Treasury.

**2.56    Moore Farms** shall refer to the 1,460 acres of farmland located at Military Road, Hidalgo County, Texas, owned by PSG Products, LLC and currently pledged to Falcon International Bank under a first lien.

**2.57    New Co.** shall mean that certain new corporation or other form of entity to be created by GrainChain on the Effective Date into which those certain specified assets as described in the Plan shall be transferred and conveyed. New Co. will be structured in a form that is acceptable to GrainChain with the equity of New Co. being owned by GrainChain and/or its authorized assigns. The function of New Co. will be to fashion continued operations of the Elkins Lease[2], with the

---

[2] Elkins and the Debtor entered into a Court approved lease of Progreso (the "Elkin's Lease"). GrainChain has been providing Elkins with certain financing through one or more factoring arrangements with Elkins, with respect to Elkins' operations of Progreso. Certain *before tax* net profits have been generated by the operations (the "Pre-Confirmation Pre-Tax Net Profits"). No operating agreement between Elkins, GrainChain and the Debtor has been entered into nor

distribution of the net profits of New Co. as specified in the Plan. New Co. will be subject to a variety of covenants to capture and retain all operating cashflow and profit of the enterprise within New Co. including, but not limited to, limitations on the ability of New Co. to further encumber its assets without the approval of the Plan Agent and satisfaction of certain credit metrics (either leverage or interest coverage) to be further negotiated. Further, New Co. will be subject to certain limitations on "Permitted Investments," "Permitted Capital Expenditures" and limitations on Restricted Payments that will not allow dividends or other distributions to the equity holders other than the Distributions specified in the Plan.

    **2.58**    **New Co. Property** shall mean those certain properties that will be contributed to the Plan Trust on the Effective Date including the Progresso Facility, the Edcouch Facility and the Baryta Industrial Tract subject to any liens in favor of Falcon International Bank but free and clear of any liens asserted by GrainChain. For the avoidance of doubt, any liens asserted by the Contested Secured Creditor with respect to New Co. Property shall be nullified under the Plan, but the lien of Falcon Bank shall not be affected.

    **2.59**    **Objection Date** shall mean the date established by the Bankruptcy Court for filing objections to confirmation of the Plan.

    **2.60**    **Opt-in** shall mean the right of Unsecured Creditors who qualify or believe they qualify as a "depositor" under the Tex. Agric. Code section 14.001(1) to participate in the proposed settlement under which proceeds from the TDA Surety Bond payments will be paid to StoneX and potential liability for avoidance actions such as preferences against them will be waived and released.

    **2.61**    **Opt-out** shall mean the right of Unsecured Creditors who qualify or believe they qualify as a "depositor" under the Tex. Agric. Code section 14.001(1) to choose to not participate in the proposed settlement and instead seek their pro rata share of the TDA Surety Bond proceeds; however, these Creditors will not be released and will potentially face liability for bona fide avoidance actions for preferences.

    **2.62**    **PACA** shall mean the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-499t, *et seq.*

    **2.63**    **PACA Reserve Account** shall mean the escrow account in which amounts related to PACA claim(s) were held.

---

approved by the Bankruptcy Court.  An operating agreement will be part of the Chapter 11 Plan and Confirmation Order dealing only with the post-confirmation operations.  The Elkins Lease will terminate on the Effective Date of the Chapter 11 Plan.

**2.64    Person** shall mean an individual, corporation, partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, unincorporated organization, governmental unit or any political subdivision thereof.

**2.65    Petition Date** shall mean the date on which Debtor filed its Petition for relief under Chapter 11 of the Bankruptcy Code, which was February 17, 2023.

**2.66    Plan** shall mean this Debtor's First Amended Plan of Reorganization as it may be modified and/or supplemented from time to time pursuant to the Bankruptcy Code.

**2.67    Plan Agent** shall mean the Richard S. Schmidt, retired U.S. Bankruptcy Judge. (Also see "**Chief Restructuring Officer**" defined above).

**2.68    Plan Trust** shall mean the Grantor Trust created under the terms of the Plan following the confirmation date into which specified assets of the Debtor's estate and certain other assets or claims owned by the Debtor shall be transferred and conveyed.

**2.69    Plascencia Adversary** shall mean the adversary proceeding initiated by the Debtor against Rodolfo Plascencia, Sr. and WNGU Properties, LLC styled: *Garcia Grain Trading Corporation v. Rodolfo Plascencia, Sr. and WNGU Properties, LLC,* Adv. Proceeding No. 23-07002, on May 26, 2023, pending before the Bankruptcy Court.

**2.70    Post-Petition Interest** shall mean the non-default interest which shall accrue on the unpaid principal balances of the Allowed Secured Claims from the Petition Date to the Effective Date calculated at the annual percentage rate established in the written agreements between the Debtor and the holders of the Allowed Secured Claims.

**2.71    Preference** shall mean any transfer of an interest of the Debtor assets that is avoidable under section 547 of the Bankruptcy Code and that is not waived, released, or discharged by the terms of this Plan or by Court Order.

**2.72    Preference Property** shall mean those certain properties including Moore Farms and Emory Farms for which any remaining equity value remaining after the full satisfaction of any liens for Secured Creditors will be contributed to the Plan Trust. For the avoidance of doubt, any liens asserted by the Contested Secured Creditor with respect to Preference Properties shall be nullified under the Plan.

**2.73    Priority Claim** shall mean any Claim, to the extent entitled to priority in payment under Section 507(a) of the Bankruptcy Code, other than an Administrative Claim, that (1) has not been barred by the Plan and (2) has not been disallowed by a Final Order.

**2.74    Priority Non-Tax Claim** shall mean any Priority Claim other than a Priority Tax Claim, Administrative Claim or Professional Claim.

**2.75    Priority Tax Claim** shall mean the allowed claims of governmental taxing authorities that are entitled to priority claims under section 507(a)(8) of the Bankruptcy Code or tax claims as otherwise specified herein.  The term "allowed" shall include the definition of "deemed allowed," as set forth in 11 U.S.C. § 502(a), when no objection has been filed to a claim of the Internal Revenue Service.

**2.76    Proceeding** or **Chapter 11 Case** shall mean this case for reorganization of the Debtor pending before the Bankruptcy Court. (Also see "**Bankruptcy Case**" defined above).

**2.77    Professional** shall mean any Person employed in the Bankruptcy Cases pursuant to Sections 326, 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

**2.78    Professional Claim** shall mean any Claim that is Filed by a Professional pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

**2.79    Progreso Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas.

**2.80    Progreso Lease** shall mean the lease agreement between Garcia Grain Trading Corporation ("Landlord"), a Texas corporation, and Elkins Grain, LLC ("Tenant"), a Texas limited liability company.

**2.81    Pro Rata** shall mean the proportion that the amount of an Allowed Claim in a particular Class bears to the aggregate Face Amount of all Allowed Claims in such Class.

**2.82    Proof of Claim** shall mean a proof of claim conforming to Bankruptcy Official Form 410.

**2.83    Representative** shall mean any Affiliate, Person, agent, insider (as defined in Section 101(31) of the Bankruptcy Code), attorney, accountant, fiduciary, heir, guardian, surety, corporate parent or subsidiary (whether direct or indirect), and other entity having a legal or equitable relationship with another entity whatsoever.

~~2.32~~.84      **Rio Bravo** ~~shall mean~~ a Mexican corporation named Granos y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo"), which acts as the importer of all corn, milo, pinto and black beans or other commodities or products to customers in Mexico, directly invoices the customers, and the customers pay Rio Bravo for the invoices, from which Rio Bravo deducts the importation fees, and wires the net receipts to the appropriate escrow account in the United States. ~~As a result of these efforts, the Debtor reflects a cash balance in the Grain Escrow Account in the amount of $3,517,611.77 as of July 31, 2023. [Dkt #463-1].~~

~~To determine the legal right to the funds in the Grain Escrow Account, on April 6, 2023, the Debtor obtained an Order Establishing Procedures for Determination of Rights, Ownership Interests, Liens, Security Interests, and All Other Interests in and to Grain and Proceeds of Grain Pursuant To~~

11 U.S.C. § 557 [Dkt #126]. Following the entry of the order establishing such procedures, only three (3) creditors filed claims against the grain and submitted briefs supporting their interest in the proceeds: StoneX Commodity Solutions, Vantage Bank Texas, and GrainChain, Inc. The Debtor timely responded to these claims and the legal arguments supporting them mainly questioning the validity of the interests asserted by StoneX in foreign and domestic grain receivables. The Bankruptcy Court's decision on these various claims to the grain and grain proceeds remains pending.

In addition, on April 14, 2023, the Debtor obtained an Order [Dkt #157] from the Court establishing procedures for the Court to determine the nature, extent, and validity of any claims of bean suppliers under the provisions of 7 U.S.C. § 499a known as the Perishable Agricultural Commodities Act ("PACA"). Subsequently, the Debtor resolved two PACA Claims of Stony Ridge Food, Inc. in the total amount of $237,077.50. The Debtor continues to hold $400,000 of bean proceeds in the PACA Reserve Account ("PACA Reserve").

Unfortunately, while the Debtor was fulfilling the corn deliveries to Impulsoro, a windstorm hit its facilities on April 29, 2023, causing substantial damage to the Progreso Facility. After filing the appropriate claim with its insurance carrier, FCCI Insurance Company, the Debtor worked to salvage the spoiled grain and cleanup and remediate the damaged facility. Currently, it is awaiting a final determination with respect to the claim associated with the salvaged grain but estimates it to total approximately $2,318,400. With respect to the physical damage to the Progreso grain storage facility the Debtor received an advance check of $275,000.00 it used to initiate the cleanup plus an additional $3.4 million check from FCCI to finance the restoration of the plant. In addition, the Debtor is waiting for the settlement to finalize the claim for the interruption of its business operations which has a policy cap of $1.2 million which will be to mitigate the losses sustained by the company due to the windstorm.

The Debtor has an ongoing arrangement with a Mexican corporation named Granos y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo"), which acts as the importer of all corn, milo, pinto and black beans to customers in Mexico, directly invoices the customers, and the customers pay Rio Bravo for the invoices, from which Rio Bravo deducts the importation fees, and wires the net receipts to the appropriate escrow account in the United States.

On May 17, 2023, the Court granted the Motion and entered its Order Granting Debtor Authority to Assume Executory Contracts for Purchase and Sale of Edible Beans and Sunflower Seeds [Docket #229]. This Order granted the Debtor to assume the bean supply contracts with Stony Ridge Food, Inc. and provided a protocol for the Debtor to purchase and pay for the beans. It also allowed the Debtor to assume contracts for the assumption of purchase contracts it had with farmers growing sunflower seeds in South Texas and for the Debtor to export them through its Mexican entity, Rio Bravo, and sell them to a Mexican company which crushes the seeds for their oil. The Debtor has projected profits from the sunflower and edible bean enterprises to total $1 million by the end of this calendar year.

At the beginning of the year management of Garcia was notified by its insurance carrier that its liability and casualty coverage on its grain facilities and inventory of grain as well as its

workmen's compensation insurance would expire and not be renewed by FCCI Insurance beyond May 31, 2023. Consequently, management planned to lease its facilities at Progreso, Santa Rosa/Donna, and Edcouch to other grain companies in the area.

The Debtor successfully entered into a lease agreement with Texas Valley Grain Co. ("TVG") to lease its grain storage located at Santa Rosa that provided for the insurance coverage to be force placed by Vantage Bank, and then reimbursed in accord with a formula tied to the amount of grain which passed through the facility. Based upon the last reports from TVG, needed repairs at Santa Rosa have been successfully completed and the operations have been generating more revenue than anticipated.

With respect to Donna Facility, Vantage Bank force placed insurance on the grain facility and warehouse located there, and the Debtor has been cooperating with the bank to explore the possibility of purchasing the portion of the facility which is built on the right of way of the Union Pacific Railroad Company so that issues related to the property impeding its sale are resolved and the proceeds of any sale can be applied to the bank's indebtedness.

Finally, the Debtor obtained authority from the Bankruptcy Court for the Progreso and Edcouch facilities to be leased to Elkins Grain, LLC ("Elkins") based upon a through-put formula of 5 cents per bushel. The funds necessary for the payment of the premiums for the insurance, including coverage for the physical plant, the grain inventory, along with liability and workmen's coverage are the subject of post-petition financing provided by GrainChain, Inc. ("GrainChain"). In this regard, arrangements have been made for GrainChain and Elkins to cooperate in the management and the use of the grain facilities pursuant to an Operating Agreement with the Debtor. This financial arrangement provides for GrainChain to supply up to $1.5 million of loans to finance the operations of the grain facilities as well as the provisions of a line of credit of up to $15 million for the purchase and sale of the grain. The financing will be provided at an interest rate of prime plus 3.0%, and extensive negotiations have led to an arrangement that allows Elkins to provide the management and accounting functions and GrainChain and the Debtor to share in a division of the net profits from the storage and marketing of the grain under an arrangement that will fund the Debtor's Plan and allow for a settlement of the contested liens which GrainChain asserts against assets of the Debtor as well as those other tracts of real estate against which GrainChain holds deeds of trust. The Operating Agreement contemplates that net profits will be paid to holders of unsecured claims who also will – through shared liens against these same properties – have guaranteed payments made to the unsecured creditor class over the life of the Plan.

The specific terms and conditions of the financing arrangement and the resolution of the lien disputes are the subject of a compromise and settlement proposed to the creditors of the Debtor in this Plan. The Debtor asserts that if the settlement is approved by its creditors and the Plan is confirmed by the Bankruptcy Judge the claims of all general unsecured creditors filing claims in the Bankruptcy Case can be paid in full.

**2.      Summary of the Plan**

~~A summary of the Plan being proposed appears below. This summary is intended to set forth in a simplified form the way the Debtor will be reorganized if the Plan is approved by the Bankruptcy Court. The summary is also intended to inform each Creditor the way their particular claims are to be paid under the terms of the Plan. A reading of the summary will provide you with general information about the Plan and its proposed treatment of all Creditors. However, to make a fully informed judgment about the Plan, you are urged to read the entire Disclosure Statement and Plan. The Plan is subject to modification prior to the approval of this Disclosure Statement and confirmation of the Plan.~~

~~The Plan provides for the Debtor to continue its organizational structure following confirmation – although its stock with be conveyed in the Plan Trust. In other words, the Plan *does not* provide for a liquidation and subsequent dissolution of the Debtor. However, in the event that the Plan Agent and GrainChain agree to the formation of a new corporation to operate the grain facilities which are the subject of an operating agreement between the Debtor, Elkins Grain, and GrainChain, they may do so.~~

**2.85    Rincon Ranch** shall refer to 1,882 acres of ranch land located in Starr County, Texas.

**2.86    Santa Rosa Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 22056 Bass Boulevard in Harlingen, Texas.

**2.87    Santa Rosa Lease** shall mean the lease agreement between Garcia Grain Trading Corporation ("Landlord"), a Texas corporation, and Texas Valley Grain – Santa Rosa #2 ("Tenant"), a series of Texas Valley Grain, LLC, a Texas registered series limited liability company, in which Texas Valley Grain, LLC is the sole member and owner.

**2.88    Section 502(c)(1) Valuation or Estimation** shall mean in the case of contingent, unliquidated claims the value of the creditor's claim as estimated by the Bankruptcy Court.

**2.89    Section 506 Valuation** shall mean the value of collateral as established by the Bankruptcy Court after a hearing held pursuant to Bankruptcy Rule 3012 and in accordance with Section 506 of the Bankruptcy Code, or made part of a Final Order of Bankruptcy Court.

**2.90    Secured Claim or Secured Claim Lien** shall mean any Claim that is secured under Section 506(a) of the Bankruptcy Code and secured by a lien, or other encumbrance that has been properly perfected as required by law with respect to property owned by the Debtor.

**2.91    Secured Creditors** shall mean all Creditors who hold a Secured Claim lien, security interest, or other encumbrance that has been properly perfected as required by law with respect to property owned by the Debtor.

**2.92    Subordinated Claim** shall mean any Claim (a) arising from rescission of a purchase or sale of a Security of any of the Debtor or of an affiliate of any of the Debtor, (b) for damages arising from the purchase or sale of such a Security, (c) for reimbursement or contribution allowed

under Section 502 of the Bankruptcy Code on account of a Claim described in (a) or (b) above, (d) otherwise subordinated pursuant to Section 510 of the Bankruptcy Code, (e) subordinated by Final Order, (f) based on fines, penalties, forfeiture or for multiple, exemplary, or punitive damages, or (g) any Claim of any Insider of the Debtor.

**2.93    TDA** shall mean the Texas Department of Agriculture established and acting under the authority of the laws of the State of Texas.

**2.94    TDA Surety Bond** shall mean those certain Surety Bonds funded by Harco National Insurance Company on behalf of Garcia Grain, thereby meeting TDA statutory requirements for licensed public grain facilities, and covering the deposits of grain in the Alamo, Edcouch, Donna/Santa Rosa, and Progreso public grain warehouse facilities operated by the Debtor.

**2.95    Texas Comptroller** shall mean the Texas Comptroller of Public Accounts.

**2.96    Union Pacific Industrial Lease** shall mean the industrial lease agreement between Union Pacific Railroad Company ("Lessor") and Garcia Grain Trading Corporation ("Lessee") dated April 22, 2009 for the lease of the land in Santa Rosa, Texas on which the Santa Rosa Facility is located.

**2.97    Unliquidated Claim** shall mean any Claim that is listed in the Schedules as "unliquidated," and did not have an exact amount owing on the indebtedness as of the Petition Date.

**2.98    Unsecured Claims** shall mean all Claims not a Secured Claim or Tax Claim.

**2.99    Unsecured Creditors** shall mean any and all Creditors having Unsecured Claims, including but not limited to Claimants holding Unsecured Deficiency Claims.

**2.100    Unsecured Deficiency Claims** shall mean all Allowed Claims of creditors that are deemed to be unsecured following valuation of the Debtor's property as a result of either a Section 506 Valuation hearing, the Bankruptcy Court or the District Court's order determining the nature, extent or validity of a creditor's lien on the Debtor's property that is not stayed on appeal, or the agreement of the parties, due to the fact that the value of the collateral securing repayment of a claim against property of the estate is less than the amount of such allowed claim as determined by the provisions of Section 506 of the Bankruptcy Code.

**2.101    Waived Unsecured Deficiency Claims** shall mean the unsecured deficiency claims of StoneX and Vantage that are waived under the Plan upon the completion of the treatments described in their respective Classes of Secured Claims.

**2.102    Wells Fargo DIP Account(s)** shall mean the Debtor-in-Possession bank accounts maintained by the Debtor at Wells Fargo Bank.

**2.103**

Rules of Interpretation. For purposes of this Plan, (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document, pleading or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented as permitted herein; (iii) the words "herein," "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (iv) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply, unless an alternate calculation is expressly provided herein (i.e., Business Days).

Computation of Time. In computing any period of time prescribed or allowed in this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

Exhibits and Plan Supplement. All exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Holders of Claims and Equity Interests may obtain a copy of the Filed exhibits upon written request to the Debtor. Upon their Filing, the exhibits may be inspected in the office of the clerk of the Bankruptcy Court or at the Bankruptcy Court's CM/ECF or PACER website. The documents contained in the exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. The Debtor expressly reserve the right to modify or make additions to or subtractions from any exhibit or to the Plan and to amend, modify or supplement any exhibit to the Plan in conformance with the provisions of this Plan.

Approved Disclosure Statement. The terms and provisions of the Disclosure Statement, as approved by the Bankruptcy Court, are expressly incorporated herein, except where such provisions of the Disclosure Statement may conflict with the terms of this Plan. In the event that such a conflict arises, the terms of this Plan and the Confirmation Order shall control, with the Confirmation Order controlling over the terms of this Plan.

### ARTICLE III
### DESIGNATION OF CLASSES OF CLAIMS

Designation of Classes of Claims. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

The First Amended Plan separates Claims against the Debtor into four main categories, which are: (I) Administrative and Priority Unsecured Claims; (II) Secured Claims, (III) Unsecured Claims, and (IV) Unsecured Claims of Harco and GrainChain, Inc.

Below is a concise list of all Classes in this Plan:

(I)      Administrative and Priority Unsecured Claims

         A.      Class 1 – Administrative Claims (Unimpaired)

Debtor's First Amended Chapter 11 Plan of Reorganization
Page 28

B.     Class 2 – Priority Unsecured Claims (Unimpaired)

(II)    Secured Claims

C.     Class 3 – Secured Claim of StoneX Commodity Solutions, LLC f/k/a FCStone Merchant Services, LLC ("StoneX") (Impaired)
D.     Class 4 – Secured Claim of Vantage Bank Texas (Impaired)
E.     Class 5 – Secured Claim of Falcon International Bank (Unimpaired)
F.     Class 6 – Contested Secured Claim of GrainChain, Inc. (Impaired)
G.     Class 7 – Secured Claim of Ford Motor Credit (Impaired)

(III)    Unsecured Claims

H.     Class 8 – Unsecured Bean Claims (Impaired)
I.     Class 9 – Unsecured Farmers' and Grain Claims (Impaired)
J.     Class 10 – Administrative Convenience Class (Impaired)
K.     Class 11 – General Trade Claims (Impaired)

(IV)    Unsecured Claims of Harco and GrainChain, Inc.

L.     Class 12 – Unsecured Claim of Harco and GrainChain, Inc. (Impaired)

## ARTICLE IV
## PAYMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY UNSECURED CLAIMS

The Plan provides for all Administrative Claims to be paid in full upon approval by the Bankruptcy Court of applications for their allowance or the Effective Date which is estimated to be ~~before December~~on March 31, ~~2023~~2024.

The ~~Debtors dispute~~Plan will pay the priority claims of unsecured claims of persons engaged in the production or raising of grain, as defined by Section 557(b) of the Code, as the Debtor owns and operates grain storage facilities as defined in such section and those claims are associated with grain or the proceeds of grain. These priority claims are estimated to total approximately $112,125, but may be more after all Claims listed as contingent, unliquidated or disputed file proofs of claim.

The Debtor disputes the Priority Tax Claim asserted by the Internal Revenue Service for income taxes because upon the filing of ~~a~~ contemplated amended ~~return~~returns it believes the Debtor will not be liable ~~be~~ for such taxes. ~~They assert that~~It appears the taxes reflected were based upon false revenues and if properly reflected the ~~Estate~~estate may be entitled to tax refunds for prior years~~.~~ ~~They intend~~ rather than being liable for taxes. The Debtor intends to object to the IRS claim~~and once~~, file the amended returns, and seek refunds if the returns reflect the Debtor is entitled to them. Provided, however, if any taxes are established~~, if any, to pay any taxes owed~~ to be due and owing, the Plan provides for the payment of them in accord with the provisions of the Bankruptcy Code within 60 months of the Petition Date.

~~The~~  The claims of ad valorem taxing authorities due local taxing authorities will be paid in full either upon the sale of the real property tracts against which the taxing authorities hold liens or as such taxes become due. The taxing authorities will retain their statutory liens to secure the payment of such taxes until they are paid in full.

**ARTICLE V**
**SUMMARY OF TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS**

    **A.    TREATMENT OF CLAIMS OF SECURED CREDITORS**

The Plan contains a comprehensive settlement of the competing claims and interests held by the four major secured creditors against the Debtor's Bankruptcy Estate, the principals of the Debtor and their related entities, and the General Unsecured Creditors.

Based upon this concept of settling all claims, the treatment of the claims of the Secured and Unsecured Creditors in the Plan is premised on the following:

    1.) it is better to settle the competing claims of StoneX and Vantage relating to their respective interests in the proceeds from the sale of grain, surety bonds covering the grain at the grain facilities in which they hold warehouse receipts as evidence of entitlement to the grain than to engage in expensive and lengthy litigation;

    2.) it is better to settle with GrainChain over the validity of their asserted liens against the various tracts of real property against which they hold deeds of trust signed by the Debtor less than a month before the Petition Date if GrainChain, the General Unsecured Creditors, and Harco can agree to share the net proceeds from the sale of the properties while allowing the Debtor and its grain facilities at Progreso and Edcouch to continue to operate under terms which provide for the sharing of the profits in the same percentage to which their respective claims bear to the total amount of unsecured claims against the Debtor;

    3.) it is better to negotiate settlements with Unsecured Creditors who received payments from the Debtor within 90 days of the Petition Date than to pursue the preference claims through litigation in the Bankruptcy Court;

    4.) it is better to reach an agreement to allow the principals of the Debtor to have time to orderly market and sell their assets and then to contribute the net proceeds to the Plan Trust than to litigate the various causes of action owned by the estate against them based upon fraudulent conveyances, breach of fiduciary duty, conversion of corporate opportunities, and other such derivative claims, and then attempt to attach and sell the assets after obtaining a judgment against them; and

    5.) it is better to reach an agreement with the TDA and Harco relating to the payment of the TDA Surety Bonds into the Plan Trust than to litigate the complex issues surrounding the TDA Surety Bond claims thereby depleting valuable resources of the Estate by funding the attorneys' fees and costs of the lawsuit(s).

Therefore, relying on such premises as being within the exercise of the best business judgment of the CRO, the major Secured Creditors of the Debtor are treated under the terms of the Plan as follows:

- StoneX Commodity Solutions LLC f/k/a FCStone Merchant Services, LLC ("**StoneX**") asserts that it holds title to or a security interest in certain grain inventory located at the Debtor's grain elevator facility in Progreso, Texas ("**Progreso** ~~facility~~**Facility**"), along with the associated grain warehouse receipts, cash, accounts receivable, and other proceeds from the sale of the grain of the Debtor at such facility to secure the repayment of indebtedness owed to it having an outstanding balance of an estimated $19.5 million. The Debtor estimates the current collateral for the repayment of the StoneX Secured Claim to be as follows:

| | | | |
|---|---|---|---|
| - | Funds in Grain Escrow Account | = | $3,517,371.00 |
| - | Collectible Accounts Receivable | = | $~~-~~812,184.00 |
| - | FCCI Claim Against Salvaged Grain | = | $2,318,400.00 |
| - | Surety Bond Claim at Progreso | = | $1,009,750.00 |
| - | Total Collateral Value | = | $7,~~711~~657,705.00 |

Thus, the Secured Claim of StoneX totals $7,~~711~~657,705.00, and its Unsecured Deficiency Claim
is approximately $11,~~749~~803,353.00

**Terms of Settlement with StoneX:**

The Debtor and StoneX have reached an agreement to compromise and settle its claims by the payment from the Plan Trust of the total sum of $13,000,000. Upon the receipt of the $13,000,000 from the Plan Trust all claims and causes of action which StoneX holds against the Bankruptcy Estate shall be fully extinguished and discharged.

The initial payment in the amount of $7,000,000 will be made on the Effective Date from the funds in the Grain Escrow Account, and contributions to the Plan Trust realized by the sale of real estate owned by Octavio Garcia as well as certain assets titled in the name of entities owned or controlled by him and his wife.

The balance of the funds totaling approximately $6,000,000 will be paid from the Plan Trust out of funds collected from grain receivables, the amount received from the Estate from FCCI Insurance for its claim for the damaged grain at the Progreso Facility, and the balance to be paid from recoveries or contributions received by the Plan Agent summarized as follows:

- Miscellaneous Funds Paid Into Plan Trust    $2,869,416

- Collected Grain Receivables    $   812,184

- FCCI Claim for Grain Stock    $2,318,400

TOTAL CONSIDERATION:             $6,000,000

**Terms of Settlement with Vantage:**

Vantage Bank Texas ("**Vantage**") holds title to or a security interest in certain grain inventory, machinery and equipment, and other personal property assets located at the Debtor's grain elevator facilities located in Santa Rosa and Donna, Texas, ("**Santa Rosa**/ **Facility" and "Donna Facility**"), and asserts title to or a security interest in any grain currently located at the Progreso facility that in the ordinary course of Debtor's business was relocated from Santa Rosa/Donna to the Progreso ~~facility~~Facility in preparation for its export and sale to Debtor's customers in Mexico. Vantage also asserts title to or a security interest in grain warehouse receipts associated with the grain inventory at Donna/Santa Rosa, along with any associated cash, accounts receivable, and other proceeds from the sale of the grain at such facilities. Vantage claims its collateral interest in such assets of the Debtor to secure the repayment of indebtedness represented by promissory notes executed by the Debtor having an estimated current outstanding balance of $8,789,064. In addition to its asserted ownership and security interest against the personal property of the Debtor, Vantage holds deeds of trust against real property of the Debtor known as the Pitts Property valued at an estimated $3,600,000; Santa Rosa/Donna having a combined estimated value of $2,750,000; and a claim against the Surety Bond at Santa Rosa/Donna $739,400 – altogether having an estimated total collateral value of $10.2 million.

