IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **GARCIA GRAIN TRADING** | § | **Case No. 23-70028-EVR-11** |
| **CORP.,** | § | |
| | § | |
| Debtor. | § | |

**DEBTOR'S MODIFIED AND SUPPLEMENTED THIRD AMENDED CHAPTER 11
PLAN OF REORGANIZATION**

**TABLE OF CONTENTS**

**ARTICLE I**
SUMMARY OF THE PLAN ......................................................................................................3

**ARTICLE II**
DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ...............4
     A. FUNCTION AND PURPOSE OF THE PLAN.......................................................4
     B. DEFINITIONS OF TERMS USED IN THE PLAN AND DISCLOSURE
        STATEMENT ....................................................................................................4

**ARTICLE III**
DESIGNATION OF CLASSES OF CLAIMS ............................................................................17

**ARTICLE IV**
PAYMENT OF ADMINISTRATIVE CLAIMS PRIORITY UNSECURED CLAIMS .............17

**ARTICLE V**
SUMMARY OF TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS .....18
     A. TREATMENT OF CLAIMS OF SECURED CREDITORS..................................18
     B. TREATMENT OF OTHER CLAIMS ..................................................................24
     C. MEANS FOR IMPLEMENTATION OF THE PLAN .........................................27

**ARTICLE VI**
TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN .....................................35

**ARTICLE VII**
TREATMENT OF CLAIMS OWNED BY THE ESTATE ........................................................84

**ARTICLE VIII**
EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................................................85

**ARTICLE IX**
THE PLAN TRUST....................................................................................................86

**ARTICLE X**
LIQUIDATION AS AN ALTERNATIVE TO PLAN CONFIRMATION .................................89

**ARTICLE XI**
TAX EFFECTS OF PLAN ..........................................................................................90

**ARTICLE XII**
FEASIBILITY AND ACCOUNTING PROCESSES USED AND THE
IDENTITY OF THE PERSONS WHO FURNISHED THE INFORMATION...........................90

    A. FEASIBILITY  ................................................................................90
    B. ACCOUNTING PROCESSES USED AND IDENTITY OF PERSONS
        FURNISHING INFORMATION .........................................................91

**ARTICLE XIII**
EFFECTS OF CONFIRMATION OF PLAN, INJUNCTION AND EXCULPATION ...............91

**ARTICLE XIV**
MODIFICATIONS OF PLAN .......................................................................................92
**ARTICLE XV**
GENERAL PROVISIONS ............................................................................................93

**ARTICLE XVI**
RETENTION OF JURISDICTION ................................................................................94

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **GARCIA GRAIN TRADING** | § | **Case No. 23-70028-EVR-11** |
| **CORP.,** | § | |
| | § | |
| **Debtor.** | § | |

## DEBTOR'S MODIFIED AND SUPPLEMENTED THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION

TO THE HONORABLE EDUARDO V. RODRIGUEZ, Chief U.S. Bankruptcy Judge, and All Creditors and Parties in Interest:

NOW COMES, Garcia Grain Trading Corporation ("**Garcia Grain**" or "**Debtor**"), the Debtor-in-Possession in the above-referenced bankruptcy proceeding, and files this its Modified and Supplemented Third Amended Plan ("**Plan**"). A Modified and Supplemented Third Amended Disclosure Statement ("**Disclosure Statement**") is simultaneously being filed which must be approved (including any approved amendments, supplements or attachments) by the Bankruptcy Court before any solicitation of the Plan may proceed. Accordingly, the filing or service of a copy of this Modified and Supplemented Third Amended Plan is not a solicitation of acceptance of this Plan until accompanied by the Approved Disclosure Statement.

This Plan sets forth the manner and means by which the Debtor proposes to treat and pay its creditors and facilitate the Debtor's post-confirmation winddown. The Approved Disclosure Statement contains adequate information intended to allow the Debtor, interested parties including the Official Committee of Unsecured Creditors, to solicit the acceptance of the Plan by persons who are entitled to vote on acceptance or rejection of the confirmation of the Plan.

## ARTICLE I
## SUMMARY OF THE PLAN

**Overview of the Plan.** THIS OVERVIEW DOES NOT REPLACE A THOROUGH READING OF THE DISCLOSURE STATEMENT AND A READING OF THIS PLAN.

The Plan provides for the resolution and treatment of outstanding Claims and Equity Interests and payments to creditors. The Plan provides for the Debtor to cancel all pre-petition issued stock and to issue new stock on the Effective Date to be transferred to the Plan Trust created herein, and to eventually to dissolve its organizational structure following confirmation – with the result being all of its assets being transferred to the **Plan Trust** and certain assets transferred to a new entity ("**New Co.**") for the primary purpose of operating the New Co. transferred assets for the benefit of the three certain Plan-issued non-recourse note-holding creditors (collectively, the "Notes" or separately a "Note"). The Plan does not provide for the continued operations of the

Debtor as an ongoing Texas corporation. Instead, the Plan contemplates certain operations by New Co. that are anticipated to generate Distributable Net Income that will be used by New Co. to make certain Note payments to the Plan Trust Agent (the "**Plan Agent**") to be distributed to the holders of unsecured claims and potentially Harco over 5-years from the Effective Date of the Plan. The Plan Agent and New Co. will also work to realize the highest obtainable price for the assets contributed to the Plan Trust on the Effective Date and to be sold in accordance with this Plan and when sold, the net proceeds to be distributed by the Plan Trust to those certain Creditors who are the Beneficiaries of the Plan Trust. Likewise, a process exists as contained herein as to the New Co. transferred assets in the event that the Unsecureds Note and the anticipated Harco Note are not paid in full during the five (5) year non-recourse note terms. The parties are in the process of preparing certain transactional documents between the respective parties which will be filed as a Plan supplement and all such transactional documents will be attached to the Confirmation Order. It is anticipated that these transactional documents will facilitate the treatment set forth in this Plan.

> **Payments to Creditors**. The Plan provides for Creditors to be paid as provided in Article V herein. All Creditors of the Debtor will be paid as provided in accordance with the priority scheme established by the Bankruptcy Code. PLEASE CONSULT ARTICLE V FOR SEPARATE INFORMATION REGARDING THE SPECIFIC TREATMENT OF YOUR CLAIM. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE II
## DEFINITIONS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.   FUNCTION AND PURPOSE OF THE PLAN OF REORGANIZATION

The Chapter 11 Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtor's assets. According to Section 1125 of the Bankruptcy Code, acceptances of a Chapter 11 Plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder. This Plan and accompanying Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

The Debtor believes the Plan and the Disclosure Statement contain adequate information – that is, information of a kind and in sufficient detail, as far as is reasonably practical in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims or interests of the relevant class to make an informed judgment about the Plan.

### B.   DEFINITIONS OF TERMS USED IN THE PLAN AND DISCLOSURE STATEMENT

Scope of Definitions. Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings. Any term used in this Plan that is not defined below but

that is defined in Title 11 of the United States Code, as amended, shall have the meaning assigned to such term therein.  Any term defined in this Plan not included in this section shall have the meaning provided in the Plan and Plan usage.

If any definition of any term used in this Plan and Disclosure Statement is not referenced in the following Definitions section, then the Bankruptcy Code shall be controlling as to the meaning of the word. However, if the term is not defined in the Bankruptcy Code, then the plain meaning of the word is intended to be used.

**General.** Unless the context otherwise requires, the following terms used in the Plan shall have the following meanings. Any term used in this Plan that is not defined below but that is defined in Title 11 of the United States Code, as, shall have the meaning assigned to such term therein.

**2.1   Administrative Claim** shall mean any Claim in respect of costs or expenses of administration for the Proceeding that is allowed under Sections 503 and 507(a) of the Bankruptcy Code.

**2.2   Affiliates** shall mean all persons or entities affiliated with the Debtor pursuant to Section 101(2) of the Bankruptcy Code.

**2.3   Allowed or Allowed Amount** shall mean the amount of any Allowed Claim.

**2.4   Allowed** shall mean, when used with respect to a Claim or Equity Interest, means the Claim or Equity Interest (as applicable) (a) to the extent that it is listed in the Schedules in a liquidated, non-contingent, and undisputed amount, but only if no proof of Claim or proof of Equity Interest is Filed with the Bankruptcy Court to evidence such Claim or Equity Interest on or before the Bar Date; (b)  as evidenced by a proof of Claim or proof of Equity Interest Filed on or before the Bar Date, but only to the extent asserted in a liquidated amount, and only if no objection to the allowance of the Claim or Equity Interest or no motion to expunge the proof of Claim or Equity Interest is Filed on or before the anticipated post-confirmation claims objection deadline; or (c) to the extent allowed by a Final Order.

**2.5   Allowed Claim** shall mean a Claim against the Debtor that (i) is allowed by an Order which is not stayed on appeal, (ii) is scheduled as liquidated, undisputed and non-contingent by the Debtor in its schedules filed with the Bankruptcy Court as they may be or supplemented (collectively the "Schedules"), (iii) is timely filed with the Clerk of the Bankruptcy Court and no objection has been made to the allowance thereof, (iv) any reconciled contested claim that has been negotiated to an agreed amount or established by Court Order, or (v) is provided to be allowed by the terms of this Plan.

**2.6   Allowed Administrative Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority pursuant to Sections 503 and 507(a)(1) of the Bankruptcy Code.

**2.7   Allowed Priority Claim** shall mean an Allowed Claim which a Claimant asserts is an Administrative Claim and is determined to be entitled to priority under Section 507 of the Bankruptcy Code.

**2.8   Allowed Secured Claim** shall mean an Allowed Claim for which a Claimant asserts and is determined by an Order not stayed on appeal to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance on property in which the Debtor have an interest to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtor's interest in the property.

**2.9   Allowed Unsecured Claim** shall mean an Allowed Claim for which the Claimant has not asserted or is determined by an Order not stayed on appeal not to hold a valid, perfected and enforceable lien, security interest or other interest in or encumbrance against property of the Debtor or right to setoff to secure the payment of such Claim.

**2.10 Austin Settlement Conference** shall mean the settlement conference that took place on July 15-16, 2023, among certain key parties and interests over two-days in Austin including the Debtor, the Secured Creditors (StoneX, Vantage and Falcon), the Contested Secured Creditor (GrainChain), the Unsecured Creditors Committee, and Octavio Garcia, individually.

**2.11 Avoidance Action** shall mean those causes of action such as preferences, fraudulent transfers and other such avoidance claims arising under section 506, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws.

**2.12 Ballot** shall mean the ballot to be delivered with the Disclosure Statement to holders of Claims and Interests on which such holder will be able to vote to accept or reject the Plan. The Ballot may be different for holders of the various Claims and Interests.

**2.13 Bankruptcy Case** shall mean the Debtor's Bankruptcy Case, commenced by the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code on February 17, 2023, and currently pending under Case No. 23-70028-EVR-11 in the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division.

**2.14 Bankruptcy Code** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*. and all amendments thereto.

**2.15 Bankruptcy Court** shall mean the United States Bankruptcy Court for the Southern District of Texas, McAllen Division.

**2.16 Bankruptcy Clerk** shall mean the Clerk of the Bankruptcy Court located at U.S. Bankruptcy Court, 1701 W. Business Hwy. 83, McAllen, Texas 78501.

**2.17 Bankruptcy Rules** shall mean the Federal Rules of Bankruptcy Procedure and all relevant local rules of the Bankruptcy Court.

**2.18 Bar Date** shall mean December 12, 2023, being the deadline ordered by the Bankruptcy Court for Claimants to file Proofs of Claim in the Bankruptcy Case.

**2.19 Baryta Industrial Tract** ("Baryta") shall mean a 22-acre tract of real property contiguous to the Progreso Facility, and legally described as Lion Lake Division Lot Nos. 28 and 29, Hidalgo County, Texas.

**2.20 Chief Reorganization Officer** shall mean Richard S. Schmidt (retired U.S. Bankruptcy Judge), who was authorized, pursuant to the Court's Agreed Order entered on August 15, 2023 [dkt #429], to serve as the Chief Restructuring Officer ("**CRO**") in the Debtor's Chapter 11 Bankruptcy Case.

**2.21 Claim** shall mean (i) a right to payment from the Debtor, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy has produced a judgment, or is fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**2.22 Claimant** shall mean the holder of a Claim.

**2.23 Class** shall mean a category designated in the Plan of holders or owners of Claims or Interests that are substantially similar pursuant to section 1122 of the Bankruptcy Code.

**2.24    Committee** shall mean the Official Committee of Unsecured Creditors of the Debtor.

**2.25    Confirmation Date** shall be the date that the Bankruptcy Court enters its written Order confirming the Plan.

**2.26    Confirmation Hearing** shall mean the hearing that will be held before the Bankruptcy Court in which the Debtor will seek Confirmation of the Plan pursuant to Section 1128 of the Bankruptcy Code.

**2.27    Confirmation Order** shall mean the Order of the Bankruptcy Court confirming the Plan.

**2.28    Contested Claims** shall mean Claims to which objections are timely filed or which are scheduled as disputed, contingent or unliquidated in the Schedules of the Debtor.

**2.29    Contested Secured Creditor** shall mean GrainChain with respect to pre-Petition liens taken against Moore Farms, Emory Farms, the Pitts Property, the Edcouch Facility and the Progreso Facility.

**2.30    Creditor** shall have the meaning set forth in Section 101(10) of the Bankruptcy Code.

**2.31    Debtor or Debtor-in-Possession** shall mean Garcia Grain Trading Corp.

**2.32**    Distributable Net Income or DNI. As currently envisioned by the income and cash flow projections, DNI is calculated as the sum of After-Tax Net Income (determined on an income tax basis without recourse to accelerated depreciation) and tax-deductible amortization. Depreciation is NOT added back in when determining DNI, because it represents a way to both build working capital and fund any additional capital expenditures.

**2.33**    **Non-Debtor Entity Owned Property** includes without limitation: Moore Farms, Garcia Balli, Ltd., PSG Products, LLC, Emory Farm, Rincon Ranch, SPI Condominium, Moore Farm South, Huffman, Toluca Ranch, Donna (Val Verde) Facility, Miscellaneous Rental Properties, and the Baryta Industrial Tract.

**2.34**    **Debtor Owned Property** includes without limitation: the Progreso Facility, the Santa Rosa Facility, the Edcouch Facility, Willacy Farm and the Pitts Property.

**2.35**    **DIP Accounts** shall mean the Debtor-in-Possession bank accounts maintained by the Debtor at Wells Fargo Bank as of the Effective Date.

**2.36**    **Disclosure Statement** shall mean the Disclosure Statement prepared and submitted by the Debtor with respect to the Plan, including all Exhibits attached thereto, and prepared pursuant to the Bankruptcy Court's Orders and Section 1125 of the Bankruptcy Code and, if applicable, Bankruptcy Rule 3018(b) for the Solicitation of Ballots, and all supplements and amendments thereto.

**2.37**    **Disputed** shall mean the portion (including, when appropriate, the whole) of a Claim or Equity Interest that is not an Allowed Claim or Allowed Equity Interest as to which: (a) a proof of Claim or proof of Equity Interest has been File, or deemed Filed under applicable law or Order of the Bankruptcy Court; (b) an objection has been or may be timely Filed; and (c) such objection has not been (i) withdrawn, (ii) overruled or denied in whole or in part pursuant to a Final Order, or (iii) granted in whole or part pursuant to a Final Order. Before the time that an objection has been or may be Filed, a Claim or Equity Interest shall be considered a Disputed Claim or Equity Interest (a) if the amount or classification of the Claim or Equity Interest specified in the proof of Claim or proof of Equity Interest exceeds the amount or classification of any corresponding Claim or Equity Interest is scheduled by a Debtor in its Schedules, to the extent of such excess; (b) in its entirety, if any corresponding Claim or Equity Interest is scheduled by a Debtor in its Schedules as disputed, contingent, or unliquidated; or (c) in its entirety, if no corresponding Claim or Equity Interest has been scheduled by a Debtor in its Schedules.

**2.38**    **Distribution(s)** shall mean funds paid out to Secured Creditors, holders of Administrative Claims, Priority Claims, Unsecured Claims, or others under the provisions of the Plan by the Plan Agent while administering the Plan Trust.

**2.39**    **Distribution Date(s)** shall mean the date(s) when the Debtor pay out the funds from the sale of unencumbered, non-exempt assets of the Estate and property transfers of certain real and personal property to the Plan Trust and New Co. as detailed herein. The Debtor anticipates that the first Distribution Date will be on the Effective Date of the Plan.

**2.40** **Donna Facility** shall mean the office, warehouse and grain elevator facility owned by Val Verde Grain Holdings, a Texas General Partnership and affiliate of the Debtor located at the municipal address of 101 North Val Verde Rd. Donna, Texas

**2.41** **Edcouch Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538.

**2.42** **Effective Date** shall mean the earlier of June 30, 2024, or the date that is the thirtieth (30th) day following the date when the Confirmation Order becomes final, if the Confirmation Order has not been stayed on appeal, or if such a stay has issued, immediately after such stay is dissolved by Final Order.

**2.43** **Elkins** shall mean Elkins Grain, LLC, a Texas limited liability company, which has its registered office address at 910 Rio Grande Dr. Mission, Texas 78572

**2.44** **Emory Farms** shall mean the 56-acres tract located at Santiago Galvan Rd. in Progreso, Texas (Lion Lake Division) titled in PSG Products.

**2.45** **Equity Interest** shall mean any equity interest, any claim of ownership of an equity interest, or any right to acquire any equity interest in Debtor.

**2.46** **Estate** shall mean the estate of Debtor created by section 541 of the Bankruptcy Code upon commencement of the case under Chapter 11 of the Bankruptcy Code.

**2.47** **Executory Contract or Unexpired Lease** shall mean an executory contract or unexpired lease within the meaning of Section 365 of the Bankruptcy Code, in effect between or among the Debtor and any other Person or Persons as of the Petition Date.

**2.48** **Face Amount** shall mean (a) when used in reference to a Disputed or Disallowed Claim, the full stated amount claimed by the holder of such Claim in any proof of claim timely Filed or otherwise deemed timely Filed by a Final Order or other applicable bankruptcy law, and (b) when used in reference to an Allowed Claim, the Allowed Amount of such Claim.

**2.49** **Filed** shall mean filed with the Clerk of the Bankruptcy Court.

**2.50** **Final Order** shall mean an order of the Bankruptcy Court or any appellate court thereof that has not been reversed, modified, or stayed, and the time for appeal or to seek review or certiorari or rehearing thereof has expired and as to which no appeal, review or rehearing is pending, and has become conclusive of all matters adjudicated thereby and is in full force and effect.

**2.51** **Garcia Grain** shall mean Garcia Grain Trading Corporation, the Debtor or Debtor in Possession in Case No. 23-70028-EVR-11, pending in the United States Bankruptcy Court for the Southern District of Texas, McAllen Division.

**2.52** **Garcia-Balli Properties** shall mean for purposes of the Plan only those certain tracts of real property and all improvements known as the South Padre Island Condominium, Toluca Ranch, Moore Farm South, and Huffman.

**2.53** **GrainChain** shall mean GrainChain, Inc., a Delaware Corporation as a Secured and Unsecured Creditor and a participant in this Plan, and thus included in the definition of terms "Secured Creditor" that holds a "Secured Claim(s)"; and "Unsecured Creditor" that holds an "Unsecured Claim(s)".

**2.54** **Harco** shall mean the Harco National Insurance Co.

**2.55** **Impaired** shall mean a class of claims or interests that falls within the definition set forth in section 1124 of the Bankruptcy Code.

**2.56** **Insider** shall mean the various persons and entities defined under section 101(31) of the Bankruptcy Code.

**2.57** **IRS** shall mean the Internal Revenue Service of the United States of America Department of the Treasury.

**2.58** **Moore Farms** shall refer to the 1,460 acres of farmland located at Military Road, Hidalgo County, Texas, owned by PSG Products, LLC and currently pledged to Falcon International Bank under a first lien.

**2.59** **New Co.** shall mean that certain New Co. corporation or other form of entity to be created by GrainChain on or before the Effective Date into which those certain specified assets as described in the Plan shall be transferred and conveyed by the assets' record owner(s) free and clear of all liens, claims, interests and encumbrances, save and except for the three non-recourse notes to be signed by New Co. secured by those certain specified assets and certain continuing rights of first refusal in favor of GrainChain. New Co. will be structured in a form that is acceptable to GrainChain with the equity of New Co. being owned by GrainChain and/or its authorized assigns. New Co. intends to hire Elkins to continue operations of the New Co. conveyed assets with the payments of the Distributable Net Income of New Co. as note payments on the three non-recourse notes, as set forth in this Plan and in one or more transactional documents detailing and memorializing in greater detail the applicable terms and conditions involving the operations, profit distribution, proposed transactions, together with an acceptable form of Confirmation Order. New Co. will be subject to a variety of covenants as outlined in the operating agreements, intercreditor agreement, non-recourse notes, deeds of trust, and any other transactional documents included as part of this Plan by way of supplement.

**2.60** **New Co. Property** shall mean those certain real and personal properties that will be conveyed by its respective record owner(s)  to  New Co. on the Effective Date including the Progresso Facility, the Edcouch Facility, and the Baryta Industrial Tract by three or more, properly executed special warranty deeds and bills of sale subject only to any asserted liens in favor of Falcon International Bank, if any, but free and clear of any and all other liens, claims, interests and encumbrances, including without limitation the pre-petition liens asserted by GrainChain. For the

avoidance of doubt, any liens asserted by any lien holder including without limitation the Contested Secured Creditor with respect to the New Co. Property shall be release under the Plan, but only the lien of Falcon shall not be affected provided that Falcon has not been already paid on its claims.  It is anticipated that ultimately Falcon will release its liens upon being paid through the sale(s) of other real property and upon that occurrence the only liens on the New Co. property will be the liens securing the three notes in favor of GrainChain, the Unsecured Creditors, and Harco. To the extent GrainChain holds, or later acquires, any other lien on, or claim to, any other property of the Debtor or Insiders to the Debtor, specifically excluding the New Co. Property(ies), GrainChain shall transfer such property to the Plan Trust as provided herein, but only during the five-year Note terms or until the Unsecureds Note is paid in full, whichever occurs first.

**2.61     Objection Date** shall mean the date established by the Bankruptcy Court for filing objections to confirmation of the Plan.

**2.62     Opt-in** shall mean the right of Unsecured Creditors who qualify or believe they qualify as a "depositor" under the Tex. Agric. Code section 14.001(1) to participate in the proposed settlement under which proceeds from the TDA Surety Bond payments will be paid to the Plan Trust and potential liability for avoidance actions such as preferences against them will be waived and released.

**2.63     Opt-out** shall mean the right of Unsecured Creditors who qualify or believe they qualify as a "depositor" under the Tex. Agric. Code section 14.001(1) to choose to not participate in the proposed settlement and instead seek their pro rata share of the TDA Surety Bond proceeds; however, these Creditors will not be released and will potentially face liability for bona fide avoidance actions for preferences.

**2.64     PACA** shall mean the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-499t, *et seq.*

**2.65     PACA Reserve Account** shall mean the escrow account in which amounts related to PACA claim(s) were held.

**2.66     Person** shall mean an individual, corporation, partnership, limited liability company, association, joint-stock company, joint venture, estate, trust, unincorporated organization, governmental unit or any political subdivision thereof.

**2.67     Petition Date** shall mean the date on which Debtor filed its Petition for relief under Chapter 11 of the Bankruptcy Code, which was February 17, 2023.

**2.68     Pitts Property** shall mean a tract of land owned by Debtor located at the Southeast corner of FM 493 and Vertrees Road a/k/a Mile 3 ½ Road North, Donna, Texas, containing approximately 260.10 acres, situated in Donna, Hidalgo County, Texas and also being all of Lots 1 and 4, Block 45, and a part or portion of Lots 2 and 3, Block 45, and all of Lots 1 and 4, Block 50, and a part or portion of Lots 2 and 3, Block 50, LA DONNA PLAT SUBDIVISION, Hidalgo County, Texas.

**2.69**   **Plan** shall mean this Debtor's Third Amended Plan of Reorganization as it may be modified and/or supplemented from time to time pursuant to the Bankruptcy Code.

**2.70**   **Plan Agent and/or Plan Trustee** shall mean the Richard S. Schmidt, retired U.S. Bankruptcy Judge. (Also see "**Chief Restructuring Officer**" defined above).

**2.71**   **Plan Trust Assets** shall mean Moore Farms and Emory Farms, which will be conveyed to the Plan Trust by each property's record owner, funds in the Wells Fargo DIP Accounts, claims against Surety Bonds, FCCI insurance claims, including but not limited to funds in the Segregated Insurance Proceeds Account,  and proceeds from the sale of Willacy Farm and McCook Farm, together with all other potential recoveries by the Plan Trust of the Debtor's, Debtor's Insiders or Affiliates, and Insiders of Affiliates.  Further, if such sales occur before the Effective Date, sale proceeds not less than $3.5 million from Octavio Garcia causing the sale of certain Non-Debtor Entity Owned Property (not already conveyed to the Plan Trust) as defined in section 2.32, *supra*, or if not sold by the Effective Date, Non-Debtor Entity Owned Property conveyed to the Plan Trust by each property's respective record owner.

**2.72**   **Plan Trust** shall mean the Grantor Trust created under the terms of the Plan following the Effective Date into which certain specified assets of the Debtor's estate and certain other assets or claims owned by the Debtor shall be transferred and conveyed by the record owner of such property and conveyed to the Plan Trust by multiple, properly executed special warranty deeds and bills of sale, together with certain Non-Debtor Entity Owned Property as may be identified prior to Confirmation.

**2.73**   **Plan Trust Committee**, which shall be governed by bylaws included in the Plan by way of supplement, the formation of which is to improve prompt decision making, handle voting to the extent that the Plan or Plan Trust provides for voting on any matter, and to otherwise implement good and effective Plan performance, and oversee operations of New Co. and the Plan Trust.  The Plan Trust Committee shall consist of a GrainChain representative, the Plan Agent, and one unsecured creditor representative (to be named at Plan confirmation by the Unsecured Creditors' Committee) and that shall be entitled to resolve:

> i. all matters not specifically resolved by a Plan term, Confirmation Order, and/or the transaction documents; and
> ii. all unaddressed matters involving the sale of Plan Trust Property; and
> iii. all unaddressed matters involving the valuation of any Plan Trust Property or New Co. Property; and
> iv. all unaddressed matters involving the manner and method of sale of the Plan Trust Property(ies) and New Co. Property(ies), including the selection of brokers, agents, appraisers, etc.; and
> v. all determinations of any Plan default by any party having an obligation to perform.

**2.74**   **Plascencia Adversary** shall mean the adversary proceeding initiated by the Debtor against Rodolfo Plascencia, Sr. and WNGU Properties, LLC styled: *Garcia Grain Trading Corporation v. Rodolfo Plascencia, Sr. and WNGU Properties, LLC,* Adv. Proceeding No. 23-07002, on May 26, 2023, pending before the Bankruptcy Court.

**2.75    Post-Petition Interest** shall mean the non-default interest which shall accrue on the unpaid principal balances of the Allowed Secured Claims from the Petition Date to the Effective Date calculated at the annual percentage rate established in the written agreements between the Debtor and the holders of the Allowed Secured Claims.

**2.76    Preference** shall mean any transfer of an interest of the Debtor assets that is avoidable under section 547 of the Bankruptcy Code and that is not waived, released, or discharged by the terms of this Plan or by Court Order.

**2.77    Preference Property** shall mean those certain properties including Moore Farms and Emory Farms for which any remaining equity value remaining after the full satisfaction of any liens for Secured Creditors will be contributed to the Plan Trust. For the avoidance of doubt, any liens asserted by the Contested Secured Creditor with respect to Preference Properties shall be released in accordance with the Plan as of the Effective Date and other transactional documents as may be drafted and agreed upon by the Contested Secured Creditor.

**2.78    Priority Claim** shall mean any Claim, to the extent entitled to priority in payment under Section 507(a) of the Bankruptcy Code, other than an Administrative Claim, that (1) has not been barred by the Plan and (2) has not been disallowed by a Final Order.

**2.79    Priority Non-Tax Claim** shall mean any Priority Claim other than a Priority Tax Claim, Administrative Claim or Professional Claim.

**2.80    Priority Tax Claim** shall mean the allowed claims of governmental taxing authorities that are entitled to priority claims under section 507(a)(8) of the Bankruptcy Code or tax claims as otherwise specified herein.  The term "allowed" shall include the definition of "deemed allowed," as set forth in 11 U.S.C. § 502(a), when no objection has been filed to a claim of the Internal Revenue Service.

**2.81    Proceeding** or **Chapter 11 Case** shall mean this case for reorganization of the Debtor pending before the Bankruptcy Court. (Also see "**Bankruptcy Case**" defined above).

**2.82    Professional** shall mean any Person employed in the Bankruptcy Cases pursuant to Sections 326, 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

**2.83    Professional Claim** shall mean any Claim that is Filed by a Professional pursuant to Sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code.

**2.84    Progreso Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas.

**2.85    Progreso Lease** shall mean the lease agreement between Garcia Grain Trading Corporation ("Landlord"), a Texas corporation, and Elkins Grain, LLC ("Tenant"), a Texas limited liability company, which shall be terminated on the Effective Date.

**2.86   Pro Rata** shall mean the proportion that the amount of an Allowed Claim in a particular Class bear to the aggregate Face Amount of all Allowed Claims in such Class.

**2.87   Proof of Claim** shall mean a proof of claim conforming to Bankruptcy Official Form 410.

**2.88   Representative** shall mean any Affiliate, Person, agent, insider (as defined in Section 101(31) of the Bankruptcy Code), attorney, accountant, fiduciary, heir, guardian, surety, corporate parent or subsidiary (whether direct or indirect), and other entity having a legal or equitable relationship with another entity whatsoever.

**2.89   Rio Bravo** shall mean a Mexican corporation named Granos y Cereales Rio Bravo, S.A. de C.V. ("Rio Bravo"), which acts as the importer of all corn, milo, pinto and black beans or other commodities or products to customers in Mexico, directly invoices the customers, and the customers pay Rio Bravo for the invoices, from which Rio Bravo deducts the importation fees, and wires the net receipts to the appropriate escrow account in the United States.