Thus, the Secured Claim of Vantage totals $7,089,400, and its Unsecured Deficiency Claim is approximately $1,699,664.

Vantage and the Debtor have reached an agreement to compromise and settle all of its claims against the estate in exchange for the following consideration:

| | |
|---|---|
| Pitts Property (1st Lien Deed of Trust) | $3,600,000.00 |
| Santa Rosa Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| Donna Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| **Subtotal** | **$6,300,000.00** |
| Assignment to the estate or its designee all Warehouse Receipts held as collateral and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,402,704 | $400,000.00 |
| Claim against the A/R in inventory and cash for the bean enterprise | $625,000.00 |

| | |
|---|---|
| **Subtotal** | **$1,025,000.00** |
| **TOTAL** | **$7,325,000.00** |

Vantage holds security interests against pre-Petition bean inventory, bean accounts receivable and proceeds from the sale of beans. By virtue of entry of an *Order Granting Debtor's Emergency Motion for Authority to Obtain Post-Petition Financing, Payoff Certain Liens of Vantage Bank and Establish Procedures for Purchase of Edible Beans* [Docket #467] the Court approved the conveyance, or modification of the automatic stay permitting foreclosure of the tracts of the real property listed in the chart above. Additionally, due to the payment of $625,000 from the PACA Reserve and the bean enterprise operating account, Vantage will release its claims against the assets of the bean enterprise. The Debtor projects that the provision of financing for the purchase of additional inventories of black and pinto beans will result in net profits from the bean enterprise in the approximate sum of $800,000. These funds then can be used to fund necessary expenditures by the Debtor in carrying out the provisions of this Plan.

Further, in complete extinguishment of all its other claims against the estate in exchange for the payment of $400,000 Vantage will transfer all of its collateral warehouse receipts to the Plan Trust.

**Terms of Plan Treatment with Falcon:**

Falcon International Bank ("**Falcon**") is owed notes totaling approximately $5,989,153 and holds a first lien deed of trust against the Progreso Elevator valued at an estimated $4,430,000 along with a first lien deed of trust against 1,460 acres of farmland known as the Moore Farms having an estimated value of $7,884,000 and a security interest in equipment having a value of an estimated $330,~~000~~000.

Thus, the Debtor believes the total collateral value to secure Falcon's debt is estimated at $12,644,000 leaving equity available of about $6,654,847.

Falcon will receive payment in full of its outstanding claim in the amount of approximately $6,000,000, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farms having an estimate value for purposes of the Plan of $7,000,000. The payment of the indebtedness owed to Falcon will be consideration for Falcon releasing its Deeds of Trust against all other real property of the estate including but not limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust.

**Terms of Settlement with GrainChain:**

GrainChain, Inc. ("**GrainChain**") has total indebtedness according to its Proof of Claim filed in this case of $7,841,055. It asserts second lien deeds of trust against real property having equity after the lien of Falcon (Progreso Elevator & Moore Farms) of approximately $6,654,847 and first lien deeds

of trust against the Baryta Industrial Tract, Emory Farms, and the Edcouch Elevator having estimated values totaling $2,754,711.

Thus, the Secured Claim of GrainChain totals $7,841,055 following the extinguishment of the Secured Claim of Falcon totaling $5,989,153 secured by the second liens against the equity in the Progreso ~~facility~~Facility and Moore Farms, as well as a first lien against the Edcouch ~~facility~~Facility, Baryta Industrial Tract, ~~an~~and Emory Farms having an estimated total collateral value of $9,409,558.

~~The Plan contains a comprehensive settlement~~Debtor asserts that all ~~of~~ the ~~competing claims and interests~~ liens held by ~~the four major secured creditors against the Debtor's bankruptcy estate, the principals of the Debtor and their related entities, and the general unsecured creditors. Based upon this concept of settling all claims, the treatment of the claims of the Secured and Unsecured Creditors in the Plan is premised on the following:~~

> ~~1.) it is better to settle the competing claims of StoneX and Vantage relating to their respective interests in the proceeds from the sale of grain, surety bonds covering the grain at the grain facilities in which they hold warehouse receipts as evidence of entitlement to the grain than to engage in expensive and lengthy litigation;~~

> ~~2.) it is better to settle with~~ GrainChain ~~over the validity of their asserted liens against the various tracts of real property against which they hold deeds of trust signed by the Debtor less than a month before the Petition Date if GrainChain, the General Unsecured Creditors, and Harco can agree to share the net proceeds from the sale of the properties while allowing the Debtor and its grain facilities at Progreso and Edcouch to continue to operate under terms which provide for the sharing of the profits in the same percentage to which their respective claims bear to the total amount of unsecured claims against the Debtor;~~

> ~~3.) it is better to negotiate settlements with Unsecured Creditors who received payments from the Debtor~~are preferential transfers which occurred within 90 days of the Petition Date~~ than~~. GrainChain asserts it has valid defenses to ~~pursue~~the ~~preference claims through litigation in the Bankruptcy Court;~~

> ~~4.) it is better to reach an agreement to allow the principals of the Debtor to have time to orderly market~~assertions ~~and sell their assets and then to contribute the net proceeds to the Plan Trust than to litigate the various causes of action owned by the estate against them based upon fraudulent conveyances, breach of fiduciary duty, conversion of corporate opportunities, and other such derivative claims, and then attempt to attach and sell the assets after obtaining a judgment against them; and~~

> ~~5.) it is better to reach an agreement with the TDA and Harco relating to the payment of the surety bonds into the Plan Trust than to litigate the complex issues surrounding the bond claims thereby depleting valuable resources of the estate funding the attorneys' fees and costs of the lawsuit.~~

**Settlement Terms with Secured and Unsecured Creditors:**

StoneX will release all its claims against the estate in exchange for the following consideration:

- Funds in the Grain Escrow Account — $3,517,371
- Surety Bond Proceeds — $2,397,850
- Collected Grain Receivables — $   812,184
- FCCI Claim for Grain Stock — $2,318,400
- Payment from Plan Agent — $3,500,000

TOTAL CONSIDERATION:        $12,545,805.

Vantage will release all its claims against the estate in exchange for the following consideration:

| | |
|---|---|
| Pitts Property (1st Lien Deed of Trust) | $3,600,000.00 |
| Santa Rosa Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| Donna Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| **Subtotal** | **$6,300,000.00** |
| Assignment to the estate or its designee all Warehouse Receipts held as collateral and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,402,704 | $400,000.00 |
| Claim against the A/R in inventory and cash for the bean enterprise | $625,000.00 |
| **Subtotal** | **$1,025,000.00** |
| **TOTAL** | **$7,325,000.00** |

Vantage holds security interests against prepetition bean inventory, bean accounts receivable and proceeds from the sale of beans. By virtue of entry of an Order Granting Debtor's Emergency Motion for Authority to Obtain Post-Petition Financing, Payoff Certain Liens of Vantage Bank and Establish Procedures for Purchase of Edible beans [Docket #467] the Court approved the conveyance, or modification of the automatic stay permitting foreclosure of the tracts of the real property listed in the chart above. Additionally, due to the payment of $625,000 from the PACA

Debtor's First Amended Chapter 11 Plan of Reorganization
Page 36

~~Reserve and the bean enterprise operating account, Vantage will release its claims against the assets of the bean enterprise. The Debtor projects that the provision of financing for the purchase of additional inventories of black and pinto beans will result in net profits from the bean enterprise in the approximate sum of $800,000. These funds then can be used to fund necessary expenditures by the Debtor in carrying out the provisions of this Plan.~~

~~Falcon will receive payment in full of its outstanding claim in the amount of approximately $6,000,000, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farm having an estimate value for purposes of the Plan of $7,000,000. The payment of the indebtedness owed to Falcon will be consideration for Falcon releasing its Deeds of Trust against all other real property of the estate including but no limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust. For purposes of the Plan,~~ ~~the Debtor projects~~<u>disputes</u> that the ~~sale of Moore Farms will result in unencumbered net proceeds available to fund the Plan in the approximate sum of $500,000~~<u>transfers are invalid</u>.

In order to compromise and settle the dispute between the Debtor and GrainChain relating to its asserted second liens against the Progreso Facility and Moore Farms, as well as its first liens against the Baryta Industrial Tract, Emory Farms and the Edcouch Facility, the ~~Parties have reached an agreement~~<u>Debtor proposes</u> to ~~nullify~~<u>settle the disputes between the parties as follows:</u>

- • <u>GrainChain's liens will be nullified as to</u> the asserted liens of GrainChain against these assets.

- • In exchange for releasing its <u>liens, including its</u> Deeds of Trust against these real property tracts ~~the Debtor has entered into an agreement whereby~~ GrainChain, the Unsecured Creditors, and Harco Insurance will hold joint liens against the tracts with GrainChain being entitled to 45%, the General Unsecured Creditors entitled to ~~40~~<u>45</u>% and Harco entitled to ~~15%.~~ <u>10%.</u>

- • Upon the sale of any of the tracts the net proceeds from the sale will be paid over to the Plan Agent and ~~he~~ will ~~distribute the funds~~<u>be distributed</u> among these <u>three</u> constituent groups in accordance with ~~such~~<u>the above</u> percentages. These percentages, and the division of the net proceeds according to these ratios, will continue until such time as the claims of the constituent groups have been paid in full or all of the real property assets have been sold.

Further, the percentages held by the three constituent groups against the real property tracts will carry over and control the division of the net profits derived from the operations of the Edcouch and Progreso Facilities in accordance with the terms of the Operating Agreement put in place ~~prior to the~~<u>upon</u> confirmation of the Plan.

GrainChain will be obligated to pay <u>up to a</u> minimum of $250,000 per year to the claims of General Unsecured Creditors~~.~~ <u>, depending on the percentage of "net profits" distributions.</u> In the event that the percentage of net profits due to be paid to the General Unsecured Creditors Class <u>is</u>

less than $250,000 to the Unsecured Creditor Class, GrainChain will pay the difference to the Plan Agent for distribution to the Unsecured Creditor Class. If the net profits distribution exceeds $250,000 the ~~larger~~excess sum shall be paid over to the Unsecured Creditor Class and paid pro-rata among the Creditors who have voluntarily chosen to be treated in such Class. ~~~~The payment of the net profits to the General Unsecured Creditors will be reduced as the claims are paid. ~~Such~~ such that for each percentage reduction the percentage of net profits to GrainChain will increase and the percentage paid to the General Unsecured Class will decrease. The Unsecured Creditor Class will not be paid any more than the principal amount of the allowed Unsecured Claims; provided, however, GrainChain will endeavor to operate the Debtor and arrange the sale of the joint lien assets at a value to pay the Unsecured Creditor Class the highest recovery possible on their Allowed Claims.

**B.** ~~Since Harco Insurance holds a contingent unliquidated claim that may not be determined by the Effective Date for the first three years~~**TREATMENT OF OTHER CLAIMS**

**Harco Proof of Claim**: Harco National Insurance Company ("**Harco**") has filed a Proof of Claim for the full amount of all TDA Surety Bonds. This Plan proposes to allow that Claim in full pursuant to the treatment and impairment set out herein. This consensual treatment provided in the Plan provides that, upon funding of the TDA Surety Bonds in full to the Creditors provided in this Plan, thereafter for the first three (3) years, the net profits shall be divided solely between GrainChain at the initial percentage of 45% and the General Unsecured Creditors receiving 55%. The ~~unsecured claim~~Unsecured Claim of Harco is being subordinated due to the fact that ~~they are~~it is a ~~creditor who~~Creditor which must fund ~~the~~ payment of the ~~surety bonds~~TDA Surety Bonds to the ~~creditors~~Creditors entitled to receive them under the provisions of this Plan. ~~After~~However, beginning in the third year of the Plan, Harco shall be entitled to receive ~~15~~10% of the net profits[3] to reduce its ~~presumably liquidated claim~~Liquidated Claim until such time as the ~~claim~~Claim is extinguished from either the receipt of net proceeds realized from the sale of real property or its share of the net profits of the Debtor~~.~~ upon completion of the five-year term of the Plan and the payment of its share of the assets of New Co.

~~The net profits are understood to be derived from the combined operations relating to the purchase and sale of grain, edible beans, and sunflower seeds as well as any other revenue generating activities undertaken by the Debtor.~~

~~Creditor~~-Farmers holding ~~claims~~Claims that may be entitled to ~~distributions~~Distributions from the proceeds of the ~~surety bonds~~TDA Surety Bonds may either choose to be paid solely by the ~~bond~~TDA Surety Bond receipts, or to participate and receive their pro-rata share of the percentages paid to General Unsecured Creditors on a ~~pr~~pro-rata basis from the receipt of net proceeds from the sales of real estate or the net profits from the operations of the Debtor as provided herein.

~~All grain~~Only claimants ~~deemed~~ that specifically "opt-out" of the Plan will be eligible to

---

[3] The "net profits" are understood to be derived from the combined operations relating to the purchase and sale of grain, edible beans, and sunflower seeds as well as any other revenue generating activities undertaken by the Debtor.

participate in the distribution of the ~~surety bond~~TDA Surety Bond proceeds ~~will be paid from the pool of funds~~ to be distributed by the ~~TDA. However, if these~~ Plan Agent. Further, for the avoidance of doubt, any holders of grain claims that choose ~~distribution from the bond~~to "opt-out" of the Plan in favor of Distribution from the TDA Surety Bond claims ~~they~~ will ~~not have any preferences they received~~ waived by the Debtor.  ~~The Debtor projects that the holders of grain claims associated with the delivery of feed grains to the Progreso Facility will be paid approximately 12 cents on the dollar; the holders of grain claims associated with the delivery of feed grains to Santa Rosa/Donna will receive approximately 5 cents on the dollar; and the holders of grain claims making deliveries to feed grains to the Edcouch Facility will receive a projected 100 cents on the dollar.~~ also face preference exposure.

The holders of grain claims who opt-in to the Plan will participate in the pool of ~~creditors~~Creditors treated in the General Unsecured Class and will have all ~~preference claims~~Preference Claims waived and released by the Debtor in exchange for their transfer and assignment of any rights they may have to assert claims and receive ~~distributions~~Distributions from the proceeds of the ~~surety bonds.~~TDA Surety Bonds. The amount of their ~~allowed general unsecured claim~~Allowed General Unsecured Claim will then share pro-rata from all ~~distributions~~Distributions made to the Debtor for the benefit of holders of General Unsecured Claims as provided in the Plan.

**———Any Plan Treatment Objections by Harco**:  Absent the agreed Plan treatment for the Harco Claim, Harco holds a contingent Unliquidated Claim that may not be determined, absent adjudication under this Plan process by the Effective Date. Thus, in such event of a Harco Objection to this Plan and/or confirmation of the Plan, the Debtor will respond and file its own written object to Harco's Claim based on:

(i)        subordination[4] of Harco's Claim to payment in full of all Creditors in the Class of Unsecured Creditors who are potential Bond Claimants, and

(ii)       the obligation of Harco to advance the full amount of its filed Proof of Claim to those Creditors provided in this Plan, and as provided in the Plan.

Such Objection by Harco and Objection by Debtor (the "**Objections**") shall be determined at, and as a part of, the Confirmation hearing upon the Bankruptcy Court invoking the Adversary Rules of Procedure to the determination of the Objections pursuant to its authority to do so.[5] The ~~Debtors~~

---

[4]     *See, American Surety Co. v. Sampsell*, 317 U.S. 269, 66 S. Ct. 571 (1946) - a surety's claim was properly postponed until payments in full were made to all claimants who were members of the class of creditors covered by the bond.

[5]     *See, e.g. Lucas v. Dynergy Inc. (In re Dynegy Inc.)*, 2013 U.S. Dist. LEXIS 78479, at *17-18 (S.D.N.Y. June 4, 2013)

At the discretion of the Bankruptcy Court, Rule 23 may be invoked in the context of an objection to the confirmation of a chapter 11 plan. The objection to the confirmation of a chapter 11 plan is a "contested matter." See Fed. R. Bankr. P. 3020(b)(1) ("An objection to confirmation is governed by Rule 9014."); *Bear Tooth Mountain Holdings Ltd. P'ship v. ML Manager LLC ("In re Mortgs. Ltd.")*, No. 2:08 bk 07465 RJH, 2013 Bankr. LEXIS 1393, 2013 WL 1336830, at *4 n.12 (Bankr. D. Ariz. Mar. 28, 2013) [*18] ("Pursuant to [Rule] 3020(b) . . . and 9014, confirmation of plans and hearings

~~project~~Debtor hereby requests the Bankruptcy Court invoke the Adversary Rules of Procedure to determine the Objections. Accordingly, it shall not be necessary to file a separate Adversary Proceeding, upon invoking the adversary rules of procedure, to resolve the Objections and the Plan treatment of Harco's.

The Debtor projects that over the five-year term of the Plan that holders of unsubordinated General Unsecured Claims will be paid ~~in full~~. At the end of the Plan, GrainChain will become the sole equity interest holder ~~owing~~owning stock in the ~~Debtor or its successor~~New Co.

~~3.      Status of~~C.   **MEANS FOR IMPLEMENTATION OF THE PLAN**

On the ~~Administration of~~day following the ~~Bankruptcy~~

~~Formation of Official Committee of Unsecured Creditors~~

~~On March 9, 2023, the U.S. Trustee's Office appointed an Official Committee of Unsecured Creditors ("UCC") in this case. The members of the Committee are as follows:~~

| | |
|---|---|
| ~~Thomas Walker, Jr.~~ | ~~Thomas Zdansky~~ |
| ~~Stony Ridge Foods, Inc.~~ | ~~1467 Fm 498~~ |
| ~~715 Atlantic Ave.~~ | ~~Lyford, TX 78569~~ |
| ~~Benson, MN 56215~~ | |
| | ~~Johnny Guin~~ |
| ~~Frank E. Russell~~ | ~~PO Box 1773~~ |
| ~~Russell Plantation II~~ | ~~Weslaco, TX 78599~~ |
| ~~28481 St. Hy 100~~ | |
| ~~Los Fresnos, TX 78566~~ | ~~Karen Arnold~~ |
| | ~~PO Box 595~~ |
| ~~William E. Bailey~~ | ~~Weslaco, TX 78599~~ |
| ~~Frank Bailey Grain Company, Inc.~~ | |
| ~~230 Montgomery St.~~ | ~~Brian Jones~~ |
| ~~Fort Worth, TX 76107~~ | ~~d/b/a Brian Jones Farms~~ |
| | ~~PO Box 213~~ |
| | ~~Edcouch, TX 78538~~ |

~~Retention and Payments to Professionals~~

on objections to confirmation are contested matters . . . ."); *In re Farrell*, 38 B.R. 654, 655 (Bankr. W.D. Mo. 1984).**6** This case involves an objection to a chapter 11 plan. Therefore, Bankruptcy Rule 9014 provided the Bankruptcy Court with discretion to decide whether to apply Bankruptcy Rule 7023 and with it the latter's inclusion of Rule 23. *In re Ephedra Prods. Liab. Litig.*, 329 B.R. 1, 5 (S.D.N.Y. 2005); *see also In re Am. Reserve Corp.*, 840 F.2d at 488 ("Rule 23 may apply . . . at the bankruptcy judge's discretion.").

Employment of Mullin Hoard & Brown, L.L.P. as counsel for the Debtor

On February 27, 2023, the Debtor filed its *Motion to Employ Mullin Hoard & Brown, L.L.P. as Counsel for the Debtor.* As set forth in the motion to employ, Mullin Hoard & Brown, L.L.P. received a retainer in the amount of $100,000.00 from Effective Date, Garcia Grain Trading Corp., prior to the filing of the Bankruptcy Case. Upon filing the Bankruptcy Case, MULLIN HOARD & BROWN, L.L.P. made a draw on the retainer of $38,866.50 to pay for legal fees and expenses that had been incurred prior to filing the petition in this case, leaving a balance in the retainer account of $61,133.50. On April 6, 2023, the Court entered an Order Granting the Motion to Employ Mullin Hoard & Brown, LLP. On August 28, 2023, counsel for the Debtor filed it First Motion for Compensation and First and Last Request for Draw Against Retainer seeking $564,500.50 in fees and reimbursement of expenses of $22,350.29 as well as a request for permission to draw against retainer funds totaling $61,133.50. The hearing on this fee application is set for September 20, 2023.

Employment of D. Williams & Co., Inc. as accountants for the Debtor.

On March 3, 2023, the Debtor filed its *Motion to Employ D. Williams & Co., Inc. as Accountants for the Debtor.* On April 6, 2023, the Court entered an Order Granting the Motion to Employ D. Williams & Co., Inc. The services of the accounting firm of D. Williams & Company included a forensic accounting investigation into the facts and circumstances that resulted in losses of grain or receipts from the grain which resulted in the Debtor's Bankruptcy and a determination as to what causes of action the Estate may have to recover the missing property of the Estate transferred to insiders within a year prior to the Petition Date. On August 28, 2023, the accountants for the Debtor filed their First Motion for Compensation seeking $61,460.03 of fees. The hearing on this fee application is set for September 20, 2023.

Employment of Jordan & Ortiz, P.C. as counsel for the UCC

On March 17, 2023, the Committee filed its *Application of the Official Committee of Unsecured Creditors of Garcia Grain Trading Corp. to Retain and Employ Jordan & Ortiz, P.C. as Counsel.* On April 10, 2023, the Court entered an order authorizing the employment of Jordan & Ortiz, P.C. as counsel for the Committee. On September 14, 2023, counsel for the UCC filed a corrected fee application with the Court seeking fees totaling $285,353.75 and expenses of $523.48. The hearing on this fee application is set for September 20, 2023.

Employment of Dundon Advisers, LLC as Financial Advisor for the UCC

On April 5, 2023, the Committee filed their *Motion to Employ Dundon Advisers, LLC as Financial Advisor for Committee.* On April 28, 2023, the Court entered an order authorizing the employment of Dundon Advisers, LLC as Financial Advisor for the Committee. On August 30, 2023, Dundon filed an application requesting fees of $92,273, and expenses of $1,606.04. The hearing on this fee application is set for September 20, 2023.

Employment of Sánchez Devanny as Counsel for Debtor to Collect Foreign Receivables

~~To expedite the collection of the Accounts Receivable in Mexico, the Debtor obtained authority to initiate foreign collection procedures [Dkt #162], and obtained an Order [Dkt #270] authorizing the Debtor to employ the law firm of Sánchez-Devanny Eseverri, S.C. ("Sánchez Devanny"), a law firm based in Nuevo León, Mexico, as counsel for Granos Y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo") to institute foreign collection procedures,~~ as reorganized pursuant to the provisions of ~~11 U.S.C. § 105. Since then, the Debtor has cooperated with Sánchez Devanny as its attorneys have undertaken efforts to analyze and address the collection of foreign receivables from customers of the Debtor in Mexico. Sánchez Devanny is in the process of preparing an application for compensation and reimbursement of expenses which is anticipated to request $8,000 in fees and $373 in expenses.~~

~~Appointment of Chief Restructuring Officer:~~

~~The Debtor engaged Richard S. Schmidt, pursuant to the Court's Agreed Order entered on August 15, 2023 [Dkt #429], serve as the Chief Restructuring Officer ("CRO" or "Schmidt") in the Debtor's Chapter 11 bankruptcy case. The compensation for the CRO has been established at $20,000 per month plus reasonable and necessary expenses, and these funds will come from the profits out of the sunflower enterprise whereby GrainChain has committed up to $250,000 to cover the administrative expenses.~~

~~Employment of Kay Walker as Independent Counsel for the Chief Reorganization Officer~~

~~The Debtor engaged Kay Walker as Independent Counsel for the CRO pursuant to the Court's Order entered on August 16, 2023 [Dkt. #431], and she was paid an initial retainer by the Debtor of $20,000. No fee application has been filed by Ms. Walker to the present date.~~

~~**3.    Status of Reorganization Efforts Undertaken by the Debtor**~~

~~Following a hearing~~ the Plan, shall emerge as a Texas corporation (the "**New Co.**"), notwithstanding that all operations will be conducted by the ~~Bankruptcy Judge on July 7, 2023, to consider  *Debtor's Amended Emergency Motion for (I) Interim Authority to Incur Post-Petition Indebtedness with GrainChain, Inc. Pursuant to 11 U.S.C. § 364(c)(1) Together with Final Authority to Grant Priority Pursuant to 11 U.S.C. § 364(c)(2),(3); (II) Request to Approve Operating Agreement with GrainChain, Inc., and~~ independent  manager.  Elkins~~Grain, LLC; and (III) Request for Preliminary and Final Hearings~~ [Dkt. #352], the Court instructed the Debtor and its counsel that the Court required a fiduciary be named on behalf of the Debtor's Bankruptcy Case to whom he could look for accountability with respect to the reorganization and management of Garcia.  The Bankruptcy Court denied final approval of the Operating Agreement pending the appointment of such a fiduciary and recommendations from such fiduciary concerning the advisability of the Debtor entering such a transaction,~~ overseen by both the Plan Agent and GrainChain and subject to the continuing jurisdiction of the Bankruptcy Court.

~~On July 13, 2023, the Court entered its Order granting the Debtor interim authority on an~~

emergency basis to incur indebtedness with GrainChain, Inc. ("GrainChain") not to exceed $1,280,281.00 secured with a super priority administrative claim under 11 U.S.C. § 364(c)(1), as reflected in the Promissory Note attached to such Order, and bearing interest at an annual interest rate of 3 points over the prime interest rate as published by the *Wall Street Journal*, and if not paid before, maturing and becoming fully payable on February 29, 2024. This Order allowed the Debtor to secure financing from GrainChain to put in place a bond with TDA in favor of Elkins Grain and by the premiums for insurance covering the Debtor's Progreso and Edcouch grain facilities, along with the grain stocks stored there, and liability and workmen's compensation insurance as well. This Order [Dkt. #373] allowed the Debtor to begin operations at Progreso and Edcouch by leasing such facilities to Elkins Grain and allowing Elkins to manage the purchase and sale of feed grains.

In response to the Bankruptcy Judge's instructions with respect to the appointment of a responsible fiduciary for the Bankruptcy Case, on July 11, 2023, the Debtor filed its *Ex Parte Emergency Motion for Authority to Engage the Honorable Richard S. Schmidt as Mediator for the Debtor* [Dkt. #366].

Following the entry of an Order appointing the mediator, the Debtor along with representatives of the major secured creditors, the UCC and its counsel and financial advisor, as well as counsel for the Debtor, the owners of Garcia and their individual counsel, attorneys from the Texas Attorney General's Office, and counsel for Harco National Insurance Co. met in Austin, Texas, to participate in negotiations toward agreements that would allow the filing of a confirmable Plan of Reorganization.

As a result of the progress made during the mediation, the Debtor along with the creditors came up with a Term Sheet which sets forth the basic terms of a Plan of Reorganization which could be further refined, drafted into written form, and submitted to the Court by the Court's established deadline.