**2.90   Rincon Ranch** shall refer to 1,882 acres of ranch land located in Starr County, Texas.

**2.91   Santa Rosa Facility** shall mean the grain elevator facility owned by the Debtor located at the municipal address of 22056 Bass Boulevard in Harlingen, Texas and includes the adjacent tract of land and rights thereto which are subject to the **Union Pacific Industrial Lease**.

**2.92   Santa Rosa Lease** shall mean the lease agreement between Garcia Grain Trading Corporation ("Landlord"), a Texas corporation, and Texas Valley Grain – Santa Rosa #2 ("Tenant"), a series of Texas Valley Grain, LLC, a Texas registered series limited liability company, in which Texas Valley Grain, LLC is the sole member and owner.

**2.93   Section 502(c)(1) Valuation or Estimation** shall mean in the case of contingent, unliquidated claims the value of the creditor's claim as estimated by the Bankruptcy Court.

**2.94   Section 506 Valuation** shall mean the value of collateral as established by the Bankruptcy Court after a hearing held pursuant to Bankruptcy Rule 3012 and in accordance with Section 506 of the Bankruptcy Code, or made part of a Final Order of Bankruptcy Court.

**2.95   Secured Claim or Secured Claim Lien** shall mean any Claim that is considered secured under Section 506(a) of the Bankruptcy Code and secured by a lien, or other encumbrance that has been properly perfected as required by law with respect to property owned by the Debtor.

**2.96   Secured Creditors** shall mean all Creditors who hold a Secured Claim lien, security interest, or other encumbrance that has been properly perfected as required by law with respect to property owned by the Debtor.

**2.97   Segregated Insurance Proceeds Account** shall mean the FCCI Insurance Company issued Check Number 2408867 in the amount of three million four hundred eighteen

thousand three hundred eighty-seven and 98/100 dollars ($3,418387.98) jointly to "Garcia Grain Trading Corporation and Falcon International Bank and Grain Chain Inc., and deposited into segregated, interest-bearing account at Wells Fargo Bank NA ("Wells Fargo"), which account shall be labeled as "Garcia Grain Trading Corp. Case No. 23-70028-EVR-11 Debtor in Possession – Progreso Reconstruction Funds Account," and as referenced in the Stipulation and Agreed Orders entered between the Debtor and GrainChain, and Falcon, respectively at docket nos. 456, 461.

**2.98    Subordinated Claim** shall mean any Claim (a) arising from rescission of a purchase or sale of a Security of any of the Debtor or of an affiliate of any of the Debtor, (b) for damages arising from the purchase or sale of such a Security, (c) for reimbursement or contribution allowed under Section 502 of the Bankruptcy Code on account of a Claim described in (a) or (b) above, (d) otherwise subordinated pursuant to Section 510 of the Bankruptcy Code, (e) subordinated by Final Order, (f) based on fines, penalties, forfeiture or for multiple, exemplary, or punitive damages, or (g) any Claim of any Insider of the Debtor.

**2.99    Surety Bond or Bonds** shall mean those certain Surety Bonds executed by Harco National Insurance Company as Surety, in which Garcia Grain Trading Corporation is named as the Principal Obligor and the Texas Department of Agriculture is named Obligee. The bonds issued by Harco covering public grain warehouses owned by the Debtor as of the Petition Date, involve three (3) statutory RGW-304 Grain Warehouse Operator Bonds for the Edcouch Facility (TXIFSU0570551), the Donna/Santa Rosa Facility (TXIFSU0570548), and the Progreso Facility (TXIFSU0570549). The total aggregate penal sum of these Bonds is $2,155,350.

**2.100    TDA** shall mean the Texas Department of Agriculture established and acting under the authority of the laws of the State of Texas.

**2.101    Texas Comptroller** shall mean the Texas Comptroller of Public Accounts.

**2.102    Unanticipated Event(s)** shall mean events outside of New Co.'s and GrainChain's control and not constituting a material default, including but not limited to: circumstances constituting force majeure, weather, acts of God, terrorism, and conflicts with Mexico (whether related to transnational criminal organizations, governmental conflicts, or otherwise).

**2.103    Union Pacific Industrial Lease** shall mean the industrial lease agreement between Union Pacific Railroad Company ("Lessor") and Garcia Grain Trading Corporation ("Lessee") dated April 22, 2009, for the lease of the land in Santa Rosa, Texas on which a portion of the Santa Rosa Facility is located.

**2.104    Unliquidated Claim** shall mean any Claim that is listed in the Schedules as "unliquidated," and did not have an exact amount owing on the indebtedness as of the Petition Date.

**2.105    Unsecured Claims** shall mean all Claims not a Secured Claim or Tax Claim.

**2.106   Unsecured Creditors** shall mean any and all Creditors having Unsecured Claims, including but not limited to Claimants holding Unsecured Deficiency Claims.

**2.107   Unsecured Deficiency Claims** shall mean all Allowed Claims of creditors that are deemed to be unsecured following valuation of the Debtor's property as a result of either a Section 506 Valuation hearing, the Bankruptcy Court or the District Court's order determining the nature, extent or validity of a creditor's lien on the Debtor's property that is not stayed on appeal, or the agreement of the parties, due to the fact that the value of the collateral securing repayment of a claim against property of the estate is less than the amount of such allowed claim as determined by the provisions of Section 506 of the Bankruptcy Code.

**2.108   Waived Unsecured Deficiency Claims** shall mean the unsecured deficiency claims of StoneX and Vantage that are solely waived against the Debtor under the Plan upon the completion of the treatments described in their respective Classes of Secured Claims.

**2.109   Wells Fargo DIP Account(s)** shall mean the Debtor-in-Possession bank accounts maintained by the Debtor at Wells Fargo Bank.

Rules of Interpretation. For purposes of this Plan, (i) any reference in the Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (ii) any reference in the Plan to an existing document, pleading or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented as permitted herein; (iii) the words "herein," "hereto" and "hereof" refer to the Plan in its entirety rather than to a particular portion of the Plan; and (iv) the rules of construction set forth in Section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply, unless an alternate calculation is expressly provided herein (i.e., Business Days).

Computation of Time. In computing any period of time prescribed or allowed in this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

Exhibits and Plan Supplement. All exhibits are incorporated into and are a part of the Plan as if set forth in full herein. Holders of Claims and Equity Interests may obtain a copy of the Filed exhibits upon written request to the Debtor. Upon their Filing, the exhibits may be inspected in the office of the clerk of the Bankruptcy Court or at the Bankruptcy Court's CM/ECF or PACER website. The documents contained in the exhibits shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. The Debtor expressly reserve the right to modify or make additions to or subtractions from any exhibit or to the Plan and to amend, modify or supplement any exhibit to the Plan in conformance with the provisions of this Plan, including without limitation supplement the Plan with any and all documents to effectuate the Plan, including the transactional documents.

Approved Disclosure Statement. The terms and provisions of the Disclosure Statement, as approved by the Bankruptcy Court, are expressly incorporated herein, except where such provisions of the Disclosure Statement may conflict with the terms of this Plan. In the event that such a conflict arises, the terms of this Plan and the Confirmation Order shall control, with the

Confirmation Order controlling over the terms of this Plan.

## ARTICLE III
## DESIGNATION OF CLASSES OF CLAIMS

Designation of Classes of Claims. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

The Plan separates Claims asserted against the Debtor into four main categories, which are: (I) Administrative and Priority Unsecured Claims; (II) Secured Claims, (III) Unsecured Claims, and (IV) Unsecured Claims of Harco.

Below is a concise list of all Classes in this Plan:

(I)     Administrative and Priority Unsecured Claims

    A.     Class 1 – Administrative Claims (Unimpaired)
    B.     Class 2 – Priority Unsecured Claims (Unimpaired)

(II)    Secured Claims (or Partially Secured Claims)

    C.     Class 3 – Secured Claim of StoneX Commodity Solutions, LLC f/k/a FCStone Merchant Services, LLC ("StoneX") (Impaired)
    D.     Class 4 – Secured Claim of Vantage Bank Texas (Impaired)
    E.     Class 5 – Secured Claim of Falcon International Bank (Unimpaired)
    F.     Class 6 – Contested Secured Claim of GrainChain, Inc. (Impaired)
    G.     Class 7 – Secured Claim of Ford Motor Credit (Impaired)

(III)   Unsecured Claims

    H.     Class 8 – Unsecured Bean Claims (Impaired)
    I.     Class 9 – Unsecured Farmers' and Grain Claims (Impaired)
    J.     Class 10 – Administrative Convenience Class (Impaired)
    K.     Class 11 – General Trade Claims (Impaired)

(IV)    Unsecured Claims of Harco

    L.     Class 12 – Unsecured Claim of Harco. (Impaired)

## ARTICLE IV
## PAYMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY UNSECURED CLAIMS

The Plan provides for all Administrative Claims to be paid in full upon approval by the Bankruptcy Court of applications for their allowance or the Effective Date, whichever is later.

The Plan will pay the priority claims of unsecured claims of persons engaged in the production or raising of grain, as defined by Section 557(b) of the Code, as the Debtor owns and operates grain storage facilities as defined in such section and those claims are associated with grain or the proceeds of grain. These priority claims are estimated to total approximately $112,125.00 subject to objection.

The Debtor disputes the Priority Tax Claim asserted by the Internal Revenue Service for income taxes because upon the filing of contemplated amended returns it believes the Debtor will not be liable for such taxes. It appears the taxes reflected were based upon likely improperly calculated and potentially overvalued revenues and if properly reflected the estate may be entitled to tax refunds for prior years rather than being liable for taxes. The Debtor intends to object to the IRS claim, file the amended returns, and seek refunds if the returns reflect the Debtor is entitled to them. Provided, however, if any taxes are established to be due and owing, the Plan provides for the payment of them in accord with the provisions of the Bankruptcy Code within 60 months of the Petition Date.

The claims of ad valorem taxing authorities due local taxing authorities will be paid in full either upon the sale of the real property tracts against which the taxing authorities hold liens or as such taxes become due. The taxing authorities will retain their statutory liens to secure the payment of such taxes until they are paid in full.

## ARTICLE V
## SUMMARY OF TREATMENT OF CLASSES OF CLAIMS AND EQUITY INTERESTS

### A.  TREATMENT OF CLAIMS OF SECURED CREDITORS

The Plan contains a comprehensive settlement of the competing claims and interests held by the four major secured creditors against the Debtor's Bankruptcy Estate, the principals of the Debtor and their related entities, and the Unsecured Creditors.

Based upon this concept of resolving all claims, the treatment of the claims of the Secured and Unsecured Creditors in the Plan is premised on the following:

> 1.) it is better to resolve the competing claims of StoneX and Vantage relating to their respective interests in the proceeds from the sale of grain, grain receivables, and Surety Bonds covering the grain at the grain facilities in which they hold warehouse receipts as evidence of entitlement to the grain than to engage in expensive and lengthy litigation;

> 2.) it is better to resolve with GrainChain over the validity of their asserted pre-petition liens against the various tracts of real property against which they hold deeds of trust signed by the Debtor less than a month before the Petition Date if GrainChain, the Unsecured Creditors, and Harco can agree to share the after tax net proceeds from the sale of the properties while allowing New Co. to operate the grain facilities at Progreso and Edcouch and pay the Distributable Net Income in the same percentage or similar percentage to which their respective claims bear to the total amount of unsecured claims against the Debtor;

3.) it is better to negotiate settlements with Unsecured Creditors who received payments from the Debtor within 90 days of the Petition Date than to pursue the preference claims through litigation in the Bankruptcy Court;

4.) it is better to reach an agreement to allow the principals of the Debtor to have time to orderly market and sell their assets and then to contribute the net proceeds to the Plan Trust or convey them to the Plan Trust than to litigate the various causes of action owned by the estate against them based upon fraudulent conveyances, breach of fiduciary duty, conversion of corporate opportunities, and other such derivative claims, and then attempt to attach and sell the assets after obtaining a judgment against them; and

5.) it is better to reach an agreement with the TDA and Harco relating to the payment of the TDA Surety Bonds into the Plan Trust than to litigate the complex issues surrounding the TDA Surety Bond claims thereby depleting valuable resources of the Estate by funding the attorneys' fees and costs of the lawsuit(s).

Therefore, relying on such premises as being the proper exercise of the CRO's business judgment, the major Secured Creditors of the Debtor are treated under the terms of the Plan as follows:

- StoneX asserts that it holds title to or a security interest in certain grain inventory located at the Debtor's grain elevator facility in Progreso, Texas at the Progreso Facility, along with the associated grain warehouse receipts, cash, accounts receivable, and other proceeds from the sale of the grain of the Debtor at such facility to secure the repayment of indebtedness owed to it having an outstanding balance of an estimated $19.5 million. The Debtor estimates the current collateral for the repayment of the StoneX Secured Claim to be as follows:

  - Funds in Grain Escrow Account  =       $3,550,402.00
  - Collectible Accounts Receivable =       $650,000.00
  - FCCI Claim Against Salvaged Grain =  $1,889,000,.00
  - Surety Bond Claims          =       $1,748,000.00
  - Total Collateral Value          =       $7,837,402.00

Thus, the Secured Claim of StoneX totals $7,837,402.00, and its Unsecured Deficiency Claim is approximately $11,803,353.00.

**StoneX Treatment:**

The Debtor and StoneX have reached an agreed-upon plan treatment regarding its claims by the payment from the Plan Trust of a minimum sum of $12,500,000 up to the total sum of not more than $13,000,000.

StoneX agrees that upon the receipt of the $12,500,000 from the Plan Trust all claims and causes of action which StoneX holds against the Bankruptcy Estate shall be fully extinguished and

discharged, thereby resolving and releasing all claims against all guarantors of such Debtor obligations owed to StoneX.

The Plan provides that an initial payment in the amount of not less than $10,000,000 will be made on or before September 30, 2024.  StoneX acknowledges that it has already received $3,550,402 from the funds in the Grain Escrow Account, and that this payment will be counted toward the $10 million due by September 30, 2024.

The Plan provides that StoneX will be paid an additional $4,049,598 on the Effective Date out of funds from the following sources:

- FCCI Grain Damage Claim   +  Interest          $1,890,598.00
- Octavio Garcia Funds from IOLTA Account        $1,114,000.00
- Octavio Garcia Funds from Note Receivable      $1,045,000.00
  TOTAL                                          $4,049,598.00

The balance of the $10 million payment to be made to StoneX by September 30, 2024, will be made from contributions to the Plan Trust realized by the sale of real estate owned by Octavio Garcia as well as certain assets titled in the name of Garcia-Balli, Ltd., an entity owned and controlled by him and his wife currently knkown herein as the Garcia-Balli Properties as follows:

| Description of Property | Estimated Net Proceeds |
|---|---|
| South Padre Island Condominium | $   200,000.00 |
| Toluca Ranch Tracts | $1,000,000.00 |
| Moore South Tract | $   450,000.00 |
| Huffman Farm Tracts | $   900,000.00 |
| TOTAL | $2,550,000.00 |

The balance of the funds necessary to achieve the $10 million payment may also be paid from the net proceeds realized from grain receivables, the net amount received from the Estate from FCCI Insurance for its supplemental claim for the damaged grain at the Progreso Facility, and the balance to be paid from recoveries or contributions received by the Plan Agent consisting of funds realized from any recovery from litigation or settlement with Harco over the Surety Bonds. The balance of the funds necessary to achieve the $12,500,000.00 threshold totaling approximately $2,350,000 will be paid from the Plan Trust out of any of the above listed assts that have not already been liquidated and turned over to StoneX. In the event the collections realized from the real estate listed above, the grain receivables, the FCCI supplemental claim for the damaged grain at the Progreso Facility, or from the funds realized from the Surety Bonds should exceed the amount necessary to pay StoneX the threshold release amount of $12,500,000, then in such event, StoneX shall be entitled to receive such surplus funds up to the total amount of the recoveries, but in no event shall its recovery exceed the total sum of $13 million. Provided, however, that the Plan Trust shall be entitled to deduct from the funds realized from the collection of funds from grain receivables, the supplemental grain damage claim against FCCI, and the recovery from any litigation associated with the Surety Bonds, all post-confirmation attorneys'

fees and costs incurred by the Plan Trust to prosecute the collection of the claims. Post confirmation, StoneX shall have consultation rights with respect to the direction of any such litigation including approval of any settlement related to the same.

Following the payments by the Plan Agent to StoneX of not less than $10,000,000 by September 30, 2024, the Plan Agent and its counsel will use their best, good faith efforts to obtain the balance of the $12,500,000 from such sources described above, and if the balance owing StoneX has not been paid by December 31, 2024, the Plan Agent shall provide a written report to StoneX of the current status of efforts being undertaken, including the status of any litigation that may be pending on such date involving the collection of the funds needed to pay the StoneX settlement amount in full, and shall provide similar reports to StoneX on the last day each calendar quarter thereafter until the balance of such settlement sum of a minimum of $12,500,000 is extinguished and paid in full.

Should the balance of the funds owing to StoneX under the terms of this settlement necessary to reach the $12.5 million threshold not be paid by the first anniversary date of the Effective Date then in such event StoneX may, at its option, request that the Plan Agent transfer and assign any pending causes of action to StoneX related to the collection of the Surety Bonds or the supplemental grain damage claim against FCCI, and may also request that any remaining tracts of real property listed hereinabove which have been conveyed to the Plan Trust by Octavio Garcia, or any of his related entities, being conveyed over to it. In the event, StoneX makes such requests for the transfer or assignment of the litigation, it shall be understood that upon any recovery from the lawsuits the Plan Trust shall be entitled to reimbursement of its attorneys' fees and costs incurred up to the date of the transfer and assignment of these causes of action. Further, any conveyance of the tracts of real property shall be subject to any existing liens or encumbrances appearing of record against them.

In the event the Debtor fails to hit the $10 million payment by September 30, 2024 or to reach the $12.5 million payment threshold by the first anniversary of the Effective Date, StoneX shall have the right to elect to be paid any deficiency from any other asset held by the Plan Trust including the profits from post confirmation operations.

The Plan provides with the unanimous consent of the members of the Plan Trust Committee it shall be empowered to address any shortfalls in the payment of the amount due to StoneX under its terms by making such distributions from the Plan Trust as in its sole discretion it may deem advisable using its best business judgment under the circumstances.

**Vantage Treatment:**

Vantage holds title to or a security interest in certain grain inventory, machinery and equipment, and other personal property assets located at the Debtor's grain elevator facilities located in Santa Rosa and Donna, Texas, at the Santa Rosa Facility and the Donna Facility, and asserts title to or a security interest in any grain currently located at the Progreso facility that in the ordinary course of Debtor's business was relocated from Santa Rosa Facility and Donna Facility to the Progreso Facility in preparation for its export and sale to Debtor's customers in Mexico. Vantage also asserts title to or a security interest in grain warehouse receipts associated with the grain inventory at Donna/the Santa Rosa Facility, along with any associated cash, accounts

receivable, and other proceeds from the sale of the grain at such facilities. Vantage claims its collateral interest in such assets of the Debtor to secure the repayment of indebtedness represented by promissory notes executed by the Debtor having an estimated current outstanding balance of $8,789,064.00. In addition to its asserted ownership and security interest against the personal property of the Debtor, Vantage holds first lien Deeds of Trust against real property of the Debtor known as the Pitts Property valued by the Debtor at an estimated $3,600,000.00; Santa Rosa/Donna Facilities having a combined estimated value by the Debtor of $2,700,000.00; and a claim against the Surety Bond at Santa Rosa and Donna Facilities in the amount of $739,400.00 – altogether having an estimated by the Debtor of a total collateral value of $10.2 million.

Thus, the Secured Claim of Vantage, as currently estimated by the Debtor, totals $7,039,400.00, and its Unsecured Deficiency Claim, as currently estimated by the Debtor, is approximately $1,749,664.00.

Vantage and the Debtor have reached agreed-upon plan treatment regarding all of its claims against the estate in exchange for the following Debtor's estimate of the net value of the consideration:

| Pitts Property (1st Lien Deed of Trust) | $3,600,000.00 |
|---|---|
| Santa Rosa Facility (1st Lien Deed of Trust) | $1,350,000.00 |
| Donna Facility  (1st Lien Deed of Trust) | $1,350,000.00 |
| **Subtotal** | **$6,300,000.00** |
| Assignment to the estate or its designee, without recourse, all Warehouse Receipts held as collateral and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,155,350 | $400,000.00 |
|  |  |
| **Subtotal** | **$1,400,000.00** |
| **TOTAL** | **$6,700,000.00** |

Vantage held security interests against pre-Petition bean inventory, bean accounts receivable and proceeds from the sale of beans. By virtue of entry of an *Order Granting Debtor's Emergency Motion for Authority to Obtain Post-Petition Financing, Payoff Certain Liens of Vantage Bank and Establish Procedures for Purchase of Edible Beans* [Docket #467] the Court approved the conveyance, or modification of the automatic stay permitting foreclosure of the tracts of the real property listed in the chart above plus payment to Vantage of any payments received attributable to any such real property during the pendency of this Bankruptcy Case and prior to the conveyance or lifting of the stay as to Vantage. Additionally, due to the payment of $625,000 from the PACA Reserve and the bean enterprise operating account, Vantage has released its claims against the

assets of the bean enterprise. The Debtor presently projects that the provision of financing for the purchase of additional inventories of black and pinto beans will result in net profits from the bean enterprise in the approximate sum of $800,000. These funds will then be used to fund the payment of administrative expenses and other necessary expenditures by the Debtor in carrying out the provisions of this Plan.

Vantage will transfer and convey, without recourse, all of its collateral warehouse receipts to the Plan Trust conditioned upon payment to Vantage of $400,000.00 on or before ninety (90) days from the entry of an order confirming the Plan. Further, Vantage will waive its unsecured deficiency claim solely against the Debtor upon the completion of the Plan treatment of Vantage described herein.

**Falcon Treatment:**

Falcon is owed notes totaling approximately $5,989,153 and holds a first lien deed of trust against the Progreso Elevator valued at an estimated $4,430,000 along with a first lien deed of trust against 1,460 acres of farmland known as the Moore Farms having an estimated value of $7,884,000 and a security interest in equipment having a value of an estimated $330,000.

Thus, the Debtor believes the total collateral value to secure Falcon's debt is presently estimated for Plan purposes at approximately $12,644,000 leaving potential equity of approximately $6,654,847.

Falcon will receive payment in full of its outstanding claim in the amount of approximately $6,000,000, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farms having an estimate value for purposes of the Plan of $7,000,000. Upon the payment in full of the indebtedness owed to it Falcon shall release its liens, including without limitation the Deeds of Trust against all other real property of the estate including but not limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust, including any and all liens in applicable insurance proceeds. Furthermore, Falcon agrees to release any liens on real property it may have filed in error covering collateral by Vantage, including the Pitts Property.

**GrainChain Treatment:**

GrainChain's Proof of Claim filed in this case asserts at least $7,841,055 in claims owed to it by the Debtor. GrainChain asserts second lien deeds of trust against real property which for Plan purposes only the Debtor asserts may have equity after the lien of Falcon (Progreso Elevator & Moore Farms) currently estimated by the Debor Plan purposes only in the amount of approximately $6,654,847 and first lien deeds of trust against the Baryta Industrial Tract, Emory Farms, and the Edcouch Elevator totaling approximately $2,754,711.

The comprehensive treatment with GrainChain is set out in greater detail in Section II(F) of the Plan, and can generally be summarized as follows: GrainChain will voluntarily release its pre-petition liens on the properties transferred to the Plan Trust and New Co. New Co. will operate

the New Co. conveyed properties (Progreso Facility, Edcouch Facility and Baryta) with the anticipation of generating Distributable Net Income to be used to make note payments on the three non-recourse notes in favor of GrainChain, the Unsecureds and possibly Harco secured by the New Co. conveyed properties.  New Co. will hire Elkins for continued grain, corn and sunflower seed operations and New Co. will also hire an operator for an anticipated bean operation, all of which is to be further detailed in the transactional documents.  Additionally, the Unsecureds, GrainChain, and potentially Harco will also receive proceeds as a trust beneficiary from properties sold and recoveries had by the Plan Trust.   Essentially, GrainChain's treatment under the plan is substantially similar to the Unsecureds treatment, except that GrainChain is voluntarily releasing its pre-petition liens and factoring New Co.'s operations on less than market factoring terms.

### Equity Holders Treatment.

All prepetition equity in the Debtor shall be cancelled and terminated as of the Effective Date.

### B.    TREATMENT OF OTHER CLAIMS

**Harco Proof of Claim**: Harco has filed a contingent and unliquidated Proof of Claim for the full amount of all TDA Surety Bonds although it has not paid, nor agreed to pay any sum certain on any of the known claims. This Plan proposes to allow that Claim in the amount that Harco actually pays into the Estate from the Surety Bonds pursuant to the described treatment and partial impairment as more fully described and set out herein. This consensual treatment provided in the Plan provides that, upon funding of the Surety Bonds in an agreed upon sum to the Plan Trust as provided in this Plan, thereafter for the first three (3) years, the Distributable Net Income shall be divided between GrainChain at the percentage of 45%, Harco at 2.5% and the Unsecured Creditors receiving an initial percentage of 52.5%; save and except for beans and sunflower seeds, during which the first year:  62.5% to be paid on the Unsecureds Note, 2.5% on the Harco Note, and 35% on the GrainChain Note; during the second year, 60% to be paid on the Unsecureds Note, 5% on the Harco Note, and 35% on the GrainChain Note; during the third year, 57.5% to be paid on the Unsecureds Note, 7.5% on the Harco Note, and 35% on the GrainChain Note, during the fourth and fifth years, 55% to be paid on the Unsecureds Note, 10% on the Harco Note, and 35% to GrainChain.It is important to note that the Debtor asserts that Harco currently holds a contingent and unliquidated general unsecured claim against the Estate that the Debtor has informally taken the position that under applicable law Harco's claim is fully subordinated to the Unsecured Creditors' Class of claims.  The Unsecured Claim of Harco is being subordinated due to the fact that it is a Creditor which must fund payment of the Surety Bonds to the qualifying Creditors entitled to receive them under the provisions of this Plan or Texas law. However, beginning in the first year of the Plan, Harco shall be entitled to receive 2.5%, the second year 5%, the third year 7.5%, and the fourth and fifth years 10% of the Distributable Net Income as note payments on Harco Note thereby reducing its Allowed Unsecured Claim memorialized by the Harco Note until such time as the Claim is either extinguished from the receipt of net proceeds realized from the sale of real property or payments on its Note calculated from its division of the Distributable Net Income of New Co. as set forth herein and contained in the transactional documents  and the distribution  of its share of the proceeds of the sale of  New Co. to a third party or from the exercise of New Co.'s right of first refusal in which case it purchases the assets as further detailed in the Intercreditor Agreement.

Unsecured Creditor-Farmers holding Claims that may be entitled to Distributions from the proceeds of the TDA Surety Bonds may either choose to be paid solely by the TDA Surety Bond receipts, or to participate and receive their pro-rata share of the percentages paid to Allowed Unsecured Creditors on a pro-rata basis from the receipt of net proceeds from the sales of real estate and the after-tax net profits from the operations of the Debtor as provided herein.

Only claimants that specifically "opt-out" of the Plan will be entitled to file a claim seeking to participate in the distribution of the TDA Surety Bond proceeds to be distributed by the Plan Agent as provided for under the terms of a settlement between the Debtor, TDA and Harco. Further, for the avoidance of doubt, any holders of grain claims that choose to "Opt-out" of the Plan in favor of Distribution from the TDA Surety Bond claims will also face exposure from the Estate for any Preference Claims they received, and which are subject to avoidance under the provisions of Section 547 of the Bankruptcy Code.

The holders of grain claims who "Opt-in" to the Plan will participate in the Class of Creditors treated in the General Unsecured Class and will have all Preference Claims waived and released by the Debtor in exchange for their transfer and assignment of any rights they may have to assert claims and receive Distributions from, or otherwise participate in, the proceeds of the Surety Bonds to the Plan Trust. The amount of their Allowed General Unsecured Claim will then share pro-rata from all Distributions made by the Plan Trust  for the benefit of holders of General Unsecured Claims as provided in the Plan.  For the sake of clarity, the Unsecured Creditors' Class does not include any Unsecured Claims asserted by GrainChain or Harco.

**Any Plan Treatment Objections by Harco**:  Absent the agreed Plan treatment for the Harco Claim, Harco holds a contingent Unliquidated Claim that may not be determined, absent adjudication under this Plan process by the Effective Date. Thus, in such event of a Harco Objection to this Plan and/or confirmation of the Plan, the Debtor will respond and file its own written object to Harco's Claim based on:

(i)      subordination[1] of Harco's Claim to payment in full of all Creditors in the Class of Unsecured Creditors who are potential Bond Claimants, and

(ii)      the obligation of Harco to advance the full amount of its filed Proof of Claim to those Creditors provided in this Plan, and as provided in the Plan;

(iii)      the fair and equal distributions, if any, from assets owned or held by Octavio Garcia or the Debtors' insiders or affiliates or insiders to Debtor's affiliates.

Such Objection by Harco and Objection by Debtor (the "**Objections**") shall constitute an objection to the Claim of Harco and shall be determined at, and as a part of, by separate adversary proceeding and/or at the Confirmation hearing upon the Bankruptcy Court invoking the Adversary Rules of Procedure to the determination of the Objections pursuant to its authority and jurisdiction to do so.[2]  The Debtor hereby requests the Bankruptcy Court invoke the Adversary Rules of Procedure

---

1      *See, American Surety Co. v. Sampsell*, 317 U.S. 269, 66 S. Ct. 571 (1946) - a surety's claim was properly postponed until payments in full were made to all claimants who were members of the class of creditors covered by the bond.