To facilitate all these tasks, on August 2, 2023, the Debtor requested appointment of a Chief Restructuring Officer ("CRO") [Dkt #393] to administer the case and to propose a confirmable Plan. An Agreed Order appointing Richard S. Schmidt as the CRO was entered on August 15, 2023 [Dkt #429].

The Plan of Reorganization and Disclosure Statement as reflected in this document is the result of hours of discussions with counsel representing the major secured creditors in the case, the UCC and its counsel, and attorneys representing the major suppliers of edible beans, as well as the attorneys representing the TDA and Harco National Insurance Co. which is the company that issued the surety bonds connected with the pre-petition licenses for Progreso, Santa Rosa/Donna, and Edcouch.

4.        Estimated Value of Current Assets and Liabilities

The estimated current value of the Debtor's major assets along with a listing of its liabilities is set forth in summary form in the charts below.

| ASSETS (As of July 31, 2023) | | | |
|---|---|---|---|
| **Category** | **Description** | | **Estimated Value** |
| **PERSONAL PROPERTY** | | | |
| Cash and Cash Equivalents | Cash on hand | | $2,800.00 |
| | Checking, savings, money market, or financial brokerage accounts | Wells Fargo – Gen. Operating | $16,365.09 |
| | | Wells Fargo – Grain Escrow | $3,517,611.77 |
| | | Wells Fargo – Edcouch repair | $868.83 |
| | | Wells Fargo – Progreso repair | $7,801.49 |
| | | Wells Fargo – Sunflower | $11,951.01 |
| | | Wells Fargo – Bean | $258,419.22 |
| | | Wells Fargo – PACA Reserve | $408,327.38 |
| | | Wells Fargo – Investment for Progreso Rehab. | $3,425,766.34 |
| **Category Subtotal** | | | **$7,649,911.13** |
| Accounts Receivable | Grain & Sunflower a/r | | $1,049,895.90 |
| | Bean a/r | | $218,459.92 |
| | Accounts receivable – Petition Date | | $2,140,698.79 |
| **Category Subtotal** | | | **$3,409,054.61** |
| Surety Bonds | Hargo National Insurance Company (Surety Bonds for grain in storage for benefits of TDA ) | | $2,155,650.00 |
| **Category Subtotal** | | | **$2,155,650.00** |
| Inventory, Excluding Agricultural Assets | Work in progress: In and out service of yellow peas | | $20,000.00 |
| | Inventory of pinto and black beans, | | $584,236.65 |
| | Grain at Progreso Elevator (Salvage Claim) | | $2,318,400.00 |
| | Soybean seed | | $284,000.00 |
| **Category Subtotal** | | | **$3,206,636.65** |
| Office Furniture, | See Dkt #50, Exhibit B50 | | $38,360.00 |

| Fixtures, and Equipment and Collectibles | | |
|---|---|---|
| **Category Subtotal** | | **$38,360.00** |
| Machinery, Equipment, and Vehicles | 2017 Ford 250 VIN#1FT7W2BT3HEE56508 | $48,999.72 |
| | 2020 Ford F159 VIN#1FTEWVV1E59LFB68462 | $29,200.00 |
| | Other – miscellaneous located at Progreso, Edcouch, Santa Rosa/Donna | $444,600.00 |
| **Category Subtotal** | | **$522,799.72** |
| **TOTAL PERSONAL PROPERTY** | | **$16,982,412.11** |

| **REAL PROPERTY** | | |
|---|---|---|
| Real Property | Santa Rosa Elevator (22056 Bass Blvd, Harlingen, Texas); Adams Gardens Subdivisions B&C PT Blk 281 and 503 | $2,000,000.00 |
| | Progreso Elevator (1/8 Mile N. Int'l Bridge 1015 | $4,430,000.00 |
| | Edcouch Elevator (624 W. Missouri Edcouch, Texas 78538) | $1,334,435.00 |
| | Pitts Property Corporate Office & Val Verde Elevator (101 N. Val Verde Rd, Donna, Texas 78537) | $2,410,000.00 |
| | Willacy Property (25 acres) | $75,000.00 |
| | McCook Property (subject to contract of sale) (FM 490 1/2 Mile East of FM 681) | $22,670.00 |
| | Donna Elevator (101 N. Val Verde) | $1,500,000.00 |
| **Category Subtotal** | | **$11,772,105.00** |
| **TOTAL REAL PROPERTY** | | **$11,772,105.00** |
| All Other Assets | Notes Receivable from Val Verde Grain Holding LC ($614,603.00) | $0 |
| | Note Receivable from PSG Products ($3,453,493.00) | $0 |

| | Note Receivable from Mission Crane, LLC ($28,000.00) | $0 |
|---|---|---|
| | Insurance Claim (Edcouch Elevator) FCCI Insurance Co. | $0 |
| Category Subtotal | | -0- |
| TOTAL OF REAL AND PERSONAL PROPERTY | | $28,439,242.28 |
| | | |
| LIABILITIES (As of July 31, 2023) | | |

Secured Creditors and Their Collateral:

| Name of Creditor | Description of Asset/Collateral | Liquidation Value of Collateral/Source of Estimated Value | Amount of Secured Claim | Amount of Equity /(Deficiency) |
|---|---|---|---|---|
| StoneX | Ownership or security interest in warehouse receipts for grain in Progreso, along with any associated accounts receivable, bond claims, or insurance claims associated with such grain | Grain Escrow Acct.: $3,571,371<br><br>Surety Bond for Progreso: $1,009,750<br><br>Accounts receivable: $812,184<br><br>FCCI Claim for grain stock: $2,318,400 (Estimated for 240,000 bushels @ $9.66)<br><br>TOTAL: $7,711,705.00 | Claim: $19,461,058.00<br><br><br>TOTAL: $19,461,058 | ($11,749,353) |
| Falcon Bank | 1st lien deeds of trust against real estate consisting of Progreso Elevator and Moore Farm (1,460 acres) | Progreso Elevator: $4,430,000<br><br>Security interest in equipment valued at $330,000<br><br>Moore Farm: $7,000,000<br><br>TOTAL: $11,760,000 | Claim: $5,989,153<br><br><br>TOTAL: $5,989,153 | $5,770,847 |

| Vantage Bank | 1st lien deeds of trust against real estate consisting of Pitts Property, 101 N. Val Verde Donna), and Santa Rosa elevator, and security interest in warehouse receipts for grain in Santa Rosa, along with inventory, accounts receivable, and cash of bean enterprise | Surety Bond for Donna/Santa Rosa (TXIFSU 0570548): $739,200.00<br><br>Pitts Property: $2,410,000<br><br>Santa Rosa Elevator: $2,200,000<br><br>101 N. Val Verde (Donna) [Titled in Val Verde Holdings]: $1,500,000<br><br>Inventory, A/R, and Cash of Bean Enterprise = $1,000,000<br><br><br>**TOTAL: $7,849,200** | Claim: $8,789,064<br><br><br><br><br><br>**TOTAL: $8,789,064** | ($939,864) |
| Grain Chain, LLC | 2nd lien against Progreso Elevator and Moore Farms;<br><br>1st lien deeds of trust against real estate consisting of Emory Farms (56 acres) [Titled in PSG Products], and Baryta Industrial [Titled in Octavio Garcia] and | Equity in Progreso Elevator and Moore Farms: $5,770,847<br><br>Emory Farms: $770,000<br><br>Baryta industrial tract: $650,276<br>Edcouch Elevator: $1,334,435 | Claim: $7,841,055<br><br><br><br>**TOTAL: $7,841,055** | $684,503 |

| | Edcouch Elevator facilities | TOTAL: $8,525,558 | | |
|---|---|---|---|---|
| EQUITY AFTER SECURED CLAIMS | | | | $684,503 |

| UNSECURED CLAIMS | | | | |
|---|---|---|---|---|
| General Unsecured | | Priority | Non-Priority | |
| American Bean, LLC | $184,000.00 | | $184,000.00 | |
| American Express | $4,617.90 | | $4,617.90 | |
| Amex Trs. Co., Inc. | $8,524.35 | | $8,524.35 | |
| Brian Jones Farms | $76,916.82 | $7,475.00 | $69,441.82 | |
| Cargill | $44,422.90 | | $44,422.90 | |
| Carl Hensz | $97,748.78 | $7,475.00 | $90,273.78 | |
| Chad Szutz | $58,495.56 | $7,475.00 | $51,020.56 | |
| Dreibelbis Farms | $290,691.70 | $7,475.00 | $283,216.70 | |
| East Fresh Farms | $65,769.41 | $7,475.00 | $58,294.41 | |
| Fike Farms | $353,230.88 | $7,475.00 | $345,755.88 | |
| Frank Bailey Grain Co. | $653,585.11 | | $653,585.11 | |
| Graneros Guadalupe SA | $506,334.56 | | $506,334.56 | |
| HAR-VEST | $182,214.60 | $7,475.00 | $174,739.60 | |
| Helena Enterprises, LLC | $518,134.08 | | $518,134.08 | |
| Internal Revenue Service | $190,597.64 | | $190,597.64 | |
| Johnny Guin | $117,560.65 | $7,475.00 | $110,085.65 | |

| | | | | |
|---|---|---|---|---|
| Karen Arnold | $107,332.39 | $7,475.00 | $99,857.39 | |
| Lothringer Family Farms | $70,618.69 | $7,475.00 | $63,143.69 | |
| Planter's Grain Coop | $255,696.00 | | $255,696.00 | |
| Robert Walsdorf | $8,018.76 | $7,475.00 | $543.76 | |
| Russell Plantation II | $668,169.85 | $7,475.00 | $660,694.85 | |
| Simplot A.B. Retail | $217,537.13 | | $217,537.13 | |
| Skalitsky Farms | $149,842.47 | $7,475.00 | $142,367.47 | |
| Sorghum Checkoff Program | $301,795.30 | | $301,795.30 | |
| Stony Ridge Food, Inc. | $1,439,027.75 | | $1,439,027.75 | |
| ValleyCoop Oil Mill | $115,201.99 | | $115,201.99 | |
| Wesley Valerius | $119,444.52 | $7,475.00 | $111,969.52 | |
| Zdansky, J.V. | $346,739.93 | $7,475.00 | $339,264.93 | |
| **TOTAL GENERAL UNSECURED** | **$7,152,269.72** | **$112,125.00** | **$7,040,144.72** | |
| | | | | |

**Administrative Claims:**

| | |
|---|---|
| Administrative Expenses | $1,500,000 |
| Priority Claims pursuant to 11 U.S.C. Section 507(a)(6)(A) | $   112,125 |
| Priority Claim of the IRS | $   571,705 |
| Priority Claim of the Texas Comptroller | $       5,676 |
| Priority Claims of Local Taxing Authorities | $   138,537 |
| **Total Estimated Priority Claims:** | **$2,328,045** |

| Summary of General Unsecured Claims: | |
|---|---|
| StoneX (Deficiency Claim) | $11,749,383 |
| Vantage Bank (Deficiency Claim) | $  939,684 |
| Unsecured Claim of the IRS (Penalties) | $  190,598 |
| Unsecured Claims (Outstanding Grain Payables) | $ 3,254,255 |
| Unsecured Claims (Outstanding Bean Payables) | $ 1,504,489 |
| Unsecured Claims (Outstanding General Payables) | $ 1,977,193 |
| Harco Insurance Co. (Outstanding Bond Claim) | $ 1,748,950 |
| **Total General Unsecured Claims:** | **$21,364,552** |

Insider Suit to Recover the Alamo Grain Elevator and Other Assets:

The Debtor will continue to prosecute and pursue to judgment the recovery of the assets transferred to Rodolfo Plascencia, Sr. and WNGU Properties, LLC as is now joined in Adversary Proceeding No. 23-7002, styled Garcia Grain Trading Corporation vs. Rodolfo Plascencia, Sr. and WNGU Properties, LLC, pending before the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division (the "Alamo Adversary"). The Alamo Adversary will be transferred to the Plan Trust and be administered by the Plan Agent.

In addition, all other causes of action owned by the estate against insiders or third parties will be transferred to the Plan Trust and administered by the Plan Agent. These claims would include any lawsuits relating to the collection of pre-petition accounts receivable as well as any preference, turnover actions, fraudulent conveyances or other rights belonging to a Debtor in Possession in the bankruptcy cases.

~~Plan~~ Governing Law.

New Co. will be maintained as a Texas corporation organized under Texas law.

Debtor's Equity.

As of the Effective Date, all of the existing equity in the Debtor will be transferred and assigned to the Plan Trust.

Plan Trust.

A post-confirmation trust (the "**Plan Trust**") will be established to carry out the implementation of the Plan and administration of Claims as provided herein. The Plan Contribution shall be transferred to the Plan Trust on the Effective Date. The Plan Agent (as defined below) shall

be the trustee of the Plan Trust. The beneficiaries of the Plan Trust shall be the General Unsecured Creditors of the Debtor as more specifically defined in the Plan of Reorganization. The Plan Agent is authorized to engage counsel and other professionals as is reasonably necessary to administer the Plan Trust without further Bankruptcy Court order or approval. The Plan Agent will charge an hourly fee as provided in the Plan for the work involved in administering the Plan Trust. The Plan Agent's fees and expenses related to the administration of the Plan Trust, including the fees and expenses of all professionals engaged by the Plan Agent shall be paid from the assets of the Trust, along with any unpaid administrative expenses of the Debtor approved by the Court shall be paid prior to disbursement to the Plan beneficiaries.

Creation of the Plan Trust.

On the Effective Date, the Plan Trust Agreement shall be executed, and the Plan Trust shall be established and become effective. In accordance with this Plan and the Plan Trust Agreement, the Plan Trust shall be established for the purpose of (i) collecting, receiving, holding, maintaining, and administering the Plan Trust Assets; (ii) making all payments and Distribution to holders of Allowed Claims in accordance with the terms of this Plan; (iii) closing the Bankruptcy Cases; and (iv) otherwise implementing the Plan and finally administering the Estate. The Plan Trust shall not engage in a trade or business and shall conduct its activities consistent with the Plan Trust Agreement. On and after the Effective Date, the Plan Trust shall perform and pay when due liabilities, if any, related to ownership or operation of the Plan Trust Assets.

Plan Agent.

Upon confirmation of the Plan of Reorganization, the CRO shall become the Plan Agent (the "Plan Agent") and shall administer the Plan Trust in accordance with the terms and provisions of the Plan Trust Agreement as described and set forth in the Plan. The Plan Agent shall be authorized to retain professionals to advise and assist in the functions of the Plan Agent and the Plan Agent and his professionals and advisors will be compensated from Plan Trust Assets.

Transfer of Plan Trust Assets.

On the Effective Date, the Plan Trust Assets shall be transferred and assigned to the Plan Trust, but subject to the Plan Trust's obligations under the Plan and Plan Trust Agreement and subject to all properly perfected Liens not released pursuant to the terms of this Plan. The Plan Agent, as trustee of the Plan Trust, shall be substituted as the plaintiff, defendant, or other party in all lawsuits in which either of the Debtor is, as applicable, a party as of the Effective Date. The conveyance of all Plan Trust Assets shall be accomplished pursuant to the Plan and the Confirmation Order and shall be deemed effective upon the Effective Date. Any Person having a Lien, encumbrance, or other interest against any Plan Trust Assets shall be conclusively deemed to have consented to the transfer and assignment of such Plan Trust Assets to the Plan Trust by failing to object to confirmation of this Plan, except as otherwise provided in this Plan. The Plan Agent may present such Order to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyance to the Plan Trust. Such Order may be presented without further notice other than as has been given in this Plan.

Specifically included as Plan Trust Assets are the following:

The following is a listing of assets and funds that the Debtor anticipates having on the Effective Date. These assets will be contributed to the Plan Trust and be available to fund the initial payments called for in the Plan on the Effective Date.

**Proceeds from the Sale of Real Property:**

| | |
|---|---|
| Proceeds from the sale of Willacy Farm | $144,000 |
| Proceeds from the sale of McCook | $22,000 |
| Subtotal Real Estate Proceeds | **$166,000** |

**Contributions to the Trust:**

| | |
|---|---|
| Funds to be contributed by Octavio Garcia: | **$3,500,000** |

**FCCI Insurance Claims:**

| | |
|---|---|
| Claim for Rehabilitation/Reconstruction – Progreso | $3,400,000 |
| Claim for Damaged Grain | $3,000,000 |
| Claim for Business Interruption | $1,200,000 |
| Claim for Damaged Conveyors | $    80,000 |
| Subtotal | **$7,680,000** |

**Claims Against Surety Bonds:**

| | |
|---|---|
| Alamo, Texas | $242,200 |
| Progreso, Texas | $1,009,750 |
| Santa Rosa and Donna, Texas | $739,200 |
| Edcouch, Texas | $406,700 |
| Subtotal | **$2,397,850** |

**Funds/Claims in Debtor-in-Possession Accounts:**

| | |
|---|---|
| Grain Proceeds Reserve Account | $3,550,402 |
| Accounts Receivable (Grain) | $812,000 |

| | |
|---|---|
| Accounts Receivable Collections (Farm Accounts) | $500,000 |
| Profits Derived from Operations of Elkins Grain | $1,313,059 |
| Subtotal | **$6,175,461** |
| **TOTAL Funds Available on Effective Date** | **$19,919,311** |

Plan Contributions.

Certain tracts of real property held in the name of PSG Products, LLC, Garcia Balli, Ltd., and Val Verde Grain Holdings, LLC, as well as in the name of Octavio Garcia, as more specifically described herein and in the plan of reorganization, will be marketed and liquidated by Octavio Garcia so that the net proceeds from the sales of these assets which shall not be less than $3,500,000 shall be paid over to the ~~CRO~~Plan Agent and ~~used~~ to pay ~~creditors~~Creditors of the Debtor's ~~bankruptcy estate~~Bankruptcy Estate as is provided in this Plan.

All funds paid into the ~~bankruptcy estate~~Bankruptcy Estate or constituting property of the ~~estate~~Estate, including any funds from the business interruption claim connected with the damage to the Progreso ~~facility~~Facility, and any funds recovered by the Debtor in any pending or contemplated litigation brought by the Debtor under the provisions of the Bankruptcy Code.

~~The sum of $350,000 to be funded by GrainChain as provided in the Operating Agreement between the Debtor, Elkins Grain Company, and GrainChain for the payment of administrative fees and expenses of Garcia.~~

~~Implementation of Restructuring:~~

~~On the day following the Effective Date, Garcia as reorganized pursuant to the provisions of the Plan shall emerge as a Texas corporation ("Reorganized Debtor").~~

~~Plan Trust:~~

~~A post-confirmation trust (the "Plan Trust") will be established to carry out the implementation of the Plan and administration of claims as provided herein. The Plan Contribution and the Alamo Adversary shall be transferred to the Plan Trust on the Effective Date. The Plan Agent (as defined below) shall be the trustee of the Plan Trust. The beneficiaries of the Plan Trust shall be the general unsecured creditors of the Debtor as more specifically defined in the plan of reorganization. The Plan Agent is authorized to engage counsel and other professionals as is reasonably necessary to administer the Plan Trust without further Bankruptcy Court order or approval. The Plan Agent will charge an hourly fee as provided in the Plan for the work involved in administering the Plan Trust. The Plan Agent's fees and expenses related to the administration of the Plan Trust, including the fees and expenses of all professionals engaged by the Plan Agent shall~~

be paid from the assets of the Trust, along with any unpaid administrative expenses of the Debtor approved by the Court shall be paid prior to disbursement to the Plan beneficiaries.

Plan Agent:

Upon confirmation of the plan of reorganization the CRO shall become the Plan Agent (the "Plan Agent"), and shall administer the Plan Trust in accordance with the terms and provisions of the trust agreement as described and set forth in the Plan.

Residual of Reserve Account From Sale of Assets:

The balance of the Plan Contribution, if any, existing after payment in full of all allowed claims as provided in the Plan, shall be returned to the Plan Sponsors.

Governing Law:

Reorganized Debtor will be maintained as a Texas corporation organized under Texas law.

Debtor's Equity:

As of the Effective Date, all of the existing equity in the Debtor will be transferred and assigned to the Plan Trust.

Post-confirmation contributions, including net profits and make-up payments to reach minimum net profits, sale of joint lien properties, recoveries on asset or avoidance litigation, and other sources.

Issuance of Plan Trust Interest.

It is an integral and essential element of this Plan that the offer and issuance of Plan Trust Interest pursuant to this Plan, to the extent such Plan Trust Interest constitute securities under the 1933 Act, shall be exempt from registration under the 1933 Act and any State or local law, pursuant to Section 1145 of the Bankruptcy Code and any other applicable exemptions, without limitation. The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Bankruptcy Cases, the Debtor, the Plan Agent, the U.S. Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that the Plan Agent is successor to the Debtor under this Plan pursuant to Section 1145 of the Bankruptcy Code, that the offer of the Plan Trust Interest is occurring pursuant to this Plan, that the offer of the Plan Trust Interest is in exchange for any Claim or Equity Interest, and that such offer and issuance, to the extent such Plan Trust Interest constitute securities under the 1933 Act, fall within the exemption from registration under the 1933 Act and any state or local law pursuant to Section 1145 of the Bankruptcy Code. In lieu of certificates evidencing the Plan Trust Interest, the Plan Agent shall maintain a register of the names, addresses and interest percentages of the Plan Trust Beneficiaries based upon the provisions of this Plan, which designate the persons who are entitled to receive the

Plan Trust Interest. The Plan Trust Interest may not be transferred, sold, pledged or otherwise disposed of, or offered for sale except for transfers by operation of law.

Cancellation of Equity Interests.

On the Effective Date, all Equity Interests in the Debtor shall be terminated and extinguished and any certificates that previously evidenced ownership of those Equity Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in the Debtor, save and except for any duties and responsibilities of the members and managers of the Debtor, along with the requisite authority, to prepare and file the final tax returns for the Debtor.

Plan Provisions for Releases and Injunction.

On the Effective Date, and except as otherwise provided herein, the Debtor, on behalf of itself and its ~~bankruptcy estate~~Bankruptcy Estate, shall release, acquit, and forever discharge the Plan Sponsors, the CRO and GrainChain, and each of their respective directors, officers, representatives, agents and attorneys, from any and all claims, counterclaims, demands, controversies, costs, contracts, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, actions, and causes of action of any nature, type or description, whether at law or equity, by common law or statute, in contract, for, or otherwise, known or unknown, asserted or unasserted, or suspected or unsuspected that have or could have been asserted in connection with the Debtor's ~~bankruptcy case~~Bankruptcy Case.

~~Conditions to Confirmation:~~

~~The Plan Contribution necessary to fund distributions under the Plan on the Effective Date as provided herein shall be not less than $6,500,000.~~

Preservation of Causes of Action and Rights.

All Causes of Action, rights of setoff and other legal and equitable defenses of the Debtor or the Estate are preserved unless expressly released, waived, or relinquished under the Plan or the Confirmation Order, and shall vest in the Plan Trust as part of Plan Trust Assets. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that a Cause of Action will not be pursued against them.

**Further, unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties not otherwise assigned to the Debtor or released as part of a Settlement are specifically reserved, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer**

actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.

Unless expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtor may hold the following claims, all of which shall be preserved and transferred to the Plan Trust pursuant to the terms of this Plan.

- Preference claims under section 547 of the Bankruptcy Code;

- Fraudulent transfer and other avoidance claims arising under section 506, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws;

- Unauthorized post-Petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and Causes of Action asserted in current litigation, whether commenced pre- or post-Petition;

- Counterclaims asserted or which may be asserted in current or future litigation;

- Any and all claims and Causes of Action against any related entities, including, without limitation any other entity sharing common ownership with the Debtor, Octavio Garcia, Baldemar Salinas, Rodolpho Plascencia, including, but not limited to, (i) any Cause of Action listed above, (ii) any claims based on any intercompany debt or amounts borrowed by any Affiliate or related company from either the Debtor or any other related entity, and (iii) any Avoidance Actions, including preference and fraudulent transfer;

- Any and all claims and Causes of Action against the officers, directors, or shareholders of the Debtor, including, but not limited to, (i) any Cause of

Action listed above, (ii) any claims based upon any amounts borrowed by a third party or credit extended to a third party, from the Debtor, (iii) breach of fiduciary duty; and (iv) Avoidance Action, including preference and fraudulent transfers;

- Any unasserted rights to pursue judgment the recovery of the assets transferred to Rodolfo Plascencia, Sr. and WNGU Properties, LLC as is now joined in Adversary Proceeding No. 23-7002, styled *Garcia Grain Trading Corporation vs. Rodolfo Plascencia, Sr. and WNGU Properties, LLC*, pending before the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division (the "**Alamo Adversary**"). Specifically, the Alamo Adversary will be transferred to the Plan Trust and be administered by the Plan Agent; and

- Any and all other causes of action, whether brought or whether known at the time, owned by the estate (whether legal or equitably) against Insiders or third parties will be transferred to the Plan Trust and administered by the Plan Agent. These claims would include any lawsuits relating to the collection of pre-Petition accounts receivable as well as any preference, turnover actions, fraudulent conveyances, or other rights belonging to the Debtor in Possession in the Bankruptcy Case.

Standing Plan Agent to Serve as Trustee and Representative of the Estate.

The Plan Agent shall serve as Trustee and shall be appointed representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Plan Trust Assets. With regard to the Plan Trust Assets, the Plan Trust may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein), settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action transferred to the Plan Trust. Except as otherwise ordered by the Bankruptcy Court, the Plan Agent shall be vested with authority and standing to prosecute the Causes of Action transferred to the Plan Trust. The Plan Agent and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

**ARTICLE ~~III~~VI**
**TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

**(I)  ADMINISTRATIVE AND PRIORITY UNSECURED CLAIMS**

**(Classes 1 and 2)**

**A.**     **Class 1 – Administrative Claims (Unimpaired)**

**Class 1** ~~shall consist~~consists of the Administrative Claims entitled to priority under Section 507(a)(1) through (7) of the Bankruptcy Code, including the fees for services rendered and expenses

incurred by the court-appointed counsel and other professionals for the Debtor through the Effective Date.

| Class 1 - Administrative Claims | | |
|---|---|---|
| **Name of Claim Holder** | **Description** | **Estimated Amount** |
| Mullin Hoard & Brown, LLP | Counsel for Debtor | $850,000 |
| D. Williams & Co. | Accountants for Debtor | $120,000 |
| Jordan & Ortiz, P.C. | Counsel for UCC | $~~450~~400,000 |
| Dundon ~~Advisors~~Advisers, LLC | Financial Advisor for UCC | $150,000 |
| Sánchez-Devanny Eseverri, S.C. | Special Counsel for Debtor | $20,000 |
| Richard Schmidt | CRO | $250,000 |
| Kay Walker | Counsel for CRO | $50,000 |
| **TOTAL** | | **$1,~~890~~840,000.00** |

The Plan provides that holders of **Class 1** claims shall be treated in the following manner: On or before the Effective Date, allowed administrative expense claims, including any unpaid fees and expenses of the CRO, counsel, financial advisors, and accountants for the Debtor and the Committee, and allowed priority tax claims shall be paid in full from the Plan Contribution. ~~Reorganized Debtor~~New Co. shall pay allowed administrative expense claims that come due after the Effective Date in the ordinary course of business as they come due. All fees for services rendered and expenses incurred after the Effective Date by court-appointed counsel and other professionals for Debtor shall be paid by the Debtor in the ordinary course of their business without the necessity of filing fee applications or seeking approval or allowance of the Bankruptcy Court.

Additionally, if there are any pre-~~confirmation~~Confirmation U.S. Trustee quarterly fees, these will be paid upon Confirmation of the Plan. Further, any post-~~confirmation fees pursuant to 28 U.S.C. § 1930(a)(6) will be paid in the Debtor's ordinary course of business as these fees arise. After confirmation, the Debtor shall file with the Court and serve on the United States Trustee a monthly financial report for each month (or portion thereof) the case remains open in a format prescribed by the U.S. Trustee and provided to the Debtor by the U.S. Trustee. All U.S. Trustee ~~Fees~~fees will cease upon the closing of the case by the ~~court~~Court.