2      *See, e.g. Lucas v. Dynergy Inc. (In re Dynegy Inc.)*, 2013 U.S. Dist. LEXIS 78479, at *17-18 (S.D.N.Y. June

to determine the Objections, to the extent not then subject to an adversary proceeding seeking the same relief. Accordingly, it shall not be necessary to file a separate adversary proceeding, upon invoking the adversary rules of procedure, to resolve any or all of the Objections and the Plan treatment of Harco's.

Harco has filed a lawsuit now pending under Case No, 7-23-CV-430 in the U.S. District Court for the Southern District of Texas, McAllen Division styled Harco National Insurance Company v. Octavio and Gabriella Garcia wherein it seeks indemnity for certain claims and recovery under its asserted indemnity agreement ("Harco Lawsuit"). The relief and injunction sought in the Harco Lawsuit would make it impossible for Octavio and Gabriella Garcia to meet their commitment to contribute a minimum of $3.5 million to fund the Plan. Continued prosecution of the Harco Lawsuit during the term of the Plan would significantly impede and interfere with his participation in the bean enterprise necessary to produce revenues that will be contributed to the Plan Trust and which are important for the successful completion of the Plan. In the event, Harco does not accept the proposed settlement of all issues pertaining to the Surety Bonds as contemplated by the language set forth in the Plan relating to the treatment of its disputed, contingent and unliquidated claim,the Plan, therefore, provides for an extension of the automatic stay under the provisions of 11 U.S.C. § 362, and upon confirmation of the Plan, the issuance of an injunction prohibiting Harco from continuing to prosecute the Harco Lawsuit because of the negative economic impact it has on other creditors of the Estate. The Debtor will show that under the circumstances of this Bankruptcy Case an injunction should be issued to prohibit Harco or other creditors from bringing actions or continuing the prosecution of lawsuits against Octavio Garcia and his wife, Gabriella Garcia because it will have a direct adverse economic impact on the Estate. Such an injunction will also prevent other creditors from pursuing derivative actions that rightfully belong to the Bankruptcy Estate and over which the Bankruptcy Court has exclusive jurisdiction. Such injunction will operate to toll the running of any applicable statutes of limitation which would infringe upon the rights of creditors having claims against these shareholder insiders by virtue of their execution of personal guarantees or indemnity agreements. In order to enforce such tolling of the statutes of limitation Octavio and Gabriella Garcia will sign tolling agreements for the five-year term of the Plan as a condition for the issuance of the injunction prohibiting the initiation or prosecution of lawsuits against them.

---

4, 2013)

   At the discretion of the Bankruptcy Court, Rule 23 may be invoked in the context of an objection to the confirmation of a chapter 11 plan. The objection to the confirmation of a chapter 11 plan is a "contested matter." See Fed. R. Bankr. P. 3020(b)(1) ("An objection to confirmation is governed by Rule 9014."); *Bear Tooth Mountain Holdings Ltd. P'ship v. ML Manager LLC ("In re Mortgs. Ltd."),* No. 2:08 bk 07465 RJH, 2013 Bankr. LEXIS 1393, 2013 WL 1336830, at *4 n.12 (Bankr. D. Ariz. Mar. 28, 2013) [*18] ("Pursuant to [Rule] 3020(b) . . . and 9014, confirmation of plans and hearings on objections to confirmation are contested matters . . . ."); *In re Farrell*, 38 B.R. 654, 655 (Bankr. W.D. Mo. 1984).**6** This case involves an objection to a chapter 11 plan. Therefore, Bankruptcy Rule 9014 provided the Bankruptcy Court with discretion to decide whether to apply Bankruptcy Rule 7023 and with it the latter's inclusion of Rule 23. *In re Ephedra Prods. Liab. Litig*., 329 B.R. 1, 5 (S.D.N.Y. 2005); *see also In re Am. Reserve Corp*., 840 F.2d at 488 ("Rule 23 may apply . . . at the bankruptcy judge's discretion.").

### C.     MEANS FOR IMPLEMENTATION OF THE PLAN

Certain real, personal, and intangible property shall be conveyed on the Effective Date to the Plan Trust and New Co., as well as certain payments to certain creditors as set forth herein.

New Co. Properties [defined in, §I, 2.58].

On or before the Effective Date, the Edcouch Facility, Progreso Facility, and Baryta shall be transferred by each property's record owner via special warranty deed together with all rights, title, and interests in and to each property to New Co., and by bill of sale(s) all related personal property located at or generally used at each location.

Such real property title and interest shall be capable of being insured by one or more title policies and insurance at the election, expense, and in favor of New Co. and/or GrainChain.

Additionally, all such conveyances of real and personal property to New Co. shall be free and clear of any and all liens, claims, interests, and encumbrances in a manner satisfactory to New Co. and GrainChain, save and except for (i). the liens securing the three non-recourse Notes (Unsecureds, Harco, and GrainChain) all in equal priority and without non-judicial foreclosure rights, and (ii). GrainChain's continuing rights of first refusal.

GrainChain will voluntarily release its asserted liens on the New Co. Properties, and the non-recourse Notes will be secured by deeds of trust executed by the respective property owners, in favor of the respective Note holders consistent with the non-recourse Note terms and deeds of trust, which deeds of trust shall be filed in the real property records together with the Intercreditor Agreement.

GrainChain will release asserted liens on New Co. Properties and Plan Trust Properties only when those properties are conveyed by the record owners to New Co. or the Plan Trust in a manner acceptable to GrainChain and the Plan Agent.

The real and personal property to be conveyed to New Co. shall be operated, protected, insured, and improved in New Co.'s business judgment and will be operated for the purpose of generating anticipated after-tax net profits that are to be used by New Co. to pay down the three non-recourse Notes until either (i). the expiration of the five-year term and liquidation thereafter, or (ii). the Unsecureds Notes and the Harco Note are paid in full, whichever is earlier.

At the conclusion of the five-year note term, in the event that the Unsecureds Note and the Harco Note have not been paid in full, the New Co. Properties will be sold, subject to GrainChain's continuing rights of first refusal, which it may exercise at its sole discretion from time to time. New Co. may continue to operate, protect and insure the New Co. Properties after the expiration of the five-year term at its and GrainChain's sole discretion, for a reasonable period of time consistent with the Plan purpose.  If operations continue beyond the five-year term by New Co. and until a sale of the New Co. Properties, Distributable Net Income shall continue to be shared (up to the payment of the full amount of the Unsecureds Note and the Harco Note.   In no event will more than the actual Note amounts be paid on the Unsecureds Note and the Harco Note.

If GrainChain acquires the New Co. Properties by one or more sales, in no event shall the post-sale profits earned from post-sale operations be shared with the Plan Trust for the benefit of the Unsecureds Note or the Harco Note.

<u>Plan Trust</u>.

A Plan Trust will be established to carry out the implementation of the Plan and administration of Claims as provided herein. The Plan Contribution shall be transferred to the Plan Trust on the Effective Date. The Plan Agent shall serve as the trustee of the Plan Trust as set forth in the Plan Trust Agreement. The beneficiaries of the Plan Trust shall be the Unsecured Creditors, Harco and GrainChain (but not as to the GrainChain Note payments made by New Co.).   The Plan Agent shall execute the Unsecureds Note and Harco Note with New Co. as the agent for the benefit of the Unsecureds and Harco, respectively.  The Plan Agent is authorized to engage counsel and other professionals as is reasonably necessary to administer the Plan Trust without further Bankruptcy Court order or approval. The Plan Agent will charge an hourly fee as provided in the Plan for the work involved in administering the Plan Trust. The Plan Agent's fees and expenses related to the administration of the Plan Trust, including the fees and expenses of all professionals engaged by the Plan Agent shall be paid from the assets of the Trust, along with any unpaid administrative expenses of the Debtor approved by the Court shall be paid prior to disbursement to the Plan beneficiaries.

<u>Creation of the Plan Trust</u>.

On the Effective Date, the Plan Trust Agreement shall be executed, and the Plan Trust shall be established and become effective. In accordance with this Plan and the Plan Trust Agreement, the Plan Trust shall be established for the purpose of (i) collecting, receiving, holding, maintaining, and administering the Plan Trust Assets; (ii) making all payments and Distribution to holders of Allowed Claims and Notes in accordance with the terms of this Plan; (iii) closing the Bankruptcy Cases; and (iv) otherwise implementing the Plan and finally administering the Estate. The Plan Trust shall not engage in a trade or business and shall conduct its activities consistent with the Plan Trust Agreement. On and after the Effective Date, the Plan Trust shall perform and pay when due liabilities, if any, related to ownership or operation of the Plan Trust Assets.

<u>Plan Agent</u>.

Upon confirmation of the Plan, the CRO shall become the Plan Agent and shall administer the Plan Trust in accordance with the terms and provisions of the Plan Trust Agreement as described and set forth in the Plan. The Plan Agent shall be authorized to retain professionals to advise and assist in the functions of the Plan Agent and the Plan Agent and his professionals and advisors will be compensated from Plan Trust Assets; provided, however, that the Unsecureds, Harco, and GrainChain Notes will be reduced dollar-for-dollar in the amount of any hold-backs.

<u>Transfer of Plan Trust Assets</u>.

On or before the Effective Date, the initial Plan Trust Assets shall be transferred and assigned to the Plan Trust by each property's respective record owner, together with all other subsequent recoveries by the Plan Trust of the Debtor's assets or of assets or funds from any of the Debtor's Insiders or Affiliates of Insiders of Affiliates, other than the real properties the

Edcouch Facility, Progreso Facility, and Baryta and their associated personal property.  All Plan Trust Property may include assigned chose in actions, pending litigation, and recoveries therefrom, including cash, tangible or intangible personal property, or real property, and is subject to the Plan Trust's obligations under the Plan and Plan Trust Agreement and subject to all properly perfected Liens not released pursuant to the terms of this Plan. The Plan Agent, as trustee of the Plan Trust, shall be substituted as the plaintiff, defendant, or other party in all lawsuits in which either of the Debtor is, as applicable, a party as of the Effective Date. The conveyance of all Plan Trust Assets shall be accomplished pursuant to the Plan and the Confirmation Order and shall be deemed effective upon the Effective Date. Any Person having a Lien, encumbrance, or other interest against any Plan Trust Assets shall be conclusively deemed to have consented to the transfer and assignment of such Plan Trust Assets to the Plan Trust by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

GrainChain is granted a 45% beneficial interest, the Unsecureds granted a 45% beneficial interest, and Harco is granted a 10% beneficial interest in the sales proceeds from Plan Trust Properties and other monies collected and/or recovered by the Plan Trust.

The Plan Agent may present such Order to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyance to the Plan Trust. Such Order may be presented without further notice other than as has been given in this Plan.  Notwithstanding the preceding sentence, the Confirmation Order shall compel and require the requisite Insiders to convey the requisite Non-Debtor Entity Owned Property to the Plan Trust and New Co. by special warranty deed(s) and bill(s) of sale. The Debtor shall request that all Insiders required to convey property as a part of the Plan shall sign the Confirmation Order.

Specifically included as Plan Trust Assets are the following:

The following is a listing of assets and funds that the Debtor conservatively anticipates having on the Effective Date.  These assets will be contributed to the Plan Trust and be available to fund the initial payments called for in the Plan on the Effective Date.

**Proceeds from the Sale of Real Property:**

| | |
|---|---|
| Proceeds from the sale of Willacy Farm | **$144,000** |
| Proceeds from the sale of McCook | $  22,000 |
| Subtotal Real Estate Proceeds | **$166,000** |

**Contributions to the Trust:**

| | |
|---|---|
| Funds to be contributed by Octavio Garcia: | **$2,159,000** |

**FCCI Insurance Claims:**

| | |
|---|---|
| Claim for Rehabilitation/Reconstruction – Progreso | **$3,400,000** |
| Claim for Damaged Grain | **$1,889,000** |
| Claim for Business Interruption | **$600,000** |

| | |
|---|---|
| Claim for Damaged Conveyors | **$   80,000** |
| Subtotal | **$5,969,000** |

**Claims Against Surety Bonds:**

| | |
|---|---|
| Progreso, Texas | **$1,009,750** |
| Santa Rosa and Donna, Texas | **$ 739,200** |
| Edcouch, Texas | **$ 406,700** |
| Subtotal | **$2,155,350** |

**Funds/Claims in Debtor-in-Possession Accounts:**

| | |
|---|---|
| Accounts Receivable (Grain) | **$ 650,000** |
| Accounts Receivable Collections (Farm Accounts) | **$ 500,000** |
| DNI Derived from Operations of Elkins Grain  $1,800,000 | |
| Estimated Subtotal | **$2,300,000** |

**ESTIMATED TOTAL Funds Available on Effective Date**     **$12,733,650**

Plan Contributions.

    In addition to the liquid funds anticipated to be available on the Effective Date as set forth above, certain tracts of real property, save and except the Donna Facility, held in the name of PSG Products, LLC, Garcia Balli, Ltd., and/or Val Verde Grain Holdings, a general partnership,  as well as in the name of Octavio Garcia, as more specifically described herein and in the Plan, will be transferred and conveyed by Octavio Garcia so that the net proceeds from the sales of these assets shall be paid over to the Plan Agent and used to pay Creditors of the Debtor's Bankruptcy Estate  as is provided in this Plan.   This list is not an exclusive list of assets which the Debtor or Plan Trustee may assert rights, if any, and nothing in this provision or this Plan constitutes a release of any claim, if any, that the Debtor or the Plan Agent may assert to any other real or personal property.

    All funds paid into the Bankruptcy Estate or constituting property of the Estate, including any funds from the business interruption claim connected with the damage to the Progreso Facility, and any funds recovered by the Debtor in any pending or contemplated litigation brought by the Debtor under the provisions of the Bankruptcy Code, including any assets or funds received by GrainChain from Insider or Affiliate assets, shall be paid over to the Plan Agent.

Issuance of Plan Trust Interest.

It is an integral and essential element of this Plan that the offer and issuance of Plan Trust Interest pursuant to this Plan, to the extent such Plan Trust Interest constitute securities under the 1933 Act, shall be exempt from registration under the 1933 Act and any State or local law, pursuant to Section 1145 of the Bankruptcy Code and any other applicable exemptions, without limitation. The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Bankruptcy Cases, the Debtor, the Plan Agent, the U.S. Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that the Plan Agent is successor to the Debtor under this Plan pursuant to Section 1145 of the Bankruptcy Code, that the offer of the Plan Trust Interest is occurring pursuant to this Plan, that the offer of the Plan Trust Interest is in exchange for any Claim or Equity Interest, and that such offer and issuance, to the extent such Plan Trust Interest constitute securities under the 1933 Act, fall within the exemption from registration under the 1933 Act and any state or local law pursuant to Section 1145 of the Bankruptcy Code. In lieu of certificates evidencing the Plan Trust Interest, the Plan Agent shall maintain a register of the names, addresses and interest percentages of the Plan Trust Beneficiaries based upon the provisions of this Plan, which designate the persons who are entitled to receive the Plan Trust Interest. The Plan Trust Interest may not be transferred, sold, pledged or otherwise disposed of, or offered for sale except for transfers by operation of law.

Cancellation of Equity Interests.

On the Effective Date, all Equity Interests in the Debtor shall be terminated and extinguished and any certificates that previously evidenced ownership of those Equity Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in the Debtor, save and except for any common law, statutory or contractual duties and responsibilities of the members and managers of the Debtor, along with the requisite authority, to prepare, sign and file the final tax returns for the Debtor.

Plan Provisions for Releases and Injunction.

On the Effective Date, and except as otherwise provided herein, the Debtor, on behalf of itself and its Bankruptcy Estate, shall release, acquit, and forever discharge the CRO, GrainChain, and Vantage and each of their respective directors, officers, representatives, employees, agents and , and members of the Committee, from any and all claims, counterclaims, demands, controversies, costs, contracts, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, actions, and causes of action of any nature, type or description, whether at law or equity, by common law or statute, in contract, for, or otherwise, known or unknown, asserted or unasserted, or suspected or unsuspected that have or could have been asserted in connection with the Debtor's Bankruptcy Case.

Preservation of Causes of Action and Rights.

All the Debtor's direct and derivative claims against the Debtor's Insiders or Affiliates and Insiders of Affiliates shall be preserved, conveyed to and exclusively owned by the Plan Trust for the benefit of the Unsecureds, Harco, and GrainChain.  GrainChain's direct claims against the

Debtor's Insiders or Affiliates and Insiders of Affiliates shall remain GrainChain's sole and exclusive property. All Causes of Action, rights of setoff and other legal and equitable defenses of the Debtor or the Estate, whether or not now pending, are preserved unless expressly released, waived, or relinquished under the Plan or the Confirmation Order, and shall vest in the Plan Trust as part of Plan Trust Assets. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that a Cause of Action will not be pursued against them.

During the five-year Note terms, or until the Unsecureds Note is paid in full, or the New Co. Properties are sold, whichever is earlier, GrainChain may not improve its recovery by recovering against the Debtor's Insiders or Affiliates or Insiders of Affiliates as to its direct claims without 55% of all such net recoveries (after expense of collection and/or recovery) being paid over to the Plan Trust for distributions in accordance with the Plan to pay down the Unsecureds Note and the Harco Note. Upon payment in full of the Unsecureds Note and the Harco Note, GrainChain (or any of its insiders or affiliates) may pursue any of its direct claims without reporting or contributing any such recovery to the Plan Trust.

**Further, unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties not otherwise assigned to the Debtor or released as part of a Settlement are specifically reserved, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

Unless expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtor may hold the following claims, all of which shall be preserved and transferred to the Plan Trust pursuant to the terms of this Plan, however all Chapter 5 claims (including without limitation Avoidance Actions) (state and federal) against GrainChain shall be released by and through the Confirmation Order, and all non-Chapter 5 claims against GrainChain shall be conditionally released by and through the Confirmation Order:

- Preference claims under section 547 of the Bankruptcy Code;

- Fraudulent transfer and other avoidance claims arising under section 506, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws;

- Unauthorized post-Petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and Causes of Action asserted in current litigation, whether commenced pre- or post-Petition including any actions to enforce settlement agreements reached with parties owing funds to the Estate;;

- Counterclaims asserted or which may be asserted in current or future litigation;

-  Any and all claims and Causes of Action against any related entities, including, without limitation any other entity sharing common ownership with the Debtor, Octavio Garcia, Baldemar Salinas, Rodolpho Plascencia, including, but not limited to, (i) any Cause of Action listed above, (ii) any claims based on any intercompany debt or amounts borrowed by any Affiliate or related company from either the Debtor or any other related entity,  and (iii) any Avoidance Actions, including any preferences and fraudulent transfers that may have occurred between the Debtor and any of these related entities specifically included, but not limited to any transfers to officers, directors or shareholders of the Debtor, any entities controlled by relatives of officers, directors or shareholders of the Debtor or any related entities owned or controlled by officers, directors or shareholders of the Debtor or their relatives;

- Any and all claims and Causes of Action against the officers, directors, or shareholders of the Debtor, including, but not limited to, (i) any Cause of Action listed above, (ii) any claims based upon any amounts borrowed by a third party or credit extended to a third party, from the Debtor, (iii) breach of fiduciary duty; and (iv) Avoidance Action, including preference and fraudulent transfers;

- Any unasserted rights to pursue judgment for the recovery of the assets transferred to Rodolfo Plascencia, Sr. and WNGU Properties, LLC as is now joined in Adversary Proceeding No. 23-7002, styled *Garcia Grain Trading Corporation vs. Rodolfo Plascencia, Sr. and WNGU Properties, LLC*, pending before the U.S. Bankruptcy Court for the Southern District of Texas, McAllen Division (the "**Alamo Adversary**"). Specifically, the Alamo Adversary will be transferred to the Plan Trust and be administered by the Plan Agent; and

- Any and all other causes of action, whether brought or whether known at the time, owned by the estate (whether legal or equitably) against Insiders or third parties will be transferred to the Plan Trust and administered by the Plan Agent. These claims would include any lawsuits relating to the collection of pre-Petition accounts receivable as well as any preference, turnover actions, fraudulent conveyances, or other rights belonging to the Debtor in Possession in the Bankruptcy Case.

Standing of the Plan Agent to Serve as Trustee and Representative of the Estate.

The Plan Agent shall serve as Trustee and shall be appointed representative of the Estate pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Plan Trust Assets. With regard to the Plan Trust Assets, the Plan Trust may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein), settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action transferred to the Plan Trust. Except as otherwise ordered by the Bankruptcy Court, the Plan Agent shall be vested with authority and standing to prosecute the Causes of Action transferred to the Plan Trust. The Plan Agent and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

Distributions from the Plan Agent to the Beneficiaries of the Trust or the holders of Administrative claims, Priority Claims, Unsecured Creditors, GrainChain, and Harco.

The Plan Agent will use funds contributed to the Plan Trust as set forth under the terms and provisions described in the Plan and make distributions in accordance with the priorities established for the payment of creditors in the Bankruptcy Code.

As provided herein, Plan Agent shall make payments to holders of Allowed Administrative Claims until such claims are paid in full. The Plan Agent shall then make distributions of the holders of Priority Claims in accordance with the prescribed treatment for such Priority Claims as is contained in the Plan.

It is anticipated that holders of Allowed Administrative Claims and Holders of Allowed Priority Claims will be paid on or before the Effective Date of the Plan, notwithstanding the right of the Allowed Administrative Claims and Holders of Allowed Priority Claims to consent to different treatment. Once all Allowed Administrative Claims and Allowed Priority Claims have been paid in full, the Plan Agent shall then make distributions to the holders of Allowed General Unsecured Claims, GrainChain and Harco. In accordance with the provisions of the Plan the net proceeds from the sale of Moore Farms and Emory Farms shall be paid according to the percentages established in the Plan such that 45% of the net proceeds will be distributed to GrainChain, 45% will be distributed to the holders of Allowed General Unsecured Claims, and 10% shall be distributed to Harco. These percentage distributions will remain the same in so far as the net distributions derived from the proceeds of real property or from recoveries obtained by the Plan Agent from other sources such as the recovery of preferences, fraudulent conveyances or other causes of actions owned by the Debtor and transferred to the Plan Trust. Any other unencumbered assets, that is, not subject to liens of any Allowed Secured Claim in the case the Plan Agent shall also distribute these percentages to these creditors. Available Distributions from

the net proceeds realized from these sources shall be paid out by the Plan Agent not less than semi-annually following the Effective Date of the Plan so long as such resources to make such distributions are more than *de minimis*.  These determinations shall be at the sole discretion of the Plan Agent.

As provided herein, any Unsecured Creditors who Opt-out of treatment under the Plan and desire to be paid exclusively from the Surety Bond(s) shall receive disbursements of their pro rata portion of the Surety Bond(s) upon determination of their respective percentage of distribution and the termination of the period allowed by law for filing such claims.

In addition, it is anticipated that New Co. will make note payments to the Plan Trust on the Unsecureds Note and the Harco Notes from the anticipated Distributable Net Income  from its operations.  These distribution note payments from New Co. shall be made on or before June 30 of each year following the Effective Date of the Plan with the first such payments from New Co. to be made on June 30, 2025 and on the same date of each year thereafter until June 30, 2029 as provided for in each non-recourse note.  The Plan Agent and, upon request the Committee, shall be entitled to full and complete copies of the New Co. filed income tax returns and attachments used to determine the after-tax distribution to the Plan Trust.

### ARTICLE VI
### TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### (I)      ADMINISTRATIVE AND PRIORITY UNSECURED CLAIMS

### (Classes 1 and 2)

**A.      Class 1 – Administrative Claims (Unimpaired)**

**Class 1** consists of the Administrative Claims entitled to priority under Section 507(a)(1) through (7) of the Bankruptcy Code, including the fees for services rendered and expenses incurred by the court-appointed counsel and other professionals for the Debtor through the Effective Date.

| Class 1 - Administrative Claims | | |
|---|---|---|
| **Name of Claim Holder** | **Description** | **Estimated Amount** |
| Mullin Hoard & Brown, LLP | Counsel for Debtor | $1,250,000 |
| D. Williams & Co. | Accountants for Debtor | $150,000 |
| Jordan & Ortiz, P.C. | Counsel for UCC | $500,000 |
| Dundon Advisers, LLC | Financial Advisor for UCC | $300,000 |
| Sánchez-Devanny Eseverri, S.C. | Special Counsel for Debtor | $20,000 |
| Stout Consultants | Insurance Consultants | $50,000 |
| Kay Walker | Counsel for CRO | $50,000 |
| Appraisers and Special Counsel | | $30,000 |
| **TOTAL** | | **$2,350,000.00** |

The Plan provides that holders of **Class 1** claims shall be treated in the following manner:

On or before the Effective Date or as otherwise agreed to by each individual Claim holder, allowed administrative expense claims, including any unpaid fees and expenses of the CRO,

counsel, financial advisors, and accountants for the Debtor and the Committee, and allowed priority tax claims shall be paid in full from the Plan Contribution. New Co.  Upon the Effective Date, as provided for under the Bankruptcy Code and applicable case law, the case professionals will cease to be case professionals and the Plan Agent shall be permitted to hire former case professionals as is determined to be proper in the Plan Agent's business judgment as necessary to assist the Plan Agent in fulfilling the terms of the Plan Trust Agreement, and no case professional shall be prohibited from representing the Plan Agent merely because such professional was a case professional prior to the Effective Date.

Additionally, if there are any pre-Confirmation U.S. Trustee quarterly fees, these will be paid upon Confirmation of the Plan. Further, any post-confirmation fees pursuant to 28 U.S.C. § 1930(a)(6) will be paid in the Debtor's ordinary course of business as these fees arise. After confirmation, the Debtor shall file with the Court and serve on the United States Trustee a monthly financial report for each month (or portion thereof) the case remains open in a format prescribed by the U.S. Trustee and provided to the Debtor by the U.S. Trustee. All U.S. Trustee fees will cease upon the closing of the case by the Court.

### B.      Class 2 – Priority Unsecured Claims (Unimpaired)

**Class 2** consists of the unpaid pre-Petition claims of the taxing authorities owed by the Debtor as to Ad Valorem taxes, income taxes and sales taxes, which are allowed pursuant to Section 507(a)(8) of the Bankruptcy Code, and unsecured priority claims of grain claimants pursuant to section 507(a)(6) of the Bankruptcy Code. A total amount of taxes due shall be determined by the Proof of Claims filed by the taxing entities prior to the date set by the Bankruptcy Court for filing proofs of claim. However, the Debtor believes that the total amount outstanding in **Class 2** for pre-Petition Ad Valorem taxes due Cameron County and for Hidalgo County to be less than the amounts reflected in the filed Proofs of Claim of these taxing authorities. Thus, the Debtor will either clarify the amount owing these counties through negotiations or, if necessary, file an objection to the Proofs of Claim and allow the Court to determine the exact amount owed by the Debtor.

| Class 2 – Priority Unsecured Claims | |
|---|---:|
| 1. IRS Asserted Priority Claim (disputed) | $571,705.00 |
| 2. Ad Valorem Tax Claims | $138,537.00 |
| 3. Grain Priority – Section 507(a)(6) | $112,125.00 |
| 4. Priority Claims of Local Taxing Authorities | $138,537.00 |
| **TOTAL:** | **$960,904.00** |

On or before the Effective Date, the Allowed Priority Tax Claims shall be paid in full from the Plan Contribution or otherwise paid in accordance with the Bankruptcy Code upon Allowance.

Treatment of Secured Tax Claims of Ad Valorem Taxing Authorities.

The allowed secured claims of ad valorem taxing authorities shall bear interest at the statutory rate (12% per annum) and shall be paid in full from the proceeds of any sales of Estate

assets, if not paid in full from the proceeds of the sale, then by the Debtor upon or before the Effective Date of the Plan by the Plan Agent from funds available in the Plan Trust. Taxing authorities shall retain their statutory liens until their allowed claims are paid in full.

**Notwithstanding anything to the contrary contained within the Plan or approved Disclosure Statement, the 2023 ad valorem taxes owed to Hidalgo County, City of Donna, Cameron County, Willacy County and Lyford CISD, shall be paid by the Debtor on or before January 31, 2024, if not sooner paid by sale proceeds from the sale of any property subject of such tax liens. All 2022 ad valorem taxes shall be paid on the Effective Date, or the date that is the thirtieth (30th) day following the date when the Confirmation order becomes final, if not sooner paid from sale proceeds from the sale of any property subject of such tax liens, whichever date is later. These taxing authorities shall retain all liens until such taxes are paid in full.**

**Default shall occur if the ad valorem taxes are not paid as hereinabove provided. In the event of default, these taxing authorities shall be free to proceed with the state law remedies for collection of all amounts due under state law pursuant to the Texas Property Tax Code.**

Treatment of Claim of State Comptroller.

On October 11, 2023, the Texas Comptroller of Public Accounts withdrew its Proof of Claim (POC #36 filed on 6/6/2023).

Treatment of Tax Claims of the Internal Revenue Service (IRS).

After the Debtor has analyzed any asserted tax claims of the IRS and filed any appropriate amended IRS returns of the Debtor, the Allowed Priority Claims of the IRS, if any, shall bear interest at the applicable statutory rate and shall be paid in sixty (60) monthly installments by the Plan Trust. Due to the findings set forth in the report concerning the Debtor's prior to the Petition Date, the Debtor intends to file an amended tax return for

**(II).**   **SECURED CLAIMS**

<b>(Classes 3 through 7)</b>

Secured Claims under the proposed Plan consist of **Classes 3** through **7** described below.

**C.**   **Class 3 – Secured Claim of StoneX (Impaired)**

**Class 3** consists of the Secured Claim of StoneX in the approximate amount of $19,461,058.00 (**POC #37** filed on 6/13/2023). StoneX has a claim represented by negotiable warehouse receipts and it asserts ownership interests or security interests in the following collateral:

- Pre-Petition Accounts Receivable ("**A/R**") derived from the sale of the grain in the approximate sum of $1,929,160.00 of which the estimated sum of **$650,000** is collectible.

- Funds in the Grain Escrow Account in the amount of **$3,550,402.00**.

- Surety Bonds totaling the amount of **$1,748,.** This amount consists of the surety bonds covering the <u>Progreso Elevator and the Donna/Santa Rosa Elevators</u> in the total amount of <u>$1,748,000</u>.