**B.    Class 2 – Priority Unsecured Claims (Unimpaired)**

**Class 2** ~~shall consist~~consists of the unpaid pre-~~petition~~Petition claims of the taxing authorities owed by the Debtor as to Ad Valorem taxes, income taxes and sales taxes, which are allowed pursuant to Section 507(a)(8) of the Bankruptcy Code~~.~~, and unsecured priority claims of grain claimants pursuant to section 507(a)(6) of the Bankruptcy Code. A total amount of taxes due shall be determined by the ~~filed~~Proof of ~~Claim~~Claims filed by the taxing entities prior to the date set by the Bankruptcy Court for filing proofs of claim. However, the Debtor believes that the total amount outstanding in **Class 2** for pre-~~petition~~Petition Ad Valorem taxes due Cameron County and for Hidalgo County to be less than the amounts reflected in the filed Proofs of Claim of these taxing authorities. Thus, the Debtor will either clarify the amount owing these counties through negotiations or, if necessary, file an objection to the Proofs of Claim and allow the Court to determine the exact amount owed by the Debtor.

| Class 2 – Priority Unsecured Claims | |
|---|---|
| 1. IRS Asserted Priority Claim | $571,705.00 |
| 2. Ad Valorem Tax Claims | $138,537.00 |
| ~~3. Texas Comptroller of Public Accounts~~3. Grain Priority – Section 507(a)(6) | $~~5,675~~112,125.00 |
| 4. ~~Grain~~Priority   ~~  Section  507(a)(6)~~Claims of Local Taxing Authorities | $~~112,125~~138,537.00 |
| **TOTAL:** | **$~~828,042~~960,904.00** |

On or before the Effective Date, the ~~allowed priority tax claims~~ Allowed Priority Tax Claims shall be paid in full from the Plan Contribution. ~~Reorganized Debtor shall pay allowed administrative expense claims that come due after the Effective Date in the ordinary course of business as they come due.~~

Treatment of Secured Tax Claims of Ad Valorem Taxing Authorities~~:~~.

The allowed secured claims of ad valorem taxing authorities shall bear interest at the statutory rate (12% per annum) and shall be paid in full from the proceeds of any sales of ~~estate~~Estate assets, if not paid in full from the proceeds of the sale, then by the Debtor upon or before the Effective Date of the ~~plan~~Plan by ~~Reorganized Debtor~~New Co. Taxing authorities shall retain their statutory liens until their allowed claims are paid in full.

Treatment of Claim of State Comptroller~~:~~.

~~Any unpaid claims of~~ On October 11, 2023, the Texas ~~State~~ Comptroller ~~will be paid in full~~of Public Accounts withdrew its Proof of Claim (POC #36 filed on ~~the Effective Date of the Plan of Reorganization.~~6/6/2023).

Treatment of Tax Claims of the Internal Revenue Service~~:~~ (IRS).

After the Debtor has analyzed any asserted tax claims of the IRS and filed any appropriate amended IRS returns of the Debtor, the ~~allowed priority claims~~Allowed Priority Claims of the IRS shall bear interest at the applicable statutory rate and shall be paid in ~~sixty~~ (60) monthly installments by ~~the Reorganized Debtor. Reorganized Debtor~~New Co. New Co. is permitted to pre-pay the ~~allowed priority tax claims are paid in full~~Allowed Priority Tax Claims at any time at its sole discretion.

## (II).   SECURED CLAIMS
### (Classes 3 through 7)

Secured Claims under the proposed Plan consist of **Classes 3** through ~~6~~7 described below.

C.   **Class 3 – Secured Claim of StoneX Commodity Solutions, LLC f/k/a FCStone Merchant Services, LLC ("StoneX") (Impaired)**

Class 3 consists of the Secured Claim of StoneX ~~Commodity Solutions, LLC f/k/a FCStone Merchant Services, LLC ("StoneX")~~ in the approximate amount of $19,461,058.~~000~~ (**POC #37** filed on 6/13/2023). StoneX has a claim represented by negotiable warehouse receipts and it asserts ownership interests or security interests in the following collateral:

- Pre-Petition Accounts Receivable ("**A/R**") derived from the sale of the grain in the approximate sum of $1,929,160.00 of which the estimated sum of **$812,184.01** is collectible.

- Funds in the Grain Escrow Account in the amount of **$3,517,371.00**.

- Surety Bond in the amount of **$1,009,750.** This amount consists of the surety bond covering the Progreso Elevator ~~(Progreso Elevator refers to the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas) in the amount of $1,009,750.~~ in the amount of $1,009,750.

- ~~FCCI Check~~Funds realized for the ~~stock~~grain insurance claim for salvaged ~~corn from out of the corn~~grain damaged in the April 2023 windstorm in the ~~amount~~estimated sum of **$2,318,400.00** ~~(i.e., ~240,000 bushels at $9.66 per bushel per Impulsora Contract)~~.

Total value of ~~these~~this collateral in which StoneX either holds title or has a security interest is approximately **$7,~~711~~657,705.0~~1~~00**.

| ~~StoneX's Security Interest in the Collateral~~ | ~~Value~~ |
|---|---|
| ~~Pre-Petition Accounts Receivable ("A/R") derived from the sale of the grain~~ | ~~$812,184.01~~ |
| ~~Funds in Grain Escrow Account~~ | ~~$3,571,371.00~~ |
| ~~Surety Bond for Progreso (TXIFSU-0570549) for $1,009,750~~ | ~~$1,009,750.00~~ |
| ~~FCCI Check for the stock insurance claim for salvaged corn~~ | ~~$2,318,400.00~~ |
| ~~Subtotal (StoneX's security interest)~~ | ~~$7,711,705.01~~ |

~~The source~~   Thus, StoneX has a secured claim against the estate estimated at $7,657,705.00 and an unsecured deficiency claim in the approximate sum of $11,803,353.

**Treatment** of **StoneX Claims:**

The Debtor and StoneX have reached an agreement to compromise and settle all secure, unsecured, priority or any other claims which StoneX holds against the estate for the consideration of $13,000,000, and to waive and release any claims against the estate over that amount. In order to raise a portion of the $13,000,000 to be paid to StoneX, Octavio Garcia and his related entities agree to contribute to the Plan Trust $3.5 million, plus such other funds as may be agreed upon between Octavio Garcia and the Debtor to reach the $13,000,000 threshold.

Upon the receipt of the $13,000,000 from the Plan Trust all claims and causes of action which StoneX holds against the bankruptcy estate shall be fully extinguished and discharged, and the personal guarantee of Octavio Garcia given to StoneX to secure the indebtedness owed by the Debtor will be released.

An initial payment for this claim is in the amount of $7,000,000 will be made on the Effective Date from the funds in the Grain Escrow Account, along with contributions to the Plan Trust realized by the sale of real estate owned by Octavio Garcia as well as certain assets titled in the name of entities owned or controlled by him and his wife which shall not be less than $3.5 million.

The sources of payment from Octavio and his related entities to satisfy his contribution to the Plan Trust comes from equity in real property assets summarized as follows:.

Octavio Garcia, the principal of the Debtor, has and his related entities have disclosed assets with an estimated value of $4,086100,000.00, which consists These assets consist of three rental houses (Garcia Balli, LLC) approximately worth $370,000.00; the Fort Stockton land (4.6 acres) worth approximately $14,000.00; equity in Rincon Ranch [i.e., 1,882 acres of ranch land located in Starr County, Texas, known as Rincon Ranch] and Duke Energy Wind Lease royalties in the approximate amount of $2,795,600.00 [consisting of 1,800,000; equity in Toluca Ranch with the valued at an estimated $1,500,000 estimated value less VantageVantage's secured position ($of $450,000.00), i.e., leaving equity of $1,050,000.00, plus Rincon Ranch ($850,000.00 in IOLTA account + $1,000,000.00 Note), i.e., $1,800,000.00), total about $2.8 million];; equity in the Moore South, SPI Condo, & Huffman in the approximate amount tract of land, South Padre Island Condominium, and Hoffman Farm all having an estimated combined value of $866,000.00. The estimated value of the unencumbered assets of These properties are all being presently marketed for sale by Octavio Garcia consisting in an effort to raise a minimum of equity in those assets is around $3,036,000.00. 5 million which he shall then contribute to the Plan Trust. There are claims against Octavio Garcia for personal guarantees on Notes; however, these claims are only worth as much as After the amount that can realistically be collected. Moreover, if payment from the Estate owns these causes Plan Agent of action, the amount recovered from Octavio Garcia's unencumbered assets would be shared with all of the creditors, not just StoneX. Instead, the parties will enter into a Compromise funds from the Grain Reserve Account equaling $3.5 million and Settlement Agreement to resolve these claims, as allowed under the Bankruptcy Code for Chapter 11 proceedings.

| Source of Payment to StoneX | Amount |
|---|---|
| StoneX's Security Interest | $7,711,705.01 |

| Payment from Plan Agent | $3,500,000.00 |
|---|---|
| **TOTAL** | **$11,211,705.01** |

If Octavio Garcia contributes around~~the other~~ $3.5 million ~~from his unencumbered assets, the amount that can~~to be contributed by Octavio Garcia, the balance of the funds totaling approximately $6,000,000 will be paid ~~to StoneX will be around $11,211,705.01 (including StoneX's security interest in~~from the amount of $7,711,705.01).

~~Treatment:~~

~~The approximate amount of StoneX's distribution~~Plan Trust from recoveries or contributions received by the ~~Debtor's estate in exchange for StoneX's release all its claims against the estate is estimated at $12,545,005.00 which is~~Plan Agent summarized ~~in~~as follows:

Miscellaneous Funds ~~in the Grain Escrow Account          $3,517,371.00~~

- ~~Surety Bond Proceeds                    Paid Into Plan Trust~~  $2,~~397,050.00~~869,416

- Collected Grain Receivables          $812,184.~~00~~

- FCCI Claim for Grain Stock            $2,318,400.~~00~~

~~Payment from Plan Agent            $3,500,000.00~~
TOTAL CONSIDERATION:            $~~12,545,005.00~~

~~In accordance with the Compromise and Settlement Agreement reached between StoneX and the Debtor, the parties have agreed to resolve all of the claims of StoneX and release the Debtor and all related parties in exchange for **payment of $12,545,005.00 to StoneX**.~~

~~Specifically, the partially secured claim of StoneX and its unsecured claim shall be treated as follows:~~

~~a.   $12,545,005.00 ("StoneX Payment") to be paid pursuant to an agreed upon Chapter 11 Plan; A minimum of $7~~6,000,000 ~~of the StoneX Payment will be paid no later than confirmation of the Chapter 11 Plan;~~

~~b.   The minimum initial payment will include the then current balance of the Grain Escrow Account and a $3.5MM cash payment paid into the bankruptcy estate from Octavio Garcia and then paid out to StoneX;~~

~~c.   After payment of $7,000,000.00, the remaining $5,545,005.00 will be paid from the Surety Bond Proceeds; Collected Grain Receivables; FCCI Claim for Grain Stock; and Accounts Receivable;~~

~~d.   The remaining $5,545,005.00 will be guaranteed by Octavio Garcia to cover any shortfalls in the sources of cash identified above; the guaranty will be executed upon plan approval and~~

will be without any defense known or unknown, specifically including any defenses raised in the pending District Court Guaranty litigation being pursued by StoneX;

e.  Until such time as the $3.5MM cash is paid by Octavio Garcia (through Plan Agent), the current District Court litigation will continue to proceed pursuant to the current Case Management Order;

f.  The parties will agree upon provisions to include in the Chapter 11 Plan to mitigate and account for the risk of Octavio's either filing or being involuntarily placed into bankruptcy within 90 days of making the $3.5MM payment; and

g.  Upon the payment of $12,545,005.00, StoneX claims will be considered fully paid and extinguished and it shall not be entitled to assert any unsecured deficiency claims against the bankruptcy estate.

### D.    Class 4 – Secured Claim of Vantage Bank Texas (Impaired)

**Class 4** consists of the Secured Claim of Vantage Bank Texas ("**Vantage Bank**") ~~who~~which filed a Proof of Claim (POC #41) in the amount of $8,789,063.88 on June 16, 2023 ~~for loan of monies~~.

Vantage Bank's claim is secured by ~~1st Lien Deed~~a first lien deed of ~~Trust~~trust against the Santa Rosa Elevator ~~(i.e., the grain elevator facility owned by the Debtor located at the municipal address of 22056 Bass Boulevard in Harlingen, Texas)~~ which the Debtor believes has an approximate value of **$1,350,000.00**; a ~~1st Lien Deed~~first lien deed of ~~Trust~~trust against the Donna Elevator ~~(i.e., the grain elevator facility owned by the Debtor located at the municipal address of 101 North Val Verde Rd. Donna, Texas)~~ which the Debtor believes has an approximate value of **$1,350,000.00**; and a ~~1st Lien Deed~~first lien deed of ~~Trust~~trust against the Pitts Property ~~(i.e., the real property owned by the Debtor with the municipal address of 1919 Mile 3 ½ Road, Donna, Texas, i.e., corporate office and the Val Verde Elevator)~~ which the Debtor believes has an approximate value of **$3,600,000.00**.

Vantage Bank has an outstanding loan in the amount of approximately $450,000 (plus interest) which his secured by a Deed of Trust against a 170-acre tract of land known as "Toluca Ranch" (the real property at the municipal address of Country Rd 793 & 1702 TX Hidalgo County, Texas) owned by Garcia Balli, Ltd. having an estimated value of $1,700,000.00; however, such indebtedness is not cross-collateralized with the debt and assets of the Debtor.

Vantage Bank also has a claim for the warehouse receipts to grain in the Donna/Santa Rosa Facility (Donna Elevator **or "Donna Facility"** refers to the grain elevator facility owned by the Debtor located at 101 North Val Verde Rd. Donna, Texas and the Santa Rosa Elevator **or "Santa Rosa Facility"** refers to the grain elevator facility owned by the Debtor located at the municipal address of 22056 Bass Boulevard in Harlingen, Texas) which has a bond (TXIFSU 0570548) in the amount of **$739,200.00**.

In addition, Vantage Bank has claim against the A/R in the inventory and cash for the bean enterprise, the Debtor estimates that Vantage Bank will be entitled to an additional amount of about $1,000,000.00. Per Compromise and Settlement agreement between the parties, the Debtor offered and Vantage Bank agreed to accept **$625,000.00** instead of $1,000,000.00 for its interest in the bean enterprise.

Thus, Vantage Bank's total collateral can be summarized as follows:

| Vantage Bank's Security Interest in the Collateral | Value |
|---|---|
| Pitts Property (1st Lien Deed of Trust) | $3,600,000.00 |
| Santa Rosa Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| Donna Elevator (1st Lien Deed of Trust) | $1,350,000.00 |
| **Subtotal** | **$6,300,000.00** |
| Assignment to the estate or its designee all Warehouse Receipts held as collateral and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,402,704 | $400,000.00 |
| Claim against the A/R in inventory and cash for the bean enterprise | $625,000.00 |
| **Subtotal** | **$1,025,000.00** |
| **TOTAL** | **$7,325,000.00** |

Therefore, the total payment to Vantage Bank is estimated to be **$6,300,000.00** (total value of its collateral) plus $1,025,000.00 which will be **$7,325,000.00**.

Therefore, Vantage Bank's estimated take-out amount will be **$7,325,000.00**.

**Treatment of Vantage Claims:**

The partially secured claim of Vantage and its unsecured claim shall be treated as follows:

    a.  **Loan #54613 [Garcia Grain Trading Corporation]** – At Vantage Bank Texas' (at times may be referred to as "Bank" or "Lender") election, the Debtor will deed and assign the Pitts Farmland including any and all rights that may include but are not limited to water and mineral rights and agreements associated with the Pitts Farmland (collectively the "Pitts Farmland Collateral"), to the Bank pursuant to a bankruptcy court order Bankruptcy Court Order deeding and assigning the Pitts Farmland Collateral to the Bank (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit the Bank to proceed with foreclosure (deed and assignment to Bank by court

order Court Order or foreclosure by Bank of Pitts Farmland Collateral shall collectively be referred to as the "Pitts Farmland Collateral Bank Sale"). Prior to the Pitts Farmland Collateral Bank Sale, the Pitts Farmland Collateral may be sold to a third party for a sales price agreed upon by the Bank in writing.  The sale of the Pitts Farmland Collateral will be subject to any Lender regulatory requirements including but not limited to such requirements of the Office of Foreign Assets Control (also referred to as "OFAC"). For clarification, prior to Pitts Farmland Collateral Bank Sale, the Pitts Farmland Collateral will not be sold nor a contract for sale be entered into with a third party ("Proposed Buyer") without prior written approval from the Bank which shall be contingent upon an OFAC search of all beneficial owners of the Proposed Buyer and/or its assigns (collectively, "Beneficial Owners") acceptable to the Bank. The Proposed Buyer and its Beneficial Owners will be required to provide any information needed by the Lender to conduct such OFAC search. The sale of the Pitts Farmland Collateral to any 3rd party approved by the Bank will be free and clear of all liens and the Bank shall be entitled to all net proceeds after payment of standard closing costs.  It is further understood that the Bank shall have the right to review and approve the closing settlement statement including all settlement or closing costs, proration of expenses and withholdings from sale proceeds upon any sale of the Pitts Farmland Collateral. Any and all income, including but not limited to rental income, due and/or received for the Pitts Farmland Collateral prior to the sale to a 3rd party approved by the Bank or the Pitts Farmland Collateral Bank Sale shall be paid to Bank. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Pitts Farmland Collateral will be the responsibility of and borne by the Debtor and Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Pitts Farmland Collateral may produce net proceeds to be paid to the Bank on its claim owed by Debtor in the approximate amount of $3,600,000.00.

b. **Loan #112382 & #112390 [Garcia Grain Trading Corporation]** – At Bank's election, the Debtor will deed and assign the Santa Rosa Grain Facility, including any and all rights that may include but are not limited to water and mineral rights, and agreements associated with the Santa Rosa Grain Facility (collectively, the "Santa Rosa Collateral"), composed of Tract 1 and Tract 2 as described in the deeds securing the  loans of Debtor to the Bank pursuant to a bankruptcy court order  deeding and assigning the Santa Rosa Collateral to the Bank (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit the Bank to proceed with foreclosure (deed and assignment to Bank by court order or foreclosure by Bank of Santa Rosa Collateral shall collectively be referred to as the "Santa Rosa Collateral Bank Sale"). Prior to the Santa Rosa Collateral Bank Sale, the Santa Rosa Collateral may be sold to a third party for a sales price agreed upon by the Bank in writing.  The sale of the Santa Rosa Collateral will be subject to any Lender regulatory

requirements including but not limited to such requirements of the Office of Foreign Assets Control (also referred to as "OFAC"). For clarification, prior to the Santa Rosa Collateral Bank Sale, the Santa Rosa Collateral will not be sold nor a contract for sale be entered into with a third party ("Proposed Buyer") without prior written approval from the Bank which shall be contingent upon an OFAC search of all beneficial owners of the Proposed Buyer and/or its assigns (collectively, "Beneficial Owners") acceptable to the Bank.  The Proposed Buyer and its Beneficial Owners will be required to provide any information needed by the Lender to conduct such an OFAC search. The sale of the Santa Rosa Collateral to any 3rd party approved by the Bank will be free and clear of all liens and the Bank shall be entitled to all net proceeds after payment of standard closing costs.  It is further understood that the Bank shall have the right to review and approve the closing settlement statement to include but not limited to all settlement or closing costs, proration of expenses, and withholdings from sale proceeds upon any sale of the Santa Rosa Collateral. It is specifically understood by Debtor that no contract for the sale of the Santa Rosa Collateral will be entered into until all impediments to the sale of the Santa Rosa Collateral have been cleared and approved by the Bank.  The sale of the Santa Rosa Collateral is subject to any limitation in the existing lease agreement between the Debtor and Texas Valley Grain and any other current limitation that may exist impacting the Santa Rosa Collateral. For clarification, the Bank is and will remain entitled to all rental income received through the existing lease period with Texas Valley Grain of the Santa Rosa Collateral. The Debtor shall work and cooperate with the Lender to resolve any issues that may impact the sale of the Santa Rosa Collateral including but not limited to Tract 2. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Santa Rosa Collateral will be the responsibility of and borne by the Debtor and Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Santa Rosa Collateral may produce net proceeds to be paid to the Bank on its claim owed by Debtor in the approximate amount of $1,350,000.00.

c.  **Loan #115998 [Garcia Balli Loan]** –Debtor, Octavio Garcia and Spouse, individually and as owners of Garcia Balli, LTD, acknowledge and agree that Vantage Bank Texas has a first lien on the property described as the- Toluca Ranch, including any and all rights that may include but are not limited to water and mineral rights, and agreements associated with the Toluca Ranch (the "Toluca Ranch Collateral") that secures the non-bankruptcy Loan #115998 to Garcia Balli, LTD, as borrower, (the "Garcia Balli Loan"). The Bank shall be paid all amounts due and owing on the Garcia Balli Loan upon the sale and/or foreclosure of the Toluca Ranch Collateral. Any and all income, including but not limited to rental income, due and/or received for the Toluca Ranch Collateral prior to the sale of the Toluca Ranch Collateral shall be paid to Lender. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from a sale of the Toluca Ranch Collateral will be

the responsibility of and borne by Garcia Balli, LTD and/or Octavio Garcia and Spouse, individually and as owners of Garcia Balli, LTD, and the Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the amount owed to Bank at time of sale of the Toluca Ranch Collateral may produce proceeds to be paid to the Bank on the Garcia Balli Loan in the approximate amount of $460,000.00 (plus any accrued interest, expenses, and costs of collection).

d. **Loan #116006 [Garcia Grain Trading Corporation]** – Debtor, Val Verde Grain Holdings, and Octavio Garcia and Spouse, individually and as owners of Val Verde Grain Holdings (collectively, Octavio Garcia and Spouse and Val Verde Grain Holdings will be referred to as "Val Verde Holdings"), acknowledge and agree that Vantage Bank Texas has a first lien on the property described as the Donna Warehouse, including any and all rights and agreements associated with the Donna Warehouse, (the "Donna Warehouse Collateral") that secures the bankruptcy Loan #116006 to Garcia Grain Trading Corporation, as Borrower, as collateral securing all amounts owed to Vantage Bank Texas by Debtor. Debtor and Val Verde Grain Holdings agree that, at the Bank's election, the Debtor and Val Verde Grain Holdings will deed and assign the Donna Warehouse Collateral to the Bank pursuant to a bankruptcy court order deeding and assigning the Donna Warehouse Collateral to the Bank (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit the Bank to proceed with foreclosure (deed and assignment to Bank by court order or foreclosure by Bank of Donna Warehouse Collateral shall collectively be referred to as the "Donna Warehouse Collateral Bank Sale"). Prior to the Donna Warehouse Collateral Bank Sale, the Donna Warehouse Collateral may be sold to a third party for a sales price agreed upon by the Bank in writing. The sale of the Donna Warehouse Collateral will be subject to any Lender regulatory requirements including but not limited to such requirements of the Office of Foreign Assets Control (also referred to as "OFAC"). For clarification, the Donna Warehouse Collateral will not be sold nor a contract for sale be entered into with a third party ("Proposed Buyer") without prior written approval from the Bank which shall be contingent upon an OFAC search of all beneficial owners of the Proposed Buyer and/or its assigns (collectively, "Beneficial Owners") acceptable to the Bank. The Proposed Buyer and its Beneficial Owners will be required to provide any information needed by the Lender to conduct such an OFAC search. The sale of the Donna Warehouse Collateral to any ~~3rd~~ third party buyer approved by the Bank will be free and clear of all liens and the Bank shall be entitled to all net proceeds after payment of standard closing costs from the sale of the Donna Warehouse Collateral. It is further understood that Vantage Bank Texas shall have the right to review and approve the closing settlement statement to include but not limited to all settlement or closing costs, proration of expenses, and withholdings from sale proceeds upon any sale of the Donna Warehouse Collateral. Any and all income, including but not limited to rental income, due and/or received for the Donna Warehouse Collateral shall be paid to the Bank. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition,

transfer, assignment, or other similar treatment of the Donna Warehouse Collateral will be the responsibility of and borne by the Debtor and/or Val Verde Grain Holdings and Bank is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Donna Warehouse Collateral may produce net proceeds to be paid to the Bank on its claim owed by Debtor in the approximate amount of $1,350,000.00.

e.   **Bean Cash Collateral Proceeds** – Debtor shall pay to Vantage Bank Texas the sum of $625,000.00 in cash ("$625,000.00 Bean Cash Collateral Payment") derived from the cash and accounts receivable from the sale of the bean inventory ("Bean Cash Collateral Proceeds") as a full and final settlement of its claim on the Bean Cash Collateral Proceeds. The $625,000.00 Bean Cash Collateral Payment shall be paid to the Bank no later than 10 days after the entry of an order approving such payment to Vantage Bank Texas.

f.   **Bean Inventory, Grain Inventory/Accounts Receivable, and Grain Surety Bonds Collateral** – There is estimated an amount in excess of $600,000.00 of value of bean inventory ("Bean Inventory Collateral") in which, pursuant to orders permitting use of the bean inventory and bean cash collateral, the Bank retains a first lien security interest.

Additionally, the Bank claims a secured claim to any and all grain inventory and grain accounts receivable of Debtor (collectively, "Grain Collateral"). It is undetermined how much of such grain inventory and grain accounts receivable that are subject to the Bank's claimed secured interest.

Further, pursuant to warehouse receipts, the Bank claims a secured claim to the proceeds of any surety bond that covers any missing grain at the Santa Rosa Grain Facility and/or Progreso Grain Facility. The amount of the surety bond for the Santa Rosa Facility is approximately $739,000.00 and the amount of the surety bond for the Progreso Facility is approximately $1,009,750.00 (collectively, the Santa Rosa surety bond and Progreso surety bond will be referred to as the "Surety Bond") for a Surety Bond total amount of $1,748,750.00.

Debtor shall pay to Vantage Bank Texas the sum of $400,000.00 in cash in consideration of the Bank releasing any and claims it has as to the Bean Inventory Collateral, Grain Collateral or rights with respect to the warehouse receipts, and Surety Bond. Vantage Bank Texas will not release its claim on the Surety Bonds until after it receives the payment of the $400,000.00 which is to paid the earlier of (i) the closing of the sale of Toluca Ranch or (ii) the effective date of the confirmed Plan of Reorganization which shall be no later than 90 days from entry of the order confirming the plan of reorganization and shall transfer to the Plan Agent the Vantage warehouse receipts.

g. **Life Insurance on Octavio Garcia** – As part of the Settlement, Octavio Garcia agrees to continue the assignment of a Life Insurance Policy #T4000118328 issued by The Lincoln National Life Insurance Company covering the life of Octavio Garcia in the amount of $3,000,000 (the "Life Insurance Policy") to Vantage Bank Texas and further agrees to continue the payment of the Life Insurance Policy through and including the Life Insurance Policy annual premium payment due for 2027. Vantage Bank Texas agrees to release its assignment of the Life Insurance Policy no earlier than 3/31/2028 and further agrees that in the event a claim is filed on the Life Insurance Policy and the Insurer tenders the benefits / funds to the Bank (the "Assigned Party'), the Bank and the Policy Owner and Beneficiaries agree that the Bank will use the Life Insurance Policy Proceeds to pay any remaining debt outstanding (the "Bank Deficiency"), if any, owed by Debtor, Garcia Grain Trading Corporation, and not paid or reduced from the net proceeds of the sale of collateral securing the loans described above, and/or other funds or proceeds as provided to the Bank as part of the Bankruptcy Settlement or a confirmed Bankruptcy Plan. For purposes of this provision, the Bank Deficiency shall include any remaining principal, accrued interest, expenses, legal and collections fees and other permissible expenses incurred by the Bank as to the above-described loans after application of any monies received by the Bank under the terms of this Agreement. All remaining Life Insurance proceeds after payment of any Bank Deficiency will be returned to the Decedent's Estate or Beneficiary of Record. The Bank retains the right to fund the annual premium owing on the Life Insurance Policy.

h. **Mutual Release:** Octavio Garcia, Gabriela Garcia, Val Verde Grain Holdings, Garcia Balli, LTD, Debtor and Debtor's Bankruptcy Estate will release any and all claims, known or unknown, that they may have as to Vantage Bank Texas, its officers, directors, etc., and upon receipt of the $400,000 from the bankruptcy estate and the exchange of the collateral warehouse receipts Vantage shall release any and all claims, known or unknown, that it may have as to Octavio Garcia, Gabriela Garcia, Val Verde Grain Holdings, Garcia Balli, LTD, their officers, directors, and shareholders along with the Debtor and its Estate.

i. **Co-Guarantor:** Vantage Bank Texas retains all rights and claims it has against co-guarantor, Plascencia.