- Funds realized for the grain insurance claim for salvaged grain damaged in the April 2023 windstorm in the estimated sum of **$1,889,000.00**.

Total value of this collateral in which StoneX either holds title or has a security interest is approximately **$7,837,402.00**.

Thus, StoneX has a secured claim against the estate estimated at $7,837,402.00 and an unsecured deficiency claim in the approximate sum of $11,623,656.00.

**Treatment of StoneX Claims:**

The Debtor and StoneX have reached agreed-upon plan treatment regarding all secured, unsecured, priority or any other claims which StoneX holds against the estate for the consideration of not less than $12,500,000, and not more than $13,000,000, and to waive and release any claims against the estate over that amount. In order to raise a portion of the $12,500,000to be paid to StoneX, Octavio Garcia and his related entities agree to transfer and convey to the Plan Trust all of their right, title and interest of any nature whatsoever the following real property:

| Description of Property | Estimated Net Proceeds |
|---|---|
| South Padre Island Condominium | $  200,000.00 |
| Toluca Ranch Tracts | $1,000,000.00 |
| Moore South Tract | $  450,000.00 |
| Huffman Farm Tracts | $  900,000.00 |
| TOTAL | $2,550,000.00 |

Upon the receipt of the $12,500,000from the Plan Trust all claims and causes of action which StoneX holds against the bankruptcy estate shall be fully extinguished and discharged, and the personal guarantee of Octavio Garcia given to StoneX to secure the indebtedness owed by the Debtor will be released. Likewise, on the Effective Date, the Debtor on behalf of itself and its Bankruptcy Estate, shall release, acquit, and forever discharge StoneX, and each of their respective directors, officers, representatives, agents and attorneys, from any and all claims, counterclaims, demands, controversies, costs, contracts, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, actions, and causes of action of any nature, type or description, whether at law or equity, by common law or statute, in contract, for, or otherwise, known or unknown, asserted or unasserted, or suspected or unsuspected that have or could have been asserted in connection with the Debtor's bankruptcy case.

An initial payment in the amount of not less than $10,000,000 will be made  no later than September 30, 2024. StoneX acknowledges that it has already received the total sum of $3,550,402 from the funds in the Debtor's Grain Escrow Account which shall be counted toward the satisfaction of the $10 million.

The sources of payment from the Debtor and Octavio and his related entities to satisfy the balance of the $10 million  contribution to the Plan Trust comes from liquid assets summarized as follows:

- HuffmanFCCI Grain Damage Claim +  Interest    $1,890,598.00
- Octavio Garcia Funds from IOLTA Account    $1,114,000.00
- Octavio Garcia Funds from Note Receivable    $1,045,000.00
- Octavio Garcia Funds from Tracts of Real Estate    $2,550,000.00
       TOTAL      $6,599,598.00

The  balance  of  the  funds  necessary  to  achieve  the  $12,500,000.00  threshold  totaling approximately $2,350,000 will be paid from the Plan Trust  out of the net proceeds  realized from grain  receivables,  the  net  amount  received  from  the  Estate  from  FCCI  Insurance  for  its supplemental claim for the damaged grain at the Progreso Facility, and the balance to be paid from recoveries  or  contributions  received  by  the  Plan  Agent  consisting  of  funds  realized  from  any recovery  from  litigation  or  settlement  with  Harco  over  the  Surety  Bonds.  In  the  event  the collections realized from the grain receivables, the FCCI supplemental claim for the damaged grain at the Progreso Facility, or from the funds realized from the Surety Bonds should exceed the amount necessary to pay StoneX the threshold release amount of $12,500,000, then in such event, StoneX shall be entitled to receive such surplus funds up to the total amount of the recoveries, but in no event shall its recovery exceed the total sum of $13 million. Provided, however, that the Plan Trust shall be entitled to deduct from the funds realized from the collection of funds from grain receivables,  the  supplemental  grain  damage  claim  against  FCCI,  and  the  recovery  from  any litigation associated with the Surety Bonds, all post-confirmation attorneys' fees and costs incurred by the Plan Trust to prosecute the collection of the claims.

Following the payments by the Plan Agent to StoneX of not less than $10,000,000 by September 30, 2024, the Plan Agent and its counsel will use their best, good faith efforts to obtain the  balance  of  the  $12,500,000  from  such  sources  described  above,  and  if  the  balance  owing StoneX has not been paid by December  31, 2024, the Plan Agent shall provide a written report to StoneX of the current status of efforts being undertaken, including the status of any litigation that may be pending on such date involving the collection of the funds needed to pay the StoneX settlement amount in full, and shall provide similar reports to StoneX on the last day  each calendar quarter thereafter until the balance of such settlement sum of a minimum of $12,500,000 is extinguished and paid in full. Should the balance of the funds owing to StoneX under the terms of this settlement necessary to reach the $12.5 million threshold not be paid by the first anniversary date of the Effective Date then in such event StoneX may, at its option, request that the Plan Agent transfer and assign any pending causes of action to StoneX related to the collection of the Surety Bonds or the supplemental grain damage claim against FCCI, and may also request that any remaining tracts of real property listed hereinabove which have been conveyed to the Plan Trust by Octavio Garcia, or any of his related entities, being conveyed over to it. In the event, StoneX makes such requests for the transfer or assignment of the litigation, it shall be understood that upon any recovery from the lawsuits the Plan Trust shall be entitled to reimbursement of its attorneys' fees and costs incurred up to the date of the transfer and assignment of these causes of action. Further, any conveyance of the tracts of real property shall be subject to any existing liens or encumbrances appearing of record against them.

In the event the Debtor fails to hit the $10 million payment by September 30, 2024 or to reach the $12.5 million payment threshold by the first anniversary of the Effective Date, StoneX shall have the right to elect to be paid any deficiency from any other asset held by the Plan Trust including the profits from post confirmation operations.

The Plan provides with the unanimous consent of the members of the Plan Trust Committee it shall be empowered to address any shortfalls in the payment of the amount due to StoneX under its terms by making such distributions from the Plan Trust as in its sole discretion it may deem advisable using its best business judgment under the circumstances.

### D.    Class 4 – Secured Claim of Vantage (Impaired)

**Class 4** consists of the Secured Claim of Vantage which filed a Proof of Claim (POC #41) in the amount of $8,789,063.88 on June 16, 2023.

Vantage 's claim is secured by a first lien deed of trust against the Santa Rosa Facility which the Debtor believes has an approximate value of **$1,350,000.00;** a first lien deed of trust against the Donna Facility which the Debtor believes has an approximate value of **$1,350,000.00;** and a first lien deed of trust against the Pitts Property which the Debtor believes has an approximate value of **$3,600,000.00**.

Vantage has an outstanding loan in the amount of approximately $465,000.00 (plus interest and costs of collection) which is secured by a Deed of Trust against a 170-acre tract of land known as "Toluca Ranch" (the real property at the municipal address of Country Rd 793 & 1702 TX Hidalgo County, Texas) owned by Garcia Balli, Ltd. having an estimated value of $1,700,000.00; however, such indebtedness is not cross-collateralized with the debt and assets of the Debtor.

Vantage also has a claim for the warehouse receipts to grain in the Donna Facility and Santa Rosa Facility which has a bond (TXIFSU 0570548) in the amount of **$739,200.00.**

In addition, Vantage Bank has claim against the A/R in the inventory and cash for the bean enterprise, the Debtor estimates that Vantage Bank will be entitled to an additional amount of about $1,000,000.00. Per the compromise and settlement agreement entered at docket no. **517** between the parties, the Debtor offered, and Vantage Bank accepted **$625,000.00** instead of $1,000,000.00 for its interest in the bean enterprise, and released its liens on the Bean cash collateral, accounts receivable, inventory, and any other related assets.

Thus, Vantage Bank's total collateral can be summarized as follows:

| Vantage Bank's Security Interest in the Collateral | Value |
|---|---|
| Pitts Property (1st Lien Deed of Trust)* | $3,600,000.00 |
| Santa Rosa Elevator (1st Lien Deed of Trust)* | $1,350,000.00 |
| Donna Elevator (1st Lien Deed of Trust)* | $1,350,000.00 |
| **Subtotal*** | **$6,300,000.00** |

| Values estimated by Borrower | |
|---|---|
| Assignment to the estate or its designee, without recourse, all of Vantage's warehouse receipts held as collateral for its claim against the Bankruptcy Estate and any right to assert claims against Surety Bonds issued by Harco National Insurance Co. in the penal sum of $2,155,350.00 | $400,000.00 |
| | |
| **Subtotal** | **$400,000.00** |
| **TOTAL** | **$6,700,000.00** |

Therefore, the estimated total payment to Vantage Bank is estimated to be **$6,300,000.00** (total value of its collateral) plus $400,000.00 which will be **$6,700,000.00.**

Therefore, the Debtor estimates the amount paid to resolve Vantage's claim(s) as to the Debtor will be **$6 700,000.00.**

**Vantage's Treatment :**

The partially secured claim of Vantage and its unsecured claim shall be treated as follows:

a. **Loan #54613 [Garcia Grain Trading Corporation]** – At Vantage Bank Texas' ("Vantage" ) election, the Debtor will deed and assign the Pitts Farm including any and all rights that may include but are not limited to water and mineral rights, payments received during the Bankruptcy Case, and agreements associated with the Pitts Farm (collectively the "Pitts Farm Collateral"), to Vantage  pursuant to a Bankruptcy Court Order deeding and assigning the Pitts Farm Collateral to the Vantage (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit Vantage to proceed with foreclosure (deed and assignment to Vantage by Court Order or foreclosure by Vantage of Pitts Farm Collateral shall collectively be referred to as the "Pitts Farm Collateral Bank Sale"). Any and all income, including but not limited to rental income, due and/or received for the Pitts Farm Collateral prior to the Pitts Farm Collateral Bank Sale shall be paid to Vantage. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Pitts Farm Collateral will be the responsibility of and borne by the Debtor and Vantage is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Pitts Farm Collateral may produce net proceeds to be paid to the Vantage on its claim owed by Debtor in the approximate amount of $3,600,000.00.

b. **Loan #112382 & #112390 [Garcia Grain Trading Corporation]** – At Vantage's election, the Debtor will deed and assign the Santa Rosa  Facility, including any and all rights that may include but are not limited to water and mineral rights, Santa Rosa Lease, Union Pacific Industrial Lease, and any and all other agreements associated with the Santa Rosa  Facility (collectively, the "Santa Rosa Collateral"), composed of Tract 1 and Tract 2 as described in the deeds securing the  loans of Debtor to Vantage pursuant to a bankruptcy court order  deeding and assigning the Santa Rosa Collateral to Vantage (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit Vantage to proceed with foreclosure (deed and assignment to Vantage by court order or foreclosure by Vantage of Santa Rosa Collateral shall collectively be referred to as the "Santa Rosa Collateral Bank Sale"). For clarification, Vantage is and will remain entitled to all rental income received through the existing lease period of the Santa Rosa Lease with Texas Valley Grain of the Santa Rosa Collateral. The Debtor shall work and cooperate with Vantage to resolve any issues that may impact the sale of the Santa Rosa Collateral including but not limited to the Union Pacific Industrial Lease. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Santa Rosa Collateral will be the responsibility of and borne by the Debtor and Vantage is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Santa Rosa Collateral may produce net proceeds to be paid to Vantage on its claim owed by Debtor in the approximate amount of $1,350,000.00.

c. **Loan #115998 [Garcia Balli Loan]** –Debtor, Octavio Garcia and Spouse, individually and as owners of Garcia Balli, LTD, acknowledge and agree that Vantage Bank Texas ("Vantage") has a first lien on the property described as the Toluca Ranch, including any and all rights that may include but are not limited to water and mineral rights, and agreements associated with the Toluca Ranch (the "Toluca Ranch Collateral") that secures the non-bankruptcy Loan #115998 to Garcia Balli, LTD, as borrower, (the "Garcia Balli Loan"). Vantage shall be paid all amounts due and owing on the Garcia Balli Loan upon the sale and/or foreclosure of the Toluca Ranch Collateral. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from a sale of the Toluca Ranch Collateral will be the responsibility of and borne by Garcia Balli, LTD and/or Octavio Garcia and Spouse, individually and as owners of Garcia Balli, LTD, and Vantage is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the amount owed to Vantage at time of sale of the Toluca Ranch Collateral may produce proceeds to be paid to Vantage on the Garcia Balli Loan in the approximate amount of $465,000.00 (plus any accrued interest, expenses, and costs of collection).

d. **Loan #116006 [Garcia Grain Trading Corporation]** – Debtor, Val Verde Grain Holdings, a general partnership ("Val Verde Grain Holdings") and Octavio Garcia and Spouse, individually and as owners of Val Verde Grain Holdings (collectively, Octavio Garcia and Spouse and Val Verde Grain Holdings will be referred to as "Val Verde Holdings"), acknowledge and agree that Vantage Bank Texas ("Vantage") has a first lien on the property described as the Donna Facility, including any and all rights and agreements associated with the Donna Facility, (the "Donna Facility Collateral") that secures the bankruptcy Loan #116006 to Garcia Grain Trading Corporation, as Borrower, as collateral securing all amounts owed to Vantage by Debtor. Debtor and Val Verde Grain Holdings agree that, at Vantage's election, the Debtor and Val Verde Grain Holdings will deed and assign the Donna Facility Collateral to Vantage pursuant to a bankruptcy court order deeding and assigning the Donna Facility Collateral to Vantage (or its designated nominee) (subject to the Texas Banking Commissioner's approval), free and clear of any and all liens, or by agreement as to a termination of automatic stay and/or any injunction to permit Vantage to proceed with foreclosure (deed and assignment to Vantage by court order or foreclosure by Vantage of Donna Facility Collateral shall collectively be referred to as the "Donna Facility Collateral Bank Sale"). Any and all income, including but not limited to rental income, due and/or received for the Donna Facility Collateral shall be paid to Vantage. Save and except ad valorem taxes, any capital gain taxes or other taxes that may be owed resulting from the sale, disposition, transfer, assignment, or other similar treatment of the Donna Facility Collateral will be the responsibility of and borne by the Debtor and/or Val Verde Grain Holdings and Vantage is released from any and all liability as to such taxes. Solely for the purposes of Debtor's/Bankruptcy Estate's estimation only, it is believed that the sale of the Donna Facility Collateral may produce net proceeds to be paid to Vantage on its claim owed by Debtor in the approximate amount of $1,350,000.00.

e. **Bean Cash Collateral Proceeds** – Debtor paid to Vantage the sum of $625,000.00 in cash ("$625,000.00 Bean Cash Collateral Payment") derived from the cash and accounts receivable from the sale of the bean inventory ("Bean Cash Collateral Proceeds") as a full and final settlement of its claim on the Bean Cash Collateral Proceeds pursuant to the Bankruptcy Court's order at docket no. 517.

f. **Bean Inventory, Grain Inventory/Accounts Receivable, and Grain Surety Bonds Collateral** – There was, before the Bankruptcy Court approved and effectuated a compromise and settlement entered into at docket no. **517**, an estimated amount in excess of $600,000.00 of value of bean inventory ("Bean Inventory Collateral") in which, pursuant to orders permitting use of the bean inventory and bean cash collateral, Vantage retained a first lien security interest that is now released pursuant to the terms of the Order at docket no. 517 and effectuation of such compromise and settlement.

Additionally, Vantage claims a secured claim to any and all grain inventory and grain accounts receivable of Debtor (collectively, "Grain Collateral"). It is undetermined how much of such grain inventory and grain accounts receivable that are subject to the Vantage's claimed secured interest.

Further, pursuant to grain warehouse receipts associated with the grain inventory at the Santa Rosa Facility ("Vantage Warehouse Receipts"), Vantage claims a secured claim to the proceeds of any surety bond that covers any missing grain at the Santa Rosa Grain Facility and/or Progreso Grain Facility. The amount of the surety bond for the Santa Rosa Facility is approximately $739,000.00 and the amount of the surety bond for the Progreso Facility is approximately $1,009,750.00 (collectively, the Santa Rosa surety bond and Progreso surety bond will be referred to as the "Surety Bond") for a Surety Bond total amount of $1,748,750.00.

Debtor shall pay to Vantage the sum of $400,000.00 in cash in consideration of the Bank releasing any claims it has as to the Bean Inventory Collateral, Grain Collateral or rights with respect to the Vantage Warehouse Receipts, and Surety Bond. Vantage will not release its claim on the Surety Bonds until after it receives the payment of the $400,000.00 which is to be paid on or before ninety (90) days from entry of the order confirming the plan of reorganization and shall transfer to the Plan Trust the Vantage Warehouse Receipts.

g. **Life Insurance on Octavio Garcia** – As part of the Settlement, Octavio Garcia agrees to continue the assignment of Life Insurance Policy #T4000118328 issued by The Lincoln National Life Insurance Company covering the life of Octavio Garcia in the amount of $3,000,000 (the "Life Insurance Policy") to Vantage Bank Texas and further agrees to continue the payment of the Life Insurance Policy through and including the Life Insurance Policy annual premium payment due for 2027. Vantage Bank Texas agrees to release its assignment of the Life Insurance Policy no earlier than 3/31/2028 and further agrees that in the event a claim is filed on the Life Insurance Policy and the Insurer tenders the benefits/funds to the Bank (the "Assigned Party'), the Bank and the Policy Owner and Beneficiaries agree that the Bank will use the Life Insurance Policy Proceeds to pay any remaining debt outstanding (the "Vantage Bank Deficiency"), if any, owed by Debtor, Garcia Grain Trading Corporation, Octavio Garcia, and not paid or reduced from the net proceeds of the sale of collateral securing the Vantage loans described above, and/or other funds or proceeds as provided to Vantage  as part of the Bankruptcy Settlement or a confirmed  Plan. For purposes of this provision, the Vantage Bank Deficiency shall include any remaining principal, accrued interest, expenses, legal and collections fees and other permissible expenses incurred by Vantage as to the above-described loans after application of any monies received by Vantage under the terms of this Agreement. All remaining Life Insurance proceeds after payment of any Vantage Bank Deficiency will be returned to the Decedent's Estate or Beneficiary of Record. Vantage retains the right to fund the annual premium owing on the Life Insurance Policy.

h. **Mutual Release:** Octavio Garcia, Gabriela Garcia, Val Verde Grain Holdings, , Debtor and  the Bankruptcy Estate will release any and all claims, known or unknown, that they may have as to Vantage Bank Texas, its officers, directors, representatives, employees, shareholders, agents and attorneys , and upon the completion of the Plan treatment of Vantage described in the Plan, including but not limited to Vantage's receipt of $400,000.00 from the Bankruptcy Estate, and, upon Vantage's assignment of the Vantage Warehouse Receipts to the Plan Trust, Vantage shall release any and all claims, known or unknown, that it may have as to the Debtor, the Bankruptcy Estate, Octavio Garcia,

Gabriela Garcia, Val Verde Grain Holdings, and  their officers, directors, representatives, shareholders agents and attorneys.

i. **Co-Guarantor:** Vantage Bank Texas retains all rights and claims it has against co-guarantor, Rodolfo Plascencia.

### E.     Class 5 – Secured Claim of Falcon (Unimpaired)

**Class 5** consists of the Secured Claim of Falcon who filed three Proofs of Claims (**POC#38** for $1,152,412.11, **POC #39** for $2,424,044.10 and **POC #40** for $2,412,696.50) in the total amount of **$5,989,152.71** on June 14, 2023, for loaned money.

Falcon's claim is secured by a first lien deed of trust against the Progreso Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 707 S. Int'l Blvd., Progreso, Hidalgo County, Texas) having an estimated value of **$4,430,000.00**, and a first lien deed of trust against Moore Farms (located at Military Road, Progreso, Texas) having a current estimated value of **$7,000,000.00** along with a security interest at equipment valued at **$330,000.00**. Falcon has $5,770,847 of equity after payment of secured debt.

Thus, Falcon's total collateral can be summarized as follows:

| Falcon's Security interest in Collateral | Value |
|---|---|
| Progreso Elevator (first lien deed of trust) | $4,430,000.00 |
| Moore Farms (first lien deed of trust) | $7,000,000.00 |
| Equipment (first lien security interest) | $330,000.00 |
| **TOTAL** | **$11,760,000** |

**Falcon's Treatment:**

Falcon will receive **payment in full of its outstanding claim in the estimated amount of approximately $6,000,000.00**, plus all accrued interest and attorneys' fees since the date of the filing of its Proof of Claim, by receiving the net proceeds from the sale of the Moore Farm having an estimated value for purposes of the Plan of $7,000,000.00. Upon the payment in full  of the indebtedness owed to it, Falcon shall release its liens, including without limitation the Deeds of Trust against all other real property of the estate including but not limited to its Deeds of Trust against the Progreso Facility and any other tracts of real property encumbered in any manner by its recorded Deeds of Trust, including any and all liens in applicable insurance proceeds. Furthermore, Falcon agrees to release any liens on real property it may have filed in error covering collateral by Vantage, including the Pitts Property.

For purposes of the Plan, the Debtor projects that the sale of Moore Farms will result in unencumbered net proceeds, after GrainChain voluntarily releases its lien in accordance with the Plan, Confirmation Order, and any related transactional documents on the Effective Date, available to fund the Plan in the approximate sum of $500,000.

Specifically:

a.  The secured claim of Falcon International Bank shall be satisfied in full by the sale of the Moore Farm tract. The Debtor agrees for the Moore Farm to be listed by Octavio with the real estate brokerage firm of Hanna Solutions for a listing price of $8,000,000, and a real estate commission of not more than 4%.

b.  Falcon agrees that it will accept a price for the Moore Farm sufficient to pay its secured claim in full. Debtor agrees that it shall accept a price of not less than **$6,000,000.00**.

c.  Any proceeds more than the amount necessary to satisfy the secured claim of Falcon shall be paid over to the Plan Agent and paid out as a plan contribution to satisfy any unpaid administrative claims and then as dividends paid to the holders of Allowed General Unsecured Claims as more specifically provided hereinbelow.

d..  If after a period of six (6) months from the date of confirmation, PSG Products, LLC has not sold enough property from the Moore Farm to satisfy the entire debt owed to Falcon International Bank, then Falcon International Bank can either request that the Debtor and PSG Products, LLC to convey such properties to Falcon by special warranty foreclosure deed(s) in full and final satisfaction of all Falcon's liens and claims and Falcon shall promptly release its liens on the real property conveyed to the Plan Trust and New Co or Falcon International Bank can grant the Debtor and PSG Products, LLC an additional six (6) months to market and sell the Moore Farm. This right to either accept the Moore Farm in full satisfaction of the debt owed to Falcon International Bank or grant additional six (6) month options to market and sell the Moore Farm shall continue until enough of the Moore Farm is sold to pay the entire debt owed to Falcon International Bank and such claim is paid in full.

### F.      Class 6 – Contested Secured Claim of GrainChain. (Impaired)

**Class 6** consists of the Secured Claim of GrainChain. GrainChain filed its secured proof of claim in the amount of at least $7,841,054.99 plus applicable, interest fees and other unliquidated liabilities [claims reg. no. 42-1].

GrainChain's claim is secured by a 2nd Lien Deed of Trust against the Progreso Elevator and Moore Farms against which Falcon holds the 1st Lien Deed of Trust. The Debtor for Plan purposes asserts that the value of GrainChain's equity interest in the above-described collateral is approximately **$5,770,847.29**. GrainChain claim also is secured by a 2nd Lien Deed of Trust against the Pitts Property which Vantage holds the 1st Lien Deed of Trust. The value of GrainChain's equity interest in the Pitts Property is estimated to be $0.00 by the Debtor for Plan purposes.

In addition, GrainChain has a 1st Lien Deed of Trust against Emory Farms (i.e., a 56-acre tract of land titled in PSG Products LLC) valued at **$770,000.00**, 1st Lien Deed of Trust against Baryta Industrial Tract (titled in Octavio Garcia) valued at **$650,276.00**, and a 1st Lien Deed of Trust against the Edcouch Elevator (i.e., the grain elevator facility owned by the Debtor located at the municipal address of 624 W. Missouri, Edcouch, Texas 78538) valued at **$1,334,435.00**.

Together, the Debtor estimates for Plan purposes that the amount of GrainChain's security interest on Debtor and Non-Debtor Entity Owned Property assets is approximately **$8,525,558.29**, which can be summarized as follows:

| GrainChain's Security interest in Collateral | Debtor's Estimated Value |
|---|---|
| Progreso Elevator and Moore Farms (2nd Lien Deed of Trust), against which Falcon holds the 1st Lien Deed of Trust | $5,770,847.29 |
| Emory Farms (1st Lien Deed of Trust) | $770,000.00 |
| Baryta Industrial Tract (1st Lien Deed of Trust) | $650,276.00 |
| Edcouch Elevator (1st Lien Deed of Trust) | $1,334,435.00 |
| **ESTIMATED TOTAL** | **$8,525,558.29** |

The Debtor asserts, among other claims regarding these liens, that GrainChain obtained its liens within 90 days of the Petition Date of February 17, 2023, as to the properties titled in the Debtor's name, known as the "preference period" under 11 U.S.C. § 547, in order to secure an antecedent debt and enabled GrainChain to receive more than it would have been paid under a Chapter 7 proceeding; and therefore those liens are subject to be nullified. Such a challenge to GrainChain's liens would be subject to any and all of GrainChain's applicable defenses, and any agreed-upon plan treatment herein, or as memorialized in the Plan Confirmation Order or any other document, is not an admission by GrainChain of the validity of any potential preference action, or any other cause of action. GrainChain in good faith seeks to resolve all matters through its agreed-upon plan treatment, including but not limited to) those liens it obtained greater than 90 days ago with respect to Non-Debtor Entity Owned Property. This, and all other matters, including allegations of preferences and the like, are fully settled between the Debtor and GrainChain as set forth in this Plan, Confirmation Order and acceptable transactional documents.

In order to resolve all disputes between the Debtor and GrainChain relating to its asserted second liens against the Progreso Facility and Moore Farms, as well as its first liens against the Baryta Industrial Tract, Emory Farms and the Edcouch Facility, the Debtor has reached an agreement for GrainChain's voluntary release[3] of the asserted liens of GrainChain against these assets upon the passage of the Effective Date after a final, non-appealable order is entered confirming the Plan and the entering of the transactional documents by all requisite parties and the conveyances of the requisite real and personal property as set forth herein, the Confirmation Order and the transactional documents.

---

3       Importantly, GrainChain will not release its lien on any of the properties until New Co. is vested with  title owner and holder of the respective property, or is otherwise able to deliver a replacement lien of equal dignity in favor of the three Note holders, which GrainChain may accomplish in any manner preserving the liens granted to the three Note holders herein.

In exchange for voluntarily releasing its Deeds of Trust against these real property tracts, the Debtor has entered into an agreement whereby (i) GrainChain, (ii) the Unsecured Creditors (only Classes 8 [Unsecured Bean Claims], 9 [Unsecured Farmers' and Grain Claims] and 11 [General Trade Claims]), and (iii) Harco Insurance will be transferred these liens or the owners of the various properties shall grant replacement liens[4] such that GrainChain, the Unsecureds, and Harco, all as Note holders, will hold *pari passu* liens against the tracts with GrainChain being entitled to anticipated Distributable Net Income of 45%, the Unsecured Creditors entitled to 45%, and Harco entitled to 10% (payment partially subordinated as set out herein), which shall be accomplished through payments on the three non-recourse Notes. These percentages, and the division of the net proceeds according to these ratios, will continue until such time as the claims of the constituent groups' Notes have been paid in full or all of the real property assets have been sold, as further detailed in the transactional documents.

In connection with the Pitts Property, which is referenced in the Order Granting the Debtor's Emergency Motion for Authority to Obtain Post Petition Financing, Pay off Asserted Liens of Vantage Bank Texas [dkt #517], GrainChain supports the settlement with Vantage and as to the Pitts Property will take such action as may be necessary regarding GrainChain's asserted lien on the Pitts Property as is congruent with the Vantage settlement contained in order at Docket Number 517 and any other order of the Court, and/or in connection with a confirmed Plan.

The debts owed to GrainChain are guaranteed by Octavio Garcia and Rene Izaguirre. Octavio Garcia and Rene Izaguirre shall agree to enter into tolling agreements with GrainChain (collectively, the "**Guaranty Tolling Agreements**") by which GrainChain agrees to withhold litigation on these guaranties. Generally, the Guaranty Tolling Agreements shall (a) provide that the guaranties will remain in full force and effect during the Chapter 11 Plan term, (b) toll any and all limitation periods through and including the sixth anniversary date of the Chapter 11 Plan's Effective Date, and (c) contain the terms and conditions upon which each guarantor will be released from their respective guaranty. The Guaranty Tolling Agreements are a part of the transactional documents and a prerequisite for GrainChain's agreed upon Plan treatment.

GrainChain advanced certain funds to the Debtor post-Petition under one or more credit facilities upon which GrainChain is entitled to interest, fees and expenses (collectively, the "**Post-Petition Indebtedness**").

Elkins and the Debtor entered into a Court approved lease of Progreso (the "**Elkins Lease**"). GrainChain has provided Elkins with certain financing through one or more factoring agreements with Elkins with respect to Elkins' operations of Progreso. Those operations are under the supervision and review of the CRO. On the Effective Date, and contingent upon Court approval of a Plan acceptable to GrainChain including, without limitation, the release of all Chapter 5 claims in the Plan and Confirmation Order as set out herein, the Debtor, subject to deduction and payment of the administrative expenses that are due and will be payable at the Effective Date, shall receive 55% of the *before tax* net profits from Elkins that have been generated by the operations (the "**Pre-Confirmation Pre-Tax Net Profits**"). Of the remaining 45% of the Pre-Confirmation Pre-Tax Net Profits on the Effective Date , such amounts may be used on the Effective Date to pay any

---

4       *See*, Note 3, *supra*.

then outstanding pre-petition ad valorem taxes as to the New Co. Property(ies) and to the extent funds are available to pay unpaid Allowed Administrative Claims.  The Elkins Lease with the Debtor will terminate on the Effective Date and Elkins will enter into an Operating Agreement with New Co. detailing the terms of the post-Effective Date relationship.