**E.    Class 5 – Secured Claim of Falcon International Bank (Unimpaired)**

**Class 5** consists of the Secured Claim of Falcon International Bank ("**Falcon**") who filed three Proofs of Claims (**POC#38** for $1,152,412.11, **POC #39** for $2,424,044.10 and **POC #40** for $2,412,696.50) in the total amount of **$5,989,152.71** on June 14, 2023 for loaned money.

Falcon's claim is secured by a 1st Lien Deed first lien deed of Trust trust against the Progreso Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas) having an estimated value of **$4,430,000.00**, and a 1st Lien Deed first lien deed of Trust trust against Moore Farms (located at Military Road, Progreso,

Texas) having a current estimated value of **$7,000,000.00** along with a security interest at equipment valued at **$330,000.00**. Falcon has $5,770,847 of equity after payment of secured debt.

Thus, Falcon's total collateral can be summarized as follows:

| Falcon's Security interest in Collateral | Value |
|---|---|
| Progreso Elevator (~~1st Lien Deed~~first lien deed of ~~Trust~~trust) | $4,430,000.00 |
| Moore Farms (~~1st Lien Deed~~first lien deed of ~~Trust~~trust) | $7,000,000.00 |
| Equipment (first lien security interest) | $330,~~000~~000.00 |
| **TOTAL** | **$11,760,000** |

~~Therefore, it follows that Falcon has an equity in the above collateral in the amount of **$5,770,847.29** (which is calculated as follows: total value of Falcon's collateral, which is $11,760,000, minus the total amount of POC #38, #39, #40, which is $5,989,152.71).~~

**Treatment of Falcon Claims:**

Falcon will receive **payment in full of its outstanding claim in the ~~estimated~~ amount of approximately $6,000,000.00**, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farm having an ~~estimate~~estimated value for purposes of the Plan of $7,000,000.00. The payment of the indebtedness owed to Falcon will be consideration for Falcon releasing its Deeds of Trust against all other real property of the estate including but ~~no~~not limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust. For purposes of the Plan, the Debtor projects that the sale of Moore Farms will result in unencumbered net proceeds available to fund the Plan in the approximate sum of $500,000.

Specifically:

a.  The secured claim of Falcon International Bank shall be satisfied in full by the sale of the Moore Farm tract. The Debtor agrees for the Moore Farm to be listed by Octavio with the real estate brokerage firm of Hanna Solutions for a listing price of $8,000,000, and a real estate commission of not more than 4%.

b.  Falcon agrees that it will accept a price for the Moore Farm sufficient to pay its secured claim in full. ~~Octavio~~Debtor agrees that it shall accept a price of not less than **$6,000,000.00**.

c.  Any proceeds more than the amount necessary to satisfy the secured claim of Falcon shall be paid over to the ~~bankruptcy estate~~Plan Agent and paid out as a plan contribution to satisfy

any unpaid administrative claims and then as dividends paid to the holders of Allowed General Unsecured Claims as more specifically provided hereinbelow.

**F.      Class 6 – <u>Contested</u> Secured Claim of GrainChain, Inc. (Impaired)**

————**Class 6** consists of the Secured Claim of GrainChain, Inc. (GrainChain") who filed a Proof of Claim (**POC #42** filed on 6/19/2023)) in the amount of **$7,841,054.99**.

GrainChain's claim is secured by a 2nd Lien Deed of Trust against the Progreso Elevator and Moore Farms (described above) against which Falcon International Bank holds the 1st Lien Deed of Trust. The value of GrainChain's equity interest in the above-described collateral is approximately **$5,770,847.29**.

In addition, GrainChain has a 1st Lien Deed of Trust against Emory Farms (i.e., a 56-acre tract of land titled in PGS Properties[6]) valued at **$770,000.00**, 1st Lien Deed of Trust against Baryta Industrial Tract (titled in Octavio Garcia) valued at **$650,276.00**, and a 1st Lien Deed of Trust against the Edcouch Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538) valued at **$1,334,435.00**.

Together, the amount of GrainChain's security interest is about **$8,525,558.29**, which can be summarized as follows:

| GrainChain's Security interest in Collateral | Value |
|---|---|
| Progreso Elevator and Moore Farms (2st Lien Deed of Trust), against which Falcon holds the 1st Lien Deed of Trust | $5,770,847.29 |
| Emory Farms (1st Lien Deed of Trust) | $770,000.00 |
| Baryta Industrial Tract (1st Lien Deed of Trust) | $650,276.00 |
| Edcouch Elevator (1st Lien Deed of Trust) | $1,334,435.00 |
| **TOTAL** | **$8,525,558.29** |

However, GrainChain obtained its liens within 90 days of the Petition Date of February 17, 2023, known as the "preference period" under 11 U.S.C. § 547, in order to secure an antecedent debt and enabled GrainChain to receive more than it would have been paid under a Chapter 7 proceeding; and therefore those liens are subject to be nullified. This matter is settled between the Debtor and GrainChain as set forth in this Plan.

---

6 PSG Equipment? PSGProducts, LLC?

In order to compromise and settle the dispute between the Debtor and GrainChain relating to its asserted second liens against the Progreso Facility and Moore Farms, as well as its first liens against the Baryta Industrial Tract, Emory Farms and the Edcouch Facility, the Parties have reached an agreement to nullify the asserted liens of GrainChain against these assets. In exchange for releasing its Deeds of Trust against these real property tracts, the Debtor has entered into an agreement whereby GrainChain, the Unsecured Creditors (only Classes 7, 8 [Unsecured Bean Claims], 9 [Unsecured Farmers' and 10) Grain Claims] and 11 [General Trade Claims]), and Harco Insurance will hold joint liens against the tracts with GrainChain being entitled to 45%, the General Unsecured Creditors entitled to 40 45% and Harco entitled to 15 10%. Upon the sale of any of the tracts the net proceeds from the sale will be paid over to the Plan Agent and he will distribute the funds among these constituent groups in accordance with such percentages. These percentages, and the division of the net proceeds according to these ratios, will continue until such time as the claims of the constituent groups have been paid in full or all of the real property assets have been sold.

Since Harco Insurance holds a contingent unliquidated claim that may not be determined by the Effective Date for the first three years the net profits shall be divided solely between GrainChain at the initial percentage of 45% and the General Unsecured Creditors receiving 55%. The unsecured claim of Harco is being subordinated due to the fact that they are a creditor who must fund the payment of the surety bonds TDA Surety Bonds to the creditors Creditors entitled to receive them under the provisions of this Plan. After the third year of the Plan Harco shall be entitled to receive 15 10% of the net profits to reduce its presumably liquidated claim until such time as the claim is extinguished from either the receipt of net proceeds realized from the sale of real property or its share of the net profits of the Debtor.

The net profits are understood to be derived from the combined operations relating to the purchase and sale of grain, edible beans, and sunflower seeds as well as any other revenue generating activities undertaken by the Debtor.

GrainChain asserts first liens on Edcouch and Baryta and the second lien on Progreso. Edcouch and Progreso are Debtor-owned and scheduled properties, and Baryta being lots 28 and 29 in the Lion Lake subdivision in Progreso, Texas with title vested in Octavio Garcia.

Falcon asserts the first lien on Progreso.

It is believed that no entity asserts liens on Edcouch and Baryta aside from GrainChain; only Falcon and GrainChain assert liens on Progreso.

GrainChain *also* asserts liens on the Debtor owned properties S FM 493 & Mile 3 North Road and 120.5 acres located on Vertrees Road in Donna, Texas, collectively referred to as the "**Pitts Property**." The Pitts Property is currently the subject of the Order Granting the Debtor's Emergency Motion for Authority to Obtain Post Petition Financing, Pay off Asserted Liens of Vantage Bank Texas [Dkt #517]. GrainChain supports the settlement with Vantage and as to the Pitts Property will take such action as may be necessary regarding GrainChain's asserted lien on the Pitts Property as is congruent with the Vantage settlement contained in order at Docket Number 517.

GrainChain *also* asserts liens on the following non-Debtor owned properties for which GrainChain's liens have been in place for greater than 90 days: (a) 1,403 acres located on Military Road collectively referred to as "**Moore Farms**" or "**PSG Moore Farms**" with recorded title vested in PSG Products LLC; (b) 55 acres located on Santiago Galvan Road in the Lion Lake subdivision in Progreso, Texas, and referred to as "**Emory Farms**" or "**PSG Emory Farms**" with recorded title vested in PSG Products, LLC.

Falcon asserts a first lien on PSG Moore Farms. PSG Moore Farms is potentially the subject of sale in an amount greater than the dollar amount of Falcon's asserted lien. It is anticipated that either: (a) the Plan Trust will receive the net sales proceeds from such sale after payment of Falcon's asserted secured claim, to be distributed pursuant to the Sale's Proceeds Division (defined below); or (b) the Plan Trust will receive PSG Moore Farms and will liquidate PSG Moore Farms satisfying Falcon's asserted secured claim with the remainder of the next sales proceeds to be distributed pursuant to the Sale's Proceeds Division.

GrainChain filed its secured proof of claim in the amount of $7,841,054.99 plus applicable, interest fees and other unliquidated liabilities [claims reg. no. 42-1]. Pursuant to 11 U.S.C. § 506, and as set out in the Plan and the Plan Support Agreement, GrainChain is deemed to be an oversecured creditor, and as such GrainChain may be entitled to reasonable attorney's fees and interest on its claim as may be allowed by the Bankruptcy Court.

The debts owed to GrainChain are guaranteed by Octavio Garcia and Rene Izaguirre. Octavio Garcia and Rene Izaguirre will enter into tolling agreements with GrainChain (collectively, the "**Guaranty Tolling Agreements**"). The Guaranty Tolling Agreements shall (a) provide that the guaranties will remain in full force and effect during the Chapter 11 Plan term, (b) toll any and all limitation periods through and including the sixth anniversary date of the Chapter 11 Plan's Effective Date, and (c) contain the terms and conditions upon which each guarantor will be released from their respective guaranty. GrainChain advanced certain funds to the Debtor post-Petition under one or more credit facilities upon which GrainChain is entitled to interest, fees and expenses (collectively, the "**Post-Petition Indebtedness**").

Elkins and the Debtor entered into a Court approved lease of Progreso (the "**Elkins Lease**") and pursuant to Bankruptcy Court order or an Operating Agreement, GrainChain has been providing Elkins with certain financing through one or more factoring arrangements with Elkins, with respect to Elkins' operations of Progreso. Those operations are under the supervision and review of the Plan Agent and GrainChain. Certain *before tax* net profits have been generated by the operations (the "**Pre-Confirmation Pre-Tax Net Profits**"). An operating agreement between Elkins, GrainChain and the Debtor or Plan Trust will be approved by the Bankruptcy Court and entered into at or as a result of Confirmation of the Plan. An operating agreement will be part of the Chapter 11 Plan and Confirmation Order dealing only with the post-confirmation operations. The Elkins Lease will terminate on the Effective Date of the Chapter 11 Plan as a result of the transfer of title, subject to the terms of this Plan, of the Progreso and Edcouch Elevator and related land and improvements.

**Treatment of GrainChain Claims:**

Debtor's First Amended Chapter 11 Plan of Reorganization
Page 74

As part of the Chapter 11 Plan, the Debtor and GrainChain are settling the Debtor's and its Estate's claims against GrainChain, if any, and GrainChain is agreeing to certain plan treatment and commitment to funding New Co.'s operations through receivable factoring and such other agreed financing, if any.  The Settlement Agreement ("**Agreement**") is generally as follows:

This Agreement deals with certain assets on which GrainChain claims a lien and certain other recovered assets, generally as follows:

a.     The "**Trust Transferred Properties**" including PSG Moore Farms, PSG Emory Farms, and Baryta Property; and

b.     The "New Co. Transferred Properties" or the "**New Co. Properties**" including the Progreso Elevator property and the Edcouch Elevator property and the Baryta property; and

c.     The "Recovered Properties," including the Alamo Elevator now subject to an avoidance action, as well as any other asset recovered on behalf of the Plan Trust including recoveries from the Debtor's Insiders or Affiliates or Insiders to the Affiliates.

Each of the asset categories shall shared among the three Classes of Creditors: (i) the Class of Unsecured Creditors; (ii) the Class of the Harco Bond Claim; and (iii) the GrainChain Allowed Secured Claim. These Claims shall be paid from Distributions of operating profits and the required or potential sale of Plan Assets, with distributions of the proceeds paid, respectively 45%, 10% and 45% toward payment of the three (3) notes reflecting each Class's Allowed Claim.

This Agreement further deals with the payment of Administrative Claims of professionals and of GrainChain. The pre-Petition lien granted by the Debtor to GrainChain for factoring (financing) of the pre-Petition accounts receivables of the Debtor from the sale of grain is not allowed and deemed released.

The following terms, provisions and structure shall be incorporated into the Debtor's Confirmed Chapter 11 Plan:

a.     On the Plan Effective Date, a Plan Trust (the "**Plan Trust**") will be created with the Chief Restructuring Officer Richard S. Schmidt ("**CRO**") or his successor serving as the Plan Agent with the Classes of Unsecured Creditors (holding the Unsecureds Class Note), GrainChain Class Note, and the Bond Company ("**Harco**") Class Note, as holders of the Notes and the sole beneficiaries of the Plan Trust distributions from the Profits and Assets.

b.     On the Effective Date GrainChain will release any purported or asserted pre-Petition liens on Progreso, Edcouch and Baryta (collectively, the "**New Co. Properties**") contingent upon those properties being transferred to New Co. as provided herein.

c.      Upon the sale of the PSG Moore Farms Properties, sale proceeds will be applied to fully satisfy any and all outstanding liens in favor of Falcon bank on its allowed secured claim such that Falcon, having been paid in full, will release its lien on the Progreso Property. Any remaining funds, if any, shall be paid to the Plan Trust.

d.      GrainChain will create an entity for post-confirmation operations in a form and structure that is acceptable to GrainChain (referred to here as "**New Co.**"), with the equity of New Co. being owned by GrainChain and/or its authorized assigns. The function of New Co. will be to continue operations of the Elkins Lease and such other operations in the business judgment of the Plan trustee and GrainChain, with the distribution of the net profits of New Co. operations described above and below [*See*, paragraphs I,1, II,3, g, o, q, r, u, v. New Co. will not further encumber assets without the approval of the Plan Agent and satisfaction of certain credit metrics (either leverage or interest coverage) to be further negotiated. New Co. will be subject to limitations on "**Permitted Investments**" and "**Capital Expenditures.**" "**Distributions**" and "**Dividends**" from New Co. will be subject to a Restricted Payment covenant, subject to further negotiation.

e.      On the Chapter 11 Plan Effective Date, and contingent upon Court approval of all of GrainChain's requested Plan treatment (including without limitation the release set forth below in the Chapter 11 Plan and Confirmation Order), the Post-Confirmation Debtor and/or the Plan Trust (as may be applicable) the Plan Agent shall receive 55% of the Pre-Confirmation Pre-Tax Net Profits to pay Allowed Administrative Expense claims of the case professionals (with GrainChain retaining the remaining 45% of the Pre-Confirmation Pre-Tax Net Profits) to be applied to any remaining balance of its Priority Loan and operations advances  of approximately a net of $300,000. As of October 31, 2023, the amount of 55% of the Pre-Confirmation Pre-Tax Net Profits is estimated to be approximately $1,750,000, subject to changes based upon the future success of the operations and commercially reasonable operational holdbacks as agreed by GrainChain and the Plan Agent.

f.      The Debtor will convey by general warranty deeds the New Co. Properties to New Co., with such conveyance being effective as of the Effective Date of the Plan (with title insurance at New Co.'s/Grain Chain's election, cost, and expense), pursuant to Sections 363 and/or 1141, free and clear of any and all liens, claims, interest, and encumbrances other than as provided herein below.

g.      Contemporaneous with the transfers, New Co. will grant liens through the applicable deeds of trust ("**New Co. Deeds of Trust**") to the Unsecured Creditors Classes [8, 9, 10 and 11 ] under the Chapter 11 Plan (the "**Unsecureds**"), Harco and GrainChain, and reflect those liens through the issuance by the Plan Agent of the three Notes payable to the Unsecureds Class, Harco Class and the GrainChain Class.  Accordingly, all proceeds generated from the Trust Transferred Properties, the Recovered Properties, and, as the case may be, the Recovered Properties shall be payable to the Plan Trust and payments on the Notes distributed 45%, 10%, and 45% respectively.

h.      The New Co. Deeds of Trust will secure the non-recourse notes ("**Notes**") executed by New Co. in favor of the Plan Trust/Plan Agent as the note oblige/payee as to the Unsecureds Note

and the Harco Note and the GrainChain Note.

i.       An intercreditor agreement between the Note Holders and New Co. shall be entered into memorializing the Notes, deed of trusts and their related contractual terms (the "**Intercreditor Agreement**"). The non-recourse notes and deed of trusts shall reference the Intercreditor Agreement and incorporate such terms therein. In the event of a conflict between the Intercreditor Agreement and this Agreement, this Agreement shall control.

j.       The Unsecured Creditors Class [8, 9, 10 and 11] balloon non-recourse note (the "**Unsecureds' Note**"), to be executed by the Plan Agent on behalf of the Plan Trust as the note oblige for the benefit of the Unsecureds upon completion of the claim objections, will be in the dollar amount of the ultimate Allowed general unsecured claims against the Debtor in the case, expressly excluding any and all deficiency claims, if any, by Vantage and Falcon; priority claims, administrative claims; any claim, if any, by StoneX; any claim, if any, by Harco; and any taxing authority claims of any kind, (including and without limitation local, county, state, and federal).  The non-recourse Unsecureds' Note will be equal to or less than the amount of Allowed Unsecured Claims. The Unsecureds' Note shall not bear interest, provide for the payment of attorneys' fees or costs or any other fees whatsoever. The Plan provides that the Plan Agent shall have a period of 180 days to complete the claims allowance process for all claims not allowed as part of the Chapter 11 Plan confirmation. To the extent that the claims allowance process is not completed pre-confirmation and/or through confirmation, in addition to the Plan Agent's right to object to claims, GrainChain and the Committee are expressly given standing to object to any general unsecured claim on any basis, separate or jointly with the Plan Agent after Plan confirmation.

k.       Harco currently holds a contingent and unliquidated general unsecured claim against the Estate.  Harco's allowed claim ("**Harco Allowed Claim**") will be in the same dollar amount as Harco actually pays on the bonds or if not advanced in full by Harco, as allowed by any claims objection heard at the confirmation hearing determining the proper amount to be paid by Harco. The Harco Class [12] non-recourse note (the "**Harco Note**"), to be executed by the Plan Agent on behalf of the Plan Trust as the Harco Note oblige for the benefit of Harco and will be in the same dollar amount of Harco Allowed Claim. It is presently estimated that the Harco claim will be equal to Two Million Four Hundred and Two Thousand Seven Hundred and Four Dollars ($2,402,704). The Harco Note shall not bear interest, provide for the payment of attorneys' fees or costs or any other fees whatsoever.

l.       The GrainChain Class [6, 12] non-recourse note (the "GrainChain Note") shall be executed by the Plan Agent as the non-recourse note oblige, shall be in the dollar amount of GrainChain's Allowed pre-Petition proof of claim Dkt #42-1, which shall be allowed under the Chapter 11 Plan and Confirmation Order in full.  It is presently anticipated that the GrainChain Note will be in the amount of its pre-Petition indebtedness, and in addition to the amounts that may be added to the Note as outlined below of $7,841,054.99. The GrainChain Note shall not bear interest, provide for the payment of attorneys' fees or costs or any other fees whatsoever. Pursuant to 11 U.S.C. § 506, and as set out in the Plan, if GrainChain's liens were Allowed in full GrainChain would be an oversecured creditor, and as such GrainChain would then be entitled to reasonable

attorney's fees and interest on its claim as determined by the bankruptcy court.

m.      The treatment of GrainChain's post-Petition indebtedness owed to it by the Debtor shall be treated as follows:

(1)      Payment of GrainChain's Post-petition advances of approximately $1.2M for the cash deposit on the TDA mandated surety bonds (approximately $900K) and startup expenses incurred to otherwise fund the initial start-up of the Elkins-managed operations (approximately $300K), which operating expenses shall be deemed an Allowed Administrative Claim due GrainChain in the amount of $300,000.00.  The Bond Deposit is owned and controlled by GrainChain as to all the bonding funds deposited and not property of the estate. In the event that New Co. or GrainChain default in the post-confirmation performance of their obligations and the cash bonds are called upon, GrainChain shall have no claim against the Plan Trust unless and until the Unsecured Class has been paid in full. Thereafter, GrainChain shall have a right to make a claim against any remaining funds or assets of the Plan Trust as the Trustee or the bankruptcy court may allow, if any.

(2)      With respect to the Bean factoring, it will be treated as contained in the Bean Operating Agreement, the Court Order at Docket Number 517, and the financing documents, with the Plan Trust and the Reorganized Debtor liable for all such indebtedness.  To the extent these amounts remain unpaid when the GrainChain Note matures, all such amounts may be then added to the GrainChain Note at GrainChain's sole discretion and election.

n.      The GrainChain Note shall be a five-year balloon non-recourse note. The Unsecureds' Note shall be a five-year balloon non-recourse note with the minimum yearly payment of two hundred and fifty thousand dollars ($250,000) to be unconditionally funded and backstopped by GrainChain whether the operations of New Co. are profitable or not. The Harco Note shall be a five-year balloon non-recourse note with the initial three-year subordinated to the Unsecureds' Class and providing for profits-sharing payments to commence in year three. Payments from the liquidation of assets or property by the Plan Trust shall, to the extent realized in year four and five, be paid pro-rata on the Harco Note.

o.      New Co. will operate with the anticipation of generating after-tax net profits. GrainChain agrees to fund New Co.'s operations in a commercially reasonable manner through factoring New Co.'s receivables.  The anticipated after-tax net profits shall be calculated as provided for in the post-confirmation operating agreement ("Elkins Operating Agreement") to be executed by Elkins, GrainChain, New Co., and Plan Agent (the "Elkins Profits") detailing the terms of the post-confirmation operations of New Co. with respect to the grain and sunflowers. New Co. shall not charge fees or expenses to the Elkins operations except as set out in the Elkins Operating Agreement nor shall New Co. or GrainChain make any monies from this parties regarding the Elkins Operations.  With respect to the bean operation (the "Beans"), the following parties will enter into a Bean Operating Agreement: Garba, LLC ("Garba"), GrainChain, New Co., and the Post Confirmation Debtor and Plan Agent.  The Bean Operating Agreement shall contain similar terms as the Elkins Operating Agreement.  The anticipated to be distributed after tax net bean profits shall be

calculated as provided for in the Bean Operating Agreement (collectively, the "Bean Profits").  The Elkins Profits and the Bean Profits are collectively referred to herein as the "After-Tax Net Profits." The Plan Trust shall be paid the After-Tax Net Profits for distributions, after payments to the Plan Trust operating expenses, and shall be paid over to the Unsecureds' Note, the Harco Note and the GrainChain Notes, 45%, 10% and 45% respectively.

p.      The Chapter 11 Plan, Confirmation Order, the Elkins Operating Agreement and the Bean Operating Agreement shall each reference and require the execution of certain non-competition agreements with New Co., Garba, Octavio Garcia and certain of the Debtor's other insiders so that the Debtor's insiders do not compete with New Co. during the first five years of its operations (collectively, the "Non-Competition Agreements").  Likewise, neither New Co. nor GrainChain will compete in the Rio Grande Valley in the grain industry outside its efforts and obligations to use best efforts to operate or cause to be operated New Co., profitably. These Non-Competition Agreements shall all be attached to the Confirmation Order.

q.      With respect to the post-confirmation operations of New Co., New Co. will either be entitled to the GrainChain Note's 45% of the After-Tax Net Profits and/or convey all or some of such anticipated monies to GrainChain, as solely determined by New Co. and GrainChain. As dollar-for-dollar note payment and balance reduction on the Unsecureds' Note, with such note payments being made to the Plan Agent as the Unsecureds' Note oblige, the Plan Trust will receive and distribute either 55% of the After-Tax Net Profits during years one, two and three or two-hundred and fifty thousand ($250,000) in year 1, two-hundred and fifty thousand ($250,000) in year 2, and two hundred and fifty thousand ($250,000) in year 3, whichever is greater on a yearly basis, with any such short-fall funded by GrainChain, and will receive either 45% of the profits in year 4 and year 5 or two-hundred and fifty thousand ($250,000) in year 4, and two hundred and fifty thousand ($250,000) in year 5, whichever is greater on a yearly basis, with any such short-fall funded by GrainChain. All such After-Tax Net Profits paid on the Unsecureds' Note shall reduce the debt balance owed on the Unsecureds' Note on a dollar-for-dollar basis. The Plan Agent may "hold-back" and not distribute to the Unsecured Creditors, a reasonable percentage of the Unsecureds' Note Payments received by the Plan Trust for reasonable and necessary Plan Trust administration fees, costs, and expenses.  As dollar-for-dollar note payment and debt reduction on the Harco Note, with such note payments being made to the Plan Agent as the Harco Note oblige, the Plan Trust will receive 10% of the After-Tax Net Profits during year 4 and year 5. All such After-Tax Net Profits paid on the Harco Note shall reduce the debt balance owed on the Harco Note on a dollar-for-dollar basis.  The GrainChain Note will not decrease during its five-year term except with respect to any required calculation of all Note Holder pro-rata sharing on property sales proceeds.  For clarity, notwithstanding GrainChain's accounting, the balance on the GrainChain Note to be used for calculation of its pro-rata shall of Asset sale proceeds from time to time will include all payments of profits and sales proceeds paid by the Plan trust. The GrainChain Note balance may increase as detailed in the Intercreditor Agreement only in the event that the minimum yearly $250,000 payment is made in any given year on the Unsecured Note, or after payment in full to the Unsecured Class.

r.      GrainChain will release its purported and asserted pre-Petition liens on the following Debtor Properties on the Effective Date, which the Debtor shall transfer to the Plan Trust free and

clear of liens, claims interests and encumbrances on the Effective Date through plan confirmation:

      1.      The Pitts Property (but only if the Vantage settlement contained in the order at Docket Number 517 is not consummated) and

      2.      any and all other real property and/or real property sales proceeds that shall be conveyed (or to be conveyed) into the Plan Trust by the requisite entities, including without limitation,

      i.      PSG Emory Farms,

      ii.      Valverde Donna (but only in the event that the Vantage settlement contained in the order at Docket Number 517 is not consummated), and

      iii.      PSG Moore Farms (or its net sales proceeds)

      iv.      Any other Debtor or Insider or Affiliate or Affiliate Insider properties recovered by the Plan Agent or post-confirmation Debtor. (hereinafter collectively referred to as "**Trust Properties**").