**GrainChain's Treatment:**

As part of the Chapter 11 Plan, the Debtor and GrainChain are resolving the Debtor's and its Estate's purported claims against GrainChain, if any, and GrainChain is agreeing to certain Plan treatment and commitment to funding New Co.'s operations through receivable factoring and such other agreed financing, if any.

This resolution and treatment deals with certain assets on which GrainChain asserts a prepetition lien and certain other recovered assets, generally as follows:

a.     The real property transferred to the Plan Trust including Moore Farms, Emory Farms, and Non-Debtor Entity Owned Property and/or sale proceeds from Non-Debtor Entity Owned Property; and

b.     The real property transferred to New Co. including the Progreso Elevator property and the Edcouch Elevator property and the Baryta property; and

c.     Any recovered properties by the Plan Trust, including the Alamo Elevator now subject to an avoidance action, as well as any other asset or funds recovered on behalf of the Plan Trust including recoveries from the Debtor's Insiders or Affiliates, or Insiders to the Affiliates.

Each of the asset categories shall be shared among the three Classes of Creditors: (i) the Class of Unsecured Creditors; (ii) the Class of the Harco Bond Claim; and (iii) the GrainChain Allowed Secured Claim. These Claims shall be paid from Distributions of operating profits and the required or potential sale of Plan Assets, with distributions of the proceeds paid, respectively 45%, 10% and 45% toward payment of the three (3) notes reflecting each Class's Allowed Claim.

In accordance with the Plan provisions, Octavio Garcia and his affiliated entities shall execute such deeds as may be necessary to convey good title to such real estate tracts to the Plan Trust and New Co. as may be applicable.

On the Effective Date GrainChain will voluntarily release any purported or asserted pre-Petition liens on Progreso, Edcouch and Baryta contingent upon full title to those properties being transferred to New Co. as provided herein and conditioned on the execution of the transactional documents and conveyances to New Co. in a form and manner acceptable to GrainChain, and a lien then granted to the three Note holders.

Upon the sale of the Moore Farms Properties, sale proceeds will be applied to fully satisfy any and all outstanding liens in favor of Falcon on its allowed secured claim such that Falcon, having been paid in full, will release its lien on the Progreso Property. Any remaining funds, if

any, shall be paid to the Plan Trust and distributed on the pro-rata split 45/45/10 between the Unsecureds, GrainChain, and Harco, respectively.

GrainChain will form an entity to operate the New Co. conveyed assets in a form and structure that is acceptable to GrainChain and New Co., with the equity of New Co. being owned by GrainChain and/or its authorized assigns. The primary business purpose of New Co. will be to continue operations with (i) Elkins under an Operating Agreement as to grain, corn and sunflower seeds and also (ii) a bean operation under an Operating Agreement with Garba. For five (5) years from the Plan Effective Date the Distributable Net Income of New Co. shall be used to pay down the three non-recourse notes. New Co. will not further encumber assets without the approval of the Plan Agent nor declare dividends or pay executive administrative salaries.

On the Chapter 11 Plan Effective Date, and contingent upon Court approval of all of GrainChain's requested Plan treatment (including without limitation the releases contained in this Plan and to be contained in the Confirmation Order) the Plan Trust through the Plan Agent shall receive 55% of the Pre-Confirmation Pre-Tax Net Profits subject to the payment of the Allowed Administrative Expense claims of the case professionals.  As of the Effective Date, the Pre-Confirmation Pre-Tax Net Profits is *estimated* to be approximately $1,699,162.00, subject to changes based upon the success of the operations and commercially reasonable operational holdbacks as agreed by the Plan Trust Committee.  Of the remaining 45% of the Pre-Confirmation Pre-Tax Net Profits, such amounts may be used on the Effective Date to pay any then outstanding pre-petition ad valorem taxes as to the New Co. Property(ies) and to the extent funds are available to pay unpaid Allowed Administrative Claims.

The Debtor and/or the record owner(s) of such properties shall convey all rights, title, and interests in and to the New Co. Properties New Co.by properly executed special warranty deeds to New Co. and by bill of sale all related personal property at each location, in accordance with the form of special warranty deed(s) and bill(s) of sale.  Generally, such conveyance(s) will provide that it is  effective as of the Plan Effective Date (with title insurance at New Co.'s/GrainChain's election, cost, and expense), pursuant to Sections 363 and/or 1141, free and clear of any and all liens, claims, interest, and encumbrances satisfactory to New Co. and GrainChain, save and except for (i) the post-Effective Date liens securing the three non-recourse Notes (Unsecureds, GrainChain, and Harco) all in equal priority and without foreclosure rights, and (ii) GrainChain's continuing rights of first refusal, and (iii) other than as provided herein.

Contemporaneous with the transfers, New Co. will grant liens through the applicable deeds of trust ("**New Co. Deeds of Trust**") to the Unsecureds as provided herein.

The New Co. Deeds of Trust will secure the non-recourse Notes.  GrainChain's Note shall be a five-year balloon non-recourse note in the dollar amount of GrainChain's Allowed pre-petition proof of claim at claim no. 42-1 ($7,841,054.99), which shall be allowed under the Plan and Confirmation Order in full.  GrainChain shall be the oblige of such Note.

An intercreditor agreement between the Plan Trustee as agent for the two Note Holders, GrainChain, and New Co. shall be entered into memorializing the Notes, deed of trusts and their related contractual terms (the "**Intercreditor Agreement**") in form approved by the Plan Trust

Committee. Generally, the non-recourse notes and deed of trusts shall reference the Intercreditor Agreement and incorporate such terms therein.

The Unsecured Creditors Class [8, 9, 10 and 11] balloon non-recourse Note (the "**Unsecureds Note**"), will  be executed by the Plan Agent on behalf of the Plan Trust as the Note oblige for the benefit of the Unsecureds upon completion of the claim objections, will be in the dollar amount of the ultimate Allowed general unsecured claims against the Debtor in the case but in no event shall exceed $9,100,000.00 , *expressly excluding* any and all deficiency claims, if any, by Vantage and Falcon; priority claims, administrative claims; any claim, if any, by StoneX; any claim, if any, by Harco; and any taxing authority claims of any kind, (including and without limitation local, county, state, and federal).  The Unsecureds' Note shall not bear interest, nor provide for the payment of attorneys' fees, costs, or any other fees whatsoever. The Plan provides that the Plan Agent and GrainChain shall have a period of 180 days to complete the claims allowance process for all claims not allowed as part of the Chapter 11 Plan confirmation. To the extent that the claims allowance process is not completed pre-confirmation and/or through confirmation, in addition to the Plan Agent's right to object to claims, GrainChain and the Committee are expressly given standing to object to any general unsecured claim on any basis, separate or jointly with the Plan Agent after Plan confirmation.

Harco currently holds a contingent and unliquidated general unsecured claim against the Estate.  Harco's allowed claim (the "**Harco Allowed Claim**") will be in the same dollar amount as Harco actually pays on the bonds or if not advanced in full by Harco, as allowed by any claim objection or related Adversary Proceeding heard at the confirmation hearing determining the proper amount to be paid by Harco. The Harco Class [12] non-recourse note (the "**Harco Note**"), will be executed by the Plan Agent on behalf of the Plan Trust as the Harco Note oblige for the benefit of Harco and will be in the same dollar amount as the Harco Allowed Claim. Notwithstanding anything else contained herein, it is presently estimated that the Harco claim will be equal to approximately Two Million Three Hundred One Hundred Fifty Five Thousand, ThreeHundred and Fifty Dollars ($2,155,350.00), but may be less. The Harco Note shall not bear interest, nor provide for the payment of attorneys' fees, costs, or any other fees whatsoever.

The GrainChain non-recourse note (the "**GrainChain Note**"), shall be in the dollar amount of GrainChain's Allowed Pre-Petition proof of claim at Dkt #42-1, which shall be allowed under the Chapter 11 Plan and Confirmation Order in full.  It is presently anticipated that the GrainChain Note will be in the amount of its pre-Petition indebtedness, and in addition to the amounts that may be added to the Note as provided in this Plan, Confirmation Order, or the Note itself, of $7,841,054.99. The GrainChain Note shall not bear interest, nor provide for the payment of attorneys' fees, costs, or any other fees whatsoever.  Notwithstanding the foregoing, pursuant to 11 U.S.C. § 506, and as set out in the Plan, if GrainChain's liens were Allowed in full GrainChain would be an oversecured creditor, and as such GrainChain would then be entitled to reasonable attorney's fees and interest on its claim as determined by the bankruptcy court.  GrainChain shall be the holder of the GrainChain Note.

All payments received by the holders of the three Notes shall be credited to the Note balance.

The Plan contemplates that the specific terms and conditions relating to the agreements reached between GrainChain, and its affiliate New Co., the Plan Trust Committee, the Debtor, Octavio Garcia, Rene Izaguirre, the CRO/Plan Agent, Harco, and any other party will be incorporated into the terms of supporting transactional documents and upon confirmation of the Plan shall be executed by the parties named therein to formerly memorialize their agreement, including:

1.      Multiple special warranty deeds properly executed conveying the certain properties to the Plan Trust by its record owner.

2.      Three or more special warranty deeds properly executed conveying Progreso, Edcouch and Baryta to New Co. subject to the liens provided herein.

3.      Three non-recourse Notes (collectively, the "Notes" or separately a "Note") and three deeds of trust on the New Co. Property in favor of the Note holders.

4.      An Intercreditor Agreement consistent with the Plan between the Note holders and New Co. shall be entered into memorializing the Notes, Deed of Trusts and their related contractual terms. The non-recourse Notes and Deed of Trusts shall reference the Intercreditor Agreement with any inconsistency being resolved by the terms of the Notes and Deeds of Trust.

5.      Three Tolling Agreements:

a.      The debts owed to GrainChain are guaranteed by Octavio Garcia and Rene Izaguirre.  Octavio Garcia and Rene Izaguirre will enter into tolling agreements with GrainChain and the Plan Trust**.**  Generally, these tolling agreements (a) provide that the guaranties will remain in full force and effect during the  Plan term, (b) toll any and all limitation periods through and including the sixth anniversary date of the  Plan's Effective Date, and (c) contain the terms and conditions upon which each guarantor will be released from their respective guaranty.

b.      The claims by the estate of the Debtor assigned to the Plan Trustee include potential claims against the Debtor's Insiders or Affiliates, or Insiders to those Affiliates, and Octavio Garcia and Rene Izaguirre will enter into tolling agreements with the Plan Trustee to: toll any and all limitation periods through and including the sixth anniversary date of the  Plan's Effective Date, and providing that upon which payment in full of the Unsecureds Note and payment under the Plan of the Harco Note, Octavio Garcia and Rene Izaguirre will be fully and finally released by the Plan Trustee on behalf of the general unsecured creditors.

c.      Regarding the released Non-Chapter-Five Claims against GrainChain, if any exist, GrainChain will enter into tolling agreements with the Plan Trust. Generally, these tolling agreements (a) provide that while the Non-Chapter Five Claims were preliminary released under the Plan and confirmation order, the finality of such release will remain abated and during such abatement period the Non-Chapter Five Claims

will remain in full force and effect during the Plan term but only upon a uncured material default (as later described herein) of New Co. or GrainChain, (b) toll any and all limitation periods through and including the fifth anniversary date of the Plan's Effective Date (the "Limitations Period"), (c) contain the terms and conditions upon which GrainChain will be fully and finally released from their respective Non-Chapter Five Claims, if any, (d) contain the Plan Trust's representation that the Plan Trust Trustee believes that it is the sole and exclusive owner of the Non-Chapter Five claims and agrees not to bring suit or otherwise demand, litigate or otherwise seek to prosecute the Non-Chapter Five Claims, if any, during the Limitations Period, unless or until a Uncured Material Default occurs by either New Co. or GrainChain.

6.      A post-confirmation Elkins operating agreement; a post-confirmation bean operating agreement.

7.      Two Groups of Non-Compete Agreements:

a.      Non-compete agreements in which the Post Confirmation Debtor, Garba, Octavio Garcia, Rene Izaguirre and certain of the Debtor's other insiders agree not compete with New Co. during the first five years of its operations**.**

b.      GrainChain's non-compete agreement that generally provides that GrainChain will not directly compete with New Co.'s sale of grain, corn, beans and/or sunflower seeds in the Rio Grande Valley during the five-year Note terms or until the Unsecureds Note is paid in full, whichever occurs first. Nothing shall prevent GrainChain from financing, factoring, or operating software with others and exercising any and all rights and remedies regarding same. New Co. will not undertake to operate, directly or indirectly, in any other market or with grain customers unless fully disclosed and unless all profits are part of, and subject to, the Plan Trust during the five-year Note Terms or until the Unsecureds Not is paid in full, whichever is earlier. And unless excused in writing by the buyer, New Co. agrees not to compete regarding the storage, handling, transportation, or sale of grain, corn, sunflower seeds, and beans, as may be applicable, against any successful buyer of any of the New Co. Properties, except to the extent New Co. is still operating the unsold property.

8.      A lease termination agreement as to the Elkins pre-confirmation lease**.**

9.      Post Confirmation Plan Committee Bylaws

These transactional documents are currently being prepared and subject to negotiation by the respective parties. The Debtor anticipates that all such transactional documents will be filed and served at a later date as a Plan supplement.

There will be three fixed principal amount non-recourse Notes that will reflect the Allowed amounts of (i). GrainChain's secured claim, which shall be an Allowed claim at confirmation in the amount of **$7,841,054.99** (GrainChain Note); (ii). the aggregate amount of the Allowed amount of all debt in the Unsecured Class after claim objections and preference actions (Unsecureds Note)

of $9.1 million or less; and (iii). the Harco Bond payment on all outstanding Bonds (Harco Note) of **$2.4 million or less.** The Three non-recourse Notes shall be without interest, without fees, and without expenses. The GrainChain Note may increase in the event that either New Co.[5] and/or GrainChain pays funds to cause the $250,00.00 yearly minimum payment on the Unsecureds Note.

The Unsecureds Note shall be a five-year balloon non-recourse to be executed by the Plan Agent on behalf of the Plan Trust as the Note oblige for the benefit of the Unsecureds upon completion of the claim objections and preference actions, if any, and such other deductions as may occur by law or by agreement. To the extent that the claims allowance process is not completed pre-confirmation and/or through confirmation, GrainChain and the Plan Trust as directed by the Plan Trust Committee shall each be expressly given standing to object to general unsecured claims on any basis, jointly or separately, with the Plan Agent before or after Plan confirmation.

Harco currently holds a contingent and unliquidated general unsecured claim against the Estate which the Debtor has informally taken the position that Harco's claim is fully subordinated to the Unsecured Creditors' Class of claims,[6] if not resolved by an agreed Plan treatment. Harco's Allowed claim will be in the same dollar amount as Harco actually pays on the bonds. The Harco non-recourse Note will be a five-year balloon non-recourse Note with payments subordinated as provided herein, and will be executed by the Plan Agent on behalf of the Plan Trust as the non-recourse Note oblige for the benefit of Harco. In the event of an order subordinating the Harco Note to all Unsecured Claims, then in that event the 10% Harco distribution provided in the Plan shall be shared equally by the Unsecured Note share and the GrainChain Note share.

The GrainChain five-year balloon non-recourse Note shall be in the dollar amount of GrainChain's Allowed prepetition proof of claim filed at docket no. 42-1($7,841,054.99), which shall be Allowed under the Plan and Confirmation Order in full.

The treatment of GrainChain's post-petition indebtedness owed to it by the Debtor shall be treated as follows: (i). the $1.2 million DIP Loan [$900,000.00 cash bond (the "GrainChain Bond") and $300,000.00 general operating loan] will be treated as contained in the Elkins operating agreement as to the $300,000.00 general operating loan which is to be paid out of New Co.'s operations and/or, in accordance with the Court Order at Docket Number 373 authorizing the DIP Loan, and the financing documents with the Debtor. The Plan Trust shall not be liable for any such indebtedness; provided, however, GrainChain shall be entitled to first look for repayment of the operating loan, as soon as practical and prior to any distributions on the Notes. As to the GrainChain Bond portion of the DIP loan (the $900,000 cash deposit), which are funds belonging to GrainChain but advanced to obtain the bond necessary to operate under the Elkins pre-confirmation lease, GrainChain shall be paid interest on the cash balance of the GrainChain Bond quarterly at the same rate as the GrainChain Factoring loan [as provided in the DIP Order at dkt. 373]. GrainChain may at any time obtain a surety bond at reasonable market rates and retrieve its cash bond balance and the New Co. operations shall be liable for payment of the bond premiums thereafter; and (ii). with respect to the Bean factoring, it will be treated as provided in the Bean

---

6       *See, American Surety Co. v. Sampsell*, 327 U.S. 269 (Sup Ct. 1946) and prior and subsequent decisions providing for the same.

operating agreement, the Court Order at Docket Number 517, and the financing documents with the Debtor. The Plan Trust shall not be liable for all such indebtedness but to the extent money is owed post-confirmation to GrainChain from advances to pay for those operations, it will be re-paid from the post-confirmation operations by New Co. before any Note payments of New Co.'s after tax net profit distributions. The Plan Trust is not a guarantor of New Co.'s grain, seed, or bean operations; provided however, to the extent these amounts remain unpaid when the GrainChain Note matures, all such amounts may be added to the GrainChain Note at GrainChain's sole discretion and election.

The Parties agree that the Plan Trust shall receive from New Co. on the Unsecureds Note at least $250,000.00 per year as a minimum note payment. GrainChain shall sign a limited guaranty, only as to the $250,000 yearly minimum if New Co. is unable to make the $250,000 yearly minimum payment on the payments as maybe applicable on the Unsecureds Note from its after tax profits. New Co.'s Distributable Net Income of shall be defined in the applicable transactional documents, including but not limited to the operating agreement(s) and generally shall be fairly determined utilizing GAAP accounting procedures and methods, and in compliance with rules and laws, which the aggregate of all payments on the Notes decrease the principal amounts of the Notes.

As further detailed in the to-be-furnished operating agreements and intercreditor agreement, the calculation of the Distributable Net Income shall be calculated in such a manner to maximize the New Co.'s Distributable Net Income, and the parties agree to mutually cooperate in good faith and consult each other to avoid the depression or adverse impact of accounting methods on the anticipated Distributable Net Income.

New Co. shall pay the GrainChain Note directly to GrainChain and not through the Plan Trust.

All Note payments made by New Co. to the Plan Trust on the Unsecureds Note and the Harco Note, and all New Co. payments to GrainChain on the GrainChain Note, shall be treated as dollar-for-dollar Note payments and principal balance reductions on the respective Notes. The Plan Agent may hold-back and not distribute a reasonable amount of the Note payments received by the Plan Trust from New Co. on the Unsecureds Note and the Harco Note for reasonable and necessary Plan Trust administration fees, costs, and expenses, including any reasonable and necessary Trust professionals. Likewise, the Plan Agent may hold-back and not distribute a reasonable amount from the property sales of the Plan Trust Properties for reasonable and necessary Plan Trust administration fees, costs, and expenses, including any reasonable and necessary Trust professionals provided that the respective Notes are not reduced dollar-for-dollar of the amount of the hold-backs. GrainChain's portion of the Distributable Net Income paid on the GrainChain Note may be used to pay for GrainChain's share of the Plan Trust operating expenses, as determined by the Plan Trust Committee, taking into account that the Plan Trust has obligations to make distributions to all Note holders from all Plan Trust Property, but only distributions to the Unsecureds and/or Harco from the Note payments made by New Co. to the Plan Trust. The Plan Trust Committee shall take into account this distinction when setting the sharing percentages as between the Unsecureds Note and Harco Note payments ultimately distributed by the Plan Trust, and the GrainChain payments or distributions of Plan Trust Property. Any monitoring of New Co.'s operations and/or GrainChain's factoring shall be performed by a neutral third party not

previously employed as a professional during the Bankruptcy Case to be selected by the Plan Trust Committee, with any reasonable fees or expenses incurred by said party not to exceed $6,000.00 per quarter and to be paid by New Co. as an operating expense.

The Parties agree that Plan Trust shall include in its decision-making a "Plan Trust Committee", which members shall consist of one GrainChain representative, the Plan Agent, and one unsecured creditor representative as defined previously in Section I, § 2.70 of this Plan.

Generally, and as memorialized in the bylaws and related transactional documents, the formation of this Plan Trust Committee is to improve prompt decision making, handle voting to the extent the Plan or Plan Trust provides for such Plan Trust Committee voting, and to otherwise assist in implementing good and effective Plan performance and operations of the Plan Trust and New Co.

The principal amount of the GrainChain Note will *increase* to the extent that GrainChain pays all or part of the $250,000 yearly minimum Unsecureds Note payment to the Plan Trust.

The Parties agree that, as set out in the to-be-furnished Plan Trust Agreement and related transactional documents, the sharing percentages of the Plan Trust Properties' net sales proceeds the (including but not limited to PSG Moore/Emory) shall be 45-10-45, with 45% paid on the GrainChain Note; 45% paid on the Unsecureds Note; and 10% paid on the Harco Note.

The Parties further agree that the sharing percentages of the Distributable Net Income earned post-confirmation shall be set out in detail in the attached intercreditor agreement and generally provide that:

**Grain Profits:**

| Harco | Unsecured Note | GrainChain Note |
|---|---|---|
| 2.5% - yr 1 | 52.5% in year 1 | 45% |
| 5.0% - yr. 2 | 50% in year 2 | 45% |
| 7.5% - yr. 3 | 47.5% in year 3 | 45% |
| 10% - yr 4 | 45% in year 4 | 45% |
| 10% - yr 5 | 45% in year 5 | 45% |

**Bean and Sunflower Seed Profits:**

| Harco | Unsecured Note | Grain Chain Note |
|---|---|---|
| 2.5% - yr 1 | 62.5% in year 1 | 35% |
| 5% - yr. 2 | 60% in year 2 | 35% |
| 7.5% - yr. 3 | 57.5% in year 3 | 35% |
| 10% - yr 4 | 55% in year 4 | 35% |
| 10% - yr 5 | 55% in year 5 | 35% |

Grain means any grain, corn, milo, sorghum, cottonseed, soy bean, or other commodity solely excluding beans and sunflower seeds.

Bean and sunflower seeds means only black beans and pinto beans and sunflower seeds.

a.  First 3 Plan-years:    During the first year: 52.5% to be paid on the Unsecureds Note, 2.5% on the Harco Note and 45% to be paid on the GrainChain Note  as to the operations by New Co.  New Co. During the second year: 50% to be paid on the Unsecureds Note, 5% on the Harco Note and 45% to be paid on the GrainChain Note. During the third year: 47.5% to be paid on the Unsecureds Note, 7.5% on the Harco Note and 45% to be paid on the GrainChain Note; save and except for beans and sunflower seeds, during which the first year: 62.5% to be paid on the Unsecureds Note, 2.5% on the Harco Note, and 35% on the GrainChain Note; during the second year, 60% to be paid on the Unsecureds Note, 5% on the Harco Note, and 35% on the GrainChain Note; during the third year, 57.5% to be paid on the Unsecureds Note, 7.5% on the Harco Note, and 35% on the GrainChain Note.

b.  Last 2 Plan-years:  45% to be paid on the Unsecureds Note, 10% to be paid on the Harco Note, and 45% to be paid on the GrainChain Note as to the grain operations by New Co. New Co.; save and except for beans and sunflower seeds, during the fourth

and fifth years, 55% to be paid on the Unsecureds Note, 10% on the Harco Note, and 35% to GrainChain.

    c. <u>After Year 5:</u> only to the extent of, and in every event only up to, the amount of unpaid principal balance of the Unsecureds Note and Harco Note:

        i. The New Co. Properties shall be marketed for sale by agreement of the Plan Trust Committee either collectively as a "going concern" operation (which may simply include the sale of New Co. equity or stock) or sold separately by one or more asset sales or a combination thereof, as the Plan Committee may determine; and

        ii. For each proposed sale, no matter the transaction structure, GrainChain shall have the rights of first refusal, to be exercised in its sole discretion, to match any sales price of such offer that the Plan Trust Committee agrees to consummate by majority vote, by matching or improving the terms of such offer and sales price and to close such ROFR sale on or before the closing date of the proposed offer, which in no event shall the closing date of the ROFR sale be less than 90 days from the Plan Trust Committee's votes to accept the proposed offer; and provided that any such exercise of the ROFR may be exceeded by the prospective qualified buyer upon which event GrainChain may match by re-exercising its ROFR; and

        iii. For each sale, unless excused in writing by the buyer, New Co. agrees not to compete regarding the storage, handling, transportation, or sale of grain, corn, sunflower seeds, and beans, as may be applicable, against any successful buyer of any of the New Co. Properties, except to the extent New Co. is still operating any unsold property.

**GrainChain's Release and Claim Allowance.**

At Plan Confirmation, GrainChain shall be released from any and all Bankruptcy Code Chapter 5 claims (state and federal) and the following satisfactory release language shall be contained in the Confirmation Order (the **"Chapter 5 Claims Release"**).

> For the good and valuable consideration detailed in the Debtor's Plan and Disclosure Statement provided by GrainChain to the Debtor and its Estate, without which the Debtor would be unable to confirm its Chapter 11 Plan and would likely convert its bankruptcy case to a case under Chapter 7 of the Bankruptcy Code, GrainChain is hereby released, waived and discharged by the Debtor and its Estate from (and the Debtor and its Estate are indefinitely barred from prosecuting or attempting to prosecute) any and all claims, obligations, interests, suits, judgments, damages, rights, remedies, causes of action, and liabilities of any kind, including any derivative claims asserted or assertable on behalf of the Debtor and/or its Estate deriving from chapter 5 of Title 11 of the United States Code (including without limitation those

causes of action such as preferences, fraudulent transfers and other such avoidance claims arising under section 506, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws), whether known or unknown, federal or state, anticipated or unanticipated, liquidated or unliquidated, matured or unmatured, contingent or non-contingent, current or forthcoming at law, in equity (collectively, the "Chapter 5 Claims"). This includes, without limitation, any claims or causes of action under the Bankruptcy Code or any other applicable law against GrainChain, its members, managers, officers, directors, employees, partners, affiliates, funds, advisors, attorneys, agents, representatives, and their respective properties.

Further, at Plan Confirmation, GrainChain shall be conditionally released from non-Chapter 5 claims, as defined below, and the following satisfactory release language shall be contained in the Confirmation Order (the **"Conditional Release"**):

GrainChain is hereby conditionally released from all other possible claims, obligations, interests, suits, judgments, damages, rights, remedies, causes of action, and liabilities of any kind, including any derivative claims asserted or assertable on behalf of the Debtor and/or its Estate, whether known or unknown, federal or state, anticipated or unanticipated, liquidated or unliquidated, matured or unmatured, contingent or non-contingent, current or forthcoming at law and in equity (the "Non-Chapter 5 Claims"). This includes, without limitation, any claims or causes of action under the Bankruptcy Code or any other applicable law against GrainChain, its members, managers, officers, directors, employees, partners, affiliates, funds, advisors, attorneys, agents, representatives, and their respective properties. Provided, however, upon an uncured material default, as further detailed in the attached operating agreements and other related transactional documents, by New Co. or GrainChain, such conditional release as to only the Non-Chapter 5 Claims shall terminated.   The Non-Chapter 5 Claims shall not terminate and shall survive confirmation, terminations, or default.   In all events, the Texas business judgment rule and defense shall govern all business decisions and in no event shall poor business performance be a material default, as well as circumstances constituting force majeure, events outside of New Co.'s and/or GrainChain's control, including without limitation any Unanticipated Events, which include without limitation events outside of New Co.'s and GrainChain's control, including but not limited to: circumstances constituting force majeure, weather, acts of God, terrorism, and conflicts with Mexico (whether related to transnational criminal organizations, governmental conflicts, or otherwise).

Further, at Plan Confirmation, GrainChain's claim shall become an allowed claim in the amount of at least $7,841,054.99 which shall form the basis of the GrainChain Note.  The Confirmation shall substantially provide as follows:

The dollar amount of GrainChain's proof of claim [Claim No. 42] is hereby allowed in the amount of $7,841,054.99 as an allowed claim.

Regarding the conditionally released Non-Chapter 5 Claims against GrainChain, if any exist, GrainChain will enter into a separate tolling agreement generally providing that all applicable limitations for the Non-Chapter 5 Claims, if any, in exchange for a covenant not to sue by the Plan Trust as the sole holder and owner of the Debtor's Non-Chapter 5 Claims. The Non-Chapter 5 tolling agreement which will generally provide that: (i) while the Non-Chapter 5 Claims are preliminary and conditionally released under the Plan and Confirmation Order, the finality of such release will remain abated; (ii) during such abatement period, the Non-Chapter 5 Claims will remain in full force and effect during the Plan term *but only upon* an uncured, material default of New Co. or GrainChain; (iii) toll any and all limitations periods through and including the fifth anniversary of the Plan's Effective Date (the "Limitations Period"); (iv) contain the terms and conditions upon which GrainChain will be fully and finally released from the Non-Chapter 5 Claims, if any; (v) contain the Plan Trust's representation, warranty, and agreement that the Plan Agent is the sole and exclusive owner of the Non-Chapter 5 Claims and agrees not to bring suit, demand, litigate, or otherwise seek to prosecute the Non-Chapter 5 Claims, if any, during the Limitations Period, unless or until an uncured material default occurs by New Co. or GrainChain.

After the conveyance of the properties to New Co., GrainChain shall furnish factoring financing in a commercially reasonable manner to New Co., only while New Co. is solely owned by GrainChain and/or GrainChain's affiliates, based on the prime rate plus an additional 3 percent (3%), together with an additional 1 percent (1%) origination fee, which is well below market rate for factoring of such commodities. All post-confirmation factoring financing shall be detailed in applicable factoring agreements between GrainChain and New Co.