Neither GrainChain nor any Affiliate or Insider claims a lien on any of the Debtor's Insiders or Affiliates, or insiders of Affiliates, property not disclosed in this Agreement. The conveyances of the Trust Properties shall be effective as of the Chapter 11 Plan's Effective Date. The Plan Agent shall market and liquidate the Trust Properties, in a commercially reasonable manner, with the net sales proceeds being distributed to the Plan Trust beneficiaries as follows:

      •      45% to the Unsecureds', with dollar-for-dollar debt payment and reduction of the balance of the Unsecureds' Note;

      •      10% to Harco, with dollar-for-dollar debt payment and reduction of the balance of the Harco Note; and

      •      45% to GrainChain with no reduction on the GrainChain Note (collectively, the "Sale's Proceeds Division") except for the purpose of calculating, the pro-rata distributions paid by the Plan Trust paid to GrainChain by the Plan Agent upon the sale or foreclosure of the New Co. Properties.

The reduction of the Unsecureds' Note and the Harco Note from the net sales proceeds shall effect the amount to be distributed from any future sale of the Trust Properties as the percentages to be paid from the net sales proceeds shall be determined by the percentage of the remaining indebtedness owed on the Unsecureds' Note and the Harco Note. At the end of the 5-year term of the Plan the net proceeds realized from the sale of the New Co. Properties from a bona fide arms-length transaction, either by third party sale or foreclosure, shall be paid out by the Plan Agent and will be applied to the Unsecureds' Note, the Harco Note and the GrainChain Note based upon the ratio of

the balances owed on the individual notes compared to the total outstanding indebtedness remaining which is secured by the liens against the New Co. Properties.

The Confirmation Order shall require that all Debtor and non-debtor owned properties and assets required to fund the Plan Trust are timely and properly conveyed to the Plan Trust. All the Debtor's and its Estate's pre-Petition accounts receivable (domestic and foreign) shall be conveyed to the Plan Trust as of the Effective Date, and the Plan Agent shall administer the net collected accounts receivable in accordance with the provisions of the Plan Trust.

s.      It is anticipated that the Unsecureds' Note, and the Harco Note will be reduced by the 45%-10% distributions of sales proceeds of the Trust Properties and the 45%-10% distributions of the After-Tax Net Profits paid as detailed above. The GrainChain Note will be reduced dollar-for-dollar from the 45% sales proceeds of the Trust Properties, but not from the receipt of 45% After Tax Net Profits paid as detailed above.

t.      GrainChain will additionally agree to release its lien on non-debtor real property only as to (a) PSG Moore Farms; and (b) PSG Emory Farms at either (a) the actual closing of such sales in a commercially reasonable manner provided that the net sales proceeds from such sales are contributed to the Plan Trust in a manner and amount satisfactory to both the Plan Agent and GrainChain; and/or (b) after the conveyance of such properties by insurable fee simple title to the Plan Trust, both for the sole benefit of GrainChain, Harco and the Unsecureds.

u.      GrainChain shall receive the following release at confirmation, which shall also be contained in the Confirmation Order:

For the good and valuable consideration detailed in the Debtor's Plan and Disclosure Statement provided by GrainChain to the Debtor and its Estate, without which the Debtor would be unable to confirm its Chapter 11 Plan and would likely convert its Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, GrainChain is hereby released and discharged by the Debtor and its Estate from (and the Debtor and its Estate are indefinitely barred from prosecuting or attempting to prosecute) any and all claims, obligations, interests, suits, judgments, damages, rights, remedies, causes of action, and liabilities of any kind, including any derivative claims asserted or assertable on behalf of the Debtor and/or its Estate, whether known or unknown, anticipated or unanticipated, liquidated or unliquidated, matured or unmatured, contingent or non-contingent, current or forthcoming at law, in equity. This includes, without limitation, any claims or causes of action under the Bankruptcy Code or any other applicable law against GrainChain, its members, managers, officers, directors, employees, partners, affiliates, funds, advisors, attorneys, agents, representatives, and their respective properties. Notwithstanding anything to the contrary herein, nothing herein should be interpreted to release any creditor or party in interest, including GrainChain, from any liabilities, if any, directly arising from criminal activity committed intentionally or knowingly, encompassing allegations or determinations of fraud, including any actions, claims, or liabilities related to any intentional or knowing conspiracy to commit fraud or collusion with any party to defraud another whether civil or criminal in nature, or any other causes of action discovered during the course of the forensic accounting investigation into the pre-Petition loss of the $20 to $30 million

of grain or grain receivables .

v.       The three deeds of trust, the three non-recourse notes, the Intercreditor Agreement, the Elkins Operating Agreement, the Bean Operating Agreement, the Guaranty Tolling Agreements and the Debtor and Insider Non-Compete Agreements shall be attached to the Confirmation Order as exhibits in substantially their final forms and the full execution and delivery of each are prerequisites to New Co.'s operations.  The three deeds of trust and the intercreditor agreement shall be filed in the real property records upon execution of the three non-recourse notes.

w.       After the expiration of five year note terms, the Unsecureds and Harco are no longer entitled to a percentage of the After-Tax Net Profits. If at the end of the five-year note terms there is any balance remaining on either the Unsecured or Harco note(s), then, as further detailed in the Intercreditor Agreement, GrainChain in its sole discretion and election in full and final satisfaction of the Unsecureds' Note and deed of trust and the Harco Note and deed of trust may either:

(a) select "The Foreclosure Election" and foreclose on its deed of trust liens on the New Co. Properties through one or more public foreclosure sales, with a prorated division of the foreclosure sales proceeds based upon the foreclosure sale price and the percentage ratios then owed on the non-recourse notes over an agreed upon time; or

(b) select "**The FMV Election**" and make payments to the Plan Agent as final payments on the two notes (Unsecureds and Harco) in a prorated amount based upon the New Co. Properties then fair market value (based upon a market valuation approach) and the percentage ratios then owed on the non-recourse notes over an agreed upon time.

If GrainChain selects The FMV Election, GrainChain will hire an appraiser to determine the fair market value based upon a market value approach for a one-year sale. The Plan Agent can either accept this appraisal or obtain an appraisal of his own at the Trust's own expense as to the fair market value based upon a market value approach for a one-year sale.  In the event no agreement is reached between GrainChain and the Plan Agent as to the fair market value, then GrainChain and the Plan Agent will jointly hire (and split costs accordingly) a third appraisal as to the fair market value based upon a market value approach for a one-year sale and then average all three values (the "**Averaged Value**") to determine the fair market value. If such Averaged Value is not acceptable to GrainChain, GrainChain may switch its election from The FMV Election to The Foreclosure Election.

x.       If GrainChain ultimately selects The Foreclosure Election, the formula (which shall be contained in the Intercreditor Agreement and referenced in the non-recourse notes and deeds of trust) shall be shall provide that the net proceeds from the sale of any of the New Co. Properties is to be paid pro rata to the Unsecureds' Note, the Harco Note, and the GrainChain Note based upon the percentage the outstanding balances owed on such notes bear to the total outstanding indebtedness owed against the New Co. Properties.

y.    If GrainChain ultimately selects The FMV Election, the formula (which shall be contained in the Intercreditor Agreement and referenced in the non-recourse notes and deeds of trust) shall provide that the net proceeds from the sale of any of the New Co. Properties is to be paid pro rata to the Unsecureds' Note, the Harco Note, and the GrainChain Note based upon the percentage the outstanding balances owed on such notes bear to the total outstanding indebtedness owed against the New Co. Properties.

z.    The Plan Trust/Plan Agent shall use all the insurance funds necessary to make the required and proper repairs on Progreso in the business judgment of GrainChain and the Plan Trust. Any disputes shall be resolved by the bankruptcy court, upon notice and hearing, pursuant to its reserved jurisdiction provided in the Plan.

aa.    All GrainChain (or any Affiliate or Insider of GrainChain) recoveries arising from the GrainChain allowed claims and not dealt with above, received or obtained from the Debtor, Debtor's Insiders or Affiliates or the Affiliates' Insiders, shall be contributed to the Plan Trust and distributed as a Plan Trust asset.

### G.    Class 7 – Secured Claim of Ford Motor Credit (Impaired)

This Class consists of the Secured Claim of Ford Motor Credit Company, LLC ("**Ford Credit**") in the amount of $29,349.59 which is secured by a purchase money security interest in a 2020 Ford F-150 bearing vehicle identification number 1FTEW1E59LFB68462. This debt is the subject of a retail installment sales contract for the vehicle.

**Treatment of Secured Claim of Ford Motor Credit**

Debtor proposes to pay the secured claim of Ford Credit in full pursuant to the terms of the Motor Vehicle Retail Installment Sales Contract (the "Contract") attached to Ford Credit's proof of claim. [POC #7] by reamortizing the balance outstanding over three (3) years at the current interest rate of 4.29%. The new reamortized payments will be paid in equal quarterly payments with the first such payment to be made on March 31, 2024, and the remaining monthly payments to be paid on or before the last business day of each quarter thereafter until the full amount of principal and interest is paid in full. Notwithstanding anything in the Plan to the contrary, (1) Ford Credit will, until the Secured Claim of Ford Credit is paid in full, require Debtor to maintain comprehensive and collision insurance coverage with a deductible not to exceed $1,000.00 as required by the terms of the Contract with Ford Credit designated as loss payee by requiring Debtor to provide proof of current coverage within five (5) days of receipt of a request for proof of insurance coverage, (2) Ford Credit shall retain its first-priority, purchase money security interest until paid in full per the terms of the Contract as modified herein, and (3) Ford Credit will be entitled to enforce the Contract pursuant to its terms without modification by this Plan save and except the payment re-amortization provisions contained herein.

### (III). CLASSIFICATION AND TREATMENT OF UNSECURED CLAIMS

The Unsecured Claims under the proposed Plan consist of Classes ~~7~~8 through ~~10~~11 described below.

The Unsecured Claims described in this section do not include the unsecured portions of the claims of StoneX, Vantage Bank, and GrainChain, Inc. because they are being treated and resolved by another method as described above. Any preferences shown in the Plan which are not specifically designated to be settled and released for opting into treatment under General Unsecured Claims or retained by the Debtor may be prosecuted or settled at the discretion of the Plan Agent.

This Plan classifies the Unsecured Claims into four main groups: **(1) Bean Claims; (2) Farmers' and Grain Claims; (3) Administrative Convenience Class;** and **(4) General Trade Claims**, each of which ~~correspond to its~~ are classified and treated in their own class.

The category "Bean Claims" (**Class ~~7~~8**) consists of the claims of companies who sold beans to the Debtor; the category "Farmers and Grain Claims" (**Class ~~8~~9**) consists of the claims of farmers or grain companies who sold grain (corn, sorghum, and the like) to the Debtor; the category "Administrative Convenience Class" (**Class ~~9~~10**) consists of the claims that total less than $50,000; and the category "General Trade Claims" (**Class ~~10~~11**) consists of the claims of parties that have sold other goods and merchandise (such as fertilizers, chemicals, and the like) to the Debtor.

### H.  Class ~~7~~8 – Unsecured Bean Claims (Impaired)

**Class ~~7~~8** (the Unsecured Bean Claims) consists of the Unsecured Bean Claims of American Bean, LLC (POC #14 filed 3/10/2023) in the amount of **$184,000.00**; and the claim of Stony Ridge Food, Inc. (POC #31 filed 5/5/2023) in the net amount of **$~~1,320,489.00~~439,027.75** after deduction of $~~237,077.50~~118,538.75 (for ~~two~~one PACA ~~Claims~~Claim paid) from the original POC #31 amount of $1,557,566.50.
The Debtor's calculations based on the information provided in its Statement of Financial Affairs (SOFA) [Dkt #51], Exhibit 3 as well as Vantage Bank statements, indicates that these two claimants have received a total of **$~~1,337~~917,189.27** of payments that constitute "preference claims" of the estate under 11 U.S.C. § 547, as shown in more detail below. Vantage Bank check numbers were noted in parenthesis next to the dates those checks were deposited.

Likewise, the creditors who did not file a POC in the Bankruptcy Case but had a claim listed in the Schedules were noted below. Those claims amount to an estimated total of **$617,572.24.** Together, all Unsecured Bean Claims have an estimated amount of **$2,240,600.24** and a portion of this amount is identified as preference amounts as noted below.

| Name of Unsecured Creditor | Amount of Claim (POC) | Potential Preference Received | |
|---|---|---|---|
| American Bean, LLC (POC #14) | $184,000.00 | 12/~~21~~28/2022 (7440) | $45,954.00 |

| Name | Amount of Claim | Date (POC #) | Potential Preference |
|---|---|---|---|
| | | ~~12/21/2022~~ 1/4/2023 (7441) | $45,954.00 |
| | | ~~12/27/2022~~ | ~~$46,000.00~~ |
| | | ~~12/27/2022~~ | ~~$46,000.00~~ |
| | | ~~11/14/2022~~ | ~~$119,000.00~~ |
| | | ~~11/14/2022~~ | ~~$119,000.00~~ |
| | | 1/~~3~~14/2023 (7462) | $~~92~~46,000.00 |
| | | 1/10/2023 (7463) | $~~90~~46,000.00 |
| | | | **TOTAL = $~~603~~183,908.00** |
| Stony Ridge Food, Inc. (POC #31) | $1,557,566.50 minus $~~237,077.50 (two~~118,538.75 (one PACA ~~Claims~~Claim paid) = $1,~~320,489~~439,028.00 | ~~12/27/2022~~1/5/2023 (7456) | $61,130.90 |
| | | ~~12/27/2022~~1/9/2023 (7457) | $59,036.85 |
| | | ~~12/27/2022~~1/18/2023 (7458) | $23,320.00 |
| | | ~~12/27/2022~~1/18/2023 (7459) | $23,320.00 |
| | | ~~12/27/2022~~1/10/2023 (7460) | $59,065.88 |
| | | 1/12/~~27/2022~~2023 (7461) | $59,065.88 |
| | | 1/~~3~~19/2023 (7495) | $59,065.88 |
| | | 1/~~3~~23/2023 (7496) | $59,065.88 |
| | | 1/~~3~~24/2023 (7497) | $60,320.00 |
| | | 1/~~3~~26/2023 (7498) | $60,320.00 |
| | | 1/~~19~~20/2023 (7542) | $58,145.00 |
| | | 1/~~19~~31/2023 (7543) | $58,145.00 |
| | | ~~1/19~~2/7/2023 (7546) | $23,320.00 |
| | | ~~1/19~~2/6/2023 (7545) | $23,320.00 |
| | | ~~1/19~~2/3/2023 (7544) | $23,320.00 |
| | | ~~1/19~~2/8/2023 (7547) | $23,320.00 |
| | | | **TOTAL = $733,281.27** |
| ~~**TOTAL**~~**Subtotal of** **Bean Claims** **(who filed POC)** | **POCs** $1,~~504,489.~~623,028.00 | | **Subtotal of** **Preferences** ~~$1,337~~(for those with POC) $917,189.27 |
| **Name of Unsecured Creditor (Not filed POC)** | **Amount of Claim** | **Potential Preference Received** | |
| Forest River Bean Co. | $565,372.75 | 2/14/2023 (7618)   $51,888.75<br>2/2/2023 (7549)   $51,964.50 | |

| | | 1/31/2023 (7548)          $51,964.50 |
|---|---|---|
| | | **TOTAL Forest River Co. Pref:** **$155,817.75** |
| PKT Associates, Inc. | $52,199.49 | (No preferences) |
| **Subtotal of Bean Claims (No POC)** | **No POCs** **$617,572.24** | **Subtotal of Preferences (for those without POC)** |
| **TOTAL Bean Claims** | **$2,240,600.24** | **TOTAL Class 8 Preferences:** **$1,073,007.02** |

This Plan will resolve the Unsecured Bean Claims as follows:

### A. The Unsecured Bean Claim of American Bean, LLC (POC #14)

American Bean, LLC has filed an unsecured claim in the amount of $184,000 (POC #14). In return, the Estate has a preference claim against American Bean, LLC in the amount of $603,908.00. The preference claims will be settled or prosecuted by the Plan Agent.

### B. The Unsecured Bean Claim of Stony Ridge Food, LLC (POC #31)

Stony Ridge Food, Inc. ("Stony Ridge") has an unsecured claim in the net amount of $1,320,489.00439,027.75 after deduction of $237,077.50118,538.75 (for twoone PACA ClaimsClaim paid) from the original POC #31 amount of $1,557,566.50. In return, theThe Estate has a preference claim against Stony Ridge in the amount of $733,281.27. The The Debtor has agreed to seek recognition of Stony Ridge as a "critical vendor" and to settle the preference claims by offsetting approximately30% of the amount of the claimed preferences against its claim and agreeing that the Estate will recognize Stony Ridge as having an Allowed Unsecured Claim in the agreed upon sum of $1,220,000 to be settled or prosecuted by the Plan Agenttreated as a General Unsecured Claim. In exchange Stony Ridge will continue to supply the Debtor with black beans at a price and terms to be mutually agreed upon between Stony Ridge and the Debtor.

### G.      Class 8 – Farmers' and Grain Claims (Impaired)

### Class 8Treatment of Unsecured Bean Claims

The Allowed Unsecured Claims of the creditors classified as Unsecured Bean Claims shall be treated equally with the Claims of General Unsecured Claims in Class 10 as described hereinbelow, and share pro rata with the holders of General Unsecured Claims from the distributions made by the Plan Agent to participants in the Unsecured Note to be paid 40% of the net after tax profits of New Co. or from the sales of the New Co. properties.

### I.      Class 9 – Unsecured Farmers' and Grain Claims (Impaired)

Class 9 (the Farmers' and Grain Claims) consists of the claims of farmers ("Farmers") or

other grain claimants ("Grain Claimants") who have sold grains to the Debtor. Farmers and Grain Claimants holding claims that may be entitled to distributions from the proceeds of the surety bonds may either choose to be paid solely by the bond receipts, or to participate and receive their pro-rata share of the percentages paid to General Unsecured Creditors on a pr-rata basis from the receipt of net proceeds from the sales of real estate or the net profits from the operations of the Debtor.

All Farmers and Grain Claimants deemed eligible to participate in the distribution of the surety bond proceeds will be paid from the pool of funds to be distributed by the TDA. However, if these holders of grain claims choose distribution from the bond claims they will not have any preferences they received waived by the Debtor.

For the **Class 9** claimants who filed POCs in the Bankruptcy Case, their Claim Amounts are calculated as the POC Amounts minus the $7,475 priority amounts claimed under the Bankruptcy Code Section 507(a)(6) where applicable, which is the non-priority positions of their claims. The priority portions of the same claims are treated under **Class 2** above. For those **Class 9** claimants who have not filed POCs, their Claim Amounts are the estimated scheduled amounts.

The Debtor's calculations based on the information provided in its Statement of Financial Affairs (SOFA) [Dkt #51], Exhibit 3 as well as Vantage Bank statements, indicates that these Farmers who have filed a POC have received ~~an~~ estimated total of **$~~2,964,506.71~~3,896,715.69** of payments that constitute "preference claims" of the Estate under 11 U.S.C. § 547, as shown in more detail below (Vantage Bank check numbers were noted in parenthesis next to the dates those checks were deposited). The claims of the Farmers and Grain Claimants who have filed a POC (calculated as the POC amount minus the priority portions of their claims which are treated under Class 2) amount to an estimated total of **$3,509,951.12**; and the claims of Farmers and Grain Claimants who have not filed a POC amount to an estimated total of **$188,515.29**, and together, **Class 9** is estimated to have a total amount of **$3,698,466.41**:

| FARMERS AND GRAIN CLAIMANTS WHO HAVE FILED A POC | | |
|---|---|---|
| **Name of Unsecured Creditor** | **Amount of Claim (POC minus the $7,475 priority amount where applicable)** | **Potential Preference Received** |
| Brian Jones Farms (POC #19) | $76,916.82 - $7,475 = **$69,441.82** | 1/27/2023 (GrainChain)  $84,749.45 <br> **TOTAL = $84,749.45** |
| Carl Hensz (POC #22) | $97,748.78 - $47,475 = **$90,273.78** | 1/~~17~~23/2023 (7536)  $50,000.00 <br> **TOTAL = $50,000.00** |
| Chad Szutz (POC #24) | $58,495.56 - $7,475 = **$51,020.56** | (No preference claims) |

| | | | |
|---|---|---|---|
| Dreibelbis Farms (POC #35) | $290,691.70 - $7,475 = $283,216.70 | (No preference claims) | |
| Eat Fresh Farms (POC #13) | $65,769.41 - $7,475 = $58,294.41 | 2/~~23~~3/2023 (7635) | $64,976.24 |
| | | 2/~~3~~23/2023 (7656) | $793.02 |
| | | 1/~~27~~30/2023 (7589) Z-Ernte (EatFresch/Advance Harvesting) | $1,900.00 |
| | | 2/~~4~~3/2023 (7631) Z-Ernte (EatFresch/Advance Harvesting) | $4,050.00 |
| | | **TOTAL = $71,719.26** | |
| Fike Farms (POC #32) | $353,230.88 - $7,475 = $345,755.88 | 1/~~3~~5/2023 (7492) | $1,515.00 |
| | | 1/~~3~~27/2023 (7493) | $37,051.61 |
| | | 12/~~12~~20/2022 (7412) | $50,000.00 |
| | | 12/~~12~~15/2022 (7411) | $50,000.00 |
| | | 1/20/2023 (7490) | $59,500.43 |
| | | 1/~~3~~10/2023 (7486) | $59,500.45 |
| | | 1/~~3~~18/2023 (7487) | $59,500.45 |
| | | 1/~~3~~13/2023 (7488) | $59,500.45 |
| | | 1/~~3~~4/2023 (7484) | $59,500.45 |
| | | 1/~~3~~6/2023 (7485) | $59,500.45 |
| | | 2/~~3~~9/2023 (7639) | $49,564.06 |
| | | **TOTAL = $~~485,632.92~~545,133.35** | |
| Frank Bailey Grain Company (POC #33) | **$653,585.11** | 12/~~17~~7/2022 (7382) | $65,375.37 |
| | | 12/~~18~~8/2022 (7383) | $58,022,48 |
| | | 12/~~13~~12/2022 (7384) | $65,830.54 |
| | | 12/~~13~~19/2022 (7419) | $58,869.22 |
| | | 12/~~13~~20/2022 (7420) | $20,292.55 |
| | | 12/~~13~~20/2022 (7421) | $46,959.48 |
| | | 12/~~13~~23/2022 (7422) | $47,286.60 |
| | | 12/~~13~~28/2022 (7423) | $54,412.81 |
| | | ~~12/13/2022~~ 1/3/2023 (7424) | $53,780.99 |
| | | ~~12/13/2022~~ 1/5/2023 (7425) | $45,108.44 |
| | | ~~12/13/2022~~ 1/9/2023 (7426) | $50,638.10 |
| | | 1/~~10~~17/2023 (7521) | $65,375.37 |
| | | 1/~~10~~18/2023 (7522) | $58,022,48 |
| | | 1/~~10~~23/2023 (7523) | $65,830.54 |
| | | **TOTAL = $639,760.01** | |
| HAR-VEST (POC #15) | $182,214.60 - $7,475 = $174,739.60 | (No preference claims) | |

| | | | |
|---|---|---|---|
| Johnny Guin (POC #25) | $117,560.65 - $7,475 = $110,085.65 | (No preference claims) | |
| Karen Arnold (POC #26) | $107,332.39 - $7,475 = $99,857.39 | (No preference claims) | |
| Lothringer Family Farms (POC #46) (Late) | $70,618.69 - $7,475 = $63,143.69 | 2/27/2023 (7636) Soybean setl | $23,452.13 |
| | | 12/15/16/2022 (7433) Z-Ernte (Harv Lothringer Soybean) | $6,300.00 |
| | | **TOTAL = $29,752.13** | |
| Planters Grain Cooperative of Odem, TX (POC #34) | $255,696.00 | 2/13/2023 (7579) | $50,661.31 |
| | | 2/13/2023 (7577) | $50,661.31 |
| | | 2/13/2023 (7578) | $50,661.31 |
| | | 2/3/2023 (7576) | $50,661.31 |
| | | 2/2/2023 (7575) | $50,661.31 |
| | | **TOTAL Preference of Planters = $253,306.55** | |
| Robert Walsdorf (POC #43) | $8,018.76 - $7,475 = $543.76 | (No preference claims) | |
| Russell Plantation II (POC #11) | $668,169.85 - $7,475 = $660,694.85 | 1/27 2/14/2023 (7600) | $66,516.99 |
| | | 1/27 2/10/2023 (7599) | $66,516.99 |
| | | 1/27 2/7/2023 (7598) | $66,516.99 |
| | | 1/27 2/6/2023 (7592) | $66,516.99 |
| | | 1/27/2023 **TOTAL = $266,067.96** | $66,516.99 |
| Skalitsky Farms (POC #29) | $149,842.47 - $7,475 = $142,367.47 | 1/27/2023 11/22/2022 (7271) | $66,516.99 |
| | | 11/25/2022 (7272) | $84,567.82 |
| | | 11/29/2022 (7273) | $84,567.82 |
| | | 12/2/2022 (7274) | $84,567.82 |
| | | 12/6/2022 (7275) | $84,567.82 |
| | | 12/8/2022 (7276) | $84,567.82 |
| | | 12/13/2022 (7310) | $84,567.82 |
| | | 12/16/2022 (7311) | $84,567.83 |
| | | | $84,567.83 |

Deleted Cells

Merged Cells
Merged Cells

| | | | |
|---|---|---|---|
| | | 12/20/2022 (7312) $84,567.83 | |
| | | 12/23/2022 (7313) $84,567.83 | |
| | | 12/28/2022 (7314) $84,567.83 | |
| | | 12/28/2022 (7315) $84,567.83 | |
| | | 1/4/2023 (7316)   $84,567.83 | |
| | | 1/6/2023 (7317)   $84,567.83 | |
| | | 1/10/2023 (7318) $84,567.83 | |
| | | 1/17/2023 (7319)   $84,567.83 | |
| | | 1/18/2023 (7320) $84,567.83 | |
| | | 1/20/2023 (7321)   $84,567.83 | |
| | | 1/27/2023 (7322) $84,567.83 | |
| | | 1/27/2023 (7323) $84,567.83 | |
| | | 1/27/2023 (7324) $84,567.83 | |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.99~~ |
| | | ~~1/27/2023~~ | ~~$66,516.94~~ |
| | | **TOTAL** = ~~$931,237.81~~**Pref: $1,775,924.37** | |
| ~~Skalitsky Farms (POC #29)~~ | ~~$149,842.47~~ | ~~(No preference claims)~~ | |
| Wesley Valerius (POC #28) | $119,444.52 - ~~$7,475~~ = **$111,969.52** | ~~1/27~~2/15/2023 (7595) | $60,100.87 |
| | | ~~1/27~~2/9/2023 (7594) | $60,100.87 |
| | | ~~1/27~~2/2/2023 (7593) | $60,100.87 |
| | | ~~1/27/2023~~ | ~~$60,100.87~~ |
| | | ~~1/27/2023~~ | ~~$59,343.64~~ |
| | | **TOTAL** = $~~299,747.12~~**180,302.61** | |

| | | | |
|---|---|---|---|
| Zdansky Joint Venture (POC #17) | $346,739.93 - $7,475 = **$339,264.93** | ~~11/9/2023 (GrainChain)~~No preferences | ~~$53,127.73~~ |
| | | ~~11/9/2023 (GrainChain)~~ | ~~$247,367.81~~ ~~TOTAL. = $300,495.54~~ |
| **TOTAL Farmers' and Grain Claims (with POC)** | ~~POCs $3,366,380.12~~ Total POCs ($3,622,076.12) minus total priority portions ($112,125) = **$3,509,951.12** | **Subtotal of Preferences (for those with POC)** ~~$2,893,094.24~~**3,896,715.69** | |

~~In sum,~~

| **FARMERS AND GRAIN CLAIMANTS WHO HAVE NOT FILED A POC** **(Only Scheduled)** | | |
|---|---|---|
| **Name of Unsecured Creditor** | **Amount of Claim** | **Potential Preference Received** |
| Attebury Grain, LLC | $58,821.21 | 12/29/2022 (7442) $53,520.03 |
| | | 12/29/2022 (7443) $53,520.03 |
| | | **TOTAL Attebury Pref: $107,040.06** |
| Cadena Farms | $13,797.49 | 2/15/2023 (7647)  $66,276.15 |
| | | **TOTAL Cadena Pref: $66,276.15** |
| Fred Karle | $14,456.18 | (No preference) |
| Luna Brothers | $40,453.65 | 2/15/2023 (7567)  $53,879.78 |
| | | 2/15/2023 (7559)  $40,453.65 |
| | | 2/10/2023 (7565)  $53,879.78 |
| | | 2/10/2023 (7566)  $53,879.78 |
| | | 2/6/2023 (7563)   $57,137.66 |
| | | 2/1/2023 (7562)   $30,052.09 |
| | | 1/27/2023 (7561)  $38,379.28 |
| | | 1/26/2023 (7558)  $1,339.86 |
| | | 1/26/2023 (7556)  $8,821.01 |
| | | 1/26/2023 (7557)  $8,164.16 |
| | | 1/4/2023 (7446)  $25,000.00 |
| | | 12/29/2022 (7445) $25,000.00 |
| | | **TOTAL Luna Bros Pref: $395,987.05** |
| Mark Miller | $986.76 | (No preference) |
| Wesley Vanderpool | $60,000.00 | 1/20/2023 (7398) |

| | | |
|---|---|---|
| | | (Vern Vanderp.) $45,386.41 1/20/2023 (7401) (Vern Vanderp.) $14,613.59 **TOTAL W.Vanderpool Pref: $60.000.00** |
| **TOTAL Farmers' and Grain Claims (without POCs)** | **Amounts $188,515.29** | **Subtotal of Preferences for those without POCs $629,303.26** |
| **TOTAL (All Class 9)** | **$3,698,466.41** | **Total Class 9 Preferences: $4,526,018.95** |

**Treatment of Claims of Unsecured Farmers' and Grain Claims**

The provisions of the Plan provide the Unsecured Farmers' and Grain Claims will be resolved according to each claimant's choice to opt in or opt out of the treatment of General Unsecured Claims under the Plan, *i.e.*, either be paid solely by the bond receipts or to participate and receive their pro-rata share of the percentages paid to General Unsecured Creditors on a pro-rata basis from the receipt of net proceeds from the sales of real estate or the net profits from the operations of the Debtor in exchange for release of all preference claims and obligations arising under this Bankruptcy Proceeding.