The record owner(s) shall convey, as explained in this Plan and as contained in the Deeds of Trust that are a part of the transactional documents, both Emory and Moore Farms to the Plan Trust, together with all other potential recoveries by the Plan Trust or GrainChain of the Debtor's assets or of assets or funds from any of the Debtor's Insiders or Affiliates and Insiders of Affiliates, other than the Edcouch Facility, Progreso Facility, and Baryta.

All the Debtor's potential direct and derivative claims against the Debtor's Insiders or Affiliates and Insiders of Affiliates shall be exclusively preserved by the Debtor in its Plan for the Plan Trust and for the benefit of GrainChain, the Unsecureds, and Harco, save and except for direct claims of GrainChain against the Debtor's Insiders or Affiliates and Insiders of Affiliates which shall remain GrainChain's sole and exclusive property.[7] During the five-year Note terms or until the Unsecureds Note is paid in full or the New Co. Properties are sold, whichever is earlier

---

[7]    The Debtor's estate (and the Plan Trust and the Plan Agent) have or assert direct claims against the Debtor's Insiders, Affiliates, and Insiders to the Affiliates, and all such direct claims, during the term of the Plan, are preserved or prosecuted for the joint interest of the Parties as Plan Trust Property, which shall remain the Plan Trust's sole and exclusive property.  None of those direct or indirect claims are waived by any Party or by confirmation of the Plan provided that the tolling agreement will provide that those parties agreeing shall be fully and finally released upon payment in full of the Unsecureds Note.

GrainChain may not improve its recovery by recovering against the Debtor's Insiders or Affiliates, or Insiders to the Affiliates as to its direct claims without 55% of all such net recoveries (after expense of collection or recovery) being paid over to the Plan Trust for distributions in accordance with the Plan to pay down the Unsecured Note and Harco Note.  Upon payment in full of the Unsecureds Note and the Harco Note, GrainChain (or any of its insiders or affiliates) may pursue any direct claims it may have without reporting or contributing any such recovery to the Plan Trust.

As discussed elsewhere in this Plan and related transactional documents, New Co. on or before the Plan Effective Date, shall be transferred by special warranty deed all rights, title and rights, title, and interests in and to, the Progreso Facility, Edcouch Facility, and Baryta, and by bill of sale all related personal property at each location necessary to operate such properties.

Such real property title and interest shall be capable of being insured by one or more title policies and insurance at the election, expense, and in favor of New Co. and/or GrainChain.

Additionally, all such conveyances of real and personal property to New Co. shall be free and clear of any and all liens, claims, interests, and encumbrances satisfactory to New Co. and GrainChain, save and except for (i) the liens securing the three non-recourse Notes (Unsecureds, GrainChain, and Harco) all in equal priority and without non-judicial foreclosure rights, and (ii) GrainChain's continuing rights of first refusal (and possibly a first lien asserted by Falcon to the extend Falcon's claim has not otherwise been satisfied).

The real and personal property to be conveyed to New Co. shall be operated, protected, insured, and improved  in New Co.'s business judgment  and will be operated for the primarily purpose of generating Distributable Net Income which are to be used by New Co. to pay down  the three non-recourse Notes until either the expiration of the five-year note terms or until the Unsecureds Note and Harco Note are paid in full, whichever is earlier.

At the end of the five-year term, in the event that the Unsecureds Note and the Harco Note have not been paid in full, the New Co. Properties will be sold, subject to GrainChain's continuing rights of first refusal, which it may exercise at its sole discretion from time to time.  New Co. may continue to operate after the expiration of the five-year term at its and GrainChain's sole discretion.

If operations are continued after the five-year term, and as outlined in the attached operating agreements, by New Co. and absent a sale of the New Co. Properties, Distributable Net Income shall continue to be shared (up to the payment of the full amount of the Unsecureds Note and the Harco Note), but not thereafter.  In the event GrainChain acquires the New Co. Properties by one or more sales, after such purchase occurs in no event shall any post-sale Distributable Net Income be shared with the Plan Trust for the benefit of the Unsecureds Note or the Harco Note (as note payments and/ otherwise).

GrainChain will only release its liens on the Plan Trust Properties when those properties are conveyed to the Plan Trust in an acceptable manner to GrainChain and the Plan Agent (including an acceptable lien ownership), and GrainChain is granted a 45% beneficial interest, Unsecureds are granted a 45% beneficial interest, and Harco is granted a 10% interest in the sales proceeds from the future anticipated sales of such Plan Trust Properties by the Plan.  With respect to the

New Co. Properties, GrainChain will only release it liens when those properties are conveyed by the Debtor to New Co. in an acceptable manner to New Co. and GrainChain and as provided for under the Plan.

As further detailed in the applicable transactional documents will be no sale or marketing, of the New Co. Properties for the first 24 months from the Plan effective date, absent an uncured material default by New Co. or GrainChain or if by the unanimous agreement of the Plan Trust Committee. In the event of a sale not based on an uncured material default of New Co. or GrainChain, in such event GrainChain shall have the continuing rights of first refusal. After the expiration of 24 months from the Plan effective date, and up to the end of the five-year term, any sale must be approved by a majority of the Plan Trust Committee and GrainChain shall maintain and have the continuing rights of first refusal. In no event shall GrainChain or New Co. purposely materially default or depress gross sales, or otherwise manipulate operations so as to trigger a sale.

The Parties agree that absent an uncured material default, for the first 24 months New Co. and GrainChain have the sole discretion to not sell the New Co. Properties unless there is an offer to purchase the New Co. Properties for an amount, which after applicable taxes, is sufficient to pay all three non-recourse Notes in full and, in the event of a "going concern" sale the buyer (to New Co.'s and GrainChain's satisfaction) unconditionally assumes and indemnifies all liabilities of New Co. and/or GrainChain relating to the future buyer's operations. In such event, GrainChain shall have its continuing rights of first refusal, which it may exercise in its sole discretion. However, to the extent that any such sale causes liabilities to either New Co. and/or GrainChain regarding the New Co. operations, and such liabilities are made known in writing and in detail to the Plan Agent and the Plan Trust Committee and thereafter a sale is agreed by the Plan Agent, any and all such amounts must be escrowed or paid from the sales proceeds, at the discretion of the Plan Agent. Upon escrow, the bankruptcy court retains jurisdiction to determine the appropriateness and amount of damages claimed. Parties shall use their best efforts to minimize all such liabilities in the event of such a sale.

If after the first 24 months and before the expiration of the five-year term, (and without the existence of a New Co. or GrainChain Uncured Material Default), unforeseen events constituting a force majeure occur necessitating either the cessation of New Co.'s operations and/or requiring the need to sell the New Co. Properties, the Plan Trust Committee in good faith shall (i) unanimously devise processes to wind down New Co.'s operations and/or to sell all New Co.'s Properties (and going concern business as may be applicable); (ii) propose terms to continue operations without New Co. and GrainChain, provided that any such proposal to continue operations under (ii) of this paragraph provides for, among other things and all to New Co.'s and GrainChain's satisfaction, buying out the GrainChain Note, and the sale and/or transfer of New Co.'s operations on an "as is, where is" basis, and unconditionally assumes and indemnifies all liabilities of New Co. and GrainChain  In the event of a sale pursuant to (i) above in this paragraph, GrainChain shall not have its rights of first  refusal if GrainChain intends to acquire  New Co.'s assets and continue to conduct its own operations of New Co. Properties but may acquire the New Co. Properties if it is the highest bidder. New Co. cannot stop operating, to allow GrainChain to buy the now-nonoperating New Co. Properties by exercising a right of first refusal, unless GrainChain is the highest bidder.

The Parties agree that if GrainChain properly exercises its continuing rights of first refusal, then GrainChain must pay only 55% of the after-tax net sales proceeds of the sales price as Note payments on the Unsecureds Note (45%) and the Harco Note (10%) or as much of the sales price as is necessary to pay those Notes in full, whichever is less. The maximum remaining required non-recourse Note payments on the Unsecureds Note and the Harco Note shall only be the then remaining principal balance of each such Note.   Once the Unsecureds Note and the Harco Note have been paid in full, all remaining New Co. value, assets, operations, going concern value, or other benefits belong to New Co. or GrainChain, as the case may be, and shall be free from all liens and claims under the Unsecureds Note, the Harco Note, and the Plan Trust.  When the New Co. Properties are sold, the Plan Trust as oblige on the Unsecureds Note will only receive 45% of the Distributable Net Income  or the remaining principal balance on the Unsecureds Note, whichever is less.  Likewise, the Plan Trust as oblige on the Harco Note will only receive 10% of the Distributable Net Income  or the remaining principal balance on the Harco Note, whichever is less.  GrainChain shall receive the remaining 45% of the Distributable Net Income .  Any sales are subject to GrainChain's continuing rights of first refusal, which it may exercise in its sole discretion.

**GrainChain's Limited Guaranty**

New Co. is obligated to use its best efforts and good business judgment to earn net profits.  The Unsecureds, Harco, and GrainChain will each receive their respective share of the Distributable Net Income  as payments on their respective notes, with the Unsecureds receiving its percentage share or a minimum of $250,000.00 per year, whichever is more.  GrainChain will guarantee the minimum annual payment on the Unsecureds Note of no more than $250,000.00 per year for the five-year Note term as set forth in the GrainChain Limited Guaranty Agreement. All amounts paid by GrainChain shall be added to the principal balance of the GrainChain Note.   However, in the event that one or more Unanticipated Events occur which materially prevent operations requiring liquidation, the GrainChain $250,000.00 per year limited guaranty of the New Co. and the Unsecureds Note shall terminate as to any future years after the year in which the Unanticipated Events occurred.

New Co.'s operations, including the factoring of its receivables, is subject to complete operational and accounting transparency.  The Plan Agent and the Plan Trust's hired  advisors shall have full access to all New Co.'s operations and all transactions, all books and records of New Co. during normal business hours on a non-disruptive basis.  Importantly, this shall include the full disclosure during the Notes' terms and in no event longer than five years (although any request or right for a review may continue for the purpose of accomplishing the review) of:

     i.   Octavio and his family's involvement in the bean and seed purchase and sales transactions; and
    ii.  All New Co. transactions with Garba, LLC and OMG, LLC and Debtor's insiders; and
   iii.  All New Co.'s transactions including all payment of all operating debts and taxes.
   iv.  A non-compete agreement that will be executed by GrainChain, in a form acceptable to GrainChain which is a part of the transactional documents.]

> v. Agreement that neither GrainChain nor New Co. will not obtain any payment, in cash or in kind, from any Insider of the Debtor, or any Affiliate of the Debtor, or any Affiliate Insider other than bean or seed related transactions as set out in this Plan, Confirmation Order, and/or the operating agreements and fully disclosed to the Plan Agent. This includes, but is not limited to, full disclosure of any bean/seeds transactions and profits.

The Bankruptcy Court approved the South of the Boarder construction contract, which was entered into by the CRO. However, due to a dispute between Construction Resources Management and South of the Border over the disclosure of the proposed vendors and subcontractors to be used in performing the reconstruction project, the Court, after appropriate application and disclosure by the CRO and the Debtor, granted authority to change contractors and instead enter into a construction contract with Reparacion Mantenimiento Industrial Agricola del Valle ("Reparacion") to complete the rehabilitation and reconstruction of the Progreso Elevator Facility for $4,800,000 (which is about $190,000 lower than South of the Border contract price).

Certain insurance proceeds have been received by the CRO and are in the Segregated Insurance Proceeds Account, and certain insurance proceeds have not yet been received. New Co. shall use any received or too be received insurance proceeds, in conjunction with the Plan Agent's advice and counsel, to repair and rebuild as may be applicable the New Co. Properties pursuant to the South of the Border construction contract. New Co. shall have the non-exclusive right to direct and spend, based on its reasonable business judgment, the insurance proceeds it receives from time to time; provided, however, prior to any other major capital improvement not covered by available or reasonably expected insurance proceeds, that will have a material impact by decreasing Distributable Net Income , the decision of New Co. must be made with a good faith basis of the need for such expenditure which shall be reported to and fully discussed with the Plan Trust Trustee and the Plan Trust Committee. If the Plan Trust Committee does not approve the capital improvement expenditure and the failure to make such expenditure materially impacts operations, it may be considered an Unanticipated Event. The Debtor shall properly address the insurance policies and the right to payment of future insurance proceeds in the Confirmation Order or separate order prior to Confirmation congruent with New Co.'s use of the insurance proceeds with the CRO/Plan Agents input under the Reparacion Contract.

### G. Class 7 – Secured Claim of Ford Motor Credit (Impaired)

This Class consists of the Secured Claim of Ford Motor Credit Company, LLC ("**Ford Credit**") in the amount of $29,349.59 which is secured by a purchase money security interest in a 2020 Ford F-150 bearing vehicle identification number 1FTEW1E59LFB68462. This debt is the subject of a retail installment sales contract for the vehicle.

### Treatment of Secured Claim of Ford Motor Credit

Debtor proposes to pay the secured claim of Ford Credit in full pursuant to the terms of the Motor Vehicle Retail Installment Sales Contract (the "Contract") attached to Ford Credit's proof of claim. [POC #7] by re-amortizing the balance outstanding over three (3) years at the current interest rate of 4.29%. The new re-amortized payments will be paid in equal quarterly payments with the first such payment to be made on March 31, 2024, and the remaining monthly payments

to be paid on or before the last business day of each quarter thereafter until the full amount of principal and interest is paid in full. Notwithstanding anything in the Plan to the contrary, (1) Ford Credit will, until the Secured Claim of Ford Credit is paid in full, require Debtor to maintain comprehensive and collision insurance coverage with a deductible not to exceed $1,000.00 as required by the terms of the Contract with Ford Credit designated as loss payee by requiring Debtor to provide proof of current coverage within five (5) days of receipt of a request for proof of insurance coverage, (2) Ford Credit shall retain its first-priority, purchase money security interest until paid in full per the terms of the Contract as modified herein, and (3) Ford Credit will be entitled to enforce the Contract pursuant to its terms without modification by this Plan save and except the payment re-amortization provisions contained herein.

### (III). CLASSIFICATION AND TREATMENT OF UNSECURED CLAIMS

The Unsecured Claims under the proposed Plan consist of Classes 8 through 11 described below.

The Unsecured Claims described in this section do not include the unsecured portions of the claims of StoneX, Vantage Bank, and GrainChain, Inc. because they are being treated and resolved by another method as described above. Any preferences shown in the Plan which are not specifically designated to be settled and released for opting into treatment under General Unsecured Claims or retained by the Debtor may be prosecuted or settled at the discretion of the Plan Agent.

This Plan classifies the Unsecured Claims into four main groups: **(1) <u>Bean Claims</u>**; **(2) <u>Farmers' and Grain Claims</u>**; **(3) Administrative Convenience Class;** and **(4) <u>General Trade Claims</u>**, each of which are classified and treated in their own class.   Notwithstanding anything else contained in this Plan, the Debtor asserts that Unsecured Claims total no more than $9.1 million, and as such, the Unsecureds Note should be in the amount of $9.1 million subject to downward adjustments based on claims objections.

**Creditors should take note that the figures reflecting the amount of the Unsecured Claims set forth in the charts below were compiled prior to the extended Bar Date set by the Court.  Therefore, the figures in the charts total more than the allowed $9.1 million, but upon a completed analysis of the claims following the expiration of such Bar Date as well as the completion of the claim reconciliation process the Debtor avers that the claims that total approximately $9,136,000.**

The category "Bean Claims" (**Class 8**) consists of the claims of companies who sold beans to the Debtor; the category "Farmers and Grain Claims" (**Class 9**) consists of the claims of farmers or grain companies who sold grain (corn, sorghum, and the like) to the Debtor; the category of "Administrative Convenience Class" **(Class 10**) consists of the claims that total less than $50,000; and the category "General Trade Claims" (**Class 11**) consists of the claims of parties that have sold other goods and merchandise (such as fertilizers, chemicals, and the like) to the Debtor.

### H.    Class 8 – Unsecured Bean Claims (Impaired)

**Class 8** (the Unsecured Bean Claims) consists of the Unsecured Bean Claims of <u>American</u>

Bean, LLC (POC #14 filed 3/10/2023) in the amount of **$184,000.00**; and the claim of Stony Ridge Food, Inc. (POC #31 filed 5/5/2023) in the net amount of **$1,439,027.75** after deduction of $118,538.75 (for one PACA Claim paid) from the original POC #31 amount of $1,557,566.50. The Debtor's calculations based on the information provided in its Statement of Financial Affairs (SOFA) [dkt #51], Exhibit 3 as well as Debtor's Vantage Bank statements, indicates that these two claimants have received a total of **$917,189.27** of payments that constitute "preference claims" of the estate under 11 U.S.C. § 547, as shown in more detail below. Debtor's Vantage Bank check numbers were noted in parenthesis next to the dates those checks were deposited.

Likewise, the creditors who did not file a POC in the Bankruptcy Case but had a claim listed in the Schedules were noted below. Those claims amount to an estimated total of **$617,572.24.** Together, all Unsecured Bean Claims have an estimated amount of **$2,240,600.24** and a portion of this amount is identified as preference amounts as noted below.

| Name of Unsecured Creditor | Amount of Claim (POC) | Potential Preference Received | |
|---|---|---|---|
| American Bean, LLC (POC #14) | $184,000.00 | 12/28/2022 (7440) | $45,954.00 |
| | | 1/4/2023 (7441) | $45,954.00 |
| | | 1/4/2023 (7462) | $46,000.00 |
| | | 1/10/2023 (7463) | $46,000.00 |
| | | | **TOTAL = $183,908.00** |
| Stony Ridge Food, Inc. (POC #31) | $1,557,566.50 minus $118,538.75 (one PACA Claim paid) = $1,439,028.00 | 1/5/2023 (7456) | $61,130.90 |
| | | 1/9/2023 (7457) | $59,036.85 |
| | | 1/18/2023 (7458) | $23,320.00 |
| | | 1/18/2023 (7459) | $23,320.00 |
| | | 1/10/2023 (7460) | $59,065.88 |
| | | 1/12/2023 (7461) | $59,065.88 |
| | | 1/19/2023 (7495) | $59,065.88 |
| | | 1/23/2023 (7496) | $59,065.88 |
| | | 1/24/2023 (7497) | $60,320.00 |
| | | 1/26/2023 (7498) | $60,320.00 |
| | | 1/20/2023 (7542) | $58,145.00 |
| | | 1/31/2023 (7543) | $58,145.00 |
| | | 2/7/2023 (7546) | $23,320.00 |
| | | 2/6/2023 (7545) | $23,320.00 |
| | | 2/3/2023 (7544) | $23,320.00 |
| | | 2/8/2023 (7547) | $23,320.00 |
| | | | **TOTAL = $733,281.27** |
| **Subtotal of Bean Claims (who filed POC)** | **POCs** **$1,623,028.00** | **Subtotal of Preferences (for those with POC) $917,189.27** | |
| **Name of Unsecured Creditor (Not filed POC)** | **Amount of Claim** | **Potential Preference Received** | |
| Forest River Bean Co. | $565,372.75 | 2/14/2023 (7618) | $51,888.75 |

| | | 2/2/2023 (7549)              $51,964.50 |
| | | 1/31/2023 (7548)            $51,964.50 |
| | | **TOTAL Forest River Co. Pref:** **$155,817.75** |
| PKT Associates, Inc. | $52,199.49 | (No known preference claims as of the date of filing this Plan) |
| **Subtotal of Bean Claims (No POC)** | **No POCs** **$617,572.24** | **Subtotal of Preferences** **(for those without POC)** |
| **TOTAL Bean Claims** | **$2,240,600.24** | **TOTAL Class 8 Preferences:** **$1,073,007.02** |

This Plan will resolve the Unsecured Bean Claims as follows:

### A. The Unsecured Bean Claim of American Bean, LLC (POC #14)

American Bean, LLC has filed an unsecured claim in the amount of $184,000 (POC #14). In return, the Estate has a preference claim against American Bean, LLC in the amount of $603,908.00. The preference claims will be settled or prosecuted by the Plan Agent.

### B. The Unsecured Bean Claim of Stony Ridge Food, LLC (POC #31)

Stony Ridge Food, Inc. ("Stony Ridge") has an unsecured claim in the net amount of $1,439,027.75 after deduction of $118,538.75 (for one PACA Claim paid) from the original POC #31 amount of $1,557,566.50. The Estate has a preference claim against Stony Ridge in the amount of $733,281.27. The Debtor has agreed to seek recognition of Stony Ridge as a "critical vendor" and to settle the preference claims by offsetting approximately 30% of the amount of the claimed preferences against its claim and agreeing that the Estate will recognize Stony Ridge as having an Allowed Unsecured Claim in the agreed upon sum of $1,220,000 to be treated as a General Unsecured Claim. In exchange Stony Ridge will continue to supply the Debtor with black beans at a price and terms to be mutually agreed upon between Stony Ridge and the Debtor.

**Treatment of Unsecured Bean Claims**

The Allowed Unsecured Claims of the creditors classified as Unsecured Bean Claims shall be treated equally with the Claims of General Unsecured Claims in Class 10 as described hereinbelow and share *pro rata* with the holders of General Unsecured Claims from the distributions made by the Plan Agent to participants in the Unsecureds Note to be paid 45% of the net after tax profits of New Co. or from the sales proceeds of the New Co. Properties.

### I. Class 9 – Unsecured Farmers' and Grain Claims (Impaired)

**Class 9** consists of the claims of Farmers ("Farmers") or other Grain Claimants ("Grain Claimants") who have sold grains to the Debtor. Farmers and Grain Claimants holding claims that may be entitled to distributions from the proceeds of the Surety Bonds may either choose to be paid solely by the Surety Bond receipts ("Opt-Out"), or to participate and receive their pro-rata share of the percentages paid to Unsecured Creditors on a pro-rata basis from the receipt of net proceeds from the sales of real estate or the Distributable Net Income from the operations of the

Debtor ("Opt-In").

All Farmers and Grain Claimants deemed eligible to participate in the distribution of the surety bond proceeds will be paid from the pool of funds to be distributed by the Plan Trust. However, if these holders of grain claims choose distribution from the bond claims they will not have any preferences they received waived by the Debtor.

For the **Class 9** claimants who filed POCs in the Bankruptcy Case, their Claim Amounts are calculated as the POC Amounts minus the $7,475 priority amounts claimed under the Bankruptcy Code Section 507(a)(6) where applicable, which is the non-priority positions of their claims. The priority portions of the same claims, if any, are treated under **Class 2** above. For those **Class 9** claimants who have not filed POCs, their Claim Amounts are the estimated amounts scheduled as non-disputed and liquidated.

The Debtor's calculations based on the information provided in its Statement of Financial Affairs (SOFA) [dkt #51], Exhibit 3 as well as Vantage Bank statements, indicates that these Farmers who have filed a POC have received an estimated total of **$3,896,715.69** of payments that constitute "preference claims" of the Estate under 11 U.S.C. § 547, as shown in more detail below (Vantage Bank check numbers were noted in parenthesis next to the dates those checks were deposited). The claims of the Farmers and Grain Claimants who have filed a POC (calculated as the POC amount minus the priority portions of their claims which are treated under Class 2) amount to an estimated total of **$3,509,951.12**; and the claims of Farmers and Grain Claimants who have not filed a POC amount to an estimated total of **$188,515.29**, and together, **Class 9** is estimated to have a total amount of **$3,698,466.41**:

| FARMERS AND GRAIN CLAIMANTS WHO HAVE FILED A POC | | |
|---|---|---|
| **Name of Unsecured Creditor** | **Amount of Claim (POC minus the $7,475 priority amount where applicable)** | **Potential Preference Received** |
| Brian Jones Farms (POC #19) | $76,916.82 - $7,475 = **$69,441.82** | 1/27/2023 (GrainChain) $84,749.45 |
| | | **TOTAL = $84,749.45** |
| Carl Hensz (POC #22) | $97,748.78 - $47,475 = **$90,273.78** | 1/23/2023 (7536) $50,000.00 |
| | | **TOTAL = $50,000.00** |
| Chad Szutz (POC #24) | $58,495.56 - $7,475 = **$51,020.56** | (No known preference claims as of the date of filing this Plan) |
| Dreibelbis Farms (POC #35) | $290,691.70 - $7,475 = **$283,216.70** | (No known preference claims as of the date of filing this Plan) |
| Eat Fresh Farms (POC #13) | $65,769.41 - $7,475 = **$58,294.41** | 2/23/2023 (7635) $64,976.24 |
| | | 2/23/2023 (7656) $793.02 |
| | | 1/30/2023 (7589) $1,900.00 |

| | | Z-Ernte (EatFresch/Advance Harvesting) | |
|---|---|---|---|
| | | 2/3/2023 (7631) Z-Ernte (EatFresch/Advance Harvesting) | $4,050.00 |
| | | **TOTAL = $71,719.26** | |
| Fike Farms (POC #32) | $353,230.88 - $7,475 = **$345,755.88** | 1/5/2023 (7492) | $1,515.00 |
| | | 1/27/2023 (7493) | $37,051.61 |
| | | 12/20/2022 (7412) | $50,000.00 |
| | | 12/15/2022 (7411) | $50,000.00 |
| | | 1/20/2023 (7490) | $59,500.43 |
| | | 1/10/2023 (7486) | $59,500.45 |
| | | 1/18/2023 (7487) | $59,500.45 |
| | | 1/13/2023 (7488) | $59,500.45 |
| | | 1/4/2023 (7484) | $59,500.45 |
| | | 1/6/2023 (7485) | $59,500.45 |
| | | 2/9/2023 (7639) | $49,564.06 |
| | | **TOTAL = $545,133.35** | |
| Frank Bailey Grain Company (POC #33) | **$653,585.11** | 12/7/2022 (7382) | $65,375.37 |
| | | 12/8/2022 (7383) | $58,022,48 |
| | | 12/12/2022 (7384) | $65,830.54 |
| | | 12/19/2022 (7419) | $58,869.22 |
| | | 12/20/2022 (7420) | $20,292.55 |
| | | 12/20/2022 (7421) | $46,959.48 |
| | | 12/23/2022 (7422) | $47,286.60 |
| | | 12/28/2022 (7423) | $54,412.81 |
| | | 1/3/2023 (7424) | $53,780.99 |
| | | 1/5/2023 (7425) | $45,108.44 |
| | | 1/9/2023 (7426) | $50,638.10 |
| | | 1/17/2023 (7521) | $65,375.37 |
| | | 1/18/2023 (7522) | $58,022,48 |
| | | 1/23/2023 (7523) | $65,830.54 |
| | | **TOTAL = $639,760.01** | |
| HAR-VEST (POC #15) | $182,214.60 - $7,475 = **$174,739.60** | (No known preference claims as of the date of filing this Plan) | |
| Johnny Guin (POC #25) | $117,560.65 - $7,475 = **$110,085.65** | (No known preference claims as of the date of filing this Plan) | |
| Karen Arnold (POC #26) | $107,332.39 - $7,475 = **$99,857.39** | (No known preference claims as of the date of filing this Plan) | |

| Lothringer Family Farms (POC #46) (Late) | $70,618.69 - $7,475 = **$63,143.69** | 2/7/2023 (7636) Soybean set | $23,452.13 |
| | | 12/16/2022 (7433) Z-Ernte (Harv Lothringer Soybean) | $6,300.00 |
| | | | **TOTAL = $29,752.13** |
| Planters Grain Cooperative of Odem, TX (POC #34) | **$255,696.00** | 2/13/2023 (7579) | $50,661.31 |
| | | 2/13/2023 (7577) | $50,661.31 |
| | | 2/13/2023 (7578) | $50,661.31 |
| | | 2/3/2023 (7576) | $50,661.31 |
| | | 2/2/2023 (7575) | $50,661.31 |
| | | **TOTAL Preference of Planters = $253,306.55** | |
| Robert Walsdorf (POC #43) | $8,018.76 - $7,475 = **$543.76** | (No known preference claims as of the date of filing this Plan) | |
| Russell Plantation II (POC #11) | $668,169.85 - $7,475 = **$660,694.85** | 2/14/2023 (7600) | $66,516.99 |
| | | 2/10/2023 (7599) | $66,516.99 |
| | | 2/7/2023 (7598) | $66,516.99 |
| | | 2/6/2023 (7592) | $66,516.99 |
| | | **TOTAL = $266,067.96** | |
| Skalitsky Farms (POC #29) | $149,842.47 - $7,475 = **$142,367.47** | 11/22/2022 (7271) | $84,567.82 |
| | | 11/25/2022 (7272) | $84,567.82 |
| | | 11/29/2022(7273) | $84,567.82 |
| | | 12/2/2022 (7274) | $84,567.82 |
| | | 12/6/2022 (7275) | $84,567.82 |
| | | 12/8/2022 (7276) | $84,567.82 |
| | | 12/13/2022 (7310) | $84,567.83 |
| | | 12/16/2022 (7311) | $84,567.83 |
| | | 12/20/2022 (7312) | $84,567.83 |
| | | 12/23/2022 (7313) | $84,567.83 |
| | | 12/28/2022 (7314) | $84,567.83 |
| | | 12/28/2022 (7315) | $84,567.83 |
| | | 1/4/2023 (7316) | $84,567.83 |
| | | 1/6/2023 (7317) | $84,567.83 |
| | | 1/10/2023 (7318) | $84,567.83 |
| | | 1/17/2023 (7319) | $84,567.83 |
| | | 1/18/2023 (7320) | $84,567.83 |
| | | 1/20/2023 (7321) | $84,567.83 |
| | | 1/27/2023 (7322) | $84,567.83 |
| | | 1/27/2023 (7323) | $84,567.83 |
| | | 1/27/2023 (7324) | $84,567.83 |
| | | **TOTAL Pref: $1,775,924.37** | |
| Wesley Valerius (POC #28) | $119,444.52 - $7,475 | 2/15/2023 (7595) | $60,100.87 |
| | | 2/9/2023 (7594) | $60,100.87 |

| | | | |
|---|---|---|---|
| | = **$111,969.52** | 2/2/2023 (7593) | $60,100.87 |
| | | | **TOTAL = $180,302.61** |
| Zdansky Joint Venture (POC #17) | $346,739.93 - $7,475 = **$339,264.93** | No known preferences as of the date of filing this Plan | |
| **TOTAL Farmers' and Grain Claims (with POC)** | Total POCs ($3,622,076.12) minus total priority portions ($112,125) = **$3,509,951.12** | **Subtotal of Preferences (for those with POC) $3,896,715.69** | |

| FARMERS AND GRAIN CLAIMANTS WHO HAVE NOT FILED A POC (Only Scheduled Claims) | | |
|---|---|---|
| **Name of Unsecured Creditor** | **Amount of Claim** | **Potential Preference Received** |
| Attebury Grain, LLC. claim scheduled with no "Opt-in" | $58,821.21 | 12/29/2022 (7442) $53,520.03 12/29/2022 (7443) $53,520.03 **TOTAL Attebury Pref: $107,040.06** |
| Cadena Farms. claim scheduled with no "Opt-in" | $13,797.49 | 2/15/2023 (7647) $66,276.15 **TOTAL Cadena Pref: $66,276.15** |
| Fred Karle. claim scheduled with no "Opt in" | $14,456.18 | (No known preferences as of the date of filing this Plan) |
| Luna Brothers claim scheduled with no "Opt-in" | $40,453.65 | 2/15/2023 (7567) $53,879.78 2/15/2023 (7559) $40,453.65 2/10/2023 (7565) $53,879.78 2/10/2023 (7566) $53,879.78 2/6/2023 (7563) $57,137.66 2/1/2023 (7562) $30,052.09 1/27/2023 (7561) $38,379.28 1/26/2023 (7558) $1,339.86 1/26/2023 (7556) $8,821.01 1/26/2023 (7557) $8,164.16 1/4/2023 (7446) $25,000.00 12/29/2022 (7445) $25,000.00 **TOTAL Luna Bros Pref: $395,987.05** |
| Mark Miller claim with no "Opt-in" | $986.76 | (No known preferences as of the date of filing this Plan) |
| Wesley Vanderpool claim scheduled with no "Opt-in" | $60,000.00 | 1/20/2023 (7398) (Vern Vanderp.) $45,386.41 1/20/2023 (7401) (Vern Vanderp.) $14,613.59 **TOTAL W. Vanderpool Pref:** |

| | | $60.000.00 |
|---|---|---|
| **TOTAL Farmers' and Grain Claims (without POCs) and** claim scheduled with no "Opt-in" | **Amounts $188,515.29** | **Subtotal of Preferences for those without POCs $629,303.26** |
| **TOTAL (All Class 9)** | **$3,698,466.41** | **Total Class 9 Preferences: $4,526,018.95** |

**Treatment of Claims of Unsecured Farmers' and Grain Claims**

The provisions of the Plan provide the Unsecured Farmers' and Grain Claims will be resolved according to each claimant's choice to Opt-in or Opt-out of the treatment of General Unsecured Claims under the Plan, *i.e.*, either be paid solely by the bond receipts or to participate and receive their pro-rata share of the percentages paid to Unsecured Creditors on a pro-rata basis from the receipt of net proceeds from the sales of real estate or the Distributable Net Income from the operations of the Debtor in exchange for release of all preference claims and obligations arising under this Bankruptcy Proceeding.