The division and distribution of profits of the Reorganized DebtorNew Co. shall be in accord with the provisions established for the split of profits in the Operation Agreement approved by the Bankruptcy Court and as provided in this Plan, whereby GrainChain, Harco National Insurance Company ("**Harco**"), and the General Unsecured Creditors each receive their respective share of the profits from the operations of the Debtor in relation to the amount their claims constitute a percentage of the total amount of the General Unsecured Class. In this regard, the total amount of unsecured claims is estimated to total $17,284,00020,126,212 while the claims of the General Unsecured Creditors are estimated to total $7,038,659.27 (40%),9,770,328.65. Harco's unliquidated and contingentallowed subrogation claim evidenced by its filed proof ofclaim tied to the payment of the surety bonds it granted to the Texas Department of Agriculture ("**TDA**") is estimated to total $2,402,704.00 (15%),, and GrainChain's unsecured claim in the amount of $7,841,054.99 (45%),.

A specific provision of the Plan of ReorganizationsReorganization shall be that upon the entry of the confirmation order the claims asserted by the estate contesting the nature, extent and validity of the liens of GrainChain against certain assets of the estate and its related entities as well as any other claims or causes of action the estate may be entitled to assert against GrainChain shall be fully compromised and settled in exchange for the commitment by GrainChain to provide post-confirmation financing to the Reorganized DebtorNew Co. and its agreement to release and declare null and void its liens asserted against the Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract. The Progreso Facility, the Edcouch

Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract are collectively referred to herein as the Contested Lien Tracts ("Contested Lien Tracts")..

In consideration of GrainChain's agreement to release its asserted liens against the Contested Lien Tracts, and in consideration of the estate's agreement to release any claims or causes of action it may hold against GrainChain, the provisions of the Plan of Reorganization shall provide that GrainChain, the General Unsecured Creditors, and Harco are each granted a lien against the Contested Lien Tracts in the amounts of their respective percentages – i.e.–, GrainChain a 45% lien to secure the payment of its claim of $7,841,054.99, the holders of General Unsecured Claims a 4045% lien to secure the payment of its estimated claims of $7,038,659.27, and Harco a 1510% lien to secure the payment of its contingent unliquidated claim in the amount $2,402,704.00.

**I.J.    Class 910 –Administrative Convenience Class (Impaired)**

**Class 910** consists of the Administrative Convenience Class. These claimants will be given two options: either (1) to receive 40% of their claims on the effective date or (2) to participate in the sharing of net profits of operation of GrainChain and Elkins according to the scheme outlined above and repeated in this section.

The Administrative Convenience Class consists of the following claims:

| Name of Unsecured Creditor | Amount of Claim (POC or Scheduled Amount) | Potential Preference Received |
|---|---|---|
| American Express National Bank (POC #12) | $4,617.90 | (No preference claims) |
| Amex Trs. Co. Inc. (POC #30) | $8,524.35 | (No preference claims) |
| Cargill Incorporated (POC #45) | $49,351.2044,422.90 | (No preference claims) |
| Citi Business Card | $2,036.05 | (No preference claims) |
| Hans Hovda | $42.89 | (No preference claims) |

| | | |
|---|---|---|
| Jonathan Ruiz | $14,589.06 | (No preference claims) |
| United Agricultural Coop | $7,967.04 | (No preference claims) |
| University of Missouri | $5,341.28 | (No preference claims) |
| USDA AMS | $131.25 | (No preference claims) |
| Vi-Cal Grain Co. | $2,428.40 | 1/13/2023 (7524)  $115,000.00<br>1/9/2023 (7504)   $49,956.20<br>1/9/2023 (7505)   $190,000.00<br>**TOTAL Vi-Cal Pref: $354,956.20** |
| **TOTAL Administrative Convenience Claims** | ~~$62,493.45~~Total Amount $90,101.12 | **Total Adm. Convenience Class Preferences: $354,956.20** |

Inserted Cells

**Treatment of Administration Convenience Claims**

  The Debtor offers to pay 40 cents on the dollar for each of the claimants making up the Administrative Convenience Claims disregarding any of its preference claims against any. This way, the amount paid for Administrative Convenience Claims will amount to ~~$24,997.38~~36,040.44 [which is calculated as $~~62,493.45~~90,101.12 (x0.40)]

  In sum, the Administrative Convenience Claims will be resolved by payment of a total sum of $~~24,997.38~~36,040.44 to the claimants making up this class in exchange of release of all claims and obligations arising under this Bankruptcy Proceeding or they participate in the Plan treatment for General Unsecured Creditors.

  ~~Of the~~The total amount of General Unsecured Claims of $~~6,848,061.63, a~~9,770,328.65 does not take into account the total amount of **$112,125.00** of "priority" portions of Farmers' claims, which ~~are considered "Priority."~~ treated under **Class 2**. This amount is made up of the claims of the Farmers claiming $7,475.00 Priority under 11 U.S.C. § 507(a)(6). Those Farmers are as follows: Brian Jones Farms, Carl Hensz, Chad Szutz, Dreibelbis Farms, Eat Fresh Farms, Fike Farms, HAR-VEST, Johnny Guin, Karen Arnold, Lothringer Family Farms, Robert Walsdorf, Russell Plantation II, Skalitsky Farms, Wesley Valerius, and Zdansky, J.V. These priority claims are treated ~~in the Administrative Claims (Class 1) category~~under **Class 2**, and priority grain claims will be paid in full on the Effective Date.

Allowed general unsecured claims in an amount less than $10,000, including the Priority Claims of shall be paid in full by the Plan Agent on the Effective Date of the Plan.

**J.K.    Class 1011 – General Trade Claims (Impaired)**

**Class 1011** consists of General Unsecured Trade Claims of the following claimants:

| Name of Unsecured Creditor | Amount of Claim (POC or Scheduled Amount) | Potential Preference Received | |
|---|---|---|---|
| Graneros Guadalupe SA de CV (POC #27) | $506,334.56 | (No preference claims) | |
| Helena Agri-Enterprises, LLC (POC #16) | $518,134.08 | (No preference claims)12/23/2022 (7430) | $9,621.26 |
| | | 12/23/2022 (7431) | $53,950.25 |
| | | 12/29/2022 (7432) | $53,950.25 |
| | | **TOTAL Helena Pref = $117,521.76** | |
| Planters Grain Cooperative of Odem, TX (POC #34) | $255,696.00 | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | 1/24/2023 | $50,661.31 |
| | | **TOTAL Preference of Planters = $253,306.55** | |
| Simplot AB Retail (POC #23) | $217,537.13 | (No preference claims) | |
| United Sorghum Checkoff Program (USCP) (POC #20) | $301,795.30 | (No preference claims)11/21/2022 (7257) | $69,533.37 |
| | | 11/29/2023 (7258) | $69,533.37 |
| | | **TOTAL USCP Pref. = $139,066.74** | |
| Valley Coop Mill (VALCO) (POC #21) | $115,201.99 | (No preference claims) | |
| BH Genetics | $228,960.00 | (No preference claims) | |
| BWAB Mexico S De RL CV AV | $303,353.30 | (No preference claims) | |
| Manuel Ramíro Sànchez | $495,000.00 | (No preference claims) | |

| Prosedora De Alimentos | $1,000,000.00 | (No preference claims) | |
|---|---|---|---|
| Texas G&S Investment | $54,844.52 | 12/7/2022 (7386) | $31,880.97 |
| | | 12/23/2022 (7439) | $26,525.19 |
| | | **TOTAL Texas G&S Pref: $58,406.16** | |
| **TOTAL General Trade Claims** | ~~POCs~~ ~~$1,914,699.06~~ ~~Amount~~ **$3,741,160.88** | **Total ~~Class 11~~ Preferences** ~~$253,306.55~~ **314,994.66** | |

**H. Class 11—Unsecured Claims of Harco and GrainChain, Inc. (Impaired)**

~~Class 11~~ To sum up, the Total Unsecured Claims (**Classes 8 through 11**) consisting of **Class 8** (Unsecured Bean Claims in the estimated total amount of **$2,240,600.24** with an estimated total Preference Amount of $1,073,007.02); **Class 9** (Unsecured Farmers' and Grain Claims in the estimated total amount of **$3,698,466.41** with an estimated total Preference Amount of $4,526,018.95); **Class 10** (Administrative Convenience Class in the estimated total amount of **$90,101.12** with an estimated total Preference amount of $354,956.20); and **Class 11** (General Trade Claims in the estimated amount of **$3,741,160.88** with an estimated total Preference Amount of $314,994.66) together add up to **$9,770,328.65** with an estimated Total Preference Amount of **$6,268,976.83**.

When we add Secured Creditors and TDA Surety Bonds, here's a concise summary of all potential preferences.

| | **Claim Amount** | **Preference Amount** |
|---|---|---|
| **TOTAL Vantage and StoneX** | POCs **$28,250,121.88** | Preferences **$6,162,339.44** |
| **TOTAL Farmers (Class 9)** | $3,509,951.12 (POC) + $188,515.29 (no POC) = **$3,698,466.41** | Preferences $3,896,715.69 (POC) + $629,303.26 (No POC) = **$4,526,018.95** |
| **TOTAL Beans (Class 8)** | $1,623,028.00 (POC) + $617,572.24 (No POC) = **$2,240,600.24** | Preferences $917,189.27 (POC) + $155,817.75 (No POC) **$1,073,007.02** |
| **TOTAL Other/General Trade Claims (Class 11)** | $1,659,003.06 (POC) + $2,082,157.82 (No POC) = **$3,741,160.88** | Preferences $256,588.50 (POC) + $58,406.16 (No POC) = **$314,994.66** |
| **TOTAL Administrative Convenience Class (Class 10)** | $57,565.15 (POC) + $32,535.97 (No POC) = **$90,101.12** | $0 (POC) + $354,956.20 (No POC) = **$354,956.20** |

| | | |
|---|---|---|
| **TOTAL GrainChain** | POC $7,841,054.99 | Preference $1,515,612.47 |
| **TOTAL TDA Surety Bond Claims** | POCs $2,402,704.00 | Preference D/K |
| **TOTAL** | $48,264,209.52 | $13,946,928.74 |

### (IV)    UNSECURED CLAIMS OF HARCO AND GRAINCHAIN, INC.
### (Class 12)

**L.    Class 12 – Unsecured Claims of Harco and GrainChain, Inc. (Impaired)**

     **Class 12** is a category of ~~unsecured claims~~ Unsecured Claims that is separate from Classes ~~7,~~ 8, 9, 10 and ~~9~~11. **Class** ~~10~~12 consists of the Unsecured Claims of **Harco National Insurance Company** ("Harco") ~~who~~which has filed a ~~claim~~Proof of Claim in the amount of **$2,402,704.00** (POC #44 filed 6/20/2023) for ~~surety bonds~~the full amounts due on the TDA Surety Bonds, general indemnity agreement, and of **GrainChain, Inc**. ~~("GrainChain") who~~ 7 which has filed a ~~claim~~Proof of Claim in the amount of **$7,841,054.99** (POC #42 filed 6/19/2023~~) for factoring Agreements, indebtedness owed, and~~). The Plan Allows Harco Claim in full upon Harco's vote to accept the Plan treatment.

     Harco's obligation on these Bonds is limited to the face amount of the Bonds to pay for lost grain handled by or in storage from time to time related to the respective elevators. It has been disclosed that the Debtor's operations caused grain stored in various Bonded elevators to be transferred between Bonded elevators and as a result co-mingled with grain in all other Bonded elevators, and in most all instances, finally transferred and comingled at the Progreso Elevator for sale to Mexico, most always the best market for grain sales.8  This Plan treats all Harco Bonds and all Debtor's Harco Bonded Elevators as effectively combined; that is the aggregate amount of the Bonds are treated as applicable to the aggregation of the Elevators Bonded. Any claim by a Creditor as to any elevator will be deemed to apply to all Elevators and all Bonds.

     TDA Surety Bond claims may only be made pursuant to the Texas Statutes applicable to the delivery of grain to a Bonded Elevator for hire;  provided, however, any claims to a right to payment on any Harco Bond and not made pursuant to this Plan provisions allowing Creditors to assign their claims, without warranty of any kind, to StoneX, shall constitute and be deemed an opt-in of the

---

7     GrainChain asserts a claim in the amount of **$7,841,054.99** (POC #42 filed 6/19/2023) for factoring financing of Grain purchase agreements, indebtedness owed, and claims against the Debtor, including but not limited to, conversion, breach of contract, misrepresentation, and/or breach of fiduciary duty.

8     Likewise, none of the Harco Bonds restricted transfer to elevators covered by other of the Harco Bonds and the Harco Bonds in total cover less than 15% of what has been discovered as missing or lost grain which likely exceeds $20 million.

Unsecured Class of Creditors entitled to all distributions provided herein, but not Distributions from the Harco Bonds. Any creditor electing to opt-out of Distributions from the Unsecured Class of Creditors must look to the Harco Bonds for payment as an exclusive remedy against the Debtor, or Harco.

Additionally, TDA may take the position that simple delivery of grain for sale to a Bonded Facility without requesting any "for hire" services entitles the delivering party (generally a farmer) to a claim on the Harco Bond (which unsecured claims are estimated in this case to exceed $25 million). Any Harco Bond claim resulting from an opt-out vote of any Creditor shall be administered as the TDA requires or allows.

Finally, a strict reading of the Texas bonding statutes may limit claims on the Harco Bonds to only those Creditors that delivered grain to an elevator "for hire" of some service – storage, handling, sale, etc. and subsequently suffered a lost. In fact, if that is the proper statutory reading, only holders of the outstanding approximately $24 million Warehouse Receipts issued by the Debtor (with less than $7 million in actual grain inventory) will be entitled to TDA Surety Bond Claims. If litigated in a state court proceeding or a state court receivership, resolution of this dispute will be delayed a number of years, not including but not limited to, conversion, breach of contract, misrepresentation, and/or breach of fiduciary duty appeals.

**The Treatment of Unsecured Claims of Harco:**

To resolve these issues as among the TDA, Harco, and the various claimants and avoid multi-years litigation, the Debtor proposes the following solution to resolve all unsecured claims (which includes the Unsecured Claims section described above, plus the unsecured portions of Harco's and GrainChain's claims):

- Since GrainChain and Elkins Grain Company ("Elkins") are leasing the Edcouch (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538) and Progreso Facility (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas), as set forth in the Operating Agreement between the parties, and

1.     Harco's filed Proof of Claim (**POC #44**) shall be allowed in full.

2.     GrainChain, Harco and General Unsecured Claims (subject to the 3-year subordination of Harco Claims Dividends) each will receive under the Plan (from Net Operating Profits and Plan Trust or GrainChain real property sales) under the Plan Distributions according to the following percentages mutually agreed between all parties Parties described herein: GrainChain 45% of the net proceeds from sale proceeds of encumbered real estate and net profits; Unsecured Claims 4045% of the net proceeds from the sale of encumbered real estate and 55% of the net profits for three (3) years and 4045% beginning on the fourth (4th) year; Harco 15% ten percent (10%) of net proceeds of all sold Plan Trust real estate, and ten percent (10%) of the proceeds of the sale of encumbered real estate, and 15% of the net profits staring in the fourth year.

Under the Plan, the Debtor will give these parties according to their respective percentages as part of settlement against those(4th) and continuing through the fifth (5th) year and final New Co. disposition of Harco's interest in New Co.'s encumbered assets. But for the first three years, Harco will be subordinated until such time as their claim is fully liquidated and the amount is established by the claims reconciliation process or by the agreement of the parties.

**Treatment:**

**Class 11** Claims will be treated as follows:

a. Upon confirmation of the Plan of Reorganization GrainChain shall exclusively control the sale and management of all assets of the Reorganized Debtor not otherwise conveyed into the Plan Trust.

b. Upon completion of the payments to the General Unsecured Creditors GrainChain will own 100% of the equity of the Reorganized Debtor.

c. The Debtor and its insiders and their affiliates cannot be involved in any grain transactions outside of the operations of the Reorganized Debtor until the unsecured creditors are paid in full, and such non-competition agreements must be signed at confirmation binding all the requisite parties to not compete with Reorganized Debtor.

d. All property of the Reorganized Debtor not otherwise liquidated by the provisions of the Plan of Reorganization shall be free and clear of all liens, claims, interests and encumbrances, including the asserted claims of GrainChain, save and except for those liens specifically identified and contemplated under the terms and provisions of the plan of reorganization.

e. The tax basis of all assets of the Reorganized Debtor will be determined by the professionals of the estate so as to minimize any tax consequences of the sale of estate assets or assets of its related entities so the maximum amount possible can be paid to GrainChain and the holders of General Unsecured Creditors as contemplated under its terms and provisions.

f. Any sale of an asset of the Reorganized Debtor will consider appropriate capital gains taxes that the Reorganized Debtor must pay and all allocation and splitting of the sale proceeds with respect to net sale proceeds shall only be distributed after applicable capital gains taxes and costs of sale are paid in full.

g. The division and distribution of profits of the Reorganized Debtor shall be in accord with the provisions established for the split of profits in the Operation Agreement approved by the Bankruptcy Court whereby GrainChain, Harco National Insurance Company ("Harco"), and the General Unsecured Creditors each receive their respective share of the profits from the operations of the Debtor in relation to the amount their claims constitute a percentage of the total amount of the General Unsecured Class. In this regard, the total amount of unsecured claims is estimated to total $17,284,000 while the claims of the General Unsecured Creditors

are estimated to total $7,038,659.27 (40%), Harco's unliquidated and contingent subrogation claim tied to the payment of the surety bonds it granted to the Texas Department of Agriculture ("TDA") is estimated to total $2,402,704.00 (15%), and GrainChain's unsecured claim in the amount of $7,841,054.99 (45%).

h. A specific provision of the Plan of Reorganization shall be that upon the entry of the confirmation order the claims asserted by the estate contesting the nature, extent and validity of the liens of GrainChain against certain assets of the estate and its related entities as well as any other claims or causes of action the estate may be entitled to assert against GrainChain shall be fully compromised and settled in exchange for the commitment by GrainChain to provide post-confirmation financing to the Reorganized Debtor and its agreement to release and declare null and void its liens asserted against the Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract. The Progreso Facility, the Edcouch Facility, the Moore Farms tract, the Emory Farms tract, and the Baryta Industrial tract are collectively referred to herein as the Contested Lien Tracts ("Contested Lien Tracts").

i. In consideration of GrainChain's agreement to release its asserted liens against the Contested Lien Tracts, and in consideration of the estate's agreement to release any claims or causes of action it may hold against GrainChain, the provisions of the Plan of Reorganization shall provide that GrainChain, the General Unsecured Creditors, and Harco are each granted a lien against the Contested Lien Tracts in the amounts of their respective percentages — i.e. GrainChain a 45% lien to secure the payment of its claim of $7,841,054.99, the holders of General Unsecured Claims a 40% lien to secure the payment of its estimated claims of $7,038,659.27, and Harco a 15% lien to secure the payment of its contingent unliquidated claim in the amount $2,402,704.00.

j. General Unsecured Creditors shall receive a minimum profit distribution of $250,000 annually or their percentage of the net profits, whichever is greater, and such net profits are to be paid over to the Plan Trust. Upon the distribution of the net profits to the Plan Agent the lien securing their claim shall be reduced by a dollar-for-dollar credit, and its percentage share of the net profits shall be reduced proportionately. The Plan Agent shall pay over the net proceeds to the holders of the General Unsecured Claim at least once annually.

k. Since Harco's claim is contingent and unliquidated Harco shall not participate in a share of the net profits of the Reorganized Debtor for the first three (3) operating years of the Plan (meaning 2023, 2024, and 2025). Thereafter, it shall be entitled to have its share of the net profits paid over to the Plan Trust, that is, the amount its allowed claim bears to the remaining claims of the Unsecured Creditors and the 45% claim of GrainChain, and the Plan Agent shall annually distribute the funds to Harco.

l. GrainChain will expeditiously market and seek to sell the Emory Farms tract and the Baryta Industrial tract ("Debtor Non-Operational Assets"), and the net sales proceeds from the sale of the Debtor Non-Operational Assets are to be paid over to the Plan Trust — 40% to be held for payments to holders of General Unsecured Claims and 15% for the benefit of Harco. It

being understood that the Plan Agent shall distribute these proceeds to the holders of General Unsecured Claims at least once annually and that the 3-year moratorium on the distribution of net profits to Harco from operations shall not apply to its percentage of the distribution of the net sales proceeds from the sale of the Debtor Non-Operational Assets. It being understood that the distributions of the percentage of net sales proceeds shall not affect the respective percentages to which the General Unsecured Creditors and Harco are entitled to share in any future sales of the Debtor Non-Operational Assets or any sales of the other assets of the Reorganized Debtor.

m.   The insurance funds paid to the Debtor for the repair of the Progreso and Edcouch Facilities shall be used by the CRO to fully repair and put in good order the two grain elevator facilities so they are fully operational. These grain elevator facilities shall continue to be leased to Elkins Grain Company and their operations financed by GrainChain in accord with the provisions of the Operating Agreement approved by the Bankruptcy Court. In this regard, Elkins Grain Company in cooperation with GrainChain agree to use their best good faith efforts to operate the facilities using the best management and storage practices recognized to be prudent and efficient in the grain industry so that they can endeavor to produce the maximum profits possible from their operations.

    3.    As to Plan Trust Asset and Properties (excluding the New Co. encumbered assets), if as and when sold at any time after the Effective Date, Harco shall receive its ten percent (10%) pro-rata portion through and including any property sales after the end of the fifth year as provided in the Plan.

**Alternative Treatment:**

    Harco has filed its proof of claim and is entitled to vote to accept or reject this Plan, and otherwise may object to this Plan treatment. In the event that Harco votes to reject the Plan, the Debtor invokes 11 U.S.C. § 1129 to confirm the Plan over dissenting votes. However, in the event Harco objects to the Plan treatment, the following Plan Terms Apply:

    a.   Harco must file a written objection to the Plan timely in accordance with the objection deadlines set by Bankruptcy Court Order;

    b.   Upon the filing of a Harco Objection, the Debtor shall be deemed to a have, without further pleading, filed a Motion to invoke the Adversary Rules of Procedure to the Objection, to all responses or intervention pleadings, to the discovery provided below, and to the testimony and evidence her or admitted, as well as any ruling and any appeal from any such ruling.

    c.   Filing of the Objection must also include any response of Harco or reply to the Plan

provisions that invoke the Adversary rules to any such Harco Objection;9   and

d.   Debtor and Creditors or Parties in Interest desiring to reply must timely file responses to the Harco Objection in accordance with the objection deadlines set by Bankruptcy Court Order;

e.   The Debtor and Harco shall be entitled to limited discovery prior to the confirmation hearing consisting of one deposition each of a corporate representative including a reasonable request for production of documents; and

f.   At the Confirmation hearing, as scheduled by the Bankruptcy Court, the Bankruptcy Court shall hear evidence and arguments of counsel and determine the Harco Objection.

## ARTICLE ~~IV~~VII
## TREATMENT OF CLAIMS OWNED BY THE ESTATE

The Debtor has initiated one ~~adversary proceeding~~Adversary Proceeding based upon fraudulent conveyance and preference actions against a former owner of the Debtor, and two Adversary Proceedings to collect outstanding accounts receivable from purchasers of grain.

Except as settled prior to or as a part of the Plan, all ~~preference claims~~Preference Claims pursuant to Section 547 of the Bankruptcy Code, all ~~fraudulent transfer claims~~Fraudulent Transfer Claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to ~~post-petition transactions~~Post-Petition Transactions under Section 549 of the Bankruptcy Code, all claims

---

9      The single distinction between the merits of a core proceeding and an adversary proceeding is the scope of the application of Part VII of the rules.  Invoking the adversary rules in a contested matter, in lieu of filing an adversary proceeding in specific circumstances, frequently occurs to facilitate the litigation procedure of the parties and resolve any issue of how to proceed.  *See, e.g., In re Zohouri Group South Padre, L.P.*, WL 1856095 at *2 (Bankr S.D. Tx. 2009); *In re ElderCare*, 568 F.3d 506, 61(5th Cir. 2009) [the Debtor's request that the Court invoke the adversary rules for this Motion as authorized by Federal Rules of Bankruptcy Procedure 8011 and 9014 was granted in declaratory judgment cause of action involving objection to proof of claim, declaratory relief, and the related motion to assume executory contract].  Rule 9014(c) provides in part:

"Except as otherwise provided in this rule, ***and unless the court directs otherwise***, the following rules shall apply: 7009, 7017, 7021, 7025, 7026, 7028-7037, 7041, 7042, 7052, 7054-7056, 7064, 7069, and 7071. . . . ***The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply.***"

*See, e.g.,* ***In re Adam Aircraft Industries, Inc.,*** 2009 WL 2100929 (Bkrtcy. D.Colo., 2009) at *7 [although Rule 7023 does not appear in the adversary rules that "shall apply to contested matters" under Rule 9014, "[t]he court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." FED. R. BANKR.P. 9014(c).]  There are a number of reported cases where various Part VII rules have been made applicable to contested matters. See, e.g., *In re Kerlo*, 311 B.R. 256 (Bkrtcy. C.D.Cal., 2004) [FRBP 9014(c) also provides that other adversary rules may be applied to contested matters upon notice and order from the court. Therefore, a court order applying FRBP 7070 is a necessary step in obtaining relief under FRBP 7070 in a contested matter]; *In re MacDonald*. 326 B.R. 6 (Bkrtcy. D.Mass., 2005); *Reid v. White Motor Corp.*, 886 F.2d 1462, 1470-72, (6th Cir. 1989) (claimant should move for permission to have Bankruptcy Rule 7023 made applicable to assert class proof of claim); *Matter of Rimsat, Ltd.*, 223 B.R. 345, 346 (Bankr. N.D. Ind. 1998) (court applies Rule 12(e) to proof of claim proceeding).

recoverable under Section 550 of the Bankruptcy Code, all claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, are hereby preserved and will vest in the Plan Trust for enforcement in accordance with the discretion of the Plan Agent subsequent to the Effective Date of this Plan for a period of two (2) years following the Confirmation Order.