The division and distribution of profits of the New Co. shall be in accord with the provisions established for the split of profits in the Operation Agreement approved by the Bankruptcy Court and as provided in this Plan, whereby GrainChain, Harco National Insurance Company ("**Harco**"), and the Unsecured Creditors each receive their respective share of the profits from the operations of the Debtor in relation to the amount their claims constitute a percentage of the total amount of the General Unsecured Class. In this regard, the total amount of unsecured claims is estimated to total $20,126,212 while the claims of the Unsecured Creditors are estimated to total $9,770,328.65, Harco's allowed subrogation claim evidenced by its filed proof of claim tied to the payment of the surety bonds it granted to the Texas Department of Agriculture ("**TDA**") is estimated to total $2,402,704.00, and GrainChain's unsecured claim, after the release of its liens in accordance with this Plan and related transactional documents, in the amount of $7,841,054.99.

### J.    Class 10 –Administrative Convenience Class (Impaired)

**Class 10** consists of the Administrative Convenience Class. These claimants will be given two options: either (1) to receive 40% of their claims on the effective date or (2) to participate in the Unsecureds $9.1 million Note.

The Administrative Convenience Class consists of the following claims:

| Name of Unsecured Creditor | Amount of Claim (POC or Scheduled Amount) | Potential Preference Received |
|---|---|---|
| American Express National Bank (POC #12) | $4,617.90 | (No known preference claims as of the date of filing this Plan) |

| | | |
|---|---|---|
| Amex Trs. Co. Inc. (POC #30) | $8,524.35 | (No known preference claims as of the date of filing this Plan) |
| Cargill Incorporated (POC #45) | $44,422.90 | (No known preference claims as of the date of filing this Plan) |
| Citi Business Card | $2,036.05 | (No known preference claims as of the date of filing this Plan) |
| Hans Hovda | $42.89 | (No known preference claims as of the date of filing this Plan) |
| Jonathan Ruiz | $14,589.06 | (No known preference claims as of the date of filing this Plan) |
| United Agricultural Coop | $7,967.04 | (No known preference claims as of the date of filing this Plan) |
| University of Missouri | $5,341.28 | (No known preference claims as of the date of filing this Plan) |
| USDA AMS | $131.25 | (No known preference claims as of the date of filing this Plan) |
| Vi-Cal Grain Co. | $2,428.40 | 1/13/2023 (7524)  $115,000.00<br>1/9/2023 (7504)   $49,956.20<br>1/9/2023 (7505)   $190,000.00<br>**TOTAL Vi-Cal Pref: $354,956.20** |
| **TOTAL Administrative Convenience Claims** | **Total Amount $90,101.12** | **Total Adm. Convenience Class Preferences: $354,956.20** |

**Treatment of Administration Convenience Claims**

The Debtor offers to pay 40 cents on the dollar for each of the claimants making up the Administrative Convenience Claims disregarding any of its preference claims against any. This way, the amount paid for Administrative Convenience Claims will amount to **$36,040.44** [which is calculated as $90,101.12 (x0.40)]

In sum, the Administrative Convenience Claims will be resolved by payment of a total sum of **$36,040.44** to the claimants making up this class in exchange of release of all claims and obligations arising under this Bankruptcy Proceeding or they participate in the Plan treatment for Unsecured Creditors.

The total amount of General Unsecured Claims of **$9.1 million** does not take into account the total amount of **$112,125.00** of "priority" portions of Farmers' claims, which are treated under **Class 2**. This amount is made up of the claims of the Farmers claiming $7,475.00 Priority under 11 U.S.C. § 507(a)(6). Those Farmers are as follows: Brian Jones Farms, Carl Hensz, Chad Szutz, Dreibelbis Farms, Eat Fresh Farms, Fike Farms, HAR-VEST, Johnny Guin, Karen Arnold, Lothringer Family Farms, Robert Walsdorf, Russell Plantation II, Skalitsky Farms, Wesley Valerius, and Zdansky, J.V. These priority claims are treated under **Class 2**, and priority grain claims will be paid in full on the Effective Date.

Allowed general unsecured claims in an amount less than $10,000, including the Priority Claims of shall be paid in full by the Plan Agent on the Effective Date of the Plan.

### K.   Class 11 – General Trade Claims (Impaired)

**Class 11** consists of General Unsecured Trade Claims of the following claimants:

| Name of Unsecured Creditor | Amount of Claim (POC or Scheduled Amount) | Potential Preference Received |
|---|---|---|
| Graneros Guadalupe SA de CV (POC #27) | $506,334.56 | (No known preference claims as of the date of filing this Plan) |
| Helena Agri-Enterprises, LLC (POC #16) | $518,134.08 | 12/23/2022 (7430)        $9,621.26<br>12/23/2022 (7431)      $53,950.25<br>12/29/2022 (7432)      $53,950.25<br>**TOTAL Helena Pref = $117,521.76** |
| Simplot AB Retail (POC #23) | $217,537.13 | (No known preference claims as of the date of filing this Plan) |
| United Sorghum Checkoff Program (USCP) (POC #20) | $301,795.30 | 11/21/2022 (7257)       $69,533.37<br>11/29/2023 (7258)       $69,533.37<br>**TOTAL USCP Pref. = $139,066.74** |
| Valley Coop Mill (VALCO) (POC #21) | $115,201.99 | (No known preference claims as of the date of filing this Plan) |
| BH Genetics | $228,960.00 | (No known preference claims as of the date of filing this Plan) |
| BWAB Mexico S De RL CV AV | $303,353.30 | (No known preference claims as of the date of filing this Plan) |
| Manuel Ramíro Sànchez | $495,000.00 | (No known preference claims as of the date of filing this Plan) |
| Prosedora De Alimentos | $1,000,000.00 | (No known preference claims as of the date of filing this Plan) |
| Texas G&S Investment | $54,844.52 | 12/7/2022 (7386)         $31,880.97<br>12/23/2022 (7439)       $26,525.19<br>**TOTAL Texas G&S Pref: $58,406.16** |

| Ford Motor Credit (POC #6) | $4,482.90 | (No known preference claims as of the date of filing this Plan) |
| Ford Motor Credit (POC #9) | $3,831.49 | (No known preference claims as of the date of filing this Plan) |
| **TOTAL General Trade Claims** | **Amount** **$3,749,475.27** | **Total Class 11 Preferences** **$314,994.66** |

To sum up, the Total Unsecured Claims (**Classes 8 through 11**) consisting of **Class 8** (Unsecured Bean Claims in the estimated total amount of **$2,240,600.24** with an estimated total Preference Amount of $1,073,007.02); **Class 9** (Unsecured Farmers' and Grain Claims in the estimated total amount of **$3,698,466.41** with an estimated total Preference Amount of $4,526,018.95); **Class 10** (Administrative Convenience Class in the estimated total amount of **$90,101.12** with an estimated total Preference amount of $354,956.20); and **Class 11** (General Trade Claims in the estimated amount of **$3,749,475.27** with an estimated total Preference Amount of $314,994.66) together add up to **$9,778,643.04** with an estimated Total Preference Amount of **$6,268,976.83**.

When added together with Secured Creditors and Surety Bonds, the following is a summary of all potential preferences.

|  | **Claim Amount** | **Potential Preference Amount** |
| --- | --- | --- |
| **TOTAL Vantage and StoneX** | POCs **$28,250,121.88** | Preferences: **StoneX: $6,162,339.44** **Vantage: $0.00** |
| **TOTAL Farmers (Class 9)** | $3,509,951.12 (POC) + $188,515.29 (no POC) = **$3,698,466.41** | Preferences $3,896,715.69 (POC) + $629,303.26 (No POC) = **$4,526,018.95** |
| **TOTAL Beans (Class 8)** | $1,623,028.00 (POC) + $617,572.24 (No POC) = **$2,240,600.24** | Preferences $917,189.27 (POC) + $155,817.75 (No POC) = **$1,073,007.02** |
| **TOTAL Other/General Trade Claims (Class 11)** | $1,667,317.45 (POC) + $2,082,157.82 (No POC) = **$3,749,475.27** | Preferences $256,588.50 (POC) + $58,406.16 (No POC) = **$314,994.66** |
| **TOTAL Administrative Convenience Class (Class 10)** | $57,565.15 (POC) + $32,535.97 (No POC) = **$90,101.12** | $0 (POC) + $354,956.20 (No POC) = **$354,956.20** |
| **TOTAL GrainChain** | POC **$7,841,054.99** | Preference **$1,515,612.47** |
| **TOTAL TDA Surety Bond Claims** | POCs **$2,402,704.00** | Preference D/K |
| **TOTAL** | **$48,272,523.91** | **$13,946,928.74** |

### (IV)    UNSECURED CLAIMS OF HARCO
#### (Class 12)

**L.        Class 12 – Unsecured Claims of Harco (Impaired)**

**Class 12** is a category of Unsecured Claims that is separate from Classes 8, 9, 10 and 11. **Class 12** consists of the Unsecured Claims of **Harco National Insurance Company** ("Harco") which has filed a Proof of Claim in the amount of **$2,402,704.00** (POC #44 filed 6/20/2023) for the full amounts due on the TDA Surety Bonds, general indemnity agreement.

Harco's obligation on these Bonds is limited to the face amount of the Bonds to pay for lost grain handled by or in storage from time to time related to the respective elevators. The Debtor's operations, however, caused grain stored in the various Bonded elevators to be transferred between Bonded elevators and co-mingled with grain in the other Bonded elevators. In most all instances, all grain delivered to the Alamo, Edcouch and Donna/Santa Rosa facilities was transported and comingled with grain at the Progreso facility where it was exported for sale to Mexico which generally is the best market for grain sales.

The Debtor's Plan treats all claims related to the storage or sale of grain equally and places them in the general unsecured class where they receive treatment with other unsecured creditors and share in the distribution of the net proceeds from real estate sales and from the Distributable Net Income of New Co. over the five-year term of the Plan.

Since TDA under the applicable Texas Statutes is responsible for the equitable distribution of the Surety Bonds, the Plan allows any Claimants against the Bonds to Opt-out of treatment under the Plan and share with other Claimants in the distribution that would be afforded such claim outside of bankruptcy.  A special reserve fund will be set up in the Plan Trust for such purpose.

Additionally, the Plan provides for those creditors who would receive only a fraction of the amount of their claim from participating in the distribution of the Surety Bonds are afforded the opportunity to Opt-in and be treated as Allowed Unsecured Claims.  The Plan seeks to provide these Claimants with the opportunity to receive up to 80% of their Allowed Unsecured Claims from a combination of distributions from the net proceeds from the sale of real property held by the Plan Trust and from the Distributable Net Income to be paid to the Plan Trust by New Co.

**Treatment of Subordinated Unsecured Claims of Harco:**

This settlement with Harco is intended to resolve the outstanding issues involving Harco National Insurance Co. ("Harco") as surety pursuant to the bonds described below (the "Bonds" or a "Bond") and The Texas Department of Agriculture as Obligee pursuant to Texas statutory requirements for licensed public grain warehouse facilities, ("TDA"), and Garcia Grain Trading Corporation named as the Principal Obligor ("Debtor" or "Garcia Grain") as owner and operator of the below described licensed public grain warehouse facilities (the "Grain Elevators") and the interest of third party creditors of Garcia Grain ("Bond Claimants") who have alleged to have deposited grain in the Grain Elevators asserted to be covered by the Bonds.

1.      The definition of "Surety Bond or Bonds" in the Third Amended Plan shall be changed to the following: "Surety Bond or Bonds shall mean those certain Surety Bonds executed by Harco National Insurance Company as Surety, in which Garcia Grain Trading Corporation is named as the Principal Obligor and the Texas Department of Agriculture is named Obligee. The bonds issued by Harco covering public grain warehouses owned by the Debtor as of the Petition Date, involve three (3) statutory RGW-304 Grain Warehouse Operator Bonds for the Edcouch Facility (TXIFSU0570551), the Donna/Santa Rosa Facility (TXIFSU0570548), and the Progreso Facility (TXIFSU0570549). The total aggregate penal sum of these Bonds is $2,155,350."

2.      Beginning on February 1, 2024, Harco and TDA will have a period of no less than 90 calendar days to investigate all known claims and reasonably known potential claims against the Bonds on a facility-by-facility basis (the "<u>Investigation</u>").

    a.  TDA will be deemed to have commenced its Investigation into all Bond claims starting on February 1, 2024. On or before April 1, 2024, TDA will prepare and submit to Harco a non-binding preliminary report on the status of its Investigation into the known claims and potential claims against the Bonds for the Progreso, Donna-Santa Rosa, and Edcouch Facilities including which amounts, if any, TDA believes each Bond Claimant to be entitled to recover under the Bonds and the basis for said recovery. In the event the amount of aggregate claim liability exceeds the penal sum for any bonded facility ("Exhaustion" with respect to any such Bond), the report shall also include TDA's proposed proration of the Bond Claims.

    b.  With respect to each claim, TDA's preliminary report should include the following to the extent possible and allowed by law:

        i.    The name and contact information for each Bond Claimant or potential Bond Claimant;

        ii.   The date(s) of receipt of each Bond Claimant's claim;

        iii.  The amount(s) of each Bond Claimant's claim;

        iv.   The document(s) and information reviewed for each Bond Claimant's claim;

        v.    Identification of the grain subject to the Bond Claimant's claim, including the type of grain, amount of grain, weight of grain, date(s) the grain was deposited, location of facility where grain was deposited, estimated value of the grain, identification of any agreement governing the relationship between the Debtor and the Bond Claimant, and any other related information;

vi.    Whether TDA believes the Bond Claimant's claim to be valid and enforceable against the Bonds, including the bases for its validity and enforceability;

vii.    If applicable, the prorated amount of the Bond Claimant's claim; and

viii.    Any potential Bond Claimants and potential Bond Claimant's claim liability for each Bond.

c.    Upon receipt of the TDA's preliminary report, beginning on April 1, 2024, Harco will have 30 days to independently determine whether it agrees with or disagrees with the TDA's findings with respect to each claim and potential claim against the Bonds for the Progreso, Donna-Santa Rosa, and EdcouchFacilities.

i.    By May 1, 2024, Harco will notify TDA and the Debtor in writing whether it agrees with or disagrees with the findings in TDA's preliminary report.

ii.    In the event Harco disagrees with any of the findings in TDA's preliminary report, Harco shall notify TDA and the Debtor which findings with respect to each Bond Claimant's claim(s) it disagrees with and the general bases for its disagreement.

iii.    On or before May 14, 2024, TDA and the Debtor shall notify Harco whether they dispute Harco's disagreement with respect to any Bond Claimant's claim(s). If TDA or the Debtor do not notify Harco of a dispute under this subsection, the Investigation shall be deemed to be completed.

iv.    Upon completion of the Investigation, Harco shall notify the Debtor and TDA of the amount it believes to be liable and will contribute to the Plan Trust in satisfaction of its liability under the Bonds, but in no event shall such amount be paid over to the Plan Trust later than the Effective Date of the Plan.

v.    The amount of Harco's allowed claim shall be equal to any amounts agreed to be paid and then actually paid by Harco to the Plan Trust. The timing of the payments by Harco to the Plan Trust shall not affect the amount of the allowed Bond Claimant's claim. Upon payment to the Plan Trust, Harco's claim shall be deemed automatically allowed without the need to file an amended proof of claim.

vi.    Any amounts paid by Harco to the Plan Trust shall reduce Harco's liability under the Bonds dollar for dollar.

1.    For example, if the penal sum of a Bond is $1,000,000 and Harco pays $800,000 to the Plan Trust for Bond Claimant's claims asserted against that Bond, then the amount of Harco's remaining liability under that Bond will be reduced to $200,000.

2.  If the amount of any payment is equal to the penal sum of any Bond, then Harco's liability under that Bond shall be extinguished in its entirety and, as set forth herein, TDA shall release Harco from that Bond and the Confirmation Order shall provide that Harco is declared to be released from and have no further liability with respect to that Bond.

3.      The Debtor agrees to fully cooperate in good faith with TDA and Harco in their Investigation. In the event TDA or Harco requests information or documentation from the Debtor, the Debtor shall provide the requested information or documentation within three (3) business days of receipt. For purposes of receipt, service of any request or response by e-mail is sufficient. If the information or documentation requested is unavailable to the Debtor, the Debtor shall notify TDA or Harco within three (3) business days that the information or documentation requested is not within the possession, custody, or control of the Debtor and the last known person(s) who had possession, custody, or control of the information or documentation requested. If the information or documentation requested does not exist, the Debtor shall notify Harco and TDA in writing that it does not exist. If the Debtor refuses or otherwise fails to provide TDA or Harco with the requested information or documentation, TDA and Harco reserve the right, but are not required to declare the Debtor to be in default of this agreement and suspend the Investigation until the requested information or documentation is provided; or as may otherwise be agreed by Harco, TDA, and the Debtor. If the Investigation is suspended, each calendar day that the Investigation is suspended shall be deemed to automatically extend the Investigation period by the number of days that the Investigation was suspended. If the Investigation is suspended for more than 15 calendar days, Harco or TDA may elect, but are not required to terminate the Investigation.

4.      Similarly, TDA and Harco shall be entitled to and, if requested, the Debtor agrees to make the Debtor's personnel available for interview in the method and manner determined by TDA and Harco with respect to the Investigation of any claim. Such interview may be conducted informally by videoconference (e.g., Teams), formal deposition, or other means, if necessary.

5.      If, the Investigation has not been concluded by May 1, 2024, and Harco or TDA need additional time to conclude their Investigation, they shall notify the Debtor of the status of the Investigation and the reason(s) why additional time for the Investigation is needed. If the Debtor disagrees with TDA or Harco, the Parties reserve the right to submit the request for an extension of time to the Bankruptcy Court.

6.      The Parties contemplate full disclosure and cooperation with respect to the Investigation; however, to the extent there is a dispute related to cooperation in the Investigation, the parties may submit it to the Bankruptcy Court for prompt resolution. Nothing in this Agreement will limit any parties right to request additional time for the Investigation either by agreement or order of the Bankruptcy Court.

7.      If the penal sum for any Bond is paid by Harco to the Plan Trust, TDA will execute and deliver a release of that Bond to Harco within 5 business days of confirmation of payment on a form of release acceptable to Harco or as otherwise allowed pursuant to applicable law.

8.      If the penal sum for any Bond is paid by Harco to the Plan Trust, the Confirmation Order shall unequivocally provide that Harco is discharged and forever released from any and all liability under that Bond.

9.      If the penal sum for any Bond is paid by Harco to the Plan Trust, the Plan Agent and/or Plan Trustee shall be obliged to resolve any additional claim(s) asserted against and/or future liability with respect to that Bond.

10.     If the amount of any payment by Harco to the Plan Trust is less than the penal sum for any Bond, the Confirmation Order shall provide that Harco's liability under the Bond is reduced dollar-for-dollar by the amount of any payment from Harco to the Plan Trust for that Bond.

11.     The Plan Trustee and/or Plan Agent will withhold 10% of any amounts paid by Harco to the Plan Trust in a segregated interest-bearing account for the benefit of potential future Bond Claimants. This amount shall be used to pay any claims against the Bonds or other liabilities that were not asserted during the pendency of the Bankruptcy Case. The Plan Trustee and/or Plan Agent shall maintain the account until February 16, 2025, which is two years from the date the Edcouch Facility was sealed, and the Debtor's license was suspended.

12.     Under the provisions of the Third Amended Plan concerning the treatment of the Harco Note, it is agreed that the principal balance of the Harco Note shall be in the sum of the amounts under the Surety Bonds it pays over to the Plan Trust. Harco shall be entitled to receive payments from the Plan Agent on the Harco Note its share in the After-Tax Net Profits of New Co., with the Note Holders receiving, through payments on the on the respective Note Holders' Note by the Plan Agent, as follows:

**Grain Profits:**

| Harco | Unsecured Note | GrainChain Note |
|---|---|---|
| 2.5% - yr 1 | 52.5% in year 1 | 45% |
| 5.0% - yr. 2 | 50% in year 2 | 45% |
| 7.5% - yr. 3 | 47.5% in year 3 | 45% |
| 10% - yr 4 | 45% in year 4 | 45% |
| 10% - yr 5 | 45% in year 5 | 45% |

**Bean and Sunflower Seed Profits:**

| Harco | Unsecured Note | Grain Chain Note |
|---|---|---|
| 2.5% - yr 1 | 62.5% in year 1 | 35% |
| 5% - yr. 2 | 60% in year 2 | 35% |
| 7.5% - yr. 3 | 57.5% in year 3 | 35% |
| 10% - yr 4 | 55% in year 4 | 35% |
| 10% - yr 5 | 55% in year 5 | 35% |

Grain means any grain, corn, milo, sorghum, cottonseed, soybean, or other commodity solely excluding beans and sunflower seeds.

Bean and sunflower seeds means only black beans and pinto beans and sunflower seeds.

GrainChain's 45% share in Grain Profits in years 1 through year 5 remain unaffected.

13.     The Plan Agent and/or Plan Trustee shall provide Harco with quarterly reports on the status of the New Co. operations and assets to be sold under the Plan in which Harco is to receive its proportional share of the profits and sale proceeds.

14.     Harco, Octavio Garcia, and Gabriela Garcia, will abate the district court lawsuit styled *Harco National Insurance Company v. Octavio Garcia and Gabriela Garcia* pending as Case No. 7:23-cv-430 in the U.S. District Court for the Southern District of Texas (the "District Court Lawsuit") pending confirmation of the Third Amended Plan as modified herein.

15.     Upon confirmation of the Plan, Harco will dismiss the District Court Lawsuit without prejudice.

16.     Octavio Garcia and Gabriela Garcia will also execute a tolling agreement preserving any and all causes of action by Harco in the District Court Lawsuit over the life of the Plan or until the Plan is terminated.  Provided, however, and strictly conditioned upon Octavio Garcia's continued service under the Plan for the full 5-year term, in the event that the payments

applied to the Harco Note total a minimum of sixty-five percent (65%) of the original principal balance from any sources of recovery, including any voluntary payments by Octavio Garcia and Gabriela Garcia, Harco agrees to release the Garcias from their liability under the terms of the indemnification agreement.

17.    In order to liquidate the Harco Proof of Claim filed in this case as provided herein, and in light of the apparent Exhaustion of a Bond or Bonds without paying all allowed Bond Claimants on a particular Bond, Debtor, TDA and Harco stipulate that any disputes concerning the disposition of the Surety Bonds including without limitation the amount owed by Harco or the amounts owed to specific claimants against the Surety Bonds will be resolved in the Bankruptcy Court through an appropriate pleading filed in the main bankruptcy case, or, if necessary and appropriate, an adversary proceeding.

18.    In the event the Debtor fails to confirm the Third Amended Plan as modified, a subsequent Plan default occurs after Confirmation, or the Bankruptcy Case is converted to a case under Chapter 7 or dismissed:

a.    Harco reserves the right and shall be entitled, but is not required to pursue any and all claims against Octavio Garcia and Gabriela Garcia individually in the District Court Lawsuit; and

b.    Bond Claimants, to the extent remaining unpaid after all Plan Trust payments have been distributed, may pursue any and all Bond Claimants remaining allowed Bond Claimant's claim, if any. Provided that Bond Claimants shall be enjoined and precluded from pursuing any claim against Harco or the TDA for any Bond for which the penal sum has been paid and has been exhausted.

19.    The Confirmation Order shall contain the following language for the benefit of TDA:

Nothing in this Confirmation Order, the Plan, any amendments thereto, or related documents, discharges, releases, precludes, or enjoins: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the Confirmation Date; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to a Governmental Unit on the part of any Person other than the Debtors. Nor shall anything in this Order enjoin or otherwise bar a Governmental Unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence.

Further, nothing in this Confirmation Order, the Plan, any amendments thereto, or related documents, authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable

legal requirements and approvals under police or regulatory law. Nothing in this Order shall relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit. Nothing in this Order shall affect any setoff or recoupment rights of any Governmental Unit. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order."

**Governing Law:** This Agreement shall be governed by Texas law. Venue shall lie exclusively in the U.S. Bankruptcy Court for the Southern District of Texas.

As to Plan Trust Asset and Properties (excluding the New Co. encumbered assets), if as and when sold at any time after the Effective Date, Harco shall receive its ten percent (10%) pro-rata portion through and including any property sales after the end of the fifth year as provided in the Plan.

**Alternative Treatment of Subordinated Unsecured Claim of Harco:**

The Plan provides for an alternative treatment of the Harco Claim if it chooses to reject the proposed settlement terms set forth above. Harco has filed its proof of claim and is entitled to vote to accept or reject this Plan, and otherwise may object to this Plan treatment. In the event that Harco votes to reject the Plan, the Debtor invokes 11 U.S.C. § 1129 to confirm the Plan over the objection of any dissenting votes. The Debtor anticipates that it will file an Adversary Proceeding to deal with the objection to the Harco Claim and the effort of Harco to complicate the ability of the Debtor to confirm its Plan by the suit Harco filed against Octavio Garcia and others. The Plan, as made known to Harco, relies on significant property and cash contributions of Octavio Garcia without which the Plan may not be confirmable. Likewise, Octavio Garcia intends to use the Gaba facility to produce the bean and seed sales and profits post-confirmation in order to obtain the Octavio Garica and family release upon payment in full of the Unsecured Creditor Class.

Harco's suit ignores that fact that Harco is subordinated as a matter of law to payment from any assets of the Estate, which includes the assets of Octavio Garcia and certain affiliates to fund this Plan. Thus, Harco seeks to reverse the law of subordination, preventing estate assets to pay the Harco claim before it may look to those assets, by attacking the owner of assets that the estate claims it has equitable ownership or equitable rights. Accordingly, the Debtor may initiate an Adversary Proceeding.

However, in the event Harco objects to the Plan treatment and the Debtor does not file an Adversary Proceeding, the following Plan Terms Apply:

a. Harco must file a written objection to the Plan timely in accordance with the objection deadlines set by Bankruptcy Court Order;

b. Upon the filing of a Harco Objection, the Debtor shall be deemed to a have, without further pleading, filed a Motion to invoke the Adversary Rules of Procedure to the Objection, to all responses or intervention pleadings, to the discovery provided

below, and to the testimony and evidence her or admitted, as well as any ruling and any appeal from any such ruling.

c. Filing of the Objection must also include any response of Harco or reply to the Plan provisions that invoke the Adversary rules to any such Harco Objection;[8] and

d. Debtor and Creditors or Parties in Interest desiring to reply must timely file responses to the Harco Objection in accordance with the objection deadlines set by Bankruptcy Court Order;

e. The Debtor and Harco shall be entitled to limited discovery prior to the confirmation hearing consisting of one deposition each of a corporate representative including a reasonable request for production of documents; and

f. At the Confirmation hearing, as scheduled by the Bankruptcy Court, the Bankruptcy Court shall hear evidence and arguments of counsel and determine the Harco Objection.