This includes any claims or causes of action that the Debtor may have derivatively or otherwise that are discovered as a result of the forensic accounting investigation being conducted by D. Williams & Co. and Dundon AdvisorsAdvisers or otherwise revealed during the course of the administration of the bankruptcy caseBankruptcy Case.

Additionally, any claims or causes of action belonging to or acquired by the Debtor over the course of the administration of the bankruptcy caseBankruptcy Case tied to or related in any way to the surety bondsTDA Surety Bonds issued to indemnify depositors of grains from the proceeds of surety bondsTDA Surety Bonds issued by Harco National Insurance Co. in order for the TDA to issue public grain warehouse licenses at the locations of the various grain facilities owned or operated by the Debtor.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties are specifically reserved to the Plan Trust with authority to manage and prosecute, as the case may be, by the Plan Agent, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

## ARTICLE VVIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

All executory contracts and unexpired leases not assumed prior to or through the Plan shall be assumed if not previously rejected by formal order of the Bankruptcy Court.

## ARTICLE ~~VII~~IX
## THE PLAN TRUST

The Plan Trust.~~.~~ The Plan Trust, duly organized under the laws of the State of Texas, is created for the purpose of carrying out the implementation of the Plan and administration of ~~claims~~Claims as provided herein and making the Payments or Distributions to (i) certain holders of Allowed Unsecured Clams and (ii) settling parties who are entitled to the payment of consideration pursuant to a compromise and settlement of claims described in the Plan. The recipients of such ~~distribution~~Distribution will be deemed Plan Trust Beneficiaries, who will be treated as grantors and deemed owners for federal income tax purposes, are the holders of Plan Trust Interest. The Plan Trust shall file federal income tax returns for the Plan Trust as a grantor trust pursuant to Section 671 of the Internal Revenue Code of 1986, as amended, and the Treasury Tax Regulations promulgated thereunder. The parties shall not take any position on their respective tax returns with respect to any other matter related to taxes that is inconsistent with treating the Plan Trust as a "Plan Trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance from the Internal Revenue Service.

Funding of Res of Trust~~.~~. For all federal and applicable state and local income tax purposes, all Persons (including without limitation the ~~Debtors~~Debtor, the Plan Agent and the Plan Trust Beneficiaries) will treat the transfers and assignment of the Plan Trust Assets to the Plan Trust for the benefit of the Plan Trust Beneficiaries as (a) a transfer of the Plan Trust Assets directly to the Plan Trust Beneficiaries followed by (b) the transfer of the Plan Trust Assets by the Plan Trust Beneficiaries to the Plan Trust. The Plan Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Plan Trust Beneficiaries will be treated as the grantors and deemed owners of their allocable portion of the Plan Trust Assets for federal income tax purposes.

The fair market value of the portion of the Plan Trust Assets that is treated for U.S. federal income tax purposes as having been transferred to each Plan Trust Beneficiary will be determined by the Plan Agent, and all parties (including, without limitation, the Plan Agent and the Plan Agent Beneficiaries) must utilize such fair market values determined by the Plan Agent for federal and applicable state and local income tax purposes.

The Plan Trust's taxable income, gain, loss, deduction or credit will be allocated to the Plan Trust Beneficiaries in accordance with their relative beneficial interests in the Plan Trust during the applicable taxable period. Such allocation will be binding on all parties for federal and applicable state and local income tax purposes, and the parties will be responsible for the payment of any federal, state and local income tax due on the income and gain so allocated to them.

Plan Agent.—— Upon confirmation of the ~~plan~~Plan of ~~reorganization~~Reorganization, the CRO shall become the Plan Agent (the "**Plan Agent**~~")~~;") and shall administer the Plan Trust in accordance with the terms and provisions of the trust agreement as described and set forth in the Plan. The Plan Agent shall administer the Plan Trust consistent with the terms of this Plan, Confirmation Order,

general trust law (except as superseded by this Plan) and the Plan Trust Agreement, and shall have all of the rights, obligations, powers and duties as set forth in the Plan, Plan Trust Agreement and Confirmation Order.

Plan Beneficiaries.    The Plan Trust beneficiaries (the "**Plan Beneficiaries**") are the holders of Allowed Secured Claims, Allowed Unsecured Claims, Priority Claims and Administrative Claims as set forth and described in the Plan.

Plan Distributions.    The Plan Agent shall make Distributions to the Plan Beneficiaries annually with the first Distribution to be made on the Effective Date and on the same date every year until the termination of the Plan Trust provided there are available funds to distribute.

Retention of Professionals.—— The Plan Agent shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Agent, are necessary to assist the Plan Agent in performance of his duties. -The Plan Agent shall be permitted to use a portion of the Plan Trust Expense Reserve to retain attorneys, accountants or other professionals that may be necessary to ~~evaluate and/or effectuate the liquidation of the Liquidating Assets.~~ perform his duties. However, after initial payments are made for retention of such professionals, any further fees of such professionals shall be paid by the Plan Trust only ~~after recovery and liquidation of the Liquidating Assets has begun, and such fees shall only be paid~~ to the extent that such fees and expenses are related to ~~Liquidating Assets that have actually been liquidated.~~ the administration of the Plan or the pursuit of causes of action owned by the Plan Trust. Subject to any further agreement with the Professionals, the Plan Trust shall bear its own expenses. -Professionals of the Debtor shall be eligible for retention by the Plan Agent, and former employees of the Debtor shall be eligible for retention by the Plan Trust and Plan Agent.

Compensation of the Plan Agent——. For services rendered by the Plan Agent in administering the Plan Trust, the Plan Agent shall receive reasonable compensation as the Plan Agent may agree to with the Plan Trust Board if one is formed.

Plan Trust Expenses.– Subject to the provisions of the Plan Trust Agreement, all costs, expenses and obligations incurred by the Plan Agent in administering this Plan, the Plan Trust, or in any manner connected, incidental or related thereto, in effecting distributions from the Plan Trust thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Plan Trust Assets remaining from time to time in the hands of the Plan Agent. Such expenses shall be paid as they are incurred without the need for Bankruptcy Court approval.

Liability, Indemnification of Plan Agent. -The Plan Agent shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Agent, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud. -The Plan Agent may, in connection with the performance of his or her functions, and in his or her sole absolute discretions, consult with attorneys, accountant and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.  Notwithstanding such authority, the Plan Agent shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so

should not result in imposition of liability on the Plan Agent unless such determination is based on willful misconduct, gross negligence or fraud. The Plan Trust shall indemnify and hold harmless the Plan Agent and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of this Plan; *provided, however*, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

Termination. The duties, responsibilities and powers of the Plan Agent shall terminate after all Plan Trust Assets, including Causes of Action transferred and assigned to the Plan Trust, are fully resolved, abandoned or liquidated and the Cash and other amounts held in Reserve Accounts have been distributed in accordance with this Plan and the Plan Trust Agreement. Except in circumstances set forth below, the Plan Trust shall terminate no later than five (5) years after the Effective Date. However, if warranted by the facts and circumstance provided for in this Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Plan Trust, the terms of the Plan Trust may be extended one or more times (not to exceed a total of five extensions, unless the Plan Agent received a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the state of the Plan Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed six months, based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court with notice thereof to all of the unpaid beneficiaries of the Plan Trust. Upon the occurrence of the termination of the Plan Trust, the Plan Agent shall file with the Bankruptcy Court a report thereof, seeking an order discharging the Plan Agent.

Plan Trust Board. —Not later than five (5) days before the Confirmation Hearing, at least three (3) of the members of the Unsecured Creditors Committee may be designated by the Committee to serve on the Plan Trust Board. The members selected to serve must, by that deadline, file with the Bankruptcy Court a notice of the same, signed by the members or its counsel (and multiple notices for multiple members may be combined into one such notice). So long as at least three (3) members file such notices, the Plan Trust Board shall be created by this Plan. If at least three (3) members do not timely file such notice(s), no Plan Trust Board shall be created and all provisions of this Plan and any provisions in the Plan Trust Agreement applicable to the Plan Trust Board shall be null and void. In the event of the death or resignation of a member of the Plan Trust Board, the remaining members of the Plan Trust Board shall have the authority to, and shall promptly, appoint a successor member to the Plan Trust Board, unless the remaining members number at least three (3), in which case the remaining members may, instead, determine to not appoint a successor member. The Plan Trust Board shall dissolve if, at any point in time, and after a reasonable period to locate and obtain a replacement member has expired, there are fewer than three (3) Plan Trust Board Members.

Function, Duties and Responsibilities. The Plan Trust Board and the Plan Agent may agree to such role for the Plan Trust Board as they find appropriate, so long as such role does not conflict with any provision of this Plan.

Compensation and Expenses. –The members of the Plan Trust Board shall be entitled to reimbursement of reasonable expenses by the Plan Trust, provided, that, any such reimbursement of reasonable expenses shall not include fees or compensation of an individual member's attorneys or other professionals. Such reimbursement shall be paid from the Plan Trust without further order of the Bankruptcy Court. Members of the Plan Trust Board shall not be entitled to any other compensation from the Plan Trust.

Liability, Indemnification of Plan Trust Board. –Neither the Plan Trust Board, nor any of its members, or designees, nor any duly designated agent or representative or the Plan Trust Board, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Trust Board, nor shall any member of the Plan Trust Board be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Trust Board, other than acts or omissions resulting from such member's willful misconduct, gross negligence or fraud. The Plan Trust Board may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with attorneys, accountants, and its agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Plan Trust Board shall be under no obligation to consult with attorneys, accountants or its agents, and its determination to not do so should not result in imposition of liability on the Plan Trust Board, or its members and/or designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Plan Trust shall indemnify and hold harmless the Plan Trust Board and its members, designees, and Professionals, and any duly assigned agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of this Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

Privilege. –All communication between the Plan Agent and the Plan Trust Board shall be confidential and privileged by the attorney-client and the joint-interest privilege, unless a majority of the Plan Trust Board waives the same for any given issue or actual litigation ensues between the Plan Agent and the Plan Trust Board.

Standing of the Plan Trust. –The Plan Trust shall be deemed an independent entity and shall have standing to sue and be sued in its own name in any court and to otherwise appear before any administrative body, tribunal or other proceeding.

**ARTICLE ~~VII~~X**
**LIQUIDATION AS AN ALTERNATIVE TO PLAN CONFIRMATION**

The alternative to a Chapter 11 Plan of Reorganization would be a Chapter 7 liquidation, whereby the assets of the bankruptcy estate would be liquidated and proceeds distributed to the

Creditors. All of the Debtor's assets are encumbered by the liens of secured creditors and upon liquidation in a Chapter 7 it is uncertain as to whether the proceeds would extinguish the amount of the secured claims. It is estimated by the Debtor that the liquidation value of the Debtor's assets is such that there would in a best-~case scenario there would be only sufficient funds to pay ~~400.~~**034%** of the claims of General Unsecured Creditors after the payment of all outstanding liens, encumbrances, and administrative claims.

However, the Debtor asserts that the proposed Plan will provide more certainty for a full pay-out to the Creditors than the Chapter 7 liquidation alternative. Under the Plan, the impaired classes of Creditors will receive a larger percentage of their claims as the Debtor continues to operate its business; whereas, a Chapter 7 liquidation would yield uncertain distributions to the General Unsecured Creditors.  The Plan provides for an immediate **40% dividend** to be paid to all ~~creditors~~Creditors in the Administrative Convenience Class and a **100% dividend** to the remaining Unsecured Creditors over a 5-year period. Thus, the Plan yields a more certain payout to Creditors than the Chapter 7 liquidation alternative.

The risk to Creditors is minimal as the Debtor has sufficient amounts of cash flow to make the above-mentioned payments from the Debtor's continued operations as well as the anticipated sale of certain real property.

**ARTICLE ~~VIII~~XI**
**TAX EFFECTS OF PLAN**

An analysis of the federal income tax consequences of the Plan to Creditors, Interest Holders, and the Debtor requires a review of the Internal Revenue Code of 1986 (the "**IRC**"), final and temporary Treasury Regulations promulgated thereunder, judicial decisions and administrative determinations of the Internal Revenue Service (the "**IRS**") in effect as of the date of this Disclosure Statement. Changes in these authorities, which may have retroactive effect or new interpretations of existing authorities, may cause the federal income tax consequences of the Plan to differ materially from the consequences described below. No rulings have been requested from the IRS and no legal opinions have been requested from counsel with respect to any tax consequences of the Plan.

No tax opinion is given by this Disclosure Statement. No representation or assurance is being made with respect to the federal income tax consequences as described herein. The foregoing discussion is not intended as tax advice to the Debtor' Creditors and Interest Holders regarding the federal income tax consequences to them under the Plan. Each Holder of a Claim or Equity Interest affected by the Plan must consult and rely upon such holder's own tax advisor regarding the specific tax consequences of the Plan with respect to such holder's claim or equity interest.

**ARTICLE ~~IX~~XII**
**FEASIBILITY AND ACCOUNTING PROCESSES USED AND THE**
**IDENTITY OF THE PERSONS WHO FURNISHED THE INFORMATION**

**A.**     **FEASIBILITY**

The Debtor believes that the Plan as proposed is feasible based on the financial projections

for the next five years as reflected in the ~~cash flow statements to be attached hereto prior to approval of the Disclosure Statement and the solicitations of votes for confirmation of the Plan. The cash flow projections reflect~~Cashflow Analysis attached to Debtor's First Amended Disclosure Statement as Exhibit "**C**" prior to approval of the Disclosure Statement and the solicitation of votes for confirmation of the Plan. Exhibit "**C**" to the Disclosure Statement (Cashflow Analysis) is a five-year (2023-2028) forecast prepared by Elkins Grain, LLC showing a projection of total revenues and expenses, net revenues and expenses, and net income for New Co. based on all information currently available to the Debtor as well as reasonable assumptions made under the circumstances. Based on the Debtor's 2023 circumstances, the Cashflow Analysis identifies five major sources of revenue for New Co. for the next five-year period, which are the sales of cottonseed, pinto beans, black beans, yellow corn, and sunflower. Each comes with its associated costs in addition to the indirect expenses and administrative expenses to be incurred in order to enable New Co.'s operations. The Cashflow Analysis projects a steady level of Total Net Revenues for each year ($60,245,086) for the next five-year period, which is significantly higher than—in fact, more than double—the 2023 figure ($27,234,148). Likewise, the Cashflow Analysis shows a steady level of Total Commodity Gross Profit for each year ($7,311,718) for the next five-year period, which is also significantly higher than—and in fact more than double—the 2023 figure ($3,212,890). The Cashflow Analysis shows increased costs and expenses; however, the five-year projections show sufficient Net Income Before Taxes, which is projected to be more than double the 2023 figures and which the Debtor believes is sufficient to justify this Plan.

In sum, the Cashflow Analysis projects that the Plan Agent will be able to make the payments contemplated under the provisions of the Plan. Therefore, based upon these financial projections, the Debtor asserts that the Plan is feasible and is not likely to be followed by liquidation or the need for further financial reorganization. These financial projections illustrate that New Co., as the successor of the Debtor, will have available the necessary cash to fund the Plan of Reorganization after ~~confirmation~~Confirmation; have the ability to generate future cash flows sufficient to make the payments called for under the Plan and necessary to continue in business; and other than vagaries of its operations and markets and general economic conditions there are no factors which might make it impossible for New Co., as successor of the Debtor, to accomplish that which it promises under the terms of the Plan or allow it to continue in business as contemplated under the Plan.

**B.    ACCOUNTING PROCESSES USED AND IDENTITY OF PERSONS FURNISHING INFORMATION**

All information in ~~the Original~~this First Amended Plan of Reorganization and ~~this Accompanying~~its accompanying First Amended Disclosure Statement that is being filed simultaneously has been submitted by the Debtor, unless otherwise indicated. The Debtor's accounting system is on a cash basis and all financial information provided herein is, therefore, based on a cash basis accounting system as opposed to an accrual basis accounting system.

**ARTICLE ~~X~~XIII**
**EFFECTS OF CONFIRMATION OF PLAN, INJUNCTION AND EXCULPATION**

Notice of the Effective Date. On or before ten (10) Business Days after occurrence of the

Effective Date, the Plan Agent shall mail or cause to be mailed to all holders of Claims and Equity Interests a notice that informs such holders of the following: (a) entry of the Confirmation Order; (b) occurrence of the Effective Date; (c) the Administrative Claim Bar Date; (d) Professional Claim Bar Date; and (e) such other matters that the Plan Agent deems appropriate.

Binding Effect of Plan. Upon the Effective Date, the Plan and each of its provisions shall be binding on the Committee, the Chapter 11 Trustee, the Debtor, the Plan Trust, the Plan Agent, all Creditors, all Equity Interest holders, and all Persons acquiring property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or Equity Interest held by any of them is Impaired under the Plan, whether or not any Claim or Equity Interest held by any of them is Allowed in full, only in part, or Disallowed in full, and whether or not a Distribution is made to any of them under the Plan.

Vesting of Assets. Upon the Effective Date, all of the Assets shall vest in the Plan Trust.

Discharge. Except as otherwise provided in this Plan or in the Confirmation Order, the Confirmation of the Plan will not discharge the Debtor of any debts.

Injunction Against Interference with Plan. Upon the Effective Date, all holders of Claims, all holders of Equity Interests, and all other parties in interest in the Bankruptcy Cases, along with their respective current and former officers, directors, principals, employees and agents, shall be and are hereby enjoined from taking any action to interfere with the implementation or consummation of the Plan, save and except for any duties and responsibilities of the members and managers of Garcia Grain, along with the requisite authority, to prepare and file the final tax returns for the Debtor.

Exculpation. NEITHER THE COMMITTEE, THE INDIVIDUAL MEMBERS OF THE COMMITTEE, AND PROFESSIONAL PERSONS EMPLOYED BY THE COMMITTEE (COLLECTIVELY, THE "EXCULPATED PARTIES"), SHALL HAVE OR INCUR ANY LIABILITY TO ANY PERSON FOR ANY ACT TAKEN OR OMISSION IN CONNECTION WITH OR RELATED TO FORMULATING, NEGOTIATING, IMPLEMENTING, CONFIRMING OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT OR THE TRUST AGREEMENT, EXCEPT FOR WILLFUL MISCONDUCT AND GROSS NEGLIGENCE. THE EXCULPATED PERSONS SHALL HAVE NO LIABILITY, EXCEPT FOR WILLFUL MISCONDUCT AND GROSS NEGLIGENCE, TO THE DEBTOR, ANY CREDITOR, ANY EQUITY INTEREST HOLDER, AND ANY OTHER PARTY IN INTEREST IN THE BANKRUPTCY CASES, OR ANY OTHER PERSON FOR ACTIONS TAKEN OR NOT TAKEN UNDER THE PLAN, IN CONNECTION HEREWITH OR WITH RESPECT THERETO, OR ARISING OUT OF THEIR ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN INCLUDING, WITHOUT LIMITATION, FAILURE TO OBTAIN CONFIRMATION OR TO SATISFY ANY CONDITION OR CONDITIONS, OR REFUSAL TO WAIVE ANY CONDITION OR CONDITIONS, TO THE OCCURRENCE OF THE EFFECTIVE DATE, AND IN ALL RESPECTS SUCH EXCULPATED PERSONS SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.

## ARTICLE XIV

## MODIFICATIONS OF THE PLAN

Amendments Prior to Confirmation Date.  The Debtor reserve the right to amend or modify the Plan prior to Confirmation pursuant to Section 1127(a) of the Bankruptcy Code, and the Plan, as amended shall become the new Plan.

Amendments After Confirmation Date.  The Debtor may amend or modify the Plan before its substantial consummation, provided that the Plan, as amended or modified, meets the requirements of the Bankruptcy Code and the Bankruptcy Court, after notice and hearing, confirms this Plan, as modified.

Effect on Claims. A holder of a Claim that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, this Plan, as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## ARTICLE XV
## GENERAL PROVISIONS

Certain Rights Unaffected. Except as otherwise provided herein, any rights or obligations which the Creditors may have among themselves as to their respective Claims or the relative priority or subordination thereof are unaffected by this Plan.

Incorporation of Valuation Motion. To the extent necessary to effectuate and implement the provisions of this Plan, the Plan shall be deemed to constitute a motion for valuation under the Bankruptcy Code, including the value of any lien, security interest, or encumbrance treated by this Plan; *provided, however,* that nothing in this Plan shall alter any valuation ordered by Final Order of the Bankruptcy Court in the Bankruptcy Cases.

Automatic Stay. The automatic stay provided in Section 362 of the Bankruptcy Code, shall remain in effect through the Effective Date, unless otherwise specifically modified, annulled, or terminated by the Bankruptcy Court pursuant to a separate order, and shall terminate on the Effective Date.

Reservation of Rights. The Plan shall have no force or effect unless and until the Effective Date occurs. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Committee with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

Dissolution of Committee. The Committee shall continue in existence through the Effective Date to exercise those powers and perform those duties specified in Section 1103 of the Bankruptcy Code. Unless otherwise ordered by the Bankruptcy Court, on the Effective Date, (a) the Committee shall be dissolved and their members shall be released of all their duties, responsibilities and obligations in connection with the Bankruptcy Case, this Plan and the implementation of the same

and (b) the retention or employment of the Committee's Professionals and other agents shall terminate.

Rights Under 1129(b). **The Debtor and Committee hereby gives notice of their intent to seek confirmation under the cramdown provisions of Section 1129(b) of the Bankruptcy Code, if necessary**.

Headings. The article and section headings used in this Plan are inserted for convenience and reference only and neither constitute a part of this Plan nor in any manner affect the terms, provisions or interpretations of this Plan.

Severability. If any term or provision in this Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of this Plan.

Governing Law. Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan and any documents, agreements and instruments executed in connection with this Plan (except to the extent such documents, agreements and instruments designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.

Successors and Assigns. The rights and obligations of any entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

Insurance. Notwithstanding anything to the contrary in this Plan, neither the Confirmation Order nor Confirmation and consummation of this Plan shall have any effect on the insurance policies of any of the Debtor or their current or former directors, officers or managers (including, but not limited to, director and officer liability policies to the extent that the Debtor or their current or former directors, officers and managers have any rights under such policies) in which any of the Debtor or their current or former directors, officer or managers are or were an insured party or any claim asserted thereunder. Each insurance company is prohibited from denying, refusing, altering or delaying coverage for any Debtor (or their current or former directors, officers or managers) on any basis regarding or related to any of the Bankruptcy Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for insured claims.

Compliance with Regulations of the Office of the U.S. Trustee. During the pendency of these Proceedings, the Debtor will comply with all regulations promulgated by the Office of the U.S. Trustee, including remaining current on all quarterly fees assessed against the Estates by the U.S. Trustee. Upon confirmation of the Plan, and until a final decree is entered in the Bankruptcy Cases, the Plan Agent shall file the required quarterly reports and pay the fees due under the provision of 28 U.S.C. section 1930(a)(6) on behalf of Garcia Grain Trading Corp.

## ARTICLE XVI

## **RETENTION OF JURISDICTION**

**Implementation of Plan.**- Until this Proceeding is closed, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including that necessary to insure that the purpose and intent of the Plan are carried out and to hear and determine all issues at Confirmation of the Plan as well as invoking the adversary rules of procedures in any contested matters in the sole discretion of the Court, and thereafter to determine any Claims and Interests set forth in Article III VI or elsewhere herein that could have been brought before the entry of the Confirmation Order.

**Causes of Action.** -The Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors Debtor, and to enforce all causes of action that may exist on behalf of the Debtors Debtor. Nothing contained herein shall prevent the Reorganized Debtors New Co. Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which may exist on behalf of the Debtors Debtor and which may not have been enforced or prosecuted, unless satisfied herein.

**Claims Determinations.**- After the Effective Date, the Bankruptcy Court shall further retain jurisdiction for the purpose of classification of Claims that have been allowed for purposes of voting, and the determination of such objections as may be filed to Claims and Interests.

**Property Determinations.** -The Bankruptcy Court shall further retain jurisdiction through and after the Effective Date for the purpose of determining all questions and disputes regarding ownership and/or title to the assets of the Estate, or the proceeds thereof, and determination of all causes of action, controversies, disputes concerning the Debtors Debtor and any other party, including, but not limited to any claim or entitlement associated with the Equity Interests of the Debtors Debtor or any right of the Debtors Debtor to recover assets pursuant to the provisions of the Bankruptcy Code and to adjudicate all Claims or controversies arising out of any purchase, sale or contract made or undertaken by the Debtors or the Debtors corporation Debtor with respect to this Proceeding, the terms or actual implementation or enforcement of the  Plan.

**Other Post-Confirmation Matters.** -The Bankruptcy Court shall further retain jurisdiction for the following purposes through and after the Cash Distribution Date:

    (a)    To modify the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code;

    (b)    To assure the performance by the Reorganized Debtors of its obligations under the New Co., GrainChain, or any obligation undertaken by any term or any party to this Plan;

    (c)    To enter such orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Reorganized Debtors New Co. and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as

the Bankruptcy Court may deem necessary;

(d)   To enter an order concluding and terminating this Proceeding;

(e)   To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan or to declare the effect or performance of or under any Plan term;

(f)   To decide issues and Claims concerning all tax liabilities which arise in connection with or related to the DebtorsDebtor, this Proceeding or the Plan, including, without limitation, to hear and determine matters concerning state, local and federal taxes pursuant to Sections 346, 505, 506, 507, 523, and 1146 of the Bankruptcy Code;

(g)   To hear and determine any action or proceeding brought by the Reorganized DebtorsNew Co. pursuant Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code;

(h)   To resolve any disputes arising from distributions made pursuant to the Plan, and adjudicate all controversies concerning classification or allowance of any Claim or Interest;

(i)   To hear and determine all Claims arising from the rejection of Executory Contracts and Unexpired Leases and to consummate the rejection and termination thereof, and further, to hear and determine all matters relating to the assumption of Executory Contracts and Unexpired Leases;

(j)   To liquidate damages or estimate Claims in connection with disputed, contingent or unliquidated Claims;

(k)   To hear and determine all actions brought by or against the Reorganized DebtorsNew Co. arising in or related to this Proceeding or arising under the Bankruptcy Code in its performance under the Plan;

(l)   To hear and determine all requests for compensation and/or reimbursement of expense that may be made after the Confirmation Date.

The Debtor requests all creditors vote in favor of confirmation of the Plan. In order to pursue a cram-down confirmation under the provisions of 11 U.S.C. § 1129(b) the Debtor invokes the Federal Rules of Bankruptcy Procedure governing adversary proceedings.

Dated: November 8, 2023

Respectfully submitted,

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806)765-7491
Facsimile: (806) 765-0553

By   /s/ David R. Langston
David R. Langston:  SBN 11923800
Southern District Bar No. 9489
**_Attorneys for Debtor, Garcia Grain Trading Corporation_**