The entry of an order from either process should prevent Harco from impeding the Debtor's use of its Insider-owned assets all related to the business or operations of the Debtor, or acquired with funds or as an opportunity of the Debtor, when in fact the law prohibits and subordinates Harco from such rights.

## ARTICLE VII
## TREATMENT OF CLAIMS OWNED BY THE ESTATE

The Debtor has initiated one Adversary Proceeding based upon fraudulent conveyance and preference actions against a former owner of the Debtor, and three Adversary Proceedings to collect outstanding accounts receivable from purchasers of grain.

---

[8]      The single distinction between the merits of a core proceeding and an adversary proceeding is the scope of the application of Part VII of the rules.  Invoking the adversary rules in a contested matter, in lieu of filing an adversary proceeding in specific circumstances, frequently occurs to facilitate the litigation procedure of the parties and resolve any issue of how to proceed.  *See, e.g., In re Zohouri Group South Padre, L.P.*, WL 1856095 at *2 (Bankr S.D. Tx. 2009);  *In re ElderCare*, 568 F.3d 506, 61(5th Cir. 2009) [the Debtor's request that the Court invoke the adversary rules for this Motion as authorized by Federal Rules of Bankruptcy Procedure 8011 and 9014 was granted in declaratory judgment cause of action involving objection to proof of claim, declaratory relief, and the related motion to assume executory contract].  Rule 9014(c) provides in part:

"Except as otherwise provided in this rule, *and unless the court directs otherwise*, the following rules shall apply: 7009, 7017, 7021, 7025, 7026, 7028-7037, 7041, 7042, 7052, 7054-7056, 7064, 7069, and 7071. . . . *The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply*."

*See, e.g.*, **In re Adam Aircraft Industries, Inc.,** 2009 WL 2100929 (Bkrtcy. D.Colo., 2009) at *7 [although Rule 7023 does not appear in the adversary rules that "shall apply to contested matters" under Rule 9014, "[t]he court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." FED. R. BANKR.P. 9014(c).]  There are a number of reported cases where various Part VII rules have been made applicable to contested matters. See, e.g.,  *In re Kerlo*, 311 B.R. 256 (Bkrtcy. C.D.Cal., 2004) [FRBP 9014(c) also provides that other adversary rules may be applied to contested matters upon notice and order from the court. Therefore, a court order applying FRBP 7070 is a necessary step in obtaining relief under FRBP 7070 in a contested matter]; *In re MacDonald*. 326 B.R. 6 (Bkrtcy. D.Mass., 2005);  *Reid v. White Motor Corp*., 886 F.2d 1462, 1470-72, (6th Cir. 1989) (claimant should move for permission to have Bankruptcy Rule 7023 made applicable to assert class proof of claim); *Matter of Rimsat, Ltd*., 223 B.R. 345, 346 (Bankr. N.D. Ind. 1998) (court applies Rule 12(e) to proof of claim proceeding).

As noted above, the Debtor will likely initiate an Adversary Proceeding in the event that Harco rejects the proposed settlement terms as set forth its treatment under the Plan as set forth above.

Except as settled prior to or as a part of the Plan and Confirmation Order, all Preference Claims pursuant to Section 547 of the Bankruptcy Code, all Fraudulent Transfer Claims pursuant to Section 548 of the Bankruptcy Code, all claims relating to Post-Petition Transactions under Section 549 of the Bankruptcy Code, all claims recoverable under Sections 544 and 550 of the Bankruptcy Code, all claims against any third party on account of an indebtedness or any other claim owed to or in favor of the Debtor, are hereby preserved and will vest in the Plan Trust for enforcement in accordance with the discretion of the Plan Agent subsequent to the Effective Date of this Plan for a period of two (2) years following the Confirmation Order.

This includes any claims or causes of action that the Debtor may have derivatively or otherwise that are discovered as a result of the forensic accounting investigation conducted by D. Williams & Co. and Dundon Advisers or otherwise revealed during the course of the administration of the Bankruptcy Case.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties are specifically reserved to the Plan Trust with authority to manage and prosecute, as the case may be, by the Plan Agent, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

## ARTICLE VIII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

All executory contracts and unexpired leases not assumed prior to or through the Plan shall be assumed if not previously rejected by formal order of the Bankruptcy Court.

# ARTICLE IX
## THE PLAN TRUST

The Plan Trust. The Plan Trust, as set out in the Plan Trust Agreement duly organized under the laws of the State of Texas, is created for the purpose of carrying out the implementation of the Plan and administration of Claims as provided herein and making the Payments or Distributions to (i) certain holders of Allowed Unsecured Clams and (ii) settling parties who are entitled to the payment of consideration pursuant to a compromise and settlement and/or agreed-upon plan treatment, as the case may be, of claims described in the Plan. The recipients of such Distribution will be deemed Plan Trust Beneficiaries, who will be treated as grantors and deemed owners for federal income tax purposes, are the holders of Plan Trust Interest. The Plan Trust shall file federal income tax returns for the Plan Trust as a grantor trust pursuant to Section 671 of the Internal Revenue Code of 1986, as amended, and the Treasury Tax Regulations promulgated thereunder. The parties shall not take any position on their respective tax returns with respect to any other matter related to taxes that is inconsistent with treating the Plan Trust as a "Plan Trust" within the meaning of Treasury Regulation Section 301.7701-4(d), unless any party receives definitive guidance from the Internal Revenue Service.

Funding of Res of Trust. For all federal and applicable state and local income tax purposes, all Persons (including without limitation the Debtor, the Plan Agent and the Plan Trust Beneficiaries) will treat the transfers and assignment of the Plan Trust Assets to the Plan Trust for the benefit of the Plan Trust Beneficiaries as (a) a transfer of the Plan Trust Assets directly to the Plan Trust Beneficiaries followed by (b) the transfer of the Plan Trust Assets by the Plan Trust Beneficiaries to the Plan Trust. The Plan Trust will be treated as a grantor trust for federal tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes. The Plan Trust Beneficiaries will be treated as the grantors and deemed owners of their allocable portion of the Plan Trust Assets for federal income tax purposes.

The fair market value of the portion of the Plan Trust Assets that is treated for U.S. federal income tax purposes as having been transferred to each Plan Trust Beneficiary will be determined by the Plan Agent, and all parties (including, without limitation, the Plan Agent and the Plan Agent Beneficiaries) must utilize such fair market values determined by the Plan Agent for federal and applicable state and local income tax purposes.

The Plan Trust's taxable income, gain, loss, deduction or credit will be allocated to the Plan Trust Beneficiaries in accordance with their relative beneficial interests in the Plan Trust during the applicable taxable period. Such allocation will be binding on all parties for federal and applicable state and local income tax purposes, and the parties will be responsible for the payment of any federal, state and local income tax due on the income and gain so allocated to them.

Plan Agent. Upon confirmation of the Plan of Reorganization, the CRO shall become the Plan Agent (the "**Plan Agent**") and shall administer the Plan Trust in accordance with the terms and provisions of the Plan Trust Agreement**.** The Plan Agent shall administer the Plan Trust consistent with the terms of this Plan, Confirmation Order, general trust law (except as superseded by this Plan) and the Plan Trust Agreement, and shall have all of the rights, obligations, powers and duties as set forth in the Plan, Plan Trust Agreement and Confirmation Order.

Plan Beneficiaries.    The Plan Trust beneficiaries (the "**Plan Beneficiaries**") are the holders of Allowed Secured Claims, Allowed Unsecured Claims, Priority Claims and Administrative Claims as set forth and described in the Plan, including without limitation GrainChain.

Plan Distributions.    The Plan Agent shall make Distributions to the Plan Beneficiaries annually with the first Distribution to be made on the Effective Date and on the same date every year until the termination of the Plan Trust provided there are available funds to distribute.  If a Plan Beneficiary fails to provide the Plan Agent with its W-9 after request by the Plan Agent in writing, such Plan Beneficiary forfeits its interest in such yearly distribution.

Retention of Professionals. The Plan Agent shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Agent, are necessary to assist the Plan Agent in performance of his duties. The Plan Agent shall be permitted to use a portion of the Plan Trust Expense Reserve to retain attorneys, accountants or other professionals that may be necessary to perform his duties. However, after initial payments are made for retention of such professionals, any further fees of such professionals shall be paid by the Plan Trust only to the extent that such fees and expenses are related to the administration of the Plan or the pursuit of causes of action owned by the Plan Trust. Subject to any further agreement with the Professionals, the Plan Trust shall bear its own expenses.  Professionals of the Debtor shall be eligible for retention by the Plan Agent, and former employees of the Debtor shall be eligible for retention by the Plan Trust and Plan Agent.

Compensation of the Plan Agent. For services rendered by the Plan Agent in administering the Plan Trust, the Plan Agent shall receive reasonable compensation as the Plan Agent may agree to with the Plan Trust Committee.

Plan Trust Expenses. Subject to the provisions of the Plan Trust Agreement, all costs, expenses and obligations incurred by the Plan Agent in administering this Plan, the Plan Trust, or in any manner connected, incidental or related thereto, in effecting distributions from the Plan Trust thereunder (including the reimbursement of reasonable expenses) shall be a charge against the Plan Trust Assets remaining from time to time in the hands of the Plan Agent. Such expenses shall be paid as they are incurred without the need for Bankruptcy Court approval.

Liability, Indemnification of Plan Agent. The Plan Agent shall not be liable for any act or omission taken or omitted to be taken in his or her capacity as the Plan Agent, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud. The Plan Agent may, in connection with the performance of his or her functions, and in his or her sole absolute discretions, consult with attorneys, accountant and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals.  Notwithstanding such authority, the Plan Agent shall be under no obligation to consult with attorneys, accountants or his or her agents, and his or her determination to not do so should not result in imposition of liability on the Plan Agent unless such determination is based on willful misconduct, gross negligence or fraud. The Plan Trust shall indemnify and hold harmless the Plan Agent and his or her agents, representatives, professionals, and employees from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or

omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of this Plan; *provided, however*, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

Termination. The duties, responsibilities and powers of the Plan Agent shall terminate after all Plan Trust Assets, including Causes of Action transferred and assigned to the Plan Trust, are fully resolved, abandoned or liquidated and the Cash and other amounts held in Reserve Accounts have been distributed in accordance with this Plan and the Plan Trust Agreement. Except in circumstances set forth below, the Plan Trust shall terminate no later than five (5) years after the Effective Date. However, if warranted by the facts and circumstance provided for in this Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Plan Trust, the terms of the Plan Trust may be extended one or more times (not to exceed a total of five extensions, unless the Plan Agent received a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the state of the Plan Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed six months, based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court with notice thereof to all of the unpaid beneficiaries of the Plan Trust. Upon the occurrence of the termination of the Plan Trust, the Plan Agent shall file with the Bankruptcy Court a report thereof, seeking an order discharging the Plan Agent.

Plan Trust Committee. Not later than five (5) days before the Confirmation Hearing, one member of the Unsecured Creditors Committee may be designated by the Unsecured Creditors Committee to serve on the Plan Trust Committee as well as one GrainChain representative to serve on the Plan Trust Committee selected by GrainChain . The Plan Agent shall also serve as the third and final member of the Plan Trust Committee.  The Plan Trust Committee shall enter into the Plan Trust Committee Bylaws upon formation.

Compensation and Expenses. The non-Plan Trustee members of the Plan Trust Committee shall be entitled to reimbursement of reasonable and necessary expenses by the Plan Trust provided that, any such reimbursement of reasonable expenses shall not include fees or compensation of an individual member's attorneys or other professionals. Such reimbursement shall be paid from the Plan Trust without further order of the Bankruptcy Court. Non-Plan Trustee Members of the Plan Trust Committee shall not be entitled to any other compensation from the Plan Trust.

Liability, Indemnification of Plan Trust Committee. Neither the Plan Trust Committee, nor any of its members, or designees, nor any duly designated agent or representative or the Plan Trust Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Trust Committee, nor shall any member of the Plan Trust Committee be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Trust Committee, other than acts or omissions resulting from such member's willful misconduct, gross negligence or fraud. The Plan Trust Committee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with attorneys, accountants, and its agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such professionals. Notwithstanding such authority, the Plan Trust Committee shall be under no obligation to consult with attorneys, accountants or its agents, and its determination to not do so should not result in

imposition of liability on the Plan Trust Committee, or its members and/or designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Plan Trust shall indemnify and hold harmless the Plan Trust Committee and its members, designees, and Professionals, and any duly assigned agent or representative thereof (in their capacity as such), from and against and in respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of this Plan; provided, however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

Privilege. All communication between the Plan Agent and the Plan Trust Committee shall be confidential and privileged by the attorney-client and the joint-interest privilege, unless a majority of the Plan Trust Committee waives the same for any given issue or actual litigation ensues between the Plan Agent and the Plan Trust Committee.

Standing of the Plan Trust. The Plan Trust shall be deemed an independent entity and shall have standing to sue and be sued in its own name in any court and to otherwise appear before any administrative body, tribunal or other proceeding.

## ARTICLE X
## LIQUIDATION AS AN ALTERNATIVE TO PLAN CONFIRMATION

The alternative to a Chapter 11 Plan would be a Chapter 7 liquidation, whereby the assets of the bankruptcy estate would be liquidated and proceeds distributed to the Creditors. All of the Debtor's assets are encumbered by the liens of secured creditors and upon liquidation in a Chapter 7 it is uncertain, and indeed unlikely, as to whether the proceeds would extinguish the amount of the secured claims. It is estimated by the Debtor that the liquidation value of the Debtor's assets is such that there would in a best-case scenario there would be only sufficient funds to pay **0.034%** of the claims of Unsecured Creditors after the payment of all outstanding liens, encumbrances, and administrative claims.

However, the Debtor asserts that the proposed Plan will provide more certainty for a full pay-out to the Creditors than the Chapter 7 liquidation alternative. Under the Plan, the impaired classes of Creditors will receive a larger percentage of their claims as the Debtor continues to operate its business; whereas, a Chapter 7 liquidation would yield uncertain distributions to the Unsecured Creditors.  The Plan provides for an immediate **40% dividend** to be paid to all Creditors in the Administrative Convenience Class and a **100% dividend** to the remaining Unsecured Creditors over a 5-year period. Thus, the Plan yields a more certain payout to Creditors than the Chapter 7 liquidation alternative.

The risk to Creditors is outweighed by the potential benefits of this Plan that the CRO has undertaken in his business judgment, and the Debtor believes that it has sufficient amounts of cash flow to make the above-mentioned payments from the Debtor's continued operations as well as the anticipated sale of certain real property.

## ARTICLE XI
## TAX EFFECTS OF PLAN

An analysis of the federal income tax consequences of the Plan to Creditors, Interest Holders, and the Debtor requires a review of the Internal Revenue Code of 1986 (the "**IRC**"), final and temporary Treasury Regulations promulgated thereunder, judicial decisions and administrative determinations of the Internal Revenue Service (the "**IRS**") in effect as of the date of this Disclosure Statement. Changes in these authorities, which may have retroactive effect or new interpretations of existing authorities, may cause the federal income tax consequences of the Plan to differ materially from the consequences described below. No rulings have been requested from the IRS and no legal opinions have been requested from counsel with respect to any tax consequences of the Plan.

No tax opinion is given by this Disclosure Statement. No representation or assurance is being made with respect to the federal income tax consequences as described herein. The foregoing discussion is not intended as tax advice to the Debtor' Creditors and Interest Holders regarding the federal income tax consequences to them under the Plan. Each Holder of a Claim or Equity Interest affected by the Plan must consult and rely upon such holder's own tax advisor regarding the specific tax consequences of the Plan with respect to such holder's claim or equity interest.

## ARTICLE XII
## FEASIBILITY AND ACCOUNTING PROCESSES USED AND THE
## IDENTITY OF THE PERSONS WHO FURNISHED THE INFORMATION

### A.    FEASIBILITY

The Debtor believes that the Plan as proposed is feasible based on the financial projections for the next five years as reflected in the Cashflow Analysis attached to the Debtor's Disclosure Statement as Exhibit "**C**" prior to approval of the Disclosure Statement and the solicitation of votes for confirmation of the Plan. Exhibit "**C**" (Cashflow Analysis) is a five-year (2023-2028) forecast prepared by Dundon Advisors, Greg Taylor, and GrainChain with input from Elkins, Octavio Garcia, and Rene Izaguirre showing a projection of total revenues and expenses, net revenues and expenses, and net income for New Co. based on all information currently available to the Debtor as well as reasonable assumptions made under the circumstances. Based on the Debtor's 2023 circumstances, the Cashflow Analysis identifies five major anticipated sources of revenue for New Co. for the next five-year period, which are the sales of cottonseed, pinto beans, black beans, yellow corn, and sunflower. Each comes with its associated costs in addition to the indirect expenses and administrative expenses to be incurred in order to enable New Co.'s operations. The Cashflow Analysis projects a steady level of Total Net Revenues for each year (around $17.5 to $17.9 million) for the next five-year period, which is higher than the 2023 figure ($13,555,019) . Likewise, the Cashflow Analysis shows a steady level of Total Commodity Gross Profit for each year (around $2.3 million) for the next five-year period, which is also comparably higher than the 2023 figure ($1,555,460). The Cashflow Analysis shows increased costs and expenses; however, the five-year projections show sufficient Net Income Before Taxes, which is projected to be higher than 2023 figures and which the Debtor believes is sufficient to justify the Debtor's Third Amended Plan.

In sum, the Cashflow Analysis projects that the Plan Agent will be able to make the payments contemplated under the provisions of the Plan. Therefore, based upon these financial projections, the Debtor asserts that the Plan is feasible and is not likely to be followed by liquidation or the need for further financial reorganization. These financial projections illustrate that New Co., , through its factoring financing with GrainChain, will have available the necessary cash to fund the Plan after the Plan Effective Date ; have the ability to generate future cash flows sufficient to make the payments called for under the Plan; and other than vagaries of its operations and markets and general economic conditions there are no factors which might make it impossible for New Co. to accomplish that which it promises under the terms of the Plan or allow it to continue in business as contemplated under the Plan.

## B.   ACCOUNTING PROCESSES USED AND IDENTITY OF PERSONS FURNISHING INFORMATION

All information in this Plan and its accompanying Disclosure Statement that is being filed simultaneously has been submitted by and ultimately approved by the Debtor through the CRO, unless otherwise indicated. The Debtor's accounting system is on a cash basis and all financial information provided herein is, therefore, based on a cash basis accounting system as opposed to an accrual basis accounting system.

## ARTICLE XIII
## EFFECTS OF CONFIRMATION OF PLAN, INJUNCTION AND EXCULPATION

Notice of the Effective Date. On or before ten (10) Business Days after occurrence of the Effective Date, the Plan Agent shall mail or cause to be mailed to all holders of Claims and Equity Interests a notice that informs such holders of the following: (a) entry of the Confirmation Order; (b) occurrence of the Effective Date; (c) the Administrative Claim Bar Date; (d) Professional Claim Bar Date; and (e) such other matters that the Plan Agent deems appropriate.

Binding Effect of Plan. Upon the Effective Date, the Plan and each of its provisions shall be binding on the Committee, the Chapter 11 Trustee, the Debtor, the Plan Trust, the Plan Agent, all Creditors, all Equity Interest holders, and all Persons acquiring property under the Plan, whether or not they voted to accept the Plan, whether or not they had a right to vote on the Plan, whether or not any Claim or Equity Interest held by any of them is Impaired under the Plan, whether or not any Claim or Equity Interest held by any of them is Allowed in full, only in part, or Disallowed in full, and whether or not a Distribution is made to any of them under the Plan.

Vesting of Assets. Upon the Effective Date, all of the Assets shall vest in the Plan Trust and/or in New Co., as outlined in this Plan, Confirmation Order, and the related transactional documents, free and clear of any and all liens, claims, interests and encumbrances.

No Fraudulent Transfers. The Confirmation Order shall provide that all of the transactions, claim terms and treatments contained in the Plan and effectuated by the Confirmation Order and/or the transactional documents are all made for reasonably equivalent value and are not made with intent to hinder, delay and/or defraud.

Discharge. Except as otherwise provided in this Plan or in the Confirmation Order, the Confirmation of the Plan will not discharge the Debtor of any debts.

<u>Injunction Against Interference with Plan</u>.  Upon the Effective Date, all holders of Claims, all holders of Equity Interests, and all other parties in interest in the Bankruptcy Cases, along with their respective current and former officers, directors, principals, employees and agents, shall be and are hereby enjoined from taking any action to interfere with the implementation or consummation of the Plan, save and except for any duties and responsibilities of the members and managers of Garcia Grain, along with the requisite authority, to prepare and file the final tax returns for the Debtor.

<u>Exculpation</u>. NEITHER THE COMMITTEE, NOR THE INDIVIDUAL MEMBERS OF THE COMMITTEE, (COLLECTIVELY, THE "<u>EXCULPATED PARTIES</u>"), SHALL HAVE OR INCUR ANY LIABILITY TO ANY PERSON FOR ANY ACT TAKEN OR OMISSION IN CONNECTION WITH OR RELATED TO FORMULATING, NEGOTIATING, IMPLEMENTING, CONFIRMING OR CONSUMMATING THE PLAN, THE DISCLOSURE STATEMENT OR THE TRUST AGREEMENT, EXCEPT FOR WILLFUL MISCONDUCT AND GROSS NEGLIGENCE. THE EXCULPATED PERSONS SHALL HAVE NO LIABILITY, EXCEPT FOR WILLFUL MISCONDUCT AND GROSS NEGLIGENCE, TO THE DEBTOR, ANY CREDITOR, ANY EQUITY INTEREST HOLDER, AND ANY OTHER PARTY IN INTEREST IN THE BANKRUPTCY CASES, OR ANY OTHER PERSON FOR ACTIONS TAKEN OR NOT TAKEN UNDER THE PLAN, IN CONNECTION HEREWITH OR WITH RESPECT THERETO, OR ARISING OUT OF THEIR ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN INCLUDING, WITHOUT LIMITATION, FAILURE TO OBTAIN CONFIRMATION OR TO SATISFY ANY CONDITION OR CONDITIONS, OR REFUSAL TO WAIVE ANY CONDITION OR CONDITIONS, TO THE OCCURRENCE OF THE EFFECTIVE DATE, AND IN ALL RESPECTS SUCH EXCULPATED PERSONS SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.

### ARTICLE XIV
### MODIFICATIONS OF THE PLAN

<u>Amendments Prior to Confirmation Date</u>.  The Debtor reserve the right to amend or modify the Plan prior to Confirmation pursuant to Section 1127(a) of the Bankruptcy Code, and the Plan, as amended shall become the new Plan.

<u>Amendments After Confirmation Date</u>.  The Debtor may amend or modify the Plan before its substantial consummation, provided that the Plan, as amended or modified, meets the requirements of the Bankruptcy Code and the Bankruptcy Court, after notice and hearing, confirms this Plan, as modified.

<u>Effect on Claims</u>. A holder of a Claim that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, this Plan, as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

## ARTICLE XV
## GENERAL PROVISIONS

Certain Rights Unaffected. Except as otherwise provided herein, any rights or obligations which the Creditors may have among themselves as to their respective Claims or the relative priority or subordination thereof are unaffected by this Plan.

Incorporation of Valuation Motion. To the extent necessary to effectuate and implement the provisions of this Plan, the Plan shall be deemed to constitute a motion for valuation under the Bankruptcy Code, including the value of any lien, security interest, or encumbrance treated by this Plan; *provided, however,* that nothing in this Plan shall alter any valuation ordered by Final Order of the Bankruptcy Court in the Bankruptcy Cases.

Automatic Stay. The automatic stay provided in Section 362 of the Bankruptcy Code, shall remain in effect through the Effective Date, unless otherwise specifically modified, annulled, or terminated by the Bankruptcy Court pursuant to a separate order, and shall terminate on the Effective Date.

Reservation of Rights. The Plan (together with the full execution of the transactional documents) shall have no force or effect unless and until a final, non-appealable order confirming the Plan is entered and the Effective Date occurs. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

Dissolution of Committee. The Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Section 1103 of the Bankruptcy Code. Unless otherwise ordered by the Bankruptcy Court, on the Effective Date, (a) the Committee shall be dissolved and their members shall be released of all their duties, responsibilities and obligations in connection with the Bankruptcy Case, this Plan and the implementation of the same and (b) the retention or employment of the Committee's Professionals and other agents shall terminate.

Rights Under 1129(b). **The Debtor hereby gives notice of its intent to seek confirmation under the cramdown provisions of Section 1129(b) of the Bankruptcy Code, as necessary**.

Headings. The article and section headings used in this Plan are inserted for convenience and reference only and neither constitute a part of this Plan nor in any manner affect the terms, provisions or interpretations of this Plan.

Severability. If any term or provision in this Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any other term or provision of this Plan.

Governing Law. Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan and any documents, agreements and instruments executed in connection with this Plan (except to the extent such documents, agreements and instruments

designate otherwise) shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.

Successors and Assigns. The rights and obligations of any entity named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such entity.

Insurance. Notwithstanding anything to the contrary in this Plan, neither the Confirmation Order nor Confirmation and consummation of this Plan shall have any effect on the insurance policies of any of the Debtor or their current or former directors, officers or managers (including, but not limited to, director and officer liability policies to the extent that the Debtor or their current or former directors, officers and managers have any rights under such policies) in which any of the Debtor or their current or former directors, officer or managers are or were an insured party or any claim asserted thereunder. Each insurance company is prohibited from denying, refusing, altering or delaying coverage for any Debtor (or their current or former directors, officers or managers) on any basis regarding or related to any of the Bankruptcy Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for insured claims.  [More specific language and greater thought maybe required because of the current posture of the insurance and the anticipated transfers of the real property to New Co.]

Compliance with Regulations of the Office of the U.S. Trustee. During the pendency of these Proceedings, the Debtor will comply with all regulations promulgated by the Office of the U.S. Trustee, including remaining current on all quarterly fees assessed against the Estates by the U.S. Trustee. Upon confirmation of the Plan, and until a final decree is entered in the Bankruptcy Cases, the Plan Agent shall file the required quarterly reports and pay the fees due under the provision of 28 U.S.C. section 1930(a)(6) on behalf of Garcia Grain Trading Corp.

## ARTICLE XVI
## RETENTION OF JURISDICTION

**Implementation of Plan.** Until this Proceeding is closed, the Bankruptcy Court shall retain such jurisdiction as is legally permissible, including that necessary to insure that the purpose and intent of the Plan are carried out and to hear and determine all issues at Confirmation of the Plan as well as invoking the adversary rules of procedures in any contested matters in the sole discretion of the Court, and thereafter to determine any Claims and Interests set forth in Article VI or elsewhere herein that could have been brought before the entry of the Confirmation Order.

**Causes of Action.** The Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtor, and to enforce all causes of action that may exist on behalf of the Debtor. Nothing contained herein shall prevent the New Co. and/or the Plan Trust from taking such action as may be necessary in the enforcement of any cause of action which may exist on behalf of the Debtor and which may not have been enforced or prosecuted, unless satisfied herein.

**Claims Determinations.** After the Effective Date, the Bankruptcy Court shall further retain jurisdiction for the purpose of classification of Claims that have been allowed for purposes of voting, and the determination of such objections as may be filed to Claims and Interests.

**Property Determinations.** The Bankruptcy Court shall further retain jurisdiction through and after the Effective Date for the purpose of determining all questions and disputes regarding ownership and/or title to the assets of the Estate, or the proceeds thereof, and determination of all causes of action, controversies, disputes concerning the Debtor and any other party, including, but not limited to any claim or entitlement associated with the Equity Interests of the Debtor or any right of the Debtor to recover assets pursuant to the provisions of the Bankruptcy Code and to adjudicate all Claims or controversies arising out of any purchase, sale or contract made or undertaken by the Debtor with respect to this Proceeding, the terms or actual implementation or enforcement of the  Plan.

**Other Post-Confirmation Matters.** The Bankruptcy Court shall further retain jurisdiction for the following purposes through and after the Effective Date :

(a)     To modify the Plan after Confirmation pursuant to the Bankruptcy Rules and the Bankruptcy Code;

(b)     To assure the performance by New Co., all parties required to act under this Plan, the Confirmation Order and the transactional documents;

(c)     To enter such orders, including injunctions, as are necessary to enforce the title, rights, and powers of the Plan Trust and/or New Co. and to impose such limitations, restrictions, terms and conditions on such title, rights and powers as the Bankruptcy Court may deem necessary;

(d)     To enter an order closing this Proceeding;

(e)     To correct any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan or to declare the effect or performance of or under any Plan term;

(f)     To decide issues and Claims concerning all tax liabilities which arise in connection with or related to the Debtor, this Proceeding or the Plan, including, without limitation, to hear and determine matters concerning state, local and federal taxes pursuant to Sections 346, 505, 506, 507, 523, and 1146 of the Bankruptcy Code;

(g)     To hear and determine any action or proceeding brought by New Co. pursuant Sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code by a party with requisite standing to assert such claims;

(h)     To resolve any disputes arising from distributions made pursuant to the Plan, and adjudicate all controversies concerning classification or allowance of any Claim or Interest;

(i)    To hear and determine all Claims arising from the rejection of Executory Contracts and Unexpired Leases and to consummate the rejection and termination thereof, and further, to hear and determine all matters relating to the assumption of Executory Contracts and Unexpired Leases;

(j)    To liquidate damages or estimate Claims in connection with disputed, contingent or unliquidated Claims;

(k)    To hear and determine all actions New Co. regarding the transactional documents implementing the terms of the Plan and Confirmation Order; and

(l)    To hear and determine all requests for compensation and/or reimbursement of expense that may be made after the Confirmation Date for pre-Effective Date periods.


The Debtor requests all creditors vote in favor of confirmation of the Plan. In order to pursue a cram-down confirmation under the provisions of 11 U.S.C. § 1129(b) the Debtor invokes the Federal Rules of Bankruptcy Procedure governing adversary proceedings.

Dated: February 26, 2024


Respectfully submitted,

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806)765-7491
Facsimile: (806) 765-0553

By  /s/ David R. Langston
David R. Langston:  SBN 11923800
Southern District Bar No. 9489
***Attorneys for Debtor, Garcia Grain Trading Corporation